**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | |
|---|---|
| CANCER STEP OUTSIDE THE BOX, LLC; TY BOLLINGER (principal owner) and CHARLENE BOLLINGER (principal owner),<br><br>   *Plaintiffs,*<br><br>-vs-<br><br>DEPARTMENT OF STATE, GLOBAL ENGAGEMENT CENTER, DEPARTMENT OF DEFENSE, DEPARTMENT OF HOMELAND SECURITY, CYBERSECURITY AND INFRASTRUCTURE SECURITY AGENCY, FEDERAL BUREAU OF INVESTIGATION, DEPARTMENT OF HEALTH AND HUMAN SERVICES, CENTER FOR COUNTERING HATE, INC., MEDIA MATTERS FOR AMERICA, CENTER FOR INTERNET SECURITY, INC., META PLATFORMS, INC. (f/k/a FACEBOOK, INC., GOOGLE, LLC, X CORP. (f/k/a TWITTER, INC), JOHN DOE 1, JOHN DOE 2, JOHN DOE 3, JOHN DOE 4, JOHN DOE 5, JOHN DOE 6, JOHN DOE 7, JOHN DOE 8, JOHN DOE 9 and JOHN DOE 10,<br><br>   *Defendants.* | )<br>)<br>)<br>)<br>)<br>)<br>) **Civil Action No.**<br>)<br>) **JURY DEMAND**<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## COMPLAINT

Plaintiffs, Cancer Step Outside the Box, LLC ("CSOB"), Ty Bollinger (50 / 50 principal owner of CSOB), and Charlene Bollinger (50 / 50 principal owner of CSOB) (collectively, the "Plaintiffs"),[1] by and through undersigned counsel, hereby sue Defendants, the Department of

---

[1] CSOB (and, thus, the Bollingers) was / is owner of TTAC Publishing, LLC ("TTAC"), and TTAV Global, LLC ("TTAV"), with TTAC and TTAV being discussed further below.

1

State ("DOS"),[2] the DOS' Global Engagement Center ("GEC"), the Department of Defense ("DOD"), the Department of Homeland Security ("DHS"), Cybersecurity and Infrastructure Security Agency ("CISA"), Federal Bureau of Investigation ("FBI"), Department of Health and Human Services ("HHS"),[3] Center for Countering Digital Hate, Inc. ("CCDH"), Media Matters for America ("MMA"), Center for Internet Security, Inc. ("CIS"),[4] Meta Platforms, Inc. ("Meta," f/k/a/ Facebook, Inc., "Facebook"), Google, LLC ("Google"), X Corp. ("X," f/k/a/ Twitter, Inc., "Twitter"),[5, 6] John Doe 1, John Doe 2, John Doe 3, John Doe 4, John Doe 5, John Doe 6, John Doe 7, John Doe 8, John Doe 9, and John Doe 10, (collectively, "Defendants"):[7]

## **TABLE OF CONTENTS**

|  |  |  | PAGE |
|---|---|---|---|
| I. | | Nature Of The Action…………………………………………………….. | 5-21 |
| II. | | Parties, Jurisdiction, And Venue…………………………………………… | 21-25 |
| III. | | Common Allegations…………………………………………………… | 26-253 |
| | A. | Underpinnings Of The Establishment's Censorship Industrial Complex….. | 27-32 |
| | | 1. Behind The Curtain – International Order Vs. Populism………….. | 32-34 |
| | | 2. The Role Of "The Council" – Shadow Governance………….......... | 34 |
| | | 3. Technology As The Enforcer of Censorship…………………………. | 35 |
| | | 4. Populism As A Threat To Council Power……………………………. | 36-37 |
| | | 5. The Role Of Courts And Legal Interpretation…………………........ | 37-38 |
| | | 6. The Illusion Of Democracy………………………………………… | 38 |

[2] Plaintiffs reserve the right to amend this Complaint to name as Defendants various leaders (in their official capacities) of the myriad Government departments at play here, depending on what discovery might show as to individual involvement with / responsibility for the wrongdoing complained of herein. For example, discovery may show that DOS head (Secretary of State) Antony Blinken deserves to be named as a Defendant in his official or personal capacity. As other examples, the various leaders of the Global Engagement Center (*e.g.*, Deputy Coordinator Leah Bray, Coordinator James P. Rubin, Principal Deputy Coordinator Daniel Kimmage, Senior Technical Advisor Alexis Frisbie, Director of the Technology Engagement Team Patricia Watts). As another example, Department of Defense head (Secretary of Defense) Lloyd J. Austin, III. As another example, Department of Homeland Security head (Secretary of Homeland Security) Alejandro Mayorkas. Moreover, Plaintiffs reserve the right to amend this Complaint to name additional Defendants (hence, John Doe placeholders) because the corrupted scheme at play here (discussed below) is so clandestine and so deep, we simply will not know where the rabbit hole ends until discovery.

[3] Hereafter, DOS, GEC, DOD, DHS, CISA, FBI, and HHS are collectively referred to as the "Government."

[4] Hereafter, CCDH, MMA, and CIS are collectively referred to as the "NGO(s)."

[5] Hereafter, Facebook, Google, and Twitter are collectively referred to as "Big Tech," "Social Media," or "Platforms."

[6] Hereafter, the NGOs and Big Tech are collectively referred to as the "Government's Instruments" or "Instruments."

[7] Herein, Facebook and Meta are used interchangeably to refer to Meta, Google and YouTube are used to refer to Google, and Twitter and X are used to refer to X.

7. The Rise Of President Trump – A Challenge To The System……….. 38-40
8. The Role Of Censorship In Maintaining "Order"…………………… 40-43
9. The Paradox Of Democracy – Competing Ideals…………………… 43-44
10. Technology's Role In Controlling Political Discourse……………… 44
11. The Future Of Democracy – A Call To Action……………………… 44-45

B. The Overall, Concerted Censorship Scheme……………….............. 45-83
1. RFK, Jr. Vs. The Establishment Party……………………………….. 53-56
2. Manufacturing Censorship Data And The "Censorship
Industrial Complex" ………………………………………………… 56-69
3. Carrying Out Censorship ………………………………............... 70-79
4. The Election Integrity Project (EIP) And Virality Project –
Censorship On Demand ……………………………………..………… 79-83

C. The Propaganda Facet Of The Censorship Industrial Complex……………. 84-121
1. The Smith-Mundt Modernization Act of 2012 As The Domestic
Propaganda / Substitution Catalyst ……………………………… 85-86
2. CCDH, MMA, Etc. Interplay In The Censorship Industrial
Complex ……………………………………………………………… 86-93
3. FBI And Big Tech Interplay In The Censorship Industrial Complex.. 93-121

D. The Government's Censorship Leverage Chip (47 U.S.C. § 230)…………… 121-127
E. The Government's Conduct Amounts To Sedition And / Or Treason……… 128-132
F. The Censorship Industrial Complex As Described In *Missouri v. Biden*…… 132-141
G. Specific Harms Suffered By Plaintiffs *Via* Defendants' Censorship
Industrial Complex……………………………………………………… 141-200
H. Most Germane Legal Principles……………………………………… 200-217
1. The 1st Amendment Prohibits Abridgment Of The Right To
Freedom Of Speech And Press ……………………………….. 200-204
2. Defendants May Not Directly Or Indirectly Abridge The 1st
Amendment Rights Of Its Citizens ……………………………….. 204-209
3. Agencies Can Only Exercise Congressionally Delegated Authority .. 209-211
4. Congress Cannot Delegate Authority Violative Of The Constitution .. 211-212
5. The Government's Funding, Development, Marketing, And Promotion
Of Private Censorship Tools, Technologies, And Censorship
Enterprises Is A Non-Final, Unlawful Agency / Instrument Action
That Must Be Enjoined ……………………………………………... 212-214
6. Alternatively, The Government's Funding Of Private Censorship
Tools Is Final Agency Action That Must Be Set Aside And Vacated… 214-217

I. Recapitulation – Information Wars ……………………………………… 217-253
1. Rise Of The Administrative State (A Shadow Network)…………….. 218-221
2. A New Hope For America……………………………………….... 221-224
3. The 2020 Election And The Establishment Menace
(Donald J. Trump)…………………………………………………… 224-234
a. COVID's Role In The 2020 Election………………………… 224-225
b. Election Security Concerns………………………………… 225-226
c. The "Globally Coordinated Coup"………………………… 226-227
d. 2024's Exposure Of Inconsistencies………………………... 227-228
e. FBI's Censorship Role In The 2020 Election……………… 228-230

3

|  |  |  |  |
|---|---|---|---|
|  |  | f.  January 6, 2021 – Insurrection Or Government Psy-Op?........... | 230-231 |
|  |  | g.  Misapplication Of Law To Send A Chilling Message............... | 231-233 |
|  |  | h.  Shift In Tactics To Secure Perpetual Control......................... | 233-234 |
|  | 4. | The Administrative State Strikes Back – The Conspiracy Unfolds... | 234-236 |
|  | 5. | Biden Administration................................................................ | 236-243 |
|  | 6. | What We Know So Far (Recap Of The Recap) – A Timeline Of Coordination And Conspiracy Before The CCDH Hit Piece On The Disinformation Dozen Went Public............................ | 243-249 |
|  | 7. | America's Great Awakening (2020-2024)................................ | 249-251 |
|  | 8. | The Decisive Battle For The Future Of The Constitutional Republic – The 2024 Election.............................................. | 251-253 |
| IV. | | Causes Of Action................................................................ | 253-281 |
| | A. | Count I – Abridgement Of Plaintiffs' Right To Freedom Of Speech (Re: All Defendants)................................................... | 253-254 |
| | B. | Count II – Abridgement Of Plaintiffs' Right To Freedom Of Press (Re: All Defendants)................................................... | 254-255 |
| | C. | Count III – *Ultra Vires* Non-Final Agency Action Beyond Statutory Authority (Re: The Government)........................................ | 255-259 |
| | D. | Count IV – Unlawful Final Agency Action In Violation Of The Administrative Procedure Act (Re: The Government)..................... | 260-261 |
| | E. | Count V – *Ultra Vires* Action Beyond Constitutional Bounds (Re: The Government)................................................................ | 261-262 |
| | F. | Count VI – Abridgement of Plaintiffs' Right To Privacy (Re: The Government)................................................................ | 263-264 |
| | G. | Count VII – Civil Conspiracy (Re: All Defendants)...................... | 264-266 |
| | H. | Prayer For Injunctive Relief................................................... | 266-268 |
| | I. | Count VIII – Tennessee Unfair Competition / Antitrust Statutes (Re: CCDH, MMA, CIS, Facebook, Google, and Twitter).................... | 268-269 |
| | J. | Count IX – Negligence (Re: CCDH, MMA, CIS, Facebook, Google, and Twitter)................................................................ | 269-270 |
| | K. | Count X – Tortious Interference With Business Relationships / Economic Relationships (Re: CCDH, MMA, CIS, Facebook, Google, and Twitter)... | 271-272 |
| | L. | Count XI – Negligent Misrepresentation (Re: Facebook, Google, and Twitter)................................................................ | 272-273 |
| | M. | Count XII – Negligent Design (Re: Facebook, Google, and Twitter)......... | 273-274 |
| | N. | Count XIII – Fraud (Re: Facebook, Google, and Twitter)..................... | 275-276 |
| | O. | Count XIV – Promissory Estoppel (Re: Facebook, Google, and Twitter)... | 276-277 |
| | P. | Count XV – Treason (Re: The Government)................................... | 278-279 |
| | Q. | Count XVI – Revocation Of 501(c)(3) Status (Re: CCDH, MMA, CIS)..... | 279-281 |
| V. | | Jury Demand................................................................ | 281 |

**[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]**

# I.     NATURE OF THE ACTION

1.      ***The greatest threat to freedom is not always the overt force of foreign enemies, but the silent erosion of rights by the very Government sworn to protect them.***

2.      *This case confronts the most insidious assault on free speech in modern history* – a systemic, systematic effort by the Government to suppress dissent (*i.e.*, suppress American voices that rightfully choose not to submit to the Government's preferred narrative), employed over decades with increasing sophistication and coordination with Big Tech (*e.g.*, Meta, X, Google), aided and abetted by foreign (*e.g.*, CCDH) and domestic (*e.g.*, MMA) entities / non-governmental organizations (NGOs).[8] In partnership with the aforementioned private tech companies and NGOs, the Government has weaponized the digital landscape (including social media platforms, which are widely considered the modern public square) to silence opposition and control public discourse. *At minimum, at least one Government agency (e.g., DOS / GEC, DHS / CISA, or DOD), in close collaboration with at least one NGO (e.g., CCDH, MMA or CIS), worked with or pressured at least one Platform (e.g., Facebook, Google, or Twitter) to directly censor or interfere*

---

[8] The First Amendment provides as follows: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances." For a nice synopsis of the ways in which the First Amendment protects speech and the ways in which it does not, see the following short article:

https://www.acludc.org/en/news/five-ways-first-amendment-protects-your-speech-and-three-ways-it-does-not#:~:text=The%20First%20Amendment%20prohibits%20government,speech%20based%20on%20its%20viewpoint.

From this article, and as it concerns this lawsuit, the following points are most germane: (a) The First Amendment protects against the Government restricting speech based on the Government's disagreement with what is said; *i.e.*, this principle is called "viewpoint neutrality" – the Government cannot suppress someone's viewpoint because the Government maintains or favors another viewpoint. Put differently, the Government is not allowed to meddle with speech because the Government disagrees with what is said. (b) The Government cannot circumvent the preceding point by laundering viewpoint censorship through private entities that (or individuals who) might otherwise be able to suppress viewpoints with which the private entity or individual disagrees. (c) The Government includes all local, state, and federal agents / agencies.

Regarding viewpoint neutrality, whether the Government was right or wrong about COVID, vaccines, elections, or otherwise is irrelevant, because the Government is supposed to remain neutral. This Court should not be concerned about whether the Government was right or wrong, or whether Plaintiffs were right or wrong; but, rather, the focus should be on whether or not the Government imparted its view / will upon U.S. citizens.

*with the free speech and / or business relationships of at least one plaintiff (e.g., Ty and / or Charlene Bollinger).*

3.      This is not merely an attack on free speech / press (Constitutionally guaranteed right under the First Amendment), it is a calculated manipulation of economic power, where Big Tech's anti-competitive interests align with the Government's desire to snuff out dissent. Together, they have monopolized the Internet's digital information markets, conveniently shielded from accountability by Government's own misinterpretation / misapplication of Title 47, United States Code, Section 230 (the Communications Decency Act, "CDA").

4.      Under the guise of combating "misinformation" and / or "disinformation," the Government coerces private platforms (Interactive Computer Service Providers, *e.g.*, Big Tech) to do what the Government is Constitutionally prohibited from doing – silencing dissent. Big Tech complies because it benefits from the Government's (*i.e.,* executive, legislative, and judicial) overbroad, whimsical, and unconstitutional interpretation of Section 230, which allows these companies to maintain their monopolies without liability exposure. This coercive / cooperative arrangement operates not only as a violation of free speech but also in direct contravention of the Due Process rights of many Americans seeking legal remedy against Big Tech corporations.

5.      This clandestine situation echoes the same kind of tyranny that led to the American Revolution, where the Founders fought against a "foreign" government that sought to suppress dissent and control public opinion. A maxim dictating that "what cannot be done directly cannot be done indirectly" applies here – the Government's acts are unconstitutional, illegal, inequitable, and statutorily repugnant, even when carried out through private entities (Government in partnership with foreign and domestic NGOs and Big Tech). This is not a hypothetical erosion of rights, it is an immediate and direct threat to the First Amendment, an absolute pillar of what

6

America stands on and for … there is a reason the First Amendment comes first in the Bill of Rights, and this case exemplifies that reason.

6.     When Government and private entities act in concert with each other to the degree of joint participation as here (conspiratorially, we submit), heightened scrutiny is required. At the heart of this case is the Government's deliberate manipulation of both free speech and competitive information markets, wielding its influence to control liability and legal remedies. Social Media platforms (once intended to be open forums) have been repurposed into Instruments of Government censorship, suppressing dissent in exchange for the Government's protection / preservation of their monopolies. Platforms like Facebook (Meta), Twitter (X), and Google have been empowered to dominate the Internet's information space, surveil citizens, and eliminate content that challenges (or even just questions) Government policies and / or philosophies.

7.     This dangerous entwining of Big Tech, NGOs, and the Government strengthens the stranglehold on the marketplace of ideas. Big Tech now acts as both the enforcer of Government censorship and as the beneficiary of its overbroad legal immunity (*i.e.*, civil liability protection) under Section 230, which such misapplied liability protection has spiraled out of control into a lawless Internet no-man's-land.

8.     This case exposes not only the unconstitutional partnership between Government and Big Tech, but also the broader economic and foreign motivations behind it. Big Tech has become an unaccountable monopoly, silencing critics and advancing the Government's agenda, alongside other censorship-oriented NGOs (*e.g.*, CCDH, MMA). These foreign actors (CCDH, at least), driven by their own objectives, have collaborated with both Big Tech and the Government to suppress domestic speech that challenges domestic and global narratives. Plaintiffs (like so many others) have had their voices *concretely* and *particularly* erased from the modern public

square as a result of this coordinated effort, as well as having had their lives turned upside down amidst, for example, immense reputational degradation, all while Big Tech continues to act without consequence.

9.      At stake is not merely the future of free expression in America, but the very survival of our Constitutional Republic. If the Government eradicates (or even erodes) the First Amendment (which absolutely positively cannot be allowed), then what follows? The Second Amendment? The Fifth Amendment? Those who seek to undermine our God-given / natural-born rights (*e.g.,* the Establishment)[9] have no end in sight (to call a fig a fig, the Administrative State's desire is to set the entire Constitution ablaze), but their efforts necessarily begin with the control and / or destruction of free speech.

10.      The entanglement of Government censorship, Big Tech's economic interests, and foreign influences threatens both individual rights and the foundation of a free society.

11.      As the last pillar upholding individual civil liberties worldwide, the U.S. Constitution's fall would signal the collapse of freedom globally. This case accordingly transcends the immediate rights of the Plaintiffs, it stands as a vital opposition to tyranny on a global scale. This Court simply cannot fail in its duty here, too much is at stake.

---

[9] We are living in a carefully constructed system often referred to as the "rules-based international order," which some might call the "New World Order," "Deep State," or, as we mostly (if not entirely) call it, the "Establishment," "Establishment Party," or "Administrative State." This amorphous blob of control is also known by many other names, reflecting its vast and unaccountable influence: the Swamp, the Bureaucratic Elite, the Shadow Government, the Permanent Government, the Uniparty, the Cabal, the Ruling Class, the Oligarchy, the Invisible Government, the Power Structure, the Globalists, the Ruling Elite, the Technocracy, the Intelligence-Industrial Complex, the Fourth Branch of Government, the Bureaucratic Class, the Surveillance State, the Military Industrial Complex, the Censorship Industrial Complex, the Security State, the Deep Bureaucracy, the Policy Elite, the Political Machine, the Hidden Hand, the Corporate-Government Alliance, the Global Regime, the Tyranny of the Minority, the Managerial State, the Leviathan, the Backroom Operators, the Inner Circle, the Architects, the Mandarins, the Hidden State, the Council, the Overlords, the Controllers, the Gatekeepers, the Faceless Few, the Masters of the Universe, and the Bureaucratic Deep. Regardless of the label, it is the unyielding and pervasive network of control driven by Government allies and unaccountable power that lies at the heart of this carefully orchestrated system.

12.     As some courts, free from corruption and guided by values and integrity, begin to narrow Section 230(c)(1)'s protection (to the plain wording and intent of the statute or otherwise), the Government's leverage to coerce Big Tech weakens. The dissipation of ambiguity surrounding Section 230 is beginning to eliminate the Government's ability to selectively shield and / or pressure (*i.e.,* use the carrot and / or the stick against) Big Tech platforms into acting as Government puppet censors (*i.e.*, Instruments) without accountability. With this ambiguity removed, liability becomes fixed and consistent – Government actors can no longer protect Big Tech from liability when convenient while simultaneously applying pressure when they want to manipulate speech.

13.     This shift ensures Section 230 is applied as originally intended, cutting off the Government's ability to strongarm platforms through legal "gray" areas. As this leverage fades, Big Tech will no longer be coerced (especially at the extreme levels the Government has exhibited) into suppressing dissent. Instead, they will be held accountable for their own publication decisions (conduct), restoring balance and responsibility to the digital marketplace.

14.     As but one example, Hillary Clinton's recent remarks reflect this changing reality and what Government (rather, the Establishment Government) intend to do to stop it: "We should be, in my view, repealing something called Section 230, which gave [] platforms on the internet immunity because they were thought to be just pass-throughs, that they shouldn't be judged for the content that is posted." *See* ¶ 20 (video), *infra*. In truth, platforms are meant to act as neutral pass-throughs, not censors of content. But Mrs. Clinton continued: "If [Big Tech does not] moderate and monitor the content, we [the Establishment] lose total control," *see id.,* point blank revealing her [the Establishment's] desire to maintain Government influence and control over public discourse.

15.     Contrary to Mrs. Clinton's assertion, Section 230 does not require repeal or amendment, it needs to be applied as originally written, intended, and in alignment with constitutional principles. The current misapplication of Section 230 has set a perilous precedent, eroding free speech and accountability. The Supreme Court has twice declined to hear *Fyk v. Facebook*, a case that underscores myriad 230-related errors in lower courts, including the misinterpretation of "the publisher or speaker" as "a publisher or speaker." The global repercussions of this grammatical oversight are evident. The solution to the Internet censorship problem, therefore, lies not in altering or rescinding Section 230, but in rectifying judicial missteps to restore the statute's true intent.

16.     As some courts with integrity and pride in America begin to remove the Government's leverage over Big Tech (*i.e.*, begin to apply Section 230 as written), Mrs. Clinton's comments reveal a deeper, more sinister sentiment: if the Establishment can no longer "control" the message (*i.e.,* the narrative), they will kill the "pass-through" by removing Big Tech's Section 230 immunity altogether. In other words, if the Establishment cannot kill the messages (voices that do not fit the Government's narrative), the Establishment will kill the messenger (Big Tech). This reveals their broader strategy – as the Establishment loses the ability to control Big Tech, political figures now aim to dismantle the very structures that were intended to protect free discourse. This is a dangerous assault on free speech, threatening the core principles that safeguard our Constitutional Republic.

17.     This case is about far more than Plaintiffs' individual rights, it is a battle for the survival of open dialogue and economic freedom. The entanglement of Government-driven censorship with Big Tech's self-serving interests, aided and abetted by NGOs of foreign (CCDH) and domestic (MMA) origin, threatens to reshape public discourse in ways that serve only the

powerful and / or the devious. Without judicial intervention (*i.e.,* redress), the First Amendment will eventually be eviscerated, leaving the public at the mercy of corporate giants aligned with Government power, beholden (in whole or in part) to foreigners with zero interest in America's well-being (in fact, the converse – interest in America's failure).

18.     The courts must now reaffirm their role as protectors of Constitutional rights. This is not merely a question of statutory interpretation, it is about safeguarding the Constitution itself. The right to speak freely, without fear of Government coercion or corporate dominance, must be preserved at all costs. If not, we will lose the fundamental freedoms that define our Constitutional Republic, which such freedoms presently teeter on a razor's edge due to the Defendants' scheme discussed herein.

19.     This moment is pivotal for the Nation. The outcome of this case will reverberate far beyond the immediate Plaintiffs, shaping the future of free speech and access to a competitive digital marketplace for all Americans, and much more. The stakes could not be higher – this is not just about the future of the Internet, it is about the ongoing preservation of freedom itself. If not us, then who? If not now, then when? If not us and if not now, soon there will be no one left to push back against the Establishment's "hidden in plain sight" objective to destroy America. Indeed, "what we do in life echoes in eternity" – it is time to stand up and demand that America remains free.

20.     If the reader finds the first seventeen averments of this Complaint difficult to believe (they are, admittedly, incredibly alarming), we encourage you to watch this video. In it, members of the Establishment openly discuss their objective to eliminate free speech, imprison dissenting voices, and eliminate Section 230 to pressure Big Tech into enforcing Government-driven censorship: https://rumble.com/v5unpk2-censorship.html

21.     The Plaintiffs (vis-à-vis TTAV and TTAC and their principals, Ty and Charlene Bollinger) were at the epicenter of Defendants' "Disinformation Dozen" ("DD") censorship blacklist (*e.g.*, CCDH hit pieces generated at the Government's behest and forced onto Big Tech to implement social media censorship).

22.     As it relates to Plaintiffs (namely, Plaintiffs' principals, Ty and Charlene Bollinger blacklisted as members of the DD), this lawsuit addresses Government's aim to eradicate (by way of the Government's Instruments, *see* nn. 4-6, *supra*) Plaintiffs (specifically, TTAV and TTAC) from Social Media platform spaces (*e.g.*, Facebook, Google, Twitter) relating to the dissemination of, for example, COVID information, over which the Government and Plaintiffs are in direct competition. Put differently, part of this lawsuit involves Government's voracious, ongoing appetite to silence competitive speech involving viewpoints that do not adhere to those of the Government, which include, for example, Plaintiffs' viewpoints on COVID in general, COVID treatment, and / or COVID prevention. Indeed, "the Government was the primary source of misinformation during the pandemic, and the Government censored dissidents [Plaintiffs] and critics [Plaintiffs] to hide that fact." ~ Stanford U. Professor J. Bhattacharya (speech with MIT Free Speech Alliance).[10, 11] And this reality is fully supported by the December 4, 2024, House Report entitled "After Action Review of the COVID-19 Pandemic: The Lessons Learned and a

---

[10] Not so surprisingly, according to a December 2022 release of the Twitter Files, Professor Bhattacharya (a critic of various COVID-19 responses / approaches, and a proponent of approaches such as herd immunity) was placed on a Twitter "trends blacklist" in August 2021 that prevented his tweets from populating in searches of trending topics. "Not so surprisingly" because Professor Bhattacharya's COVID-19 viewpoints contradicted those of the Government and, so, the Government's Instruments (*e.g.*, Twitter) were obliged to censor Professor Bhattacharya at the Government's behest.

[11] Of course, as further discussed below, Defendants censorship warfare has not been limited to COVID-19 nor will it stop there. While the COVID-19-related censorship was the thrust of Defendants' directly eradicating Plaintiffs from the modern public square (Social Media platforms), the Defendants' scheme laid out in this Complaint applies to far more; *e.g.*, elections, and public narratives.

12

Path Forward."[12] The House Report reveals that those who were maligned (*e.g.*, the DD / Plaintiffs) were not the wrongdoers and, in fact, the Government (including its "yes men" like Fauci, who downplayed the lab leak theory and covered up facts) was wrong in myriad respects and that the vaccines in fact did more harm than good.

23. As to the Government's Instruments' of anti-competitive animus vis-à-vis censorship, for example, this lawsuit also addresses Big Tech's anti-competitive animus towards Plaintiffs concerning Social Media space / market (*e.g.*, Facebook, Google, and Twitter platforms) in general, which such space is of substantial revenue generating potential (*e.g.*, advertising monies and web trafficking monies, derived from the dissemination of information; *i.e.*, information content provision) and which such space Plaintiffs and Defendants (Facebook, for example) compete over. Put differently, part of this lawsuit involves Big Tech's insatiable, monopolistic greed to augment corporate profit in anti-competitive fashion. This, as discussed below, not only serves Big Tech in fulfilling the Government's coerced censorship objectives, but also in fulfilling Big Tech's unlawful monopolistic money-making content development objectives.

24. Social Media and other digital platforms are widely considered, at least by the public, to be the digital version of the modern "public square."[13] But the modern public square that is Social Media and other digital platforms has become anything but an open, interactive gathering place for public opinion to be freely expressed or consumed, despite the false promises as to same of Social Media and digital platform leaders like Facebook, Google, and Twitter.

25. Over approximately the last year, through the release of the internal communications at Twitter (the "Twitter Files"), the preliminary discovery in *Missouri, et al. v.*

---

[12] The entire House Report can be found here and is incorporated fully herein by reference: <u>12.04.2024-SSCP-FINAL-REPORT.pdf</u> *See also, e.g.,* ¶ 231, *infra.*

[13] <u>https://www.merriam-webster.com/dictionary/public%20square</u> (defining "public square" as "the sphere of public opinion" and / or "an open public area … where people gather;" *e.g.,* digitally "interact").

*Biden, et al.*, No. 2:22-cv-01213 (W.D. La.), the House of Representatives' release of the "Facebook Files," ongoing responses to FOIA requests, and released FBI reporting, for examples, Americans have learned that the Government has affirmatively coerced and jointly participated with Social Media platforms (*e.g.*, Facebook, Google, Twitter) to artificially censor lawful, legitimate (but disfavored) information from their own users (*e.g.*, Plaintiffs), using manufactured, derogatory labels (*e.g.*, "misinformation" / "disinformation" / "untrustworthiness" / "unreliableness" / "riskiness") created by the NGOs. That is, the Government has not only coerced (*via* exertion of extreme pressure and threat) Big Tech into the Government's desired censorship campaign (*i.e.*, overt molding / manipulation of the modern public square), but the Government has also effectuated equipping Big Tech with the maligning / discriminatory NGO-based information (*e.g.*, CCDH "blacklist") by which to carry out such heavy-handed censorship.

26. Distilled, the design of the Government's effort to define and control "truth" (here, the "truth" regarding COVID, COVID-related vaccinations, and COVID-related whatever) was / is three-fold (not necessarily in this order, and not necessarily parsed out):

(a) Create mass confusion / hysteria as to the "truth." *See, e.g.,* ¶ 20, *supra*, https://youtu.be/J4zpbuuwPeU at 0:00 – 0:08, 0:41 – 1:00 (Barack Obama's April 21, 2022, speech to Stanford University graduates: "flood [the] country's public square with … enough raw sewage, … raise enough questions, spread enough dirt, plant enough conspiracy theorizing, that citizens no longer know what to believe"). Indeed, confusion often sows doubt, and doubt often leads to questions … questions that, per the Establishment and its Censorship Industrial Complex, must only be answered by Government so as to maintain complete control. Censoring and confusing people is how the Administrative State maintains control. *See, e.g., id.*, *supra*, at 13:42 – 14:25

14

(Hillary Clinton's October 5, 2024, interview with CNN: "if the platforms … don't moderate and monitor the content, uh, we lose total control").

(b) Eradicate from the modern public square (Social Media) those individuals or entities whose voices concerning the "truth" do not align with Government's voice concerning the "truth." Here, eradication, within the modern public square, of Plaintiffs and their voices concerning any and all things (*e.g.,* COVID, elections, the Hunter Biden laptop, Russian influence*, et cetera*) that compete with (*i.e.*, question, challenge, debate, contradict, contest, *et cetera*) Government's narrative. *See, e.g.*, *id. supra,* at 3:51 – 8:02 (providing a small illustration of how targeted and aggressively enhanced the Defendants' censorship efforts were with respect to the DD, inclusive of Plaintiffs); *see also, e.g.*, *id., supra*, at 9:16 – 10:20 (a small illustration of Government's teaming up with various other so-called "credible" sources / "influencers" from different walks of life in order to combat purported "misinformation" spreading); *see also, e.g., id.*, *supra*, at 10:21 – 12:09 (a small illustration of Government's enhanced efforts / collaboration with Big Tech to eradicate dissenting voice).

(c) Government's amplification of its voice domestically. *See, e.g., id., supra*, at 8:03 – 10:10, *see also, e.g.*, *infra* ¶¶ 139-140, 571, 572, 575 (discussion of the National Defense Authorization Act, "NDAA," enacted in the Barack Obama administration, expanding the GEC's mission, authorizing it to counter foreign "propaganda and disinformation" that undermines not only the United States' national security interests abroad, but also the "policies, security, or stability" of the U.S. and our allies); *see also* § III.C.1 of this Complaint (discussion of the Smith-Mundt Modernization Act of 2012, which was an Obama administration amendment of the Smith-Mundt Act of 1948, which such Modernization Act allowed the Government to inject propaganda into the discourse of the United States' citizenry).

15

27.     Distilled even further – the Defendants' scheme around which this lawsuit revolves is to blur / distort / manipulate real reality, then concoct a new "reality," and pervasively promote that new "reality." Put differently, the methodology described in ¶ 24(a)-(c), *supra*, is to reduce the voice of dissenters (¶ 24(a)), remove the voice of dissenters (¶ 24(b)), and replace the voice of dissenters (¶ 24(c)).

28.     "History repeats itself,"[14] if left unchecked; and, inevitably, future proves past. "But if [history is] faced with courage, [it] need not be lived again."[15] Here lies the terrifying cycle of history repeating itself, which we must confront with courage right now to ensure it is never relived:

> If you tell a lie big enough and keep repeating it, people will eventually come to believe it. The lie can be maintained only for such time as the State can shield the people from the political, economic and/or military consequences of the lie. It thus becomes *vitally important for the State to use all of its powers to repress dissent, for the truth is the mortal enemy of the lie, and thus by extension, the truth is the greatest enemy of the State.*[16]

Here, the Government's anti-competitive drive to silence Plaintiffs (a significant digital news-media presence) stems from a motivation to strip them of their voice, economic stability, and civil liberties. This censorship was executed through Government-coerced, Big Tech-facilitated censorship / suppression, backed by smear campaigns labeled "misinformation," "disinformation," "untrustworthiness," "unreliability," and "riskiness" (data fabricated by the NGOs). The core reason for targeting Plaintiffs is that they were, are, and will continue to be ongoing media competitors to the Government and its affiliates within the healthcare and life

---

[14] Karl Marx.

[15] Maya Angelou.

[16] Unknown speaker / author, but attributed to Joseph Goebbels (emphasis added).

sciences information sphere, with differing views on various related topics. None of the actions taken against Plaintiffs were conducted in "good faith" or reflective of a "Good Samaritan;" instead, they epitomize malicious misconduct by anti-American Defendants.

29.     Here, one of the central issues (although not necessarily the only issue because the issues remain ongoing) over which Plaintiffs (by way of TTAC and TTAV, and principals Ty and Charlene Bollinger) and the Government did / do not share similar views and over which Plaintiffs and the Government were / are in competition for Social Media platform (*i.e.*, the modern digital public square) space was / is COVID. And, here, the Government does not want to concede Social Media space to anybody (Plaintiffs) who holds differing viewpoints on COVID because the public may well choose to get COVID information from Plaintiffs instead of the Government and choose to make health-related decisions based on Plaintiffs' information rather than the Government's information – and that concept is simply unbearable for Defendants, namely the Government. Or, the public may well choose to consult various sources of information (both Plaintiffs and Defendants, for example) and draw their own conclusions after being fully informed of competing views – and that concept is also unbearable for Defendants.

30.     Because Plaintiffs presented / present a competitive voice to the Government (perceived by the Government as a threat to its COVID-related narrative control), Plaintiffs were / are disfavored by the Government (*i.e.*, blacklisted as supposed sources of supposed "misinformation," "disinformation," "riskiness," "untrustworthiness," and "unreliableness" per the Government and NGO opinions elicited by the Government) and were / are targeted for elimination from the modern public square that is Social Media vis-à-vis Government-coerced censorship through Big Tech's hook-line-and-sinker, thoughtless, callous *carte blanche*

17

acceptance / usage of the Government-elicited NGO opinions and / or Big Tech's otherwise robotic Kowtowing to the Government's censorship demands.

31.     Plaintiffs' principals (50 / 50 owners of CSOB), Ty and Charlene Bollinger, are proud Americans, particularly proud of the freedom to create success and express creativity through hard work and dedication in America. Plaintiffs' principals are extremely concerned with what a world without the freedoms guaranteed by our Constitution would look like, especially having had their Constitutionally guaranteed freedoms (*e.g.*, individual civil liberties like free speech / free press) suppressed by Defendants in coordination with foreign censorship efforts, including the CCDH's DD censorship campaign.

32.     The following common allegations first discuss the history and lead-up to the unimaginable point we are at where Defendants can unilaterally silence voices (without legal consequence) through coordinated censorship schemes – what we now recognize as the formation of the Censorship Industrial Complex. Context is crucial to understanding how we arrived at this highly disturbing (and downright terrifying) point in U.S. history.

33.     Our below common allegations then turn to the specific harms suffered by Plaintiffs vis-à-vis Defendants' implementation of the Censorship Industrial Complex against them.

34.     Plaintiffs' lost revenue (both past and prospective) as a result of the Defendants' wrongdoing outlined herein vastly exceeds $75,000.00; *i.e.*, the amount in controversy here is easily cleared.

35.     Moreover, Plaintiffs (namely the principals Ty and Charlene Bollinger) have suffered significant reputational damage as a result of the Defendants' wrongdoing outlined herein. At present, monetary quantification of such damage is a virtual impossibility.

36.     America is plagued by the collective Defendants' censorship foul play that is the subject of this litigation.  Those who attempt to speak out are punished, inducing a chilling effect on speech worldwide, and entrepreneurs are made examples of when they strive to do good or improve their livelihoods in pursuit of the American Dream. Plaintiffs' online presence was, and continues to be, artificially restricted and suppressed to prevent their growth, with Defendants ultimately aiming to completely erase Plaintiffs from the modern public square (Social Media Platforms) simply because they dared to speak out on "controversial" issues. Plaintiffs cannot imagine an America where Constitutional rights are continuously denied. Plaintiffs are deeply committed to this cause, particularly in defense of free speech and press.

37.     This action stands as a defense of the First Amendment and of freedom itself. Plaintiff assert that the Government, through pervasive entwinement and joint participation with Big Tech and influential NGOs, has orchestrated an unprecedented campaign to silence dissenting voices. Through coercion and strategic alliances, the Government has transformed Social Media platforms into Instruments of censorship, suppressing views that challenge its narrative on vital issues, including COVID-19.

38.     Enabled by a distorted application of Title 47, United States Code, Section 230, Big Tech wields immunity while advancing the Government's ill interests, targeting voices like Plaintiffs that dare to present alternative perspectives. This entangled alliance – a Censorship Industrial Complex – actively suppresses dissent, damages reputations, and monopolizes the public square, erasing the (digital) marketplace of ideas from which freedom springs.

39.     This lawsuit is not only about seeking justice for wrongs done to Plaintiffs, it is a battle to preserve the very foundation of free expression and Constitutional rights for every American. If this pervasive censorship is not stopped here and now, it will eventually obliterate

19

free speech, and with it, the essence of freedom itself. This Court's action is pivotal – failure to act means the erosion of liberty for all, marking the end of open discourse and the beginning of a future devoid of true freedom. The stakes could not be higher.

40. Defendants' unlawful, inequitable, and unconstitutional conduct (the NGOs' mischaracterizations of Plaintiffs and Big Tech's related censorship / blackballing of Plaintiffs, all at the coercive behest and funding of the Government in whole or in part) has resulted in Plaintiffs experiencing (and continuing to experience to this day and doubtless moving forward) the following, for examples: (a) threat to their lives and / or physical wellbeing; (b) reputational damage; (c) reduced growth; (d) lost business opportunities / prospective economic advantage; (e) substantial monetary harm (*e.g.*, reduced advertising / web trafficking revenue); (f) loss of voice / speech within Plaintiffs' marketplaces (*e.g.,* news-media and holistic healthcare) or otherwise; and (g) *et cetera*.

41. This lawsuit seeks both monetary and non-monetary relief for the wrongs (illegalities, inequities, and unconstitutionalities) perpetrated against Plaintiffs by the collective Defendants. As to monetary redress, the amount in controversy (exclusive of attorneys' fees, costs, and interest) well exceeds $75,000.00. To be clear, monetary relief is sought from the private / commercial Defendants who are the closest proximate causes of the subject censorship-related harms (*e.g.*, CCDH, MMA, Facebook, Google, Twitter) and the non-monetary relief (injunction) is sought from all contributory Defendants (including the Government).

42. This Complaint is made up of hundreds of pages of legally / factually / procedurally indispensable information. While the entire Complaint is mind-blowing, we submit, it is admittedly a very lengthy and time-consuming read in total. So, for the casual reader, we suggest next reading the Recapitulation section of this Complaint (Section III.G below) before (and if)

returning to the balance of the Complaint sandwiched between this section and Section III.G. Even for the formal reader (*e.g.*, Judges, clerks), we suggest it would not be a bad idea to do the same; *i.e.*, next read Section III.G below before returning to balance of this Complaint sandwiched between this section and Section III.G. Reason being, this Complaint is so lengthy and so detailed that it would likely be helpful to the reader to first fully prime himself / herself to the overall censorship scheme by reading this section and Section III.G first, then return to the remainder of the Complaint sandwiched in-between.

## II.    PARTIES, JURISDICTION, AND VENUE

43.     At all material times, Cancer Step Outside the Box, LLC, was / is a company formed in Tennessee, with its principal place of business / nerve center / headquarters in Sumner County, Tennessee. CSOB's two managing members are Ty and Charlene Bollinger, both of whom are State of Tennessee citizens domiciled / residing in Sumner County, Tennessee.[17]

44.     At all material times, the DOS was / is an executive agency of the United States of America ("USA"). At all material times, the highest bodies / agencies of the federal Government were / are headquartered in the District of Columbia.

45.     At all material times, the GEC was / is an interagency center housed in, and funded by, the DOS. At all material times, the highest bodies / agencies of the federal Government were / are headquartered in the District of Columbia.

46.     At all material times, the DOD was / is an executive agency of the USA. At all material times, the highest bodies / agencies of the federal Government were / are headquartered

---

[17] At all material times, TTAC and TTAV were Nevada-registered companies, with their main offices / nerve center in Sumner County, Tennessee. These two companies were managed by Ty and Charlene Bollinger, both Tennessee residents. TTAC is still active, but classified as a disregarded entity for federal income tax purposes due to CSOB's 100% ownership. TTAV, however, was forced to dissolve a few years ago due to the pervasive censorship campaign (now referred to as the Censorship Industrial Complex) that is central to this lawsuit.

in the District of Columbia.

47.     At all material times, the DHS was / is an executive agency of the USA. At all material times, the highest bodies / agencies of the federal Government were / are headquartered in the District of Columbia.

48.     At all material times, CISA was / is an interagency center housed in, and funded by, the DHS. At all material times, the highest bodies / agencies of the federal Government were / are headquartered in the District of Columbia.

49.     At all material times, the FBI was / is an executive agency of the USA. At all material times, the highest bodies / agencies of the federal Government were / are headquartered in the District of Columbia.

50.     At all material times, the HHS was / is an executive agency of the USA. At all material times, the highest bodies / agencies of the federal Government were / are headquartered in the District of Columbia.

51.     At all material times, CCDH was / is an NGO 501(c)(3) (EIN 86-2006080) with its principal place of business / nerve center / headquarters (as listed in IRS Form 990 (2021)) in Washington, D.C. (with principal officer, Simon Clark, listing an address of 1250 Connecticut Ave. NW 700, Washington, D.C., 20036), and with a professed mission of "counter[ing] hate and disinformation, by disrupting the online architecture enabling its rapid worldwide growth through research, social media campaigns and public education" (per the aforementioned IRS FORM 990 (2022)). CCDH's board members (per the aforementioned Form 990) consist of (a) Simon Clark (principal office / chair of the board); (b) Imran Ahmed (CEO); (c) Thomas Conrad Brookes (director); (d) Kirsty Jean McNeill (director); (e) Aleen Keshishian (director); (f) Zack

Morgenroth, and (g) Coby Schoffman (director).[18]

52. At all material times, MMA was an NGO 501(c)(3) (EIN 47-0928008) with its principal place of business / nerve center / headquarters (as listed in IRS Form 990 (2022)) in Washington, D.C. (with principal officer, Angelo Carusone, listing an address of P.O. Box 44811, Washington, D.C., 20026), and with a professed mission of "dedicated to comprehensively monitoring, analyzing, and correcting conservative misinformation in the U.S. media" (per the aforementioned IRS FORM 990 (2022)). Continuing (per the same IRS FORM 990): "Media Matters for America works to notify activists, journalists, pundits and the general public about instances of misinformation, providing them with the resources to rebut false claims and take direct action against offending media institutions." MMA's board members (per the aforementioned Form 990) consist of: (a) Angelo Carusone, (Chairman and President); (b) Pilar Martinez (CFO); (c) Will Lippincott (Secretary); (d) Tom Castro (Treasurer); (e) Bonnie Turner (Director); (f) Michael Pollock (Director); (g) Karen White (Director); (h) Cecile Richards (Director); (i) Tom Perez (Director); (j) Oliver Willis (Director); (k) Mark Buell (Director); (l) Cynthia Padera (COO); (m) Julie Millican (V.P.); (n) Sergio Munoz (V.P Research & Policy); (o) John Whitehouse (Senior Director); and (p) Laura Keiter (Communications Director).

53. At all material times, CIS was an NGO 501(c)(3) (EIN 52-2278213) with its principal place of business / nerve center / headquarters (as listed in IRS Form 990 (2023)) in New York (with principal officer, John Gilligan, listing an address of 31 Tech Valley Dr., East

---

[18] CCDH attained its 501(c)(3) status from the IRS on April 23, 2021, with tax exempt status being granted retroactively to December 11, 2020. The CCDH also has English roots dating back to 2017 / 2018. Once CCDH enjoyed censorship-oriented success in England (with respect to things such as swaying elections and diminishing competing voices), the CCDH set up its 501(c)(3) shop in Washington, D.C. to expand its nefarious reach and deeds onto American soil. Per the United Kingdom's Companies House, Center for Countering Digital Hate, Ltd. (Company #11633127), CCDH's English operations incepted on October 19, 2018. The registered office for the English branch of CCDH is Langley House, Park Road, East Finchley, London, United Kingdom, N2 8EY.

23

Greenbush, NY, 12061), and with a professed mission of "safeguard[ing] organizations against cyber threats" (per the aforementioned IRS FORM 990 (2023)). Continuing (per the same IRS FORM 990): "the mission of the Center for Internet Security is to enhance the security readiness and response of public and private sector entities, with a commitment to excellence through collaboration." CIS' board members (per the aforementioned Form 990) consist of: (a) John Gilligan, (President and CEO); (b) Roberta Bobbie Stempfley (Board Chair); (c) Bruce Moulton (Treasurer); (d) Ramon Barquin (Director); (e) Jane Holl Lute (Director); (f) Richard Schaeffer (Director); (g) Chris Painter (Director); (h) William Pelgrin (Director); (i) Todd Kimbriel (Director); (j) Cynthia Valles (Director); (k) Amit Yoran (Director); (l) Tracy Doaks (Director); (m) Albert Szesnat (CFO); (n) Lisa Greene (General Counsel and CLO); (o) Curtis Dukes (Exec. V.P. and GM of SBP); (p) Regina Chapman (COO); and (q) Thomas Michelli (Exec. V.P. and GM of Operations and Security Service).

54.     At all material times, Meta was / is a Big Tech company incorporated in Delaware, with its principal place of business / nerve center / headquarters in San Mateo County, California.

55.     At all material times, Google was / is a Big Tech Delaware limited liability company with its citizenship (*i.e.*, principal place of business / "nerve center") in Santa Clara County, California. Google's members / authorized persons consist of Sundar Pichai (CEO), Ruth Porat (CFO), Kent Walker (Secretary), Kenneth Yi (Assistant Secretary), and XXVI Holdings, Inc. (Authorized Member), all of whom, in corporate filings, set forth Mountain View, California (Santa Clara County) with respect to domicile / residence.

56.     At some material times, X was a Big Tech company incorporated in Delaware, with its principal place of business / nerve center / headquarters in San Francisco County, California. At other material times, X was / is a company incorporated in Nevada, with its principal

place of business / nerve center / headquarters in San Francisco County, California. More recently, X's principal place of business / nerve center / headquarters has been relocated to Bastrop County, Texas.

57.     John Does 1-10 are presently fictious Defendants "named" as parties to this action based on the likelihood that other parties are also responsible for the wrongs set forth in this Complaint (without discovery, we do "not know where the rabbit hole ends"). Of course, following a reasonable period for discovery (*i.e.*, after the identity of other wrongdoers is learned), Plaintiffs reserve the right to amend this Complaint to set forth the true names of the present John Doe Defendants.

58.     This Court possesses jurisdiction pursuant to Title 28, United States Code, Section 1332. The parties are completely diverse (*i.e.*, there are no Tennesseans in Defendants' camp), and the amount in controversy exceeds $75,000.00 exclusive of fees, costs, interest, or otherwise. Moreover, because the Constitution (First Amendment) is implicated by this case, the Court also possesses federal question jurisdiction pursuant to Title 28, United State Code, Section 1331.

59.     Venue is proper in the Middle District Court of Tennessee pursuant to Title 28, United States Code, Section 1391(b), since this judicial district is where Plaintiff CSOB maintains its principal place of business (and where CSOB's two principals, Tennessee citizens, are domiciled / reside) and since various substantial events or omissions which give rise to and / or underlie this suit occurred within this judicial district. And the Nashville Division of this Court has personal jurisdiction due to Defendants' minimum contacts in this forum.

60.     All conditions precedent to the institution of this action have occurred, been performed, been waived, or were futile.

### III.  COMMON ALLEGATIONS

61.     The complexities of the Censorship Industrial Complex—responsible for the concrete and particular harms suffered by Plaintiffs, the countless injuries inflicted upon others across this nation, and the devastating harms yet to come if left unchecked—are vast and deeply entrenched. These intricacies, as evidenced by the hundreds of pages that follow, are no accident; they are the deliberate design of Defendants, shrouding their actions in immense opacity. This immense censorship machinery constitutes, in the words of *Missouri v. Biden*, No. 22-cv-01213 (W.D. La.), [D.E. 293] at 2, "the most massive attack against [Constitutional rights, namely] free speech[,] in United States history." The Common Allegations of this Complaint aim to shed light on the dark origin and evolution of Defendants' Censorship Industrial Complex as a whole. Because sans wider reaching history / background / context, one might not fully grasp just how pervasive and deep rooted the Censorship Industrial Complex is and just how dire the circumstances are. Circumstances that Plaintiffs have already concretely and particularly suffered and continue to suffer, circumstances that thousands of other Americans have (knowingly and unknowingly) suffered directly or indirectly, and circumstances that otherwise pose "grave risk[s]" to America and its defining liberties. Plaintiffs' circumstances must be immediately redressed, not only because Plaintiffs are constitutionally, legally, and equitably entitled to redress, but also because the well-being of this country literally hangs in the balance.

62.     Our close examination of historical events, legislative actions, judicial decisions, and *et cetera* in the first portion of the Common Allegations reveals that certain Plaintiff injuries were not incidental; but, rather, the result of Defendants' deliberate planning or policy decisions. This historical analysis uncovers the motives and contextual forces underlying Plaintiffs' situation and the harm they have suffered and continue to suffer, offering deeper insight into how the

26

Government orchestrated and built the Censorship Industrial Complex in joint participation with Big Tech and NGO Defendants.

**A.     *Underpinnings Of The Establishment's Censorship Industrial Complex***

63.     The U.S. Government's involvement in censorship during the COVID-19 pandemic reflects a concerted, preplanned, and multi-faceted effort to suppress dissenting voices, especially those challenging the official narratives on public health and political matters – Plaintiff CSOB, with its principals (Plaintiffs, Ty and Charlene Bollinger), was blacklisted by Defendants as part of the DD.

64.     This censorship regime, often referred to as the "Censorship Industrial Complex," was characterized by a close partnership between federal agencies (the Government), NGOs (*e.g.*, CCDH, MMA, CIS), and major tech companies (*e.g.*, Meta f/k/a/ Facebook, Google, and X f/k/a/ Twitter.

65.     The purpose of these collaborations was to monitor, identify, and censor what the Government deems "misinformation," "disinformation," or "malinformation," particularly competitive information regarding COVID-19 and vaccines.

66.     Here, the Government's enlisted censorship NGOs (*e.g.*, CCDH) played a crucial role in deliberately developing and promoting censorship hit pieces concerning Plaintiffs and their principals. This Government tool (CCDH) was designed to blacklist media outlets and individuals, including figures from the DD. The subject hit pieces here (mainly, but not entirely, generated by CCDH), identified key individuals, including Plaintiffs Ty and Charlene Bollinger, as purportedly responsible for a significant portion of anti-vaccine misinformation online, supposedly leading to the Government's targeted suppression of Plaintiffs' content (inclusive of TTAC and TTAV) on Social Media platforms, by, for example, through the U.S. Surgeon General's hit piece (advisory

report).[19]

67.     In a Tweet referencing the "Facebook files," Representative Jim Jordan simplified how this censorship regime operated:

> Foreign activists at the CCDH feed false info to the Biden White House [*e.g.,* the DD are responsible for 65% of misinformation online]. The Biden Administration [and the Establishment Party] then uses the full weight of the federal government to coerce Facebook [amongst other Government Instruments of censorship] to censor Americans, Biden's critics and political opponents, and the truth.

This joint collaboration, fueled by *foreign* organizations (with CCDH hailing from London prior to establishing its sham / shell 501(c)(3) in the U.S.) and facilitated by Governmental coercion, targeted not only specific individuals but also fundamental civil liberties.

68.     The overall suppression was not limited to voluntary actions by Big Tech companies; Government agencies actively exerted both public and private pressure (overtly and covertly, and extremely) on Big Tech platforms. Meetings, emails, and public threats to "scrutinize," "amend," or "repeal" Title 47, United States Code, Section 230 (the Communications Decency Act, "CDA"), a Social Media company's civil liability shield (its "Good Samaritan" affirmative defense), were used by the Government as coercive tactics to ensure Big Tech compliance, for example. The Platforms, in turn, adopted increasingly anti-competitive and strict censorship policies, removing or downranking content, applying warning labels (all of which conduct amounts to a form of its own speech), and creating algorithmic barriers (product design changes) to the spread of disfavored content (such as that of Plaintiffs; again, whose principals, Ty and Charlene Bollinger, were blacklisted as part of the DD), in the competitive digital information

---

[19] "Supposedly" because, contrary to initial assumptions, evidence has revealed that the Government itself orchestrated this campaign from the outset. The Government gathered the adverse data and then enlisted the Center for Countering Digital Hate (CCDH) to draft narratives that it later used to justify its pressure on Big Tech, effectively creating a circular mechanism of censorship targeting its critics. This revelation underscores that the Censorship Industrial Complex is not merely a consequence of Government pressure on private entities but the result of a calculated and deliberate Government operation.

market.

69.     This censorship regime extended beyond public health information. The 2016 U.S. election and the rise of populist figures like Donald Trump demonstrated the transformative power of Social Media in allowing political figures to directly connect with the electorate, bypassing traditional media gatekeepers. This widespread ability to communicate unfiltered messages to the public challenged the Establishment's control over political narratives.

70.     In response, Social Media companies were pressured (they had no real choice, given the Government's exertion of extreme liability exposure / pressure from multiple departments) into adopting tools and policies that curbed the influence of American voices seen as threats to the Establishment's control. This dynamic, highlights a deeper issue where censorship not only suppresses misinformation but also limits political discourse and marginalizes dissenting voices, restricting the ability of political figures to engage directly with voters, thereby ensuring the preservation of institutional / Administrative / Establishment power.

71.     At the core, the Government's actions were premeditated and deliberate, constituting one of the most significant and potentially seditious / treasonous attacks on free speech and the foundational rights of We The People in U.S. history. Like the plaintiffs in *Missouri v. Biden* (a case quite similar to this case, discussed further below), the Plaintiffs in this case assert that the COVID-19 pandemic was not a reason to diminish civil liberties guaranteed by the Constitution. Citing to Justice Gorsuch's dissent in *Does 1-3 v. Mills*: "If human nature and history teach anything, it is that civil liberties face grave risks when governments proclaim indefinite states of emergency." *Missouri, et al. v. Biden, et al*., [D.E. 293] at 118 (citing *Does 1-3 v. Mills*, 142 S. Ct. 17, 20–21 (2021) (Gorsuch, J., dissenting)). Along with Judge Doughty of *Missouri v. Biden*, we submit that the "grave risk" presented here is the most massive attack on free speech in U.S.

29

history.

72.     This unprecedented campaign of suppression blurred the lines between public and private action, actively subverting the Constitution and undermining the fundamental protections guaranteed by the First Amendment. Plaintiffs contend that this censorship apparatus is not merely an isolated issue but part of a broader, ongoing global agenda designed to maintain control over public discourse and political outcomes worldwide. Again, this concerted effort poses a grave threat to the very foundation of democratic governance and individual freedoms, effectively eroding the Constitutional rights intended to safeguard free speech / press and open political participation.

73.     That which is discussed in ¶¶ 63-72 (and throughout this Complaint, for that matter) sounds very much like the Communist movement(s) of the 1950s, which the Internal Security Act of 1950 (McCarran Act) / Subversive Activities Control Act of 1950 described as follows (emphasis added):

> As a result of evidence adduced before various committees of the Senate and House of Representatives, the Congress hereby finds that – (1) There exists a world Communist movement **[here, for example, the New World Order's censorship movement]** which, in its origins, its development, and its present practice, is a world-wide revolutionary movement whose purpose it is, by treachery, *deceit, infiltration into other groups (governmental and otherwise),* espionage, sabotage, terrorism, and any other means deemed necessary, to establish a Communist totalitarian dictatorship in the countries throughout the world through the medium of a world-wide Communist organization **[here, again, the New World Order]**. (2) The establishment of a totalitarian dictatorship in any country **[here, the Establishment party as a member of the New World Order]** *results in the suppression of all opposition to the party in power, the subordination of the rights of individuals to the state, the denial of fundamental rights and liberties which are characteristic of a representative form of government, such as freedom of speech* **[here, the Censorship Industrial Complex]***, of the press* **[here, the Censorship Industrial Complex]***, of assembly, and of religious worship, and results in the maintenance of control over the people* through fear, terrorism, and brutality. … (4) The direction and control of the world Communist movement is vested in and exercised by the Communist dictatorship of a foreign country **[here, for example, the United Kingdom]**. (5) The Communist dictatorship of such foreign country, in

30

exercising such direction and control and in furthering the purposes of the world Communist movement, establishes or causes the establishment of, and utilizes, in various countries, action organizations **[here, for example, the CCDH]** which are not free and independent organizations, but are sections of a world-wide Communist organization and are controlled, directed, and subject to the discipline of the Communist dictatorship of such foreign country **[here, for example, the United Kingdom]**. (6) The Communist action organizations **[Censorship Industrial Complex]** so established and utilized in various countries, acting under such control, direction, and discipline, *endeavor to carry out the objectives of the world Communist movement* **[New World Order]** *by bringing about the overthrow of existing governments by any available means*, … and setting up Communist totalitarian dictatorships which will be subservient to the most powerful existing Communist totalitarian dictatorship. Although such organizations usually designate themselves as political parties, they are in fact constituent elements of the world-wide Communist movement and *promote the objectives of such movement by conspiratorial and coercive tactics, instead of through the democratic processes of a free elective system or through the freedom-preserving means employed by a political party which operates as an agency by which people govern themselves*. (7) In carrying on the activities referred to in paragraph (6), such Communist organizations in various countries are *organized on a secret, conspiratorial basis and operate to a substantial extent through organizations* **[here, Big Tech]**, commonly known as 'Communist fronts', which in most instances are created and maintained, or used, in such manner as *to conceal the facts as to their true character and purposes and their membership. One result of this method of operation is that such affiliated organizations are able to obtain financial and other support from persons who would not extend such support if they knew the true purposes of, and the actual nature of the control and influence exerted upon*, such 'Communist fronts'. … (9) *In the United States those individuals who knowingly and willfully participate in the world Communist movement* **[here, New World Order]***, when they so participate, in effect repudiate their allegiance to the United States, and in effect transfer their allegiance to the foreign country* **[here, for example, the United Kingdom]** in which is vested the direction and control of the world Communist movement. … (11) The agents of communism **[here, the Defendants, but in particularly the NGO Defendants]** have devised clever and ruthless … sabotage tactics which are carried out in many instances in form or manner successfully evasive of existing law **[here, for example, the Big Tech Defendants' illegalities are immunized by 47 U.S.C. § 230]**. (12) The Communist network in the United States is inspired and controlled in large part by *foreign agents who are sent into the United States* **[here, for example, the CCDH]** ostensibly as attaches of foreign legations, affiliates of international organizations, members of trading commissions, and in similar capacities, but who use their diplomatic or semidiplomatic status as a shield behind which to engage in activities prejudicial to the public security **[here, for example, the infiltration of the CCDH into the United States and the obtaining of 501(c)(3) semi-diplomatic status, highly prejudicial to the American public's security]**. … (14) One device for infiltration by Communists is by procuring naturalization for disloyal aliens who use their

31

citizenship as a badge for admission into the fabric of our society **[here, for example, the CCDH's 501(c)(3) semi-diplomatic badge]**. (15) The Communist movement in the United States is an organization numbering thousands of adherents, rigidly and ruthlessly disciplined. Awaiting and seeking to advance a moment when the United States may be so far extended by foreign engagements **[for example, direct participation in war(s) in the Middle East, or indirect participation in the Russian / Ukraine war]**, so far divided in counsel **[America is highly divided in political affinities]**, or so far in industrial or financial straits, **[or otherwise, such as the huge distraction that was the COVID pandemic and rising inflation]**, that overthrow of the Government of the United States … may seem possible of achievement, it seeks converts far and wide by an extensive system of schooling and indoctrination **[here, the propaganda generated by the likes of CCDH and MMA, and enabled by the likes of the Smith-Mundt Modernization Act of 2012]**. Such preparations by Communist organizations in other countries have aided in supplanting existing governments **[for example, the CCDH's efforts in or around 2017-2020 succeeded in the United Kingdom, with CCDH, among other things, (a) smearing *The Canary* (a news website that actively published on English politics), resulting in *The Canary* having to significantly downsize its operations (*i.e.*, having less voice as to English politics, politicians, and elections), and (b) in swaying elections by hoking up various smears that resulted in the suspensions or expulsions of various English politicians (*e.g.*, Chris Williamson who was ultimately left with little choice other than resignation from the Labour Party), clearing the way for election of candidates who the CCDH favored, such as Keir Starmer who became the leader of the Labour Party in 2020 not-so-coincidentally right after CCDH's aforementioned efforts and who has been England's Prime Minister since 2024]**. The Communist organization **[the Censorship Industrial Complex]** in the United States, pursuing its stated objectives, the recent successes of Communist **[Censorship Industrial Complex]** methods in other countries **[the United Kingdom vis-à-vis CCDH]**, and the nature and control of the world Communist movement itself, *present a clear and present danger to the security of the United States and to the existence of free American institutions, and make it necessary that Congress, in order to provide for the common defense, to preserve the sovereignty of the United States as an independent nation, and to guarantee to each State a republican form of government*, enact appropriate legislation recognizing the existence of such *worldwide conspiracy* and designed to *prevent it from accomplishing its purpose in the United States* **[this lawsuit is designed specifically to prevent the Censorship Industrial Complex from accomplishing its Communist purpose in the United States].**

1.     **Behind The Curtain – International Order Vs. Populism**

74.     In an era where political transparency and free speech are at the forefront of public debate, it is essential to examine the complex forces shaping our political landscape. Recent discussions on censorship, populism, and the international order challenge us to question whether

32

democracy, as we understand it, is more illusory than real, raising concerns about the future of governance and the role technology plays in controlling political discourse.

75. According to respected scholars (*e.g.*, Eric Weinstein),[20] we are living in a carefully constructed system often referred to as the "rules-based international order," which some might call the "New World Order" or, as we call it, the "Establishment," "Establishment Party," or "Administrative State." This system consists of a complex web of agreements, both explicit and clandestine, designed to maintain global stability, open markets, and prevent war. While these objectives may sound noble on their face (and perhaps once were – like almost a hundred years ago post- World War II when such objectives were established), the Communist methods employed by modern day "politicians" to achieve them stand in stark contrast to the freedoms the Constitution was designed to protect. Behind the scenes, the Establishment (left, right, blue, red, conservative, and liberal) works to eliminate or marginalize populist candidates who might threaten the global New World Order status quo, effectively curtailing the people's ability to elect leaders who represent genuine American change.

76. For decades, the two major political parties in the U.S. have participated in this system, offering voters what Mr. Weinstein calls a "magician's choice" – the illusion of democracy where, regardless of which candidate wins, the interests of this hidden international order are safeguarded. This subversion of true democratic choice undermines the Constitutional rights of free speech, political participation, and self-determination, as it pre-selects leaders aligned with the Establishment's agenda, rather than reflecting the will of the people. The Founders envisioned a government that derives its power from the consent of the governed, yet this New World Order

---

[20] *See, e.g.,* Weinstein's Williamson interview, https://www.youtube.com/watch?v=PYRYXhU4kxM

Communist system quietly overrides that consent, placing institutional control above individual freedom.

### 2.     The Role Of "The Council" – Shadow Governance

77.     The presence of what has come to be known as "The Council" (the Council of Inspectors General on Integrity and Efficiency, "CIGIE") illustrates the very embodiment of the power dynamics that Mr. Weinstein has described. Established in 1978, initially as a mechanism for Governmental transparency and accountability, "The Council" has since evolved into an untouchable institution, deeply embedded within the structures of Government and corporate power.[21] This organization, invisible to the average voter (the vast majority of voters), upon information and belief, wields immense influence over the DOJ, the FBI, and even major Social Media platforms like Meta, Google, and X, for examples.

78.     "The Council" exerts its authority not only by selecting the political winners and losers, but also by controlling the flow of information through, for example, Social Media platforms that shape public discourse. During critical moments for this country, such as the 2020 U.S. presidential election and the COVID-19 pandemic, platforms like Meta were strong-armed into engaging in heavy censorship, ensuring that dissenting voices were suppressed.[22] The idea that these Social Media platforms act independently is a farce; they are ultimately beholden to "The Council" and act according to its directives to maintain the global status quo, as Mr. Stenstrom explains (*see* n. 76, *supra*).

---

[21] *See, e.g., The Council: Who is Running the United States?* by Greg Stenstrom. https://intelligencer.today/the-council-who-is-running-the-united-states-of-america/18/07/2024/8132/

[22] Quite recently, Mark Zuckerberg has admitted to (and purported to apologize for) such, vowing to "push back" against Government if the Government ever tries to strongarm it again in the vein of the Censorship Industrial Complex. *See, e.g.*, https://www.pbs.org/newshour/politics/zuckerberg-says-the-white-house-pressured-facebook-to-censor-some-covid-19-content-during-the-pandemic

34

### 3. Technology As The Enforcer Of Censorship

79.     This partnership between Government and Big Tech reflects a broader trend of technological control over political discourse (or just discourse / speech, period). Under the guise of fighting "misinformation," Social Media platforms (rather than media outlets) have become the gatekeepers of information (indeed, Social Media is indisputably the modern-day public square), deciding what content is permissible and what must be suppressed (a form of their own speech). Section 230 of the CDA, which was initially meant to foster free speech online, has morphed into an impenetrable legal shield that grants Big Tech giants near-total immunity (at least in the California judiciary which consequently handles the majority of social media related – Section 230 cases) and, with it, total editorial control, even when they act in concert with Government agencies to suppress speech.

80.     Through cases such as *Missouri v. Biden* (again, a case quite similar to this case), it is crystal clear that the Government has directly influenced Social Media platforms to silence dissenting voices, particularly during the pandemic. This influence is not just a violation of the First Amendment, it represents a broader assault on democratic freedoms. When the Government directs a private platform to censor content, that platform is acting as an arm / "Instrument" of the State, and Section 230 immunity should not apply at all.

81.     As Mr. Weinstein argues (*see* n. 20, *supra*), this joint participation partnership between the State and Big Tech companies not only distorts the democratic process but also gives rise to a "magician's choice" where the public is led to believe they are making free choices when, in reality, the outcomes are predetermined by powerful, unelected institutions influenced by foreign governments.

35

### 4. Populism As A Threat To Council Power

82. One of the key tactics of CIGIE has been to neutralize populism, which threatens to dismantle the Establishment's carefully curated global order. Populist movements and candidates (such as Donald Trump) in the U.S. and others worldwide, have been painted as destabilizing forces ("a threat to Democracy"), often met with institutional roadblocks, media attacks, and legal hurdles.

83. CIGIE's reach extends into every corner of the political, legal, and media spheres. When President Trump, as a populist figure, emerged with an agenda that posed a direct threat to the established global order ("the swamp"), he became the target of numerous investigations, media smear campaigns, lawsuits, and direct censorship. Censoring the speech of a sitting U.S. President like Donald Trump is not only an egregious act but an outright rejection of the public's will. A President, elected by the people to represent their interests, embodies the voice of the electorate. To suppress that voice cannot possibly serve the public interest, as it denies citizens their right to hear the unfiltered words of their chosen leader and undermines the very foundation of representative democracy. This coordinated effort demonstrates how CIGIE / the Establishment uses its institutional control to maintain power. Figures like Inspector General Michael Horowitz and Attorney General Merrick Garland, who oversee crucial parts of this system, are emblematic of how power is maintained behind the scenes.

84. In the same vein, populist movements in Europe, South America, and elsewhere are similarly suppressed under the guise of maintaining "global stability" within the New World Order. The globalists working within CIGIE (and its network of international counterparts) ensure that populism (which advocates for national sovereignty and the interests of the people; *i.e.*, it

aligns with constitutionally protected principles) never gains enough traction to upend their carefully designed system of covert control.

### 5. The Role Of Courts And Legal Interpretation

85.     Moreover, Courts within the United States have been complicit in maintaining CIGIE's / the Establishment's dominance. *See, e.g., Fyk v. Facebook,* No. 4:18-cv-05159-HSG (N.D. Cal. 2018).

86.     The judiciary (predominantly in California) has often interpreted laws like Section 230 of the CDA in ways that disproportionately favor Big Tech and Governmental interests over individual civil liberties. We submit that these types of decisions (and there have been many) are not merely judicial missteps; but, instead, reflect a broader pattern of judicial deference to the status quo established by CIGIE.

87.     By refusing to recognize the role of platforms (like Meta) as State actors / Government instruments, Courts have effectively allowed Big Tech companies to continue their censorship role unchecked. *See, e.g., Fyk v. Facebook* (wherein Fyk's California Courts have thus far shielded Facebook from its own conduct erroneously under Section 230(c)(1) exclusively, even though the platform was actively manipulating / developing content and deliberately harming a business for its own monetary gain, conduct contrary to the express "Good Samaritan" legislative affirmative defense intent). The legal travesty that is *Fyk v. Facebook* (thus far, at least, the case remains pending and may be headed to the Supreme Court for a third time if the Ninth Circuit denies Fyk's en banc petition)[23] in many ways underscores Mr. Weinstein's prerogative that the

---

[23] The situation has deteriorated to the point where Mr. Fyk was approached by members of Congress to potentially testify against judges in his case who willfully denied him due process, propagated falsehoods perpetuated by Facebook, and held millions in technology stocks during material times. Shortly after, the mysterious resignations of two Republican members (Rep. Ken Buck (R-CO) and Rep. Mike Gallagher (R-WI)) altered majority dynamics and diminished impeachment authority. This reflects a broader issue: courts have deliberately failed to unify the

37

illusion of democracy is maintained (even through the judiciary) by offering people a false choice and hollow protection, all while the real decisions are being made in shadowy corridors of power.

### 6. The Illusion Of Democracy

88. At its core, the illusion of democracy is maintained through this intricate web of Government, Social Media, private organizations, and technological control. The people are led to believe that they have a say in their governance when, in reality, their choices are heavily influenced / curtailed (if not outright controlled) by institutions like CIGIE or what we call the Administrative State.

89. This system ensures that only candidates aligned with the Establishment's goals rise to power. Whether through direct suppression of populist candidates or the manipulation of information to control public perception, the democratic process is subverted at every turn. The rise of Big Tech as an enforcer of Government censorship within the Censorship Industrial Complex at issue in this lawsuit, combined with a (mainly Californian) judiciary that continues to fail to uphold Constitutional rights (*i.e.,* continues to misinterpret Section 230), ensures that the Establishment remains untouchable.

### 7. The Rise Of President Trump – A Challenge To The System

90. The rise of Donald Trump in 2016 (and again in 2024) represented a severe rupture in the Administrative State's system. President Trump, as the first president with no prior experience in Government or active military, challenged the very foundation of the post-World

---

application of Section 230, knowing that properly applying the statute would undermine the Censorship Industrial Complex's grip on Big Tech. Without unwarranted immunity, Big Tech's anticompetitive practices would be curtailed, restoring fair competition and innovation. Platforms would be held accountable for bad-faith moderation, ensuring transparent, neutral content arbitration as intended by Congress. Misuse of Section 230 has deprived Americans of due process, free speech, and economic liberty for far too long, but correcting this distortion would protect constitutional rights, dismantle monopolistic behavior, and transform the internet into a space defined by fairness, competition, and freedom. Therefore, fixing Section 230's judicial misapplication is critical to resolving the pervasive issues complained of herein.

War II New World Order. His victory in 2016 was seen as a wake-up call for those who traditionally manage this global structure, as it demonstrated the dangers of allowing a candidate outside the pre-approved framework to ascend to power. But President Trump's 2016 success can be traced back to a critical oversight by the Establishment – *they failed to recognize the transformative power of Social Media.*

91.     In the lead-up of the 2016 election, Social Media platforms like Facebook / Twitter played a pivotal role in enabling direct communication between President Trump and the electorate, bypassing traditional gatekeepers like the mainstream / legacy media. The Establishment underestimated this new "connective" force. For example, in October 2016, Facebook announced the removal of 300 "Russian" bot accounts in an effort to purportedly curb foreign influence – a move similar in nature to Big Tech's removal of twelve members of the so-called "Disinformation Dozen" to curb "vaccine hesitancy." For example, in October 2016, Facebook announced the removal of 300 "Russian" bot accounts in an effort to purportedly curb foreign influence. Among the so-called "Russian" accounts taken down were many U.S. citizens who supported Trump and were unaffiliated with Russia, illustrating how even legitimate American voices were silenced under the false pretense of election security – ironically, to sway the election. At the time, Facebook likely believed that eliminating just a few hundred accounts would be enough to sway the 2016 election in favor of the status quo candidate (Hillary Clinton); but, fueled by his direct engagement with the public on social media, President Trump's popularity prevailed.

92.     President Trump broke through the Establishment's grip (and its typical "magician's choice") and its Censorship Industrial Complex, precisely because a significant

portion of America was / is rejecting the Establishment's grip on political power. Then and now, this terrifies those who benefit from the existing system.

93.     President Trump's ability to mobilize support outside of traditional channels exposed the fragility of the Establishment's control (because it was forced to operate in the shadows), which is why there was such a concerted effort to discredit and ultimately remove him from office. As a direct response to this threat, platforms such as Twitter, Facebook, and others took the unprecedented step of completely banning President Trump from their platforms (*i.e.*, they came out from the shadows and revealed their censorship agenda), effectively severing his direct line of communication with the electorate. This move not only disconnected President Trump from his base but also demonstrated the power of these platforms to control political discourse, and, with it, the democratic process.

94.     By removing President Trump from social media, these platforms ensured that his ability to bypass traditional media gatekeepers was neutralized, further emphasizing the growing disconnect between the governing elite and the will of the people. President Trump's presidency represented a serious threat to established agreements and institutions, and the bans / censorship illustrated how deeply intertwined Big Tech had become with the Establishment's efforts to maintain institutional power and suppress dissenting voices.

**8.      The Role Of Censorship In Maintaining "Order"**

95.     One of the most concerning aspects of this narrative is the role that censorship plays in perpetuating the illusion of choice, part and parcel with the illusion of Constitutional rights (*e.g.*, free speech) under the Establishment's iron-clad grip.

96.     Mr. Weinstein emphasizes that the media, Social Media platforms, and other gatekeepers of public information act not just to inform but to maintain a specific narrative that

protects institutional interests. This becomes particularly evident when populist candidates or voices challenge the status quo. The censorship of such voices is not merely an issue of political bias; but, rather, a means of ensuring that the electorate does not dismantle the International Order with their votes.

97.     Censorship, therefore, is not just about suppressing "misinformation" or harmful content. It operates at a deeper level, managing what narratives are permissible (*e.g.*, the narratives of Plaintiffs being deemed impermissible) and ensuring that voices (*e.g.*, the voices of Ty and Charlene Bollinger, branded as DD) that would disrupt the chosen narratives of the existing power structures are silenced or marginalized. Mr. Weinstein also points out the bizarre behavior of the media lately, which increasingly presents an "edited" version of reality to the public (*e.g.*, most recently, the suppression of news coverage, in an election year, concerning Hurricane Helene's decimation, namely the apocalyptic decimation experienced by various communities in Western North Carolina). This selective presentation of purported "facts" is a clear example of *censorship by substitution*, creating a distorted understanding of current events, manipulating public opinion while maintaining the illusion of choice.

98.     A prime example of this dynamic is Mark Zuckerberg's 2018 testimony to Congress,[24] where he appeared to take responsibility for Facebook's failures in preventing foreign interference and harmful content. On the surface, Zuckerberg framed Facebook as an idealistic platform focused on connecting people, building communities, and amplifying voices, stating, in pertinent part, as follows:

> My top priority has always been our social mission of connecting people, building community, and bringing the world closer together. Advertisers and developers will never take priority over that as long as I am running Facebook. Facebook is an idealistic and optimistic company. For most of our existence, we focused on all the good that connecting people can do, and as Facebook has grown, people

---
[24] https://www.youtube.com/watch?v=ZIvhBMGOdYs

everywhere have gotten a powerful new tool for staying connected to the people they love, for making their voices heard, and for building communities and businesses. But it's clear now that we didn't do enough to prevent these tools from being used for harm as well, and that goes for fake news, foreign interference in elections, and hate speech. As developers and data privacy, we didn't take a broad enough view of our responsibilities, and that was a big mistake, and it was my mistake, and I'm sorry. I started Facebook, I run it, and I'm responsible for what happens here, so now we have to go through all of our relationships with people and make sure that we're taking a broad enough view of our responsibilities.

99. Zuckerberg's testimony was not an apology for failing to protect users, we submit; rather, Zuckerberg's testimony was an apology to the Establishment for failing to protect the status quo. Zuckerberg's acknowledgment that Facebook did not do enough to prevent "harm," was his acknowledgment that Facebook did not censor enough during the 2016 election to change its outcome. Zuckerberg's commitment to doing better in the future was his vow to the Establishment to more effectively manage political discourse (*i.e.,* censor) and ensure that populist candidates do not break through the status quo ever again.

100. As it pertains to elections, the Defendants' heightened censorship efforts were effective in 2020, paving the way for Biden to assume the presidency. In 2024, however, President Trump prevailed through sheer determination, resilience, and brute force, aided by a great awakening amongst the American people. Growing increasingly disillusioned with the Establishment's detrimental and often hostile practices, Americans have begun to push back against the forces that have upended the nation – be it in the economy, public safety (rising crime rates, lack of border control), education, foreign relations, healthcare, and more. By electing Donald Trump in 2024, the American people delivered a resounding mandate for transformative change, rejecting the status quo and demanding bold shifts in immigration, trade, federal governance, and the protection of free speech. This election was more than a call for policy adjustments, it was an unequivocal repudiation of the entrenched Administrative State and its

42

overreach, particularly its pervasive censorship and suppression of dissenting voices. The mandate, however, is not President Trump's alone to carry out, it extends to this Court to heed. We the People are tired of the Administrative State's unbridled control and demand a return to constitutional principles that uphold accountability, individual liberty, and governance by the consent of the governed.

**9.     The Paradox Of Democracy – Competing Ideals**

101.    Mr. Weinstein also introduces the concept of two conflicting types of democracy: "Type A" (which reflects the will of the people through voting and plebiscites) and "Type B" (which centers on the institutions that sprang from democratic principles but have evolved to serve the maintenance of global stability). The clash between these two types of democracy presents a paradox – how can a system claim to represent the will of the people while simultaneously limiting their choices to preserve the interests of the New World Order or Establishment – an entity that is not solely the U.S. Government but also includes the influence of foreign governments and other non-governmental organizations.

102.    This paradox is central to the current political climate. The electorate is increasingly dissatisfied with the choices they are given, and populist movements on both the left (*e.g.,* Bernie Sanders, Tulsi Gabbard, and Robert F. Kennedy, Jr.) and right (*e.g.,* Tim Scott, Ted Cruz, Vivek Ramaswamy, and Donald Trump) are gaining momentum, while Establishment candidates (*e.g.,* Nikki Haley, Jeb Bush, Joseph Biden, and Kamala Harris, for examples) are losing momentum. These populist movements, however, face an uphill battle, as they challenge not just their political rivals but the entire system that governs how political discourse is structured and controlled. Simply put, the will of the Establishment seeks to undermine the will of the People, with the Government's instruments described herein (*e.g.*, CCDH, MMA, CIS, Facebook, Google, Twitter)

43

aiding, abetting, and jointly participating in the Establishment Party's efforts to suppress dissent and exert political and ideological control over the will of the People, in direct contradiction to the freedoms ensured by the United States Constitution.

### 10. Technology's Role In Controlling Political Discourse

103. Technology plays a pivotal role in this dynamic. Social Media platforms, often misperceived as bastions of free speech, have come under scrutiny for their role in moderating content and controlling narratives. Mr. Weinstein's analysis suggests that these Big Tech platforms, far from being neutral arbiters, are, in fact, complicit in maintaining the Establishment's status quo. The algorithms that control what content is seen by users, combined with the decisions of human moderators (both forms of their own speech), create an ecosystem where dissenting voices are systematically suppressed (*e.g.*, the Plaintiffs) in favor of their own views and opinions.

104. The use of artificial intelligence ("AI") and automated algorithmic moderation at scale raises additional concerns. As Mr. Weinstein aptly notes, the U.S. appears to be in "full self-driving mode," with much of the governance and decision-making happening behind a veil of technological opacity. The integration of AI in media and Government decision-making creates a new scenario where it is increasingly unclear who or what is in control.

### 11. The Future Of Democracy – A Call To Action

105. The concerns raised by Mr. Weinstein are not merely theoretical; rather, they point to a deeper, systemic issue within modern governance that threatens the very foundation of a free, democratic society. As long as the current structures of censorship, institutional power, and global agreements remain hidden from public view, true democratic choice will remain elusive and a farce. The electorate may believe they are voting for change; but, in reality, the options available

to them have been carefully curated to ensure the continuity of the New World Order / Establishment / Administrative State; *i.e.*, the magician's choice.

106. This illusory dynamic poses serious risks to the future of democracy. If people feel that their votes do not lead to meaningful change, the risk of political disillusionment and unrest will grow.

107. Are we willing to accept a system where our choices are limited to preserve an "international order," or do we demand a system that is American through-and-through (not English or German or something else) where the will of the American people (and American people alone) can be truly heard, given actual purpose, and meaningfully carried out, notwithstanding inevitable, related disruption of the status quo? The answer is plain – the latter! The latter, however, is not where this country is at (as evidenced by the very real Defendants Censorship Industrial Complex that has developed unnoticed / unchecked for years right underneath our noses and the very real harm suffered by the Plaintiffs as a result of same), and not where this country is heading unless the Censorship Industrial Complex is immediately snuffed out vis-à-vis strong redress afforded by the judiciary in cases such as this one.

## B. *The Overall, Concerted Censorship Scheme*

108. On November 11, 2020, the U.S. and U.K. announce their coordinated "cyber war" on misinformation, marking the beginning of the information war. The United States Government actively collaborated and "jointly participated" with both foreign and domestic NGOs (such as CCDH, MMA, and others) and Social Media platforms (such as Google, Facebook, Twitter, and others) to create, promote, and substitute propaganda, implementing a strategy of "censorship by substitution." Under the Smith-Mundt Modernization Act of 2012 (discussed in greater detail in § III.C.1 of this Complaint), this competitive propaganda was unlawfully used to restrict, discredit,

45

and / or replace competing ideas. At the same time, the Government leveraged its legislative, executive, and judicial authority (specifically, its ability to "amend, repeal, or scrutinize" Section 230 protections under the threat of antitrust action, discussed in greater detail below; *e.g.*, § III.D) to coerce social media platforms into becoming "instruments" of Government censorship. This unconstitutional scheme, characterized by "pervasive entwinement" between public and private entities, directly harmed individuals disparagingly labeled as the "Disinformation Dozen" (*e.g.,* Plaintiffs). Simply stated, the Government used private organizations as instruments of Government censorship through a coercive and anticompetitive strategy to "remove, reduce, and replace" Americans' speech.

109.    For examples, the DOS (through, for example, its GEC), the DHS (through, for example, its CISA and other tightly knit partners such as CIS), the DOD, and the FBI jointly participate with NGOs (such as CCDH) and Big Tech (such as Facebook, Twitter, and Google) in actively intervening in the news-media information market to illegally, inequitably, and / or unconstitutionally quash the profitability of outlets within the news-media market that Government disfavors; *e.g.*, Plaintiffs. Said differently, in order to suppress the "free" speech of a disfavored segment of the American press (*e.g.,* CSOB, Webseed, Brighteon Media, Daily Wire, Federalist, and *et cetera*, in addition to TTAV and TTAC) and thereby strongarm such segment out of the entirely speech-dependent information news-media market,[25] the Government (a) supports (sometimes, even financially supports) the infrastructure, development, marketing, and promotion of private censorship enterprises (the NGOs) and their associated censorship "technology" / "data" (*e.g.*, CCDH DD-related reporting) and, then, (b) levels, in whole or in part, such "technology" /

---

[25] Daily Wire and Federalist were selected as other examples not only because they are entities somewhat similar in nature to Plaintiffs but also because they are involved in a somewhat similar lawsuit in the United States District Court Eastern District of Texas (Tyler Division). Same with Brighteon Media, Inc. and Webseed, Inc., only that their similar lawsuit is pending in the United States District Court Western District of Texas (Austin Division).

"data"  against the aforementioned disfavored segment vis-à-vis private Platforms. In sum, the Government (obligated to protect the public) launders censorship of members of the public (*i.e.*, harms members of the public) through the private sector made up of the NGOs and Big Tech.

110.    We reiterate the maxim set forth in Paragraph 5 above: "what cannot be done directly cannot be done indirectly" – the Government's censoring (*i.e.*, depriving the free speech of) members of the public (*e.g.*, the DD) through its Instruments (Big Tech and NGOs) is unconstitutional, illegal, inequitable, and statutorily repugnant, even when carried out indirectly through partnerships with private entities (foreign and domestic NGOs, and Big Tech).

111.    CCDH is a censorship NGO / Government Instrument bearing the "corporate status" of an American 501(c)(3) (although, in reality, CCDH's home turf is the United Kingdom) with a self-professed mission of "protect[ing] human rights and civil liberties online."[26] CCDH's website goes on as follows:

> Social media companies erode basic human rights and civil liberties by enabling the spread of online hate and disinformation. Social Media companies deny the problem, deflect the blame, and delay taking responsibility. The Center for Countering Digital Hate holds them accountable and responsible for their business choices by highlighting their failures, educating the public, and advocating change from platforms and governments to protect our communities.[27]

The CCDH's website goes on to describe its "impact" as follows:

> The Center for Countering Digital Hate delivers change by *exposing hate and disinformation producers*, galvanizing support from the public and advertisers for tech reform, shaping informed debates, and driving policy changes, and collaborating with civil society leaders for social media reform.[28]

112.    Defendants have no authority (statutory or otherwise) to fund or promote censorship and / or censorship technology or otherwise support censorship enterprises (private or

---

[26] https://counterhate.com/about/

[27] *Id.*

[28] https://counterhate.com/our-work/ (emphasis added).

public) that target the American press, branding disfavored domestic news organizations (*e.g.*, Plaintiffs) as spreaders of "disinformation" / "misinformation." Not only do Defendants (working as joint participants) not have the authority to censor free speech or the press, the Constitution (namely the First Amendment) also expressly forbids it. And, to make matters even worse, foreigners (CCDH, English in origin) are involved, at least in part, in treading on Americans' constitutional rights (namely, free speech / press). Our nation sprung from a revolt against English governmental control of ideas and speech. At its core, the Revolutionary War represented Americans' rejection of censorship and demand for the right to think, speak, and act freely – a right that, although eroded by Defendants' actions complained of herein, remains fundamental to the identity of the United States of America. We have literally come full circle.

113. The full breadth of Defendants' censorship scheme cannot be fully known until discovery unfolds;[29] but, again, at least one Government agency (*e.g.*, DOS / GEC, DHS / CISA, or DOD), in pervasive entwinement with at least one NGO (*e.g.*, CCDH, MMA, or CIS), did jointly participate with and / or coerce at least one Platform (*e.g.*, Facebook, Google, or Twitter) into concretely, particularly, and directly censoring free speech and / or tortiously interfering with the business relationships of at least one Plaintiff (Ty and / or Charlene Bollinger). Plaintiffs accordingly have clear standing to bring this action against all the joint participants in this censorship and anticompetitive scheme (*i.e.*, the collective Defendants).

114. The strategy behind Defendants' scheme is relatively simple in design, but multi-faceted in effectuation.

---

[29] Because the breadth of Defendants' misdeeds is currently unknown sans discovery, Plaintiffs respectfully reserve the right to amend this Complaint to, among other things, modify named parties. Part and parcel with this reservation of right, the above case style contains fictitious John Doe Defendants. And, as discovery unfolds and the breadth of Defendants' misdeeds is accordingly fleshed out, it may well be warranted to amend this Complaint to modify causes of action (not just parties); *e.g.*, it strongly appears as though Defendants (in whole or in part) were / are engaged in the unlicensed / unauthorized practice of medicine with respect to COVID prevention, treatment, *et cetera*.

115.     Usually at the start of the Censorship Industrial Complex process, an NGO (*e.g.*,
CCDH) generates what is commonly known as a "blacklist" of so-called ostensibly risky or
unreliable American news outlets (*e.g.,* Plaintiffs), discrediting them in order to tortiously
demonetize and / or suppress the disfavored press and redirect money and distribution to favored
news organizations that publish Defendants' (namely, the Government's) favored viewpoints; *i.e.,*
their own form of competitive, substitutive speech. Evidence, however, suggests that the Biden
White House actually initiated this censorship campaign by requesting vaccine hesitancy data
directly from Facebook, constitutionally repugnant to the Fourth Amendment's protection of
privacy (searches and seizures). Facebook, in turn, provided this data to the White House who then
provided it to the CCDH, effectively directing the 501(c)(3) Government endorsed organization
(*i.e.,* instrument) to produce the hit-piece blacklist (*i.e.,* the tool) that would later justify further
Government pressure on Big Tech to suppress dissenting voices like the DD. This sequence
underscores the Government's central role in orchestrating the censorship effort.

116.     Plaintiffs were / are directly targeted as "unreliable" and / or "risky" sources of
"misinformation" and / or "disinformation" by the Government-elicited censorship Instrument that
is an NGO (*e.g.*, CCDH, MMA, and / or CIS). Here, for example, CCDH fabricated "blacklist"
reports / hit pieces that were provided to the Government for implementation; *i.e.*, for effectuation
of Platform censorship.[30] Defendants' collectively unlawful and unconstitutional scheme injured

---

[30] Facebook, for example, is doubtless quite amenable to this relationship (involving NGOs and Government) because
while Facebook certainly is not opposed to crushing people and businesses (like Plaintiffs) by way of censoring its
own competition on the Facebook platform, Facebook claims (pretends, we submit) to not be keen on personally
carrying out the "misinformation" / "disinformation" / "unreliableness" / "trustworthiness" / "riskiness" assessment
(*i.e.,* their own form of speech) that leads up to and underlies their arbitrary restrictions / censoring. Rather, Facebook
has proclaimed (disingenuously / falsely, we submit) that neither "Facebook [n]or internet platforms in general should
be arbiters of truth." ~ Mark Zuckerberg (May 2020 CNBC Interview). And, so, Facebook is doubtless quite amenable
to this relationship involving others (*e.g.*, Government, CCDH, or "fact-checkers") carrying out for Facebook the
"misinformation" / "disinformation" / "unreliableness" / "trustworthiness" / "riskiness" assessment that Facebook
needs to justify censoring on the Facebook platform.

Plaintiffs by, among other things, starving them out of (*i.e.*, extorting) reach / distribution, advertising revenue / web trafficking monies, and reducing the circulation of Plaintiffs' reporting and speech.[31]

117.    As already alluded to above, and as discussed in greater detail throughout this Complaint, the CCDH (on behalf of the White House at the very least) discriminatorily labeled Plaintiffs as purported sources of misinformation, disinformation, or malinformation (among other things). The discriminatory "blacklisting" of Plaintiffs, in and of itself, directly, substantially, and concretely damaged (and continues to damage) Plaintiffs by way of lost business revenues and lost prospective economic advantage and / or business relationships, for examples. And such damage was / is compounded by Big Tech's conversion of that "blacklisting" into Platform censorship – unlawful and unconstitutional civil liberty restraint.

118.    CCDH's "blacklisting" of Plaintiffs was carried out at the Government's behest and perhaps even by way of Defendants' funding. The reason being, the Government had / has great interest in, for example and specific to this case, eradicating COVID / COVID vaccination critics such as Plaintiffs from the public eye (suppressing the speech of such critics into oblivion), and Big Tech had / has great dually-aligned interest in remaining in the Government's good graces and augmenting corporate profit in one fell swoop.

119.    Plaintiffs actively endorse and / or promote alternative approaches to improving health, which often challenge Defendants' COVID vaccine mandates. Plaintiffs also encourage

---

[31] Sort of in the same vein as n. 24, *supra*, Facebook is undoubtedly willing to starve Plaintiffs out of the news-media information market (advancing the Government's anti-competitive agenda in the social media space, particularly regarding COVID-related information) because Plaintiffs and Facebook are also competitors in the digital information space beyond the COVID-19 realm. Facebook's compliance with the Government's coercive demands effectively serves two purposes – it strengthens Facebook's entwinement with the Government while also enhancing its profits by eliminating a competitor. In other words, Facebook's exclusion of Plaintiffs from the news-media market is driven by both the Government's anti-competitive (speech) interests and Facebook's own anti-competitive (financial) motivations.

consumers to critically assess and become well-informed about vaccinations before deciding to proceed. Put differently, whereas Plaintiffs aim to provide people with information about alternative options allowing for informed decision-making, Defendants seek to limit / suppress the public's informed decision-making by restricting access to such alternative perspectives. This is dangerous.

120.    So as to ensure the public believed / believes the only option was / is to accept the unknown / untested / unreliable (and now proven to be dangerous) Government-pushed COVID vaccinations (*i.e.,* to ensure there were / are no other credible alternative remedies / approaches / viewpoints to COVID), the Government acted to formulate "disinformation" / "misinformation" "data" (through the NGOs) necessary to openly and aggressively suppress (vis-à-vis Big Tech Platform-oriented censorship) anyone who suggested otherwise (such as Plaintiffs).

121.    Defendants' overt, coercive goal here was / is to "blacklist" (*i.e.*, restrain) anyone (here, Plaintiffs) who contradicted(s) the Government and to indicate that any such contradictory person / entity was / is an unreliable and / or risky source of information, providing only misinformation / disinformation propaganda, so as to result in the eradication and substitution of Plaintiffs' speech on Social Media Platforms such as Facebook, Google, and Twitter.

122.    Such NGO-generated "misinformation" "data" / propaganda elicited by the Government is used by Big Tech as "justification" to carry out the censorship / de-platforming / substitution demanded by the Government. Along similar lines as *Missouri v. Biden*, Big Tech was coerced by the Government (*via* relentless pressure and threat, such as losing its coveted Government civil liability "protections," Title 47 U.S.C. § 230) into implementing the Government's censorship. In these ways, the NGOs and Big Tech are the Government's indirect censorship Instruments.

123.     Put differently, the NGOs' analyses / studies of Plaintiffs resulted in damaging "misinformation" / "disinformation" / "untrustworthiness" / "unreliableness" / "riskiness" characterizations of Plaintiffs,[32] which such (mis)characterizations served (in whole or in part) as the foundation for Big Tech's Government-induced (in whole or in part) extreme and direct censorship of Plaintiffs – members of the DD.

124.     Government was motivated to strip Plaintiffs of their voices and economic well-being because Plaintiffs were Government's competitors in the space of healthcare and life sciences who did not, on several topics / issues (namely, COVID and COVID vaccinations), share the same viewpoints as Government or its officials.[33]

125.     More specifically and for example, the Government and Plaintiffs were / are "competing" for public space / information distribution as to how one's body is best handled / approached in the treatment of COVID and / or in the avoidance of contracting COVID. The Government did not like the dissenting news (information) that Plaintiffs were advancing on this front (and / or similar fronts) and the Government did not like, for example, the treatment regimen (anti-vaxx) Plaintiffs were advocating for / endorsing on this front (and / or similar fronts). So, the Government, by way of its pervasively entwined joint participation, (a) enlisted CCDH (for

---

[32] Examples of CCDH's publications concerning the DD / Plaintiffs include the following:

March 24, 2021: https://counterhate.com/wp-content/uploads/2022/05/210324-The-Disinformation-Dozen.pdf

April 28, 2021: https://counterhate.com/wp-content/uploads/2022/05/Disinformation-Dozen-The-Sequel.pdf

[33] Digital mediums (such as Plaintiffs) dissenting from the COVID viewpoints of the Government or its officials presented (and presents) a major problem for the Government because digital mediums had gained (and continued to gain) a great deal of strength in the early 21st century (as opposed to "conventional" controlled paper or television news outlets). As of 2023, "a large majority of U.S. adults (86%) say they often or sometimes get news from a smartphone, computer or tablet, including 56% who say they do so often." This compares to only 37% of U.S. adults who often or sometimes get news from print publications. *See* Jacob Liedke & Luxuan Wang, *News Platform Fact Sheets,* Pew Res. Ctr. (Nov. 15, 2023), available at https://www.pewresearch.org/journalism/fact-sheet/news-platform-fact-sheet/. Of those who indicated they get their news digitally, 67% said they often or sometimes use news *websites* or *apps* as a news source, 50% said they often or sometimes use social media as a news sources, and 71% responded that they use Google or other search engines to get the news. *See id.*

52

example) to drum up / create the "misinformation" / "disinformation" / "untrustworthiness" / "unreliableness" / "riskiness" analysis of Plaintiffs (the DD) and (b) coerced Big Tech into converting / developing such analysis / propaganda into censorship or censorship by substitution. The first half of this (the NGO element) has been seen in at least two other relatively recent lawsuits (mentioned in n. 20, *supra*),[34] and the second half of this (the Big Tech element) has been seen in at least two other relatively recent lawsuits (*Missouri v. Biden* and *Brighteon & Webseed v. DOS, et al.*).[35]

### 1. RFK, Jr. Vs. The Establishment Party

126. On August 24, 2024, Robert F. Kennedy, Jr. ("RFK"), part of the purported DD along with Ty and Charlene Bollinger (Plaintiffs' principals), suspended his independent presidential campaign and endorsed President Trump, delivering a speech that highlighted his disillusionment with the Democratic Party and his concerns over the fracturing of American democracy. Central to his message was the idea that the Democratic Party had split into two factions – the Establishment Party and those, like RFK, who rejected the Establishment Party's growing alignment with censorship and control over public discourse. RFK's departure, he explained, was a rejection of the Establishment's narrative, which he accused of betraying democratic principles.

127. RFK expressed deep disappointment with the Democratic Party, accusing its Establishment faction of abandoning core democratic values. He claimed the party, driven by the entrenched Establishment, actively worked to silence both him and President Trump (populist

---

[34] *See The Daily Wire, LLC, et al. v. Department of State, et al.*, No. 23-cv-00609-JDK (E.D. Tex. 2023); *Webseed, Inc. & Brighteon Media, Inc. v. Department of State, et al.*, No. 24-cv-576 (W.D. Tex. 2024).

[35] *See State of Missouri, et al. v. Joseph Biden, Jr., et al.*, No. 22-cv-01213 (W.D. La. 2022); *Webseed, Inc. & Brighteon Media, Inc. v. Department of State, et al.*, No. 24-cv-576 (W.D. Tex. 2024).

candidates from both parties) through legal challenges, media blackouts, and concerted efforts to remove them from the political conversation. This reflects the broader critique that the Democratic Party, in alignment with global power structures, has prioritized the protection of institutional world "order" over representation of the will of the American people. Like the "rules-based international order" described by Mr. Weinstein, this version of democracy offers voters only the illusion of choice, carefully pre-selecting leaders to maintain the status quo. And, to be clear, the Republican Party is also made up of Establishment members, actors who align with the Administrative State's agenda (referred to as "RINOS" Republican In Name Only), forming a controlled opposition that creates the illusion of choice while maintaining the status quo (remember, the "magician's choice" sans populist "intruders").

128.     RFK condemned the mainstream media and Establishment for engaging in widespread censorship, particularly through Social Media platforms. RFK argued that this censorship, supported by the Government, stifles free speech and limits democratic debate, thus shaping public opinion to align with Establishment narratives (*e.g.*, COVID-19 … Plaintiffs). Citing Judge Doughty's ruling in *Missouri v. Biden*, RFK pointed to the Court's characterization of Government-driven censorship (at issue here) as the most severe violation of the First Amendment in U.S. history. This aligns with Mr. Weinstein's assertion that Social Media, once a tool for free expression, has been co-opted by institutions seeking to maintain control by marginalizing dissenting voices and narratives.

129.     In his speech, RFK also strongly criticized U.S. involvement in the Ukraine / Russia war, framing it as yet another instance of Establishment-driven policy influenced by the military-industrial complex rather than a genuine effort to prevent aggression. He compared the justification for this conflict to previous wars, arguing that misleading narratives (supported by Government

54

censorship) were used to manipulate public opinion. This reflects the broader issue of how the Establishment controls the discourse around key political and military decisions, limiting the public's ability to challenge or fully understand these events.

130.  RFK's endorsement of President Trump and his departure from the Democratic Party were suggestive of a larger political divide. RFK positioned himself in opposition to the Establishment faction of the Democratic Party, which he viewed as fundamentally aligned with censorship, suppression of dissent, and manipulation of public perception. RFK's speech echoed the concerns of other figures, like Ty and Charlene Bollinger (Plaintiffs' principals), who believe that, pursuant to their COVID-related restrictions, the current political system is deeply fractured, with the Establishment wielding undue power to silence opposition and sustain and tighten its grip on governance.

131.  In his speech, RFK referenced the Democratic Party's role in fostering what he termed the "Censorship Industrial Complex." RFK described how, shortly after Biden took office, Government agencies, including the CIA, FBI, and CISA (agencies at the heart of the censorship apparatus), were invited to work with Social Media companies to suppress political dissidents like himself and the Bollingers (members of the purported DD). This orchestrated effort to control public discourse mirrors the critique that the Government, in collaboration with media and Big Tech giants, has blurred the lines between State and corporate power, using censorship to protect the interests of the Establishment at the expense of democratic freedoms.

132.  RFK, along with Plaintiffs, are part of a select group of individuals disparagingly labeled the "Disinformation Dozen."

133.  The DD includes the following individuals in order as they appear in the CCDH blacklist report: (1) Joseph Mercola, (2) Robert F. Kennedy Jr., *(3) Ty and Charlene Bollinger,* (4)

Sherri Tenpenny, (5) Rizza Islam, (6) Rashid Buttar, (7) Erin Elizabeth, (8) Sayer Ji, (9) Kelly Brogan, (10) Christiane Northrup, (11) Ben Tapper, (12) Kevin Jenkins.

134. On March 24, 2021 the CCDH published a 40-page hit piece report and a related article titled "The Disinformation Dozen."[36] The report examines how a small group of twelve individuals were allegedly responsible for the majority of anti-vaccine misinformation spread online, particularly on Social Media platforms. According to the CCDH, this group, which included Plaintiffs' principals (Ty and Charlene Bollinger), was said to be "responsible for up to 65% of the anti-vaccine content shared on Facebook and Twitter." This claim, however, was badly misleading. Much of the information shared by RFK, the Bollingers, and others in the DD group was largely accurate, and the figure of 65% was entirely fabricated, with no basis in actual content metrics from Social Media.

## 2. Manufacturing Censorship Data And The "Censorship Industrial Complex"

135. As digital mediums gained in size and strength, the Government conspired amongst Defendants to censor anyone (*e.g.,* Plaintiffs) that did / does not adhere to the preferred views of the Government and substitute it with the Government's preferred propaganda.

136. This lawsuit addresses the Government's promotion (and likely funding) of privately (CCDH, MMA, CIS) fabricated censorship "data" / propaganda (*e.g.*, "disinformation," "misinformation," "malinformation," "unreliableness," "riskiness," *et cetera*) used by private Platforms to censor Americans' speech under extreme pressure from the Government to do so. Government backed NGOs that specifically blacklisted Plaintiffs in creating and developing "data" intended to restrain Plaintiffs' ability to distribute competitive information. In turn, and under immense pressure from the Government, Big Tech used this propaganda to interfere with

---

[36] 210324-The-Disinformation-Dozen.pdf

Plaintiffs' ability to advertise, monetize, and distribute competitive information (*i.e.,* competitive to Government and / or its official, at least in the COVID-19 vein). The intent is clear – restrain Plaintiffs' access to the digital information market (the modern-day digital public square).

137.    DOS' GEC has taken a lead role in coordinating the Government's efforts to censor speech. GEC (a multi-agency center housed within the DOS) originated in 2011 as the Center for Strategic Counterterrorism Communications ("CSCC"), following the Obama administration's issuance of an executive order that created the CSCC to support federal agencies in targeting "violent extremism and terrorist organizations." Regarding GEC taking a "lead role" in the Censorship Industrial Complex plaguing America, Elon Musk fairly recently admitted that "multiple branches of the Government were involved in social media censorship," but that GEC was perhaps the "worst offender," directing social medial platforms, such as Mr. Musk's X, to eradicate / censor hundreds of thousands of users such as Plaintiffs (250,000++ Twitter users / accounts according to the evidence Mr. Musk was seeing at Twitter, which Mr. Musk admitted that Twitter "largely, if not entirely, complied" with). In other words, Mr. Musk "inherited a crime scene."

138.    In 2016, the Obama administration issued a second executive order morphing the CSCC into the GEC but left its counterterrorism mission intact: "The Global Engagement Center replaced the Center for Strategic Counterterrorism Communications. The new strategy seeks to be more effective in the information space and is focused on *partner-driven* [*e.g.,* private – state] messaging and data analytics."[37]

---

[37] https://2009-2017.state.gov/r/gec/ (emphasis added)

139. When Congress created the GEC, through its passage of the National Defense Authorization Act ("NDAA"),[38] the GEC's purpose was expanded beyond its original mandate of countering the influence of foreign terrorists. Specifically, the 2017 NDAA directed the GEC to "coordinate efforts of the Federal Government" to counter foreign state and nonstate "propaganda and disinformation efforts aimed at undermining United States national security interests."

140. In 2019, the NDAA expanded the GEC's mission, authorizing it to counter foreign "propaganda and disinformation" that undermines not only the United States' national security interests abroad, but also the "policies, security, or stability"[39] of the U.S. and our allies.

141. While Congress dramatically expanded the breadth of the GEC's mission, its purpose remained limited to combatting "*foreign*" disinformation – not *domestic* disinformation. Congress explicitly included a limitation that provided: "None of the funds authorized to be appropriated or otherwise made available to carry out this section shall be used for purposes other than countering *foreign* propaganda and misinformation that threatens United States national security."[40] While Congress expressly forbade the GEC from using appropriated funds to suppress domestic speech, many of the GEC's activities and initiatives targeted Americans' speech nevertheless. What was framed as a mission to protect "national security" often appeared to shield the interests of the Establishment, protecting the status quo of the current democratic system rather than addressing legitimate foreign threats. This shift implied that the "national security" they sought to protect was less about safeguarding the country from foreign interference and more

---

[38] John S. McCain National Defense Authorization Act for Fiscal Year 2019, Pub. L. No. 115-232, § 1284, 132 Stat. 1636, 2076 (2018).

[39] https://www.state.gov/about-us-global-engagement-center-2/

[40] National Defense Authorization Act for Fiscal Year 2017, Pub. L. No. 114-328, § 1287, 130 Stat. at 2548, (2016).

about preserving the Establishment Party's version of democracy by censoring any dissenting voices, whether foreign or domestic. By 2019, the GEC's mandate had grown to include countering "disinformation" that could undermine U.S. security and stability both domestically and abroad, blurring the line between foreign and domestic speech.

142.    According to the DOS, the GEC's Technology Engagement Division ("TED")[41] "funded and supported the *Disinfo Cloud*[42] website,[43] an open-source platform that GEC's grantee partner maintained."[44] Disinfo Cloud[45] (DOS' alter ego) also maintained a Twitter account. The (DOS / GEC's) Disinfo Cloud Twitter Feed promoted the censorship enterprises of NewsGuard and GDI, and amplified GDI's posts expressly acknowledging its goal was to ensure websites deemed "disinformation websites" would be unable to profit from digital ads[46] (*i.e.,* the Government's goal was anticompetitive and unconstitutional).[47]

---

[41]    https://www.state.gov/bureaus-offices/under-secretary-for-public-diplomacy-and-public-affairs/global-engagement-center/technology-engagement-division/

[42] https://2017-2021.state.gov/disinfo-cloud-launch/

[43] https://disinfocloud.com/

[44] Office of Inspector General, United States Department of State, *Inspection of the Global Engagement Center,* September 2022, at 21, available at https://www.stateoig.gov/uploads/report/report_pdf_file/isp-i-22-15.pdf

[45] https://www.state.gov/defeat-disinfo/ The State Department's website contains this notice: "All good things must come to an end: with the start of the new year, the GEC's Disinfo Cloud platform and the Disinfo Cloud Digest have been retired as GEC-sponsored efforts. However, the GEC's work to elevate technology solutions to disinformation challenges continue with *new projects designed to adapt to the current environment*. Stay tuned for more information on the next iteration of this program!" Note: Several of the programs described herein are being dissolved, only to inevitably morph into new "iterations" designed to perpetuate the same unconstitutional practices. This is particularly concerning as it creates a scenario where we are, in effect, chasing ghosts – unable to hold these evolving mechanisms accountable while their underlying harm continues unabated.

[46]    @DisinfoCloud    Tweets,    Dec.    14,    2021,    Dec.    20,    2021,    available    at https://twitter.com/DisinfoIndex/status/1472947344865906696; https://twitter.com/DisinfoCloud/status/1472957094961848324

https://twitter.com/NewsGuardRating/status/1470799423462596611.

[47] GDI is also a United Kingdom entity. Yet another foreigner the Government enlisted to censor Americans' free speech. This country has not been under British rule for over a couple hundred years.

59



143. Many of the GEC's early activities and initiatives were performed by the DOS' other partners (*e.g.*, NewsGuard, GDI, ISD), which the DOS specifically funded[48] to carry out Government censorship endeavors.[49] And such was / is no different with respect to the cast of NGOs here – CCDH, MMA, and CIS; *i.e.,* these programs represent the next iteration of the Government's censorship instruments, which will inevitably morph again into further iterations, perpetuating the same unconstitutional practices and highlighting the ongoing and systemic nature of the issue at hand. For example, next up for the Administrative State seems to be the complete control of AI. *See, e.g.*, https://x.com/ShawnRyan762/status/1868300505471975443?s=19 . That is, of course, unless this Court (God willing) completely snuffs out the nefarious conduct outlined herein vis-à-vis this case – this Court simply cannot allow the "Ministry of Truth" to continue,

---

[48] https://www.washingtonexaminer.com/?p=2773271

[49] ISD is also a United Kingdom entity. Yet another foreigner the Government enlisted to censor Americans' free speech. Again, this country has not been under British rule for over a couple hundred years.

such is beyond dangerous and would completely destroy America beyond the destruction already experienced as a result of the specific conduct outlined herein.

144.     DOS' Disinfo Cloud promoted censorship enterprises like NewsGuard and GDI through its weekly "Disinfo Cloud Digest," which began publishing for the DOS in December 2020. The Disinfo Cloud Digest featured Government censorship tools, used by American businesses, like NewsGuard's "Responsible Advertising for News Segment (RANS)," which Disinfo Cloud promoted in its April 6, 2021, Digest, stating that such technology "help[s] advertising companies avoid websites known to host or produce mis/disinformation."[50]

145.     Disinfo Cloud users, including members of the private sector like Defendants Facebook, Google, and Twitter, who are located within the United States, and were encouraged to submit requests to test the technology against their needs (*i.e.,* use the Government's censorship tools to censor domestically). The webpage directed users to ask Disinfo Cloud for assistance in drafting "a test proposal for a tool."[51]

146.     The GEC's TED used Disinfo Cloud to run its "tech challenge" initiative.[52] The tech challenge initiative sought to identify and "advance" "innovative counter-disinformation tech

---

[50]The Disinfo Cloud Digest, Apr. 6, 2021, available at https://myemail.constantcontact.com/New-tools--a--29M-counter-disinfo-fund--and-a-musical.html?soid=1134000290001&aid=6VULxmHPp-M.

[51] Although entities like the Disinfo Cloud, NewsGuard, and ISD, for example, are not named as Defendants in this action, they exemplify the ongoing systematic and systemic censorship enterprise iterations in which the U.S. Government has been actively engaged in for well over a decade. While Plaintiffs cannot yet trace direct evidence of the Government's censorship through *these* specific entities, circumstantial evidence suggests their involvement may have contributed to harms against Plaintiffs. As discovery progresses, these connections may be substantiated. Moreover, the relationships between these entities and the Government are similar in nature to, and set the stage for, the very relationships that directly harmed the Plaintiffs in this case such as the CCDH, MMA, CIS, and others. This Complaint highlights the origins and pervasive entwinement between Government and private entities, demonstrating how these collaborations have been weaponized to effectuate domestic censorship over time.

[52] The Disinfo Cloud Digest, Dec. 21, 2021, available at https://myemail.constantcontact.com/Thank-you-and-farewell--for-now-.html?soid=1134000290001&aid=ixx_30MZGGU (last visited November 21, 2023).

solutions."[53] The censorship tools and technologies identified through the tech challenges targeted both *foreign* and *domestic* speech and, upon information and belief, included the Government-elicited NGOs used to target Plaintiffs / suppress American speech.

147.    Many of the Disinfo Cloud censorship tools and technologies were funded, promoted, and / or marketed by the Government, including two media rating companies: GDI and NewsGuard. The DOS, through its alter egos / instruments (Government-elicited NGOs), actively intervened in the digital media market, intent on anticompetitively rendering disfavored media, like Plaintiffs, unprofitable.

148.    As another example of tightening its control over the digital information landscape, in 2019, the GEC launched the "Silicon Valley Engagement" ("SVE") initiative, which significantly strengthened the collaboration between the Government and leading Big Tech companies. Private American companies (*e.g.*, Facebook, Google, Twitter) were encouraged to join Disinfo Cloud, a platform initially established for .mil and .gov users, to identify "a technological solution" best suited to the specific tech company's (*i.e.,* Big Tech) needs to scale "counter propaganda and disinformation." Through the Government's SVE initiative, the GEC marketed its censorship technology to private American social media companies (*e.g.*, Facebook, Google, Twitter). Through this initiative, the GEC supplied Social Media platforms with even more sophisticated censorship tools designed to better manage the spread of "misinformation" and "disinformation" (terms that increasingly came to mean Government disapproved narratives) faster and easier.

---

[53] Events—Technology Engagement Division, available at https://www.state.gov/upcoming-events-technology-engagement-division/ (last visited November 21, 2023).

149.    Disinfo Cloud marketed itself as a place "to identify and learn about technologies to counter adversarial propaganda and disinformation."[54] DOS' website further states that Disinfo Cloud allowed "stakeholders to search for assessed tools or technologies that fit identified needs or requirements,"[55] and offered users help in "identify[ing] appropriate counter propaganda and disinformation tools and technologies to suit different groups' needs."[56] Government's goal here was tantamount to helping private companies (here, for examples, Facebook, Google, Twitter, CCDH, and CIS) censor disfavored American speech better, faster, and easier.

150.    DOS' webpage requested users (including Facebook, Google, and Twitter, for examples) to: "Write to inform TE[D] or Disinfo Cloud what your office needs to counter propaganda and disinformation. Ask us for assistance in identifying a technological solution."[57] Said differently, in this case, "we're not necessarily telling you what to censor (that will come later), but the Government is going to help you censor better, by providing you with better censorship tools (CCDH and CIS), so that you (Big Tech) can be a better instrument of domestic censorship." Eventually, the Government transitioned to overtly and directly instructing Social Media platforms on what content and who to suppress, further intensifying its control over the digital information landscape.

151.    Discovery in *Missouri v. Biden* revealed the GEC maintained a permanent disinformation liaison Samaruddin K. Stewart ("Stewart"), between the Government and Silicon Valley (*e.g.,* between Government and Big Tech). Stewart helped set up meetings with social media platforms to discuss "countering disinformation" (*i.e.,* not specifically censoring foreign

---

[54] Defeat Disinfo, *available at* https://www.state.gov/defeat-disinfo/ (last visited November 21, 2023).

[55] Disinfo Cloud Flyer, *available at* https://www.state.gov/wp-content/uploads/2021/04/Disinfo-Cloud-flyer-April042921.pdf (last visited November 21, 2023).

[56] https://www.state.gov/defeat-disinfo/ (last visited November 21, 2023) no longer available.

[57] *Id.*

63

propaganda, but any dissenting disinformation). Among other things, Stewart offered private social media companies access to Government's Disinfo Cloud censorship tools, encouraging them to use those tools to "identify[], understand[], and address[] misinformation" [58] (*i.e.,* Government encouraged American companies to use their tools to censor Americans' speech).

152.    A representative from GEC's TED, Alexis Frisbie, revealed "GEC's front office and senior leadership meets with social-media platforms every few months, sometimes quarterly," and these "meetings focus on the 'tools and techniques' of stopping the spread of disinformation on [*domestic*] social media . . . ."[59]

153.    Upon information and belief, the "tools and techniques" highlighted by the GEC's front office and senior leadership include censorship tools and instruments that abridged Plaintiffs' First Amendment rights.

154.    The Government's network of censorship NGOs is shockingly vast. Not only does the network include the likes of NewsGuard, GDI, and ISD, but so too includes the NGOs that directly targeted the Plaintiffs here: CCDH, MMA, and CIS.

155.    CCDH is a not-for-profit (Government endorsed) 501(c)(3). According to CCDH's IRS Form 990 (2022), its professed mission is "counter[ing] hate and disinformation, by disrupting the online architecture enabling its rapid worldwide growth through research, social media campaigns and public education." *See* ¶ 51, *supra*.

156.    MMA is also a not-for-profit (Government endorsed) 501(c)(3). According to MMA's IRS Form 990 (2022), its professed mission is "comprehensively monitoring, analyzing,

---

[58] *Id.*

[59] *See Missouri v. Biden,* ----F.Supp.3d----, 2023 WL 4335270 *36 (W.D. LA July 4, 2023), *rev'd in part*, No. 2330445, --- F.4th --, 2023 WL 5821788 (5th Cir. Sept. 8, 2023), *cert. granted* in *Murthy v. Missouri*, 601 U.S. ----, --- S.Ct. ----, 2023 WL 6935337 (Mem).

64

and correcting conservative misinformation in the U.S. media." *See* ¶ 52, *supra*. Continuing (per the same IRS FORM 990): "Media Matters for America works to notify activists, journalists, pundits and the general public about instances of misinformation, providing them with the resources to rebut false claims and take direct action against offending media institutions." *Id.*

157.     CIS is also a not-for-profit 501(c)(3). According to CIS' IRS Form 990 (2023), its professed mission is "safeguard[ing] organizations against cyber threats." *See* ¶ 53, *supra*. Continuing (per the same IRS FORM 990): "the mission of the Center for Internet Security is to enhance the security readiness and response of public and private sector entities, with a commitment to excellence through collaboration." *Id.*

158.     Translating these professed missions: CCDH, MMA, and CIS are elicited by the Government (*i.e.,* operating under the Government's own endorsed tax deductible status) to generate a blacklist / hit piece regarding the Government's disfavored media sources (here, Plaintiffs) for use by Social Media companies (instruments such as Facebook, Google, Twitter) for the express purpose of anticompetitively "excluding," "defunding," and "disrupting the business model" of the blacklisted companies (including Plaintiffs) and to create competitive smear "data" (*i.e.,* propaganda) that is used to "substitute" / "inform" / "replace" the disfavored media source's free speech.

159.     By no means are CCDH, MMA, or CIS (or even NewsGuard, GDI, or ISD) the only Government-funded, Government-contracted, and / or Government-promoted blacklisting services. Whereas CCDH, MMA, and CIS seem to be the primary censoring NGOs here (although we will not be certain as to the universe of involved NGOs until discovery), there have certainly been other instances where NewsGuard, GDI, and ISD were the primary censoring NGOs. *See,*

*e.g.,* n. 51, *supra*. It was / is really a matter of pick your poison / organization on any given occasion.

160.    Upon information and belief, the censorship tools / NGOs license / provide their Government facilitated and endorsed reliability ratings (*i.e.,* its blacklist) to domestic advertisers to make decisions about which news sources to advertise on. Such recipients include search engines [*e.g.,* Google] and platforms [*e.g.,* Facebook, Twitter], internet service providers [*e.g.,* John Doe], advertising companies [*e.g.,* John Doe], health and medical institutions [*e.g.,* John Doe], educational organizations [*e.g.,* John Doe], cybersecurity companies [*e.g.,* John Doe], *governments* [*e.g., Defendants*], researchers [*e.g.,* John Doe], and more. All of which are clandestine instruments of domestic Government endorsed censorship (*i.e.,* all joint participants).

161.    And, according to NewsGuard's webpage, for example (again, with NGOs such as CCDH, MMA, and CIS being similarly-situated to the likes of NewsGuard): "A [] portion of [NewsGuard's] revenue comes from *government* entities in Western democracies licensing NewsGuard's data about state-sponsored disinformation campaigns …" A portion of NewsGuard's revenue comes not only from the DOS, but also from the DOD.[60]

162.    Translated, NewsGuard receives Government funding from multiple Government agencies to rate the reliability of 95% of all U.S. news and information online, then licenses its blacklist to U.S. companies with the express intent of tortiously defunding companies that it deems unreliable. So too, we allege, with respect to CCDH, MMA, and CIS (and probably more). Indeed, upon information and belief, NewsGuard works in close partnerships with named Defendant NGOs.

---

[60] https://www.usaspending.gov/award/CONT_AWD_FA864921P1569_9700_-NONE-_-NONE-

163.    NewsGuard was recently quoted as stating the company's world-wide expansion "empower[s] *governments*, brands, advertising agencies, and non-profit organizations with *human-vetted* insights to support quality journalism and systemically defund sources of harmful misinformation."  Once more, we allege that CCDH, MMA, and CIS function the same way. In lay terms, censorship NGOs (inclusive of CCDH, MMA, and CIS) provide biased opinions to "empower" Government and Government's Platform instruments (*e.g.*, Facebook, Google, Twitter) to help "support" (*i.e.,* develop) favored information, and to help censor (*i.e.,* restrict) disfavored information, by, for example, tortiously interfering with advertising business relationships and / or substituting it with the Government's / Platform's / NGO's preferred narratives / information / materials.

164.    The NGOs blacklists / hit pieces ultimately reduced Plaintiffs' revenue, reduced their visibility on social media websites, reduced their ranking results from browser searches, reduced users' ability to post or even message links directed to Plaintiffs' websites, thereby reducing their reach, distribution, and access to the digital information market, and otherwise negatively impacted their operations.

165.    According to the DHS website, in its *Fiscal Year 2023 Targeted Violence and Terrorism Prevention Grantee Abstracts*, the DHS granted $817,129.52 to ISD (and English-based censorship NGO, much like a CCDH). "The Institute for Strategic Dialogue, through the Strong Cities Network ("SCN"), which it has managed since its launch in 2015, will work with several partners [*e.g.,* GDI] to fill gaps in existing targeted violence prevention [*e.g.,* domestic extremist speech] support to smaller cities." [61] It is incredibly disconcerting that Americans are being

---

[61] https://www.dhs.gov/fiscal-year-2023-targeted-violence-and-terrorism-prevention-grantee-abstracts

stripped of constitutionally guaranteed free speech, especially given such freedom deprivation is being controlled by foreigners (*e.g.*, ISD, GDI, and CCDH out of the United Kingdom).

166.    According to the SCN website,

> *The Institute for Strategic Dialogue (ISD) worked with mayors and government partners to launch Strong Cities* at a meeting during the opening of the UN General Assembly in 2015. Since then, ISD has expanded and supported Strong Cities membership and has delivered its programming. ISD continues to host the Management Unit and contributes its research and expertise to meet the policy and practice needs of *cities and local governments* around the world. [62]

167.    Everywhere one looks, there is either funding or intense pressure flowing from Government agencies to private companies, alongside Government agencies collaborating with, coercing, or funding foreign entities and private "partners" to suppress dissenting domestic speech. This systematic entwinement illustrates a coordinated and far-reaching effort to stifle dissenting viewpoints, both directly and indirectly, through a web of domestic and international mechanisms. The pervasive entwinement of the Censorship Industrial Complex is the epitome of egregious (and even that is put mildly).

168.    All the Government-funded, Government-elicited, Government-endorsed, and / or Government-promoted blacklisting services provided by, for examples, CCDH, MMA, and CIS, that directly harmed Plaintiffs, ultimately converge on Defendants Facebook, Google, and Twitter.

169.    Discovery in *Missouri v. Biden* (which such case is discussed in further detail below, *see* § III.F) point blank revealed that the DD (inclusive of Plaintiffs) was being targeted by the United States Government and its joint participants.

---

[62] https://strongcitiesnetwork.org/resource/a-guide-for-mayors/ (emphasis added)

170.    According to a report released by ISD:  *The Boom Before the Ban: QAnon and Facebook*, ISD, NewsGuard, and Facebook were all collaborating:

> This report is a **collaboration** between the *Institute for Strategic Dialogue* (ISD) and the nonpartisan news-rating organisation *NewsGuard.* It analyses QAnon-related contents on *Facebook* during a period of increased activity, just before the platform implemented moderation of public contents spreading the conspiracy theory. [63]

Again, whatever is said in this Complaint concerning NewsGuard, GDI, and ISD can also be said for CCDH, MMA, and CIS (and vice versa), as it provides a historical basis for the ongoing harms that occurred here. These collaborative relationships did not stop with ISD, NewsGuard, GDI, and others, they simply morphed over time into new relationships / iterations with CCDH, MMA, CIS, and similarly-situated entities. These metastasized relationships are ongoing and will undoubtedly continue if not remedied by the courts, with each new iteration targeting dissenters with new tools and instruments designed to suppress speech. In the case of Brighteon and Webseed, *see* nn. 28-29, the primary tool used was ISD's (a foreign entity's) hit piece. In this case involving the Bollingers, the primary tool used was CCDH's hit piece(s). Ironically, CCDH is also a foreign entity who ostensibly operates under U.S. tax-exempt status granted by none other than its partner Defendants – the United States Government. These evolved relationships (*e.g.,* with CCDH, MMA, CIS, Facebook, Google, and Twitter), and tools (*e.g.,* the CCDH's hit piece: "*DISINFORMATION DOZEN – WHY PLATFORMS MUST ACT ON TWELVE LEADING ONLINE ANTI-VAXXERS*") directly harmed the Plaintiffs here and reflect a persistent and systemic approach to stifling dissent.

---

[63] https://www.isdglobal.org/wp-content/uploads/2020/12/20201218-ISDG-NewsGuard-QAnon-and-Facebook.pdf

### 3. Carrying Out Censorship

171. As discussed above, Government elicits, endorses, and sometimes even funds the censorship tools / data (*e.g.*, CCDH, MMA, CIS) that it then pushes online Platforms to use as its instrument in carrying out the actual censorship. When that did not have the desired effect (*i.e.,* the Platforms did not censor "enough"), the Government transitioned to directly issuing overt censorship directives (*via* immense coercion / pressure / threat) for Big Tech to facilitate on their Platforms. Simply put, when shadowy censorship proved insufficient, it was forced to step out from behind the curtain and engage in overt censorship.

172. The Government's Instruments (*e.g.,* Facebook, Google, Twitter, and most of Big Tech) use anticompetitive, unlawful, and / or inequitable means to eliminate or severely diminish any threat to the competitive dominance of the U.S. Government (or its partners, Big Tech) over the digital information, advertising, and computer application ("App") markets.

173. As to the Big Tech's anticompetitive animus, Facebook's plan, for example, is simple and admitted: "remove, reduce, and inform."[64] Translated, "remove, reduce, and *replace*" competitors' (actual or potential) competitive materials, thereby reducing their ability to monetize, their ability to advertise, and their ability to compete in the free market.[65] This is a prime example of censorship by substitution – Facebook's clandestine content "develop[ment]" / "information content provision" scheme in action. Big Tech's anticompetitive animus, illegal conduct, and / or inequitable conduct (all such wrongdoing stemming from independent legal duties owed by Big Tech to Plaintiffs outside the confines of Big Tech publishing or speaking) was / is, at least here,

---

[64] https://about.fb.com/news/2019/04/remove-reduce-inform-new-steps/

[65] Indeed, Facebook has openly admitted to its anticompetitive animus: "… so going after actors who repeatedly share this type of content [*e.g.*, financially motivated], and reducing their distribution, removing their ability to monetize, removing their ability to advertise is part of our strategy." ~ Tess Lyons (Facebook).

70

effectuated by Big Tech's arbitrary (unsubstantiated, at the very least) contention that its users' competitive materials purportedly violated deliberately ambiguous "Community Standards," followed by Big Tech's replacing its competitors' materials with its (and its partner's – the Government's) own self-benefitting materials.

174. Big Tech's aforementioned anticompetitive animus, illegal conduct, and / or inequitable conduct flowed from the desire to wield competitive dominance across the digital information, App, and advertising markets to (a) extort users into paying for reach and distribution (*i.e.,* access to the digital information market), while deceptively and artificially disrupting users' preestablished organic (*i.e.,* free services) reach and distribution by disrupting users' ability to work with competing advertisers and / or to provide competitive information or competitive Apps, or (b) otherwise eliminate users (like Plaintiffs) altogether from the modern day digital public square.

175. Put differently, because the Government's Big Tech Instruments are the "'Interactive Computer Service' provider" ("ICS" / "ICSP"), *see* Title 47, United States Code, Section 230(f), they maintain dominant control over almost all of the Internet's digital information distribution market. Because of its dominant power in the "ICSP" market, Big Tech can force unsolicited content upon its own users (a form of its own speech), while deceptively acting as a dominant "Information Content Provider" ("ICP"), *see id.*, which naturally displaces other users' competitive materials, like Plaintiffs' otherwise solicited information. Simplified further – because the Government's "protected" Big Tech Instruments are the ICSP, they can deceptively act as the dominant ICP, forcing other competitive ICPs information, like Plaintiffs, out of the digital distribution ICP market.

176. By deploying opaque "rules" that benefit themselves (and their partners; *e.g.,* industry and the Government) and harm rivals, Big Tech has successfully wielded its monopoly power across the digital information, advertising, and App markets to dictate the terms of service (contract of adhesion) upon which its rivals (*i.e.,* its competitors like Plaintiffs) can(not) compete or negotiate with Big Tech or its partners (Defendants). Big Tech abuses its monopoly power and protection in the digital ICS market to severely disadvantage anyone who dares use Big Tech's "free" ICS for their own financial purposes, shares competing ideas, or anyone who uses, for example, Facebook's "free" services to compete against Facebook, or its partners (Government), to provide better products / information at a lower cost.

177. Big Tech uses its market ICSP dominance over digital distribution control to extort more transactions to its own "sponsored"[66] (*i.e.*, paid for) advertising products, whereby Big Tech extracts inflated advertising fees to line its own pockets at the expense of the very users it purportedly services for "free;" *i.e.,* to starve its competitive users (here, Plaintiffs) out of the digital media news market for Big Tech's benefit and / or the Government's benefit.

178. Big Tech uses its dominance over digital distribution and reach control to eradicate competing ideas, whereby the Government's Big Tech Instruments remove anything they, or their partners (Government) do not agree with, reduce the availability of anything they do not value, and then replace (*e.g.,* "inform") its users' information with information the Government's Instruments choose to develop / endorse / provide, based on their own values and / or based on the values of its partners (*e.g.,* industry and Government) – a form of their own speech.

---

[66] Tess Lyons (Facebook) explained: "if it says sponsored, that means someone spent money to increase its distribution."

72

179.    Big Tech's boundless (because courts have traditionally not restrained them at all) anticompetitive behavior (*e.g.,* the fraudulent reduction of users' *free* distribution to extort *paid* distribution, or to restrain competing ideas in the same competitive market, or to prevent competitors from making money) has raised barriers to entry to artificially high levels, forced competitors like Plaintiffs out of (or severely curtailed participation in) the digital information market under negligent / deceitful / fraudulent pretext, dissuaded potential competitors from joining the market, and left Big Tech's few remaining organic competitors marginalized and unfairly disadvantaged, all of which effectuates a chilling of free speech, free press, and the free market.

180.    The harm is clear – users audacious enough to use Big Tech's purportedly "free" ICS products and services to advertise organically (and for financial purposes) or to share competing ideas will be forced to earn less (or nothing at all) because of Big Tech's artificially reduced distribution, and Big Tech's (a) advertising business "partners" will pay more for Big Tech's artificially increased distribution than they would in an unfettered, freely competitive market wherein competitive pressure ultimately results in better engagement at lower cost for market, participants, and (b) Government partner will be appeased.

181.    The Government's Instruments' / Big Tech's anticompetitive animus and conduct hurts virtually everyone who uses the Internet, because as ICS users (like Plaintiffs) make less money from advertising, fewer users can offer to produce better quality products (*i.e.,* create quality inventory and share more information) and offer diverse viewpoints (speech) to the American public. As a result, recipient users receive less *solicited* materials and are forced to receive far more *unsolicited* materials, which Big Tech is paid to, or instructed to, provide them; *i.e.,* Big Tech is *consciously responsible*, at least in part, for the development / advancement of

73

almost all information on its APP / ICS, acting as a dominant ICP (acting as a publisher / curator / content developer / content provider in disguise).

182.     In the curation / development vein (in *prima facie* publisher capacity), Facebook has been quoted as follows, for examples:

- "… to have better monetization for publishers then we have today in Newsfeed because the relationship we will have there is that, unlike a Newsfeed where friends might see a link somewhere and might pass it along, in this case Facebook could potentially have a direct relationship with publishers in order to make sure their content is available in this, if it's really high quality content." ~ Mark Zuckerberg (Facebook).

- "We really want to, to the full extent that we can, build services that help to fund more investigative journalism and high-quality journalism." ~ Mark Zuckerberg. So that "new types of journalism can thrive." ~ Mark Zuckerberg (Facebook).

- "I would hope that we can be one of the ways that we can support [new high-quality journalism] and make that more sustainable both from a distribution and monetization perspective." ~ Mark Zuckerberg (Facebook).

- "We're making a series of updates to show more high quality, trusted news. Last week we made an update to show more news from sources that are broadly trusted across our community. Today our next update is to promote news from local sources." ~ Mark Zuckerberg (Facebook).

- "I've asked our product teams to make sure we prioritize news that is trustworthy, informative, and local." ~ Mark Zuckerberg (Facebook).

- "Newsfeed promotes high quality news." ~ Mark Zuckerberg (Facebook).

- "The hard question we struggled with is how to decide what news sources are broadly

74

trusted." ~ Mark Zuckerberg (Facebook).[67]

- "It will only shift the balance or news you see towards sources that are determined to be trusted." ~ Mark Zuckerberg (Facebook).

183.    In the curation / development vein (in *prima facie* publisher capacity), Google has been quoted as follows, for examples:

- "Computer algorithms determine what shows up in Google News. The algorithms determine which stories, images, and videos show, and in what order. In some cases, people like publishers and *Google News teams choose stories*."[68]

- "Google News *aims to promote* original journalism and expose users to diverse perspectives. It doesn't accept payments to expedite or improve a site's search appearance or ranking."[69]

- "Authoritativeness signals help prioritize high-quality information from the most reliable sources available. To do this, our systems are designed to identify signals that can help determine which pages demonstrate expertise, authoritativeness, and trustworthiness on a given topic, based on feedback from Search raters. Those signals can include whether other people value the source for similar queries or whether other prominent websites on the subject link to the content."[70]

- "The quality rater guidelines are more than 170 pages long, but if we have to boil it down to one phrase, we'd say they help make sure Search is returning relevant results from the

---

[67] Note that this relates back to the "blacklists."

[68] https://support.google.com/googlenews/answer/9005749?hl=en (emphasis added)

[69]      https://support.google.com/news/publisher-center/answer/9606702?hl=en&sjid=18149230632996078902-NA (emphasis added)

[70] https://newsinitiative.withgoogle.com/hownewsworks/approach/surfacing-useful-and-relevant-content/

<u>most reliable sources available</u>. Information quality is at the heart of Search, and our systems fundamentally work to surface high-quality information. The rater guidelines help raters determine if a planned improvement is meeting that goal by providing a clear, uniform definition that all raters use to assess the results they see. More specifically, high-quality information is content which demonstrates expertise, authoritativeness, and trustworthiness on a topic, or E-A-T for short. For example, a health site with content from doctors and produced by a medical institution would have a high level of what many would consider to be expertise, authoritativeness, and trustworthiness. The rater guidelines also define low-quality content on the web, such as content that spreads hate or seeks to deceive users."[71]

- "Our search quality raters provide us with insights and evaluate pages against our guidelines to help make sure our systems — and proposed improvements — are working as intended. What that looks like in practice is often a "side-by-side" test where a rater will look at two sets of Search results, one from the current version of Google and the other from an improvement we're testing."[72]

- "Raters review every page listed in the results set and evaluate that page against the query, based on our rater guidelines. They evaluate whether those pages meet the information needs based on their understanding of what that query was seeking, and they consider things like <u>how authoritative and trustworthy that source seems to be on the topic in the query</u>. To evaluate things like expertise, authoritativeness, and trustworthiness (again, sometimes referred to as "E-A-T") raters are asked to do reputational research on the

---

[71] https://blog.google/products/search/overview-our-rater-guidelines-search/

[72] https://blog.google/products/search/overview-our-rater-guidelines-search/

sources."[73]

- "The COVID-19 pandemic is impacting different communities in different ways. As cities and towns across the world respond with local policies and guidelines, the need for timely and authoritative local news and information is paramount. To help people navigate these complexities, we're working across our news products <u>to highlight the latest local guidance</u> and surfacing more content from local news publishers so users can understand how the virus is affecting their community."[74]

- "Local news plays a critical role in informing people about the virus' impact in their communities. The COVID-19 feature in Google News puts local news front and center with a dedicated section highlighting the latest authoritative information about the virus from local publishers in your area."[75]

184.    In the curation / development vein (in *prima facie* publisher capacity), Twitter has been quoted as follows, for examples:

- "If advertisers complain about an account we will turn off advertising for that account." ~ Elon Musk.

- "We have a policy against misinformation in three categories, which are manipulated media, public health, specifically COVID, and civic integrity election interference and voter suppression. That is all the policy we have for misinformation." ~ Jack Dorsey

- Twitter shut down thousands upon thousands of accounts (in excess of 100,000) that it tied to the Chinese government, contending that such accounts were pushing deceptive

---

[73] https://blog.google/products/search/raters-experiments-improve-google-search/

[74] https://blog.google/products/news/understand-how-covid-19-impacting-your-community/

[75] https://blog.google/products/news/ways-stay-informed-coronavirus-news/

narratives about Hong Kong protests, COVID, and more.[76]

- "When you're excited about something you've posted and want to share it with more people, you can promote it to increase its reach and help it find a bigger audience. Promoting a post is easy, and we provide tools to help you track progress and view results along the way."[77]

- "Who will see my promoted Post? We send your Post to the people who are most likely to appreciate your content. We model based on your current followers, given that your followers are the people who have opted in to see your Posts."[78]

- "X may include Promoted Accounts as suggestions for accounts for you to follow."[79]

- "Our account suggestions are based on algorithms that make personalized suggestions for you."[80]

- "A blog post by Rumman Chowdhury, Twitter's director of software engineering, and Luca Belli, a Twitter researcher, said the findings could be 'problematic' and that more study needed to be done. The post acknowledged that it was concerning if certain tweets received preferential treatment not as a result of the way in which users interacted, but because of the inbuilt way the algorithm works. 'Algorithmic amplification is problematic if there is preferential treatment as a function of how the algorithm is constructed versus the interactions people have with it.'"[81]

185. Having discussed the overall Defendants' clandestine information content

[76] Twitter deletes over 170,000 accounts, some of which tried to spin Covid-19 in China's favor | CNN Business

[77] How to increase your reach on X with X promotions (twitter.com)

[78] Id.

[79] https://help.twitter.com/en/using-x/account-suggestions

[80] https://help.twitter.com/en/resources/recommender-systems/account-recommendations

[81] Twitter admits bias in algorithm for rightwing politicians and news outlets | X | The Guardian

provision / content development scheme at play, we turn now to a discussion of how we ended up in such a place; *i.e.*, a discussion of the buildup and formation of the Censorship Industrial Complex.

### 4. The Election Integrity Partnership (EIP) And Virality Project (VP) – Censorship On Demand

186. The phrase "election integrity" evokes thoughts of safeguarding democracy, ensuring fair play, and maintaining public trust in electoral processes. The rise of initiatives like the EIP, however, formed ostensibly to protect elections from disinformation, has raised critical and deeply concerning questions. Does the EIP represent a genuine effort to shield the democratic process from foreign interference and misinformation, or is it a nefarious overreach that undermines free speech, censors dissent, and serves the Establishment's unconstitutional interests?

187. The EIP was formed by the Stanford Internet Observatory ("SIO"),[82] the University of Washington's Center for an Informed Public ("UWCIP"), the Atlantic Council's Digital Forensic Research Lab ("ACDFRL"), and the social media analytics firm Graphika, working with numerous federal entities (including Defendants the DHS, the DHS' CISA, the DOS, and DOS' GEC, for examples) to monitor online election-related speech and to induce social media companies to censor the speech the EIP and its Government partners disfavored. The EIP, in one form or another, through new iterations, continues to this day.

188. The EIP set up a concierge-like service in 2020 that allowed federal agencies (*e.g.*, DHS, CISA, DOS, GEC) to file 'tickets' requesting that online story links and social media posts be censored or flagged by Big Tech.

---

[82] Like the GEC that is supposedly set to dissolve in the weeks to come, the SIO is another example of an entity that is scheduled for dissolution. But, as discussed above, unless this Court puts an absolute end to the madness, entities such as these will simply reemerge as different acronyms under the Administrative State.

189. The EIP, on its face, was launched to monitor and combat election-related "disinformation;" but, the underlying mission of EIP was politically charged (*e.g.*, to ensure that populist figures, like President Trump, were removed from office or could not make their way into office). While the EIP's mission facially appeared to be about protecting democracy, its methods (working closely with Big Tech platforms like Meta, X, and Google to flag and remove content) sparked concerns about censorship and election interference. The lack of transparency in determining what qualified as "disinformation" led to accusations that the EIP stifled legitimate dissent and shaped the election narrative to benefit Establishment interests and candidates under the auspices of safeguarding electoral integrity.

190. Quite disconcerting is the idea that if the EIP, working in conjunction with Government agencies, actively suppressed the will of the People by silencing political voices and manipulating election-related discourse, it was effectively engaging in an active coup against democracy. The EIP's controlling the flow of information was not about preserving political stability, it was about undermining the foundation of democratic choice and subverting the will of the electorate (*i.e.,* We The People).

191. As early as June 2020, the EIP was developing systems to manage the flow of information. Working closely with CISA and CIS, the EIP created a "Reporting Portal" that allowed Government officials to report election "misinformation" to Social Media platforms for removal.

192. According to reports, the EIP collaborated with Government entities like CISA and the DOS to monitor and influence election-related content. Per EIP's research manager, Renee DiResta, EIP succeeded in having platforms like Facebook, Google, and Twitter (under, for example, their "remove, reduce, or inform" policies – their disguised censorship by substitution

80

information content provision process) remove or flag 35% of the URLs it identified as problematic, affecting millions of posts (not just 300 "Russian" so-called "bot" accounts) leading up to the 2020 election. DiResta highlighted the significant role the partnership played in curbing "disinformation," which was tantamount to swaying elections or "electioneering." According to EIP's own data, the EIP achieved labeling of nearly 22,000,000 tweets (marked to indicate supposed falseness or unreliability) in the leadup to the 2020 vote.

193.    The involvement of CISA deepened as the agency expanded its "disinformation" efforts following the 2020 election. In November 2021, CISA Director Jen Easterly announced that the agency was "beefing up its disinformation and misinformation team," stressing the importance of managing "cognitive infrastructure," a phrase she used to justify Government oversight of online speech. Ms. Easterly emphasized that protecting cognitive infrastructure (the public's access to certain facts and narratives) was essential to maintaining election security. Furthermore, Ms. Easterly revealed ongoing frustrations with Social Media platforms' hesitation to fully cooperate with the Government's censorship efforts, underscoring the Government's desire to overcome this reluctance.

194.    Ms. Easterly's communication with Matthew Masterson, a former CISA official, reveals the scale of the Government's coordination with Social Media platforms. In a text message, Ms. Easterly and Mr. Masterson expressed concerns about the "chaos" that would ensue if different federal agencies independently reached out to platforms to address misinformation. Ms. Easterly noted that CISA's role was to centralize these efforts to avoid such chaos (*i.e.,* streamline Government censorship), a clear indication that federal involvement / joint participation in content moderation was not only happening but was pervasive, chaotic, and deliberate.  statement suggests that multiple Government agencies (known and unknown) were independently contacting Social

81

Media platforms, demonstrating the widespread nature of Government-directed censorship efforts. The concern about the term "chaos" highlights how integrated and extensive these Government efforts were to control online discourse across various Social Media platforms.

195. Defendants' joint censorship participation raises significant and highly disturbing concerns about free speech. By setting up a "concierge-like" system with Big Tech Platforms for filing tickets to censor content, the EIP enabled federal agencies, as well as private groups like the Democratic National Committee, Common Cause, and the NAACP, to also request content removal. This clandestine partnership blurred the already blurry lines between Government regulation and private censorship, making it difficult to distinguish between Governmental influence, NGO influence, and Social Media platforms' purportedly independent thought and decision-making processes guided by statutory language (*see* 47 U.S. § 230(c)) such as "Good Samaritan" and "good faith" content moderation. Internal communications from X, revealed in the "Twitter Files," show that platforms treated the EIP and CISA as interchangeable, illustrating the close coordination between State, State actors, NGOs, and Social Media companies.

196. The EIP's approach mirrors a broader critique of modern governance articulated by Mr. Weinstein, particularly his concept of the "illusion of democracy." Mr. Weinstein argued that powerful institutions, such as the ones behind the EIP, in cooperation with Government organizations like CISA, control public narratives through Social Media platforms as their indirect "Instrument" of Government censorship, offering only the appearance of choice while maintaining a firm Governmental grip on political outcomes. In this view, the EIP, though potentially well-intentioned, became an extension of Establishment power, regulating speech and limiting democratic debate by controlling what information was deemed legitimate.

82

197. After its success in influencing the 2020 election and contributing to President Trump's "defeat," the EIP transitioned / morphed into the Virality Project ("VP"). The newly named censorship initiative expanded its focus to address misinformation surrounding public health issues, particularly COVID-19, continuing its collaboration with Government agencies and Big Tech to monitor and moderate content (*i.e.*, censor) across social media platforms.

198. During the COVID-19 pandemic, people sought to make informed decisions about their health, turning to various untraditional sources for guidance – people they chose to follow online. Plaintiffs aimed to provide such "alternative" and informative health information to the public. The Government, however, had other ideas. Rather than foster open dialogue and public choice, the Government conspired (with its Big Tech instrumentalities and its NGO tools) to withhold, suppress, and chill any health information that competed with the official narrative and substitute it with its own. This was achieved through a combination of "pressure," "coercion," "significant encouragement," and "joint participation" between Government agencies, NGOs, and Social Media companies, creating a "pervasive entwinement" in the Platforms' internal operations.

199. As the EIP successfully transitioned into the VP, its focus shifted from controlling election-related content to controlling health-related information. This shift marked the beginning of the Government's heightened efforts to suppress content like that offered by Plaintiffs and its principals (Ty and Charlene Bollinger). The Government's inextricable intertwinement with Social Media companies was not limited to monitoring and flagging content, it extended to actively influencing the Platforms' policies to censor or limit the reach of information that diverged from the approved narratives.

83

## C. The Propaganda Facet Of The Censorship Industrial Complex

200. As discussed elsewhere in this Complaint in different contexts, the Government is not supposed to direct time and money (all of which is U.S. taxpayer dollars) towards the censorship of Americans. The Government, if needed, can advance such efforts against foreigners on foreign soils, but it cannot (either directly or indirectly) do so against Americans in the U.S.A.

201. Similarly, elsewhere in this Complaint it is discussed that tasks assigned to Government agencies (*e.g.*, the DOS' GEC) were supposed to be limited to foreign affairs. And, yet, as discussed elsewhere in the Complaint, the scope was wrongly broadened (or stretched) into domestic affairs.

202. Similarly, for quite some time the Government was not allowed to disseminate propaganda on U.S. soil. Any Government propaganda distribution was to be confined to foreigners / foreign lands. That is, until the Smith-Mundt Modernization Act of 2012 (enacted / amended during Obama's Presidency).[83, 84]

---

[83] While Obama has not yet been named a Defendant herein, he is most certainly a person of interest (as all signs point to his intimate involvement in the scheme at issue) and we accordingly reserve amendment rights under the John Doe Defendants.

[84] The systematic conspiracy at play in this lawsuit gained significant momentum under the Obama Administration. The systematic conspiracy continues to erode fundamental liberties and will persist unless decisive action dismantles the Administrative State's pervasive influence. Without intervention, the Administrative State will continue to operate in the shadows, undermining democracy, and constitutional governance. For instance, during a November 2020 interview with *Stephen Colbert* on *The Late Show,* Barack Obama made a revealing statement about his desire to influence from behind the scenes:

> If I could make an arrangement where I had a stand-in or a frontman [*e.g.*, Joe Biden] or frontwoman [*e.g.*, Kamala Harris], and they had an earpiece in and I was just in my basement in my sweats looking through the stuff, and I could sort of deliver the lines, but somebody else was doing all the talking and ceremony, I'd be fine with that.

This statement illustrates how deeply entrenched the Administrative State's influence has become, operating independently of visible political leadership while maintaining control over critical institutions. The battle for liberty is not just against visible injustices but also against the unseen forces of an entrenched system, operating in the shadows, that undermines the very principles of freedom and accountability.

1.    **The Smith-Mundt Modernization Act Of 2012 As The Domestic Propaganda / Substitution Catalyst**

203.    Not only has the NDAA and associated GEC (discussed in greater detail above, *see* § III.B.2) strengthened Government's grip on political discourse and the ability to sway public narratives (all underlain by a desire to silence opposing voices), but so too has legislation such as the Smith-Mundt Modernization Act of 2012. The original Smith-Mundt Act of 1948 was enacted to allow the Government to disseminate propaganda abroad, whereas the Smith-Mundt Modernization Act of 2012 allowed Government to disseminate propaganda here at home. A scary proposition to allow Government to propagate its version of "truth" while also allowing Government to get away with suppressing dissenting viewpoints (such as those of Plaintiffs in relation to COVID vaccinations). The epitome of Orwellian.

204.    No need to reinvent the wheel, Wikipedia contains an acceptable description of the Smith-Mundt Modernization Act of 2012:

> The Act was developed to regulate broadcasting of programs for foreign audiences produced under the guidance by the State Department, and it prohibited domestic dissemination of materials produced by such programs as one of its provisions. The original version of the Act [1948] was amended by the Smith-Mundt Modernization Act of 2012 which allowed for materials produced by the State Department and the Broadcasting Board of Governors (BBG) to be made within the United States.[85]

205.    Not-so-coincidentally, amendment of the Smith-Mundt Act of 1948 occurred during the Obama Administration (in 2012, to be precise). "Not-so-coincidentally" because much of Government's brainwash-oriented legislation was enacted or amended during Obama's Administration. After all, recall the sentiments of Obama relayed to a Stanford graduating class regarding the creation of mass confusion / hysteria as to the "truth." *See, e.g.,* ¶ 20, *supra*, https://youtu.be/J4zpbuuwPeU at 0:00 – 0:08, 0:41 – 1:00 (Barack Obama's April 21, 2022, speech

---

[85] https://en.wikipedia.org/wiki/Smith%E2%80%93Mundt_Act (footnotes omitted).

to Stanford University graduates: "flood [the] country's public square with … enough raw sewage, … raise enough questions, spread enough dirt, plant enough conspiracy theorizing, that citizens no longer know what to believe").

### 2. CCDH, MMA, Etc. Interplay In The Censorship Industrial Complex

206. The Smith-Mundt Modernization Act of 2012 quietly paved the way for an unprecedented shift in how Government-aligned propaganda operates within the U.S. Originally designed to prevent the federal Government from disseminating propaganda domestically, the Act's modernization permitted the use of taxpayer dollars to influence domestic audiences. This legislative shift enabled the Government to create and amplify narratives that promote its Communist agenda, often at the expense of dissenting voices. Media Matters for America ("MMA"), a 501(c)(3) nonprofit, has become a dedicated player in this propaganda machine, collaborating with Government agencies, Big Tech, and allied NGOs like the Center for Countering Digital Hate ("CCDH") to target and suppress disfavored speech. CIS is another example of a 501(c)(3) NGO engaged in Censorship Industrial Complex activities similar to those of MMA and CCDH, though CIS' activities are traditionally more associated with CISA's activities on the Government Defendants side of the equation.

207. Defendants, including various Government actors, have formed an ongoing and pervasive entwinement with MMA, CCDH, and CIS, for examples, jointly participating in censorship activities under the guise of combating "misinformation." This collaboration has extended beyond simple information-sharing to active coordination on content moderation and product design changes across major Social Media Platforms.

208. CCDH and MMA have functioned as semi-diplomatic private agents working in concert with Government bodies (and in concert with each other) to promote and execute domestic

86

censorship policies. Defendants leveraged MMA's and CCDH's influence to suppress lawful speech and targeted viewpoints, including, but not limited to, content on COVID-19, alternative health information, and politically sensitive topics relevant to the 2020 Presidential election.

209. MMA and CCDH, in partnership with Government Defendants, implemented the "Disinformation Dozen" campaign, specifically targeting individuals like Plaintiffs for their views on COVID-19 and vaccines. This campaign, coordinated with the White House and other Democratic legislators, like Representative Doyle, encouraged Platforms to deplatform Plaintiffs and others as part of a targeted strategy to control COVID-19 narratives and marginalize dissenting viewpoints.

210. Whereas CCDH, for example, functions mostly in the realm of manufacturing "misinformation" / "disinformation" hit pieces at the Government's behest to later serve as the purported justification for Big Tech's platform censorship activities, MMA's role is more in the realm of the "substitution" prong of the "censorship by substitution." The Censorship Industrial Complex, as revealed through this case, does not merely silence dissent, it replaces independent viewpoints with Government-endorsed narratives in a process best described as "censorship by substitution." While Big Tech deplatforms individuals, NGOs like MMA fill the void with Establishment-approved messaging. According to its IRS filings, MMA claims to "monitor, analyze, and correct conservative misinformation in the U.S. media;" but, in practice, it simply acts as an operational arm of the Administrative State (*e.g.,* the New World Order), disseminating propaganda under the guise of independent oversight.

211. MMA provides the "substitution" element by aggressively promoting Establishment narratives to replace suppressed speech (*i.e.,* "monitor, analyze, and [substitute unwanted] conservative []information in the U.S. media") while targeting dissenters, like Plaintiffs

87

here, with coordinated smear tactics. This is evident in its campaigns against notably Conservative Plaintiffs, where MMA not only amplified the CCDH's "Disinformation Dozen" narrative but worked alongside Big Tech and Government actors to ensure its adoption by platforms like Facebook, Twitter, and Google / YouTube.

212.    MMA's broader role in the Censorship Industrial Complex is one of close ties with other organizations (*e.g.*, CCDH) in propagating Establishment narratives and discrediting dissenters like the Bollingers. For examples: (a) Collaborating with CCDH: MMA coordinated with CCDH in amplifying the "Disinformation Dozen" campaign, targeting Plaintiffs as purveyors of "misinformation" while ignoring the veracity of their content.[86] (b) Shaping Platform Policies: MMA's propaganda directly influenced Big Tech content moderation policies, reinforcing censorship demands initially elicited by Government actors; *i.e.*, MMA and CCDH have engaged in joint initiatives with Government actors to pressure Platforms into policy shifts and product design changes that restrict lawful speech. For example, both organizations have recently collaborated on campaigns to "kill Musk's Twitter" by pressuring advertisers and urging

---

[86] Examples of collaborative articles between CCDH and MMA:

https://counterhate.com/blog/we-demand-action-on-hiddenhate/

https://counterhate.com/blog/ccdh-and-partner-organizations-demand-that-meta-act-on-hiddenhate/

https://counterhate.com/blog/twitter-makes-millions-as-anti-lgbtq-grooming-narrative-jumps-119-under-elon-musk/

https://counterhate.com/blog/coalition-of-charities-and-advocacy-groups-demand-action-from-tiktok-on-the-mental-health-and-well-being-of-children/

https://counterhate.com/blog/watch-global-summit-to-address-online-harms-and-misinformation/

https://counterhate.com/blog/ccdh-made-instagram-act-on-violence-against-women-and-girls/

regulatory action, specifically aiming to coerce Twitter to suppress content and viewpoints that contradict Government narratives. MMA's and CCDH's pressure campaigns led to direct modifications in content moderation algorithms and design adjustments on Platforms such as Twitter and Facebook. These product changes were specifically implemented to restrict or deprioritize speech aligned with Plaintiffs' views, revealing an unconstitutional entwinement between private advocacy groups and Government directives. Through their entwinement with MMA and CCDH, Defendants actively promoted false narratives under the pretext of "fact-checking." Specifically, during the Hunter Biden laptop incident, Defendants collaborated with MMA and CCDH to misrepresent the story as Russian disinformation, despite no factual basis for this claim. Plaintiffs' content was similarly downranked and removed under the same baseless pretense of combating foreign influence. (c) Attacking Plaintiffs' Credibility: MMA propagated false and derogatory claims about the Bollingers under the guise of "fact-checking" and combating misinformation. These actions directly undermined Plaintiffs' business, reputation, and First Amendment rights.

213. MMA's conduct harmed the Plaintiffs along the following lines: (a) Deplatforming: MMA's campaigns contributed to the March 25, 2021, Congressional hearing that led to the immediate removal of Plaintiffs' accounts from Facebook, followed by suspensions on Twitter (April 1, 2021) and YouTube (May 17, 2021). (b) Reputational Damage: MMA amplified the CCDH's false narrative that Plaintiffs were part of the "Disinformation Dozen," branding them as public health threats despite the lack of evidence to support this claim. (c) Economic Harm: By pressuring platforms to remove Plaintiffs' content, MMA deprived them of their ability to engage with their audience and sustain their business. (d) First Amendment Violations: MMA's actions, in joint participation / coordination with Government directives, directly suppressed Plaintiffs'

lawful speech, replacing it with propaganda that misinformed the public about health-related issues.

214. The Smith-Mundt Modernization Act enabled organizations like MMA, CIS, and CCDH to blur the line between independent advocacy and Government propaganda. By working in tandem with the CCDH, Big Tech, and Government actors like the New World Order, MMA transformed into an unofficial propaganda arm of the Administrative State. Its professed mission of correcting "conservative misinformation" belies its true purpose – ensuring that dissenting (mainly Conservative) voices are silenced and replaced with Establishment-approved messaging.

215. MMA's involvement in the CCDH's "Disinformation Dozen" campaign exemplifies its role in the Censorship Industrial Complex. The timeline of events leading up to and following the March 24, 2021, release of the CCDH report illustrates a well-orchestrated effort to suppress Plaintiffs: (a) Pre-Release Coordination: MMA worked alongside CCDH and other entities to frame the Plaintiffs as disinformation superspreaders, ensuring the narrative was widely disseminated ahead of, during, and after the March 25, 2021, Congressional hearing. (b) Media Amplification: MMA leveraged its influence to amplify the CCDH report, pressuring platforms to deplatform the Plaintiffs while replacing their content with state-aligned narratives. (c) Ongoing Smears: Even after the deplatforming, MMA continued to attack the Bollingers, and continues to this day, through media campaigns, compounding the harm and reinforcing the Administrative State's agenda.

216. A recent, particularly egregious example of the aforementioned MMA efforts is a November 2, 2024, article titled "Close RFK Jr. friend whose account promoted 'Jew World

90

Order' conspiracy theory says she's 'working with' Trump's transition team."[87] The phrase "Jew World Order" (placed in quotation marks by this MMA author, Eric Hananoki) was never uttered by Plaintiffs. Indeed, Plaintiffs have never uttered words, conveyed prerogatives, and / or the like of an antisemitic nature.

217.    This case highlights the necessity of addressing the full scope of the Censorship Industrial Complex, including media organizations like MMA that operate as propaganda tools for the Administrative State. Without accountability, the Smith-Mundt Modernization Act and entities like MMA will continue to erode fundamental liberties, replacing free discourse with controlled narratives. In fact, MMA's conduct is so egregious that it has led to an investigation by Texas Attorney General Ken Paxton:

**[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]**

---

[87]https://www.mediamatters.org/antisemitism/close-rfk-jr-friend-whose-account-promoted-jew-world-order-conspiracy-theory-says-shes



**KEN PAXTON**
ATTORNEY GENERAL OF TEXAS

**FOR IMMEDIATE RELEASE**                              **PRESS OFFICE: (512) 463-2050**
November 20, 2023                                             Communications@oag.texas.gov
www.texasattorneygeneral.gov

### Attorney General Ken Paxton Opens Investigation into Media Matters for Potential Fraudulent Activity

AUSTIN – The Office of the Attorney General ("OAG") is opening an investigation into Media Matters for potential fraudulent activity. Under the Texas Business Organizations Code and the Deceptive Trade Practices Act, the OAG will vigorously enforce against nonprofits who commit fraudulent acts in or affecting the state of Texas.

Attorney General Paxton was extremely troubled by the allegations that Media Matters, a radical anti-free speech organization, fraudulently manipulated data on X.com (formerly known as Twitter).

"We are examining the issue closely to ensure that the public has not been deceived by the schemes of radical left-wing organizations who would like nothing more than to limit freedom by reducing participation in the public square," said Attorney General Paxton.

###

*Connect with us: Follow us on Twitter at @TXAG • Find us on Facebook*
Please DO NOT REPLY to this message. It comes from an un-monitored mailbox. If you have any questions regarding this announcement, please contact the Attorney General's Press Office at (512) 463-2050.

218.    As a direct result of the Defendants' actions in partnership with MMA and CCDH, Plaintiffs have suffered substantial harm, including diminished online reach, reputational damage, and financial losses. By systematically targeting Plaintiffs' content and suppressing their ability to communicate with their audience, Defendants, in coordination with MMA and CCDH, have deprived Plaintiffs of their constitutional rights to free speech / press and fair competition. While we recognize the CIS, CCDH, MMA Facebook, Googe, Twitter, an *et cetera* retain their First Amendment right to say whatever they want, that right does not absolve them of liability for the consequences of their statements or their joint participation in the Censorship Industrial Complex.

219.    MMA's role in the conspiracy against Plaintiffs exemplifies the dangerous entwinement of NGOs, media, Big Tech, and Government actors. As a key player in the

Censorship Industrial Complex, MMA not only suppresses dissent but actively propagates Government-aligned narratives, directly harming individuals like the Bollingers while undermining the democratic principles it claims to uphold. This lawsuit seeks to dismantle these coordinated efforts and restore the fundamental liberties guaranteed by the First Amendment.

### 3. FBI And Big Tech Interplay In The Censorship Industrial Complex

220. An FBI report dated October 30, 2024, surfaced entitled "Election Interference: How the FBI 'Prebunked' a True Story About the Biden Family's Corruption in Advance of the 2020 Presidential Election."[88]

221. The FBI's report featured, among other things, this internal Facebook message from a meeting with the FBI: "[W]hen we get hauled up to [Capitol] hill [or before this Court] to testify on why we influenced the 2020 elections we can say we have been meeting for YEARS with USG [U.S. Government] to plan for it."[89]

222. The FBI report reveals substantial supporting direct evidence of the coordinated effort between the Government and Big Tech to actively suppress information regarding the Biden family's alleged influence peddling before the 2020 presidential election, including Plaintiffs' information. This effort, characterized as "prebunking" (*i.e.*, pre-distributed propaganda), involved the FBI directing Social Media companies to preview information about Hunter Biden and Burisma as potential "Russian disinformation." The information, however, was *not* Russian disinformation at all – it was true information, the FBI knew that, but it posed a threat to the candidacy of their preferred candidate, Joe Biden.

---

[88] file:///C:/Users/jason/Downloads/Fbi_Election_Interference_Report_Final_(10.pdf

[89] Internal messages among Facebook personnel (July 15, 2020, 3:17 p.m. EST), featured as Ex. 10 in the FBI report.

223.     The FBI obtained Hunter Biden's laptop in late 2019 and authenticated its contents, which reportedly included evidence of influence peddling. Yet, instead of disclosing this information to the public, the FBI orchestrated multiple meetings with Big Tech throughout 2020 to warn of a possible hack-and-leak operation involving Hunter Biden and Burisma, framing the contents as Russian disinformation to preemptively cast doubt on its authenticity. Ironically, the FBI employed United States propaganda to deliberately misinform the American public about alleged Russian propaganda, shaping narratives, and influencing public perception ahead of a pivotal U.S. Presidential election.

224.     In an August 2022 interview on "The Joe Rogan Experience," Meta CEO Mark Zuckerberg discussed Facebook's handling of that Hunter Biden laptop story prior to the 2020 election. He explained that the FBI had, in fact, approached Facebook, advising them to be vigilant about potential "Russian propaganda" like that seen in the 2016 election, which was also Government disinformation.

225.     Zuckerberg stated: "The background here is the FBI, I think, basically came to us – some folks on our team – and was like, 'Hey, just so you know, you should be on high alert. We thought that there was a lot of Russian propaganda in the 2016 election; we have it on notice that basically there's about to be some kind of dump that's similar to that, so just be vigilant.'"[90]

226.     Zuckerberg further clarified that while the FBI did not specifically reference the Hunter Biden laptop story, Facebook interpreted the agency's warning as fitting the described pattern. Consequently, Facebook reduced the story's distribution in users' news feeds for about five to seven days while so-called "third-party" fact-checkers (who were paid by Facebook to create / produce content for Facebook to provide, a form of Facebook's own speech) scrutinized

---

[90] https://www.bbc.com/news/world-us-canada-62688532.amp

and contested the story's authenticity. In effect, Facebook suppressed accurate information while paid fact-checkers (*i.e.*, subcontracted publishers) "created" counter-narratives that Facebook then provided / developed (at least in part) to cast doubt on the truth, exemplifying a practice of "censorship by substitution." Today, Facebook acknowledges that suppressing the story was a mistake; *i.e.*, Facebook's speech was wrong. This restriction on the Hunter Biden laptop story was not a "good faith" effort to limit objectionable content, it was a response to a Government directive aimed at censoring real information and developing the Government's falsehoods. Whether voluntary or not, this collaboration between Government and private entities to stifle a story that was both true and potentially impactful on the election outcome is deeply troubling and further illustrates what is at issue in this action.

227.    Upon information and belief, Plaintiffs were among the millions of individuals directly subjected to the Hunter Biden Laptop story shadow banning (Defendants actions taken in bad faith that led to reduced visibility on Defendants' platforms) based on directives influenced by Government actors, including the FBI. This suppression, driven by false narratives promoted by Government Defendants, targeted Plaintiffs in part due to their reporting on the Hunter Biden laptop story around the time of the New York Post's coverage. Under Government pressure, Defendants' platforms "manually" restricted the distribution of this story (a form of Defendants' speech), misrepresenting truth as misinformation and misinformation as truth, censoring Plaintiffs' speech, and ultimately influencing public perception during a critical election period.

228.    This coordinated censorship effort not only directly violated Plaintiffs' immediate rights to free speech but also struck at the heart of a free and fair election. By restricting access to critical information that could influence voter decisions, the Government's interference denied Plaintiffs (and millions of Americans supporting President Trump) their right to choose their

candidate without manipulation. Plaintiffs, dedicated supporters of President Trump, were stripped of a vital platform to advocate for their candidate, while the suppression of the Hunter Biden laptop story benefited Joe Biden's campaign by silencing damaging truths. This Government-facilitated censorship amounted to interference in the electoral process, depriving not just Plaintiffs but also half of America (mainly Trump supporters) of an unbiased election.

229.    Plaintiffs, along with millions of Trump supporters, were effectively denied their candidate due to this Government-directed "censorship by substitution," a tactic that replaced true information with state-influenced false narratives (Government speech). This manipulation (content development) demonstrates widespread harm that reached far beyond individual users, undercutting the democratic process itself, and undermining the very foundation of Americans' rights to make informed choices.

230.    The far-reaching implications of this Government-aligned censorship mirror the same nefarious tactics seen in other high-stakes contexts, such as the suppression of COVID-19 misinformation and anti-vaccine content. These efforts to control narratives continued into 2021, sidelining accurate health information, and resulting in widespread misinformation about COVID-19's impacts. Recent statements by Dr. Fauci finally acknowledge the long-term health consequences of COVID-19 policies (*i.e.*, the Government's opinion was wrong), potential consequences Plaintiffs attempted to warn their followers about, even in cases where lives were affected. This Government-backed industrial censorship machine did not just stifle Plaintiffs' political views and alter election outcomes, it also limited the distribution of crucial health information (*i.e.,* informed consent was suppressed), demonstrating how seemingly isolated acts of censorship can have severe, far-reaching consequences for public health, free speech, and democratic processes.

231. Again, there is the December 4, 2024, House Report found in footnote 12 above. Most germane aspects of the House Report (as it would pertain to this Complaint, at least) can be summarized as follows:

- There is strong evidence that SARS-CoV-2 emerged due to a laboratory accident at the Wuhan Institute of Virology (WIV).
- The U.S. National Institutes of Health (NIH) funded gain-of-function research at the WIV, which may have contributed to the pandemic's emergence.
- The report identifies significant issues with government responses:
  - Fraud and Abuse: Rampant fraud, waste, and abuse plagued the COVID-19 response.
  - Pandemic-Era School Closures: These closures had a lasting negative impact on children's education and mental health.
  - Misinformation Campaigns: Public health officials often mischaracterized scientific information, leading to public mistrust.
- The report criticizes the actions of key public health figures:
  - Dr. Anthony Fauci: Played a role in downplaying the lab leak theory and covered up facts.
  - Operation Warp Speed: While successful, it was marred by political interference and lack of transparency.
- The pandemic had severe economic consequences:
  - Business Closures: Mandatory lockdowns led to temporary and permanent closures, disproportionately affecting rural and low-income areas.
  - Unemployment: The pandemic exacerbated existing inequalities in the job market.
  - Supply Chain Issues: A lack of supply chain diversity hindered recovery efforts.
- The report evaluates vaccine development:
  - Operation Warp Speed Success: Rapid vaccine development saved millions of lives, but was subject to political pressure.
  - Vaccine Mandates: Not supported by science and caused more harm than good, including disrupting military readiness.
  - Adverse Events Reporting System (VAERS): Inadequate and not transparent in reporting potential side effects.
- The subcommittee found that pandemic-era school closures were not justified by scientific evidence:
  - Long-Term Impacts: Disrupted education, increased mental health issues, and worsened physical health.
  - American Federation of Teachers (AFT): Advocated for overly broad mitigation measures without sufficient scientific basis.
- The report calls for greater accountability and transparency in government agencies:
  - Executive Branch Obstruction: The Biden administration obstructed investigations into the origins of COVID-19.
  - EcoHealth Alliance Misconduct: Engaged in obstruction, misleading public statements, and document tampering.
- The report recommends several steps to better prepare for future pandemics:

97

- o Independent Oversight: Establish independent oversight bodies to ensure transparency and accountability.
- o Enhanced Communication: Improve communication between scientists, policymakers, and the public.
- o Preparedness Plans: Develop comprehensive preparedness plans that include stockpiling medical supplies and diversifying supply chains.

232. As evidenced by ongoing censorship practices from 2020 through election-related information in 2023 and 2024, plainly the Government-aligned censorship on Defendants' platforms in general shows no signs of stopping. Without decisive redress, this ongoing censorship (enabled by the Government's influence over private Platforms) will continue unchecked … if not checked. Plaintiffs and other users remain resolute in their efforts to share vital information, enduring constant harm for the betterment of society, underscoring the urgent need to address this unconstitutional entwinement between Government influence and Platform censorship to protect the rights of all Americans.

233. Starting in early 2020, the FBI held over thirty meetings with Platforms like Defendants Facebook, Twitter, and Google to discuss purported "foreign" influence and alleged disinformation; essentially, content that diverged from the Government's narrative. These meetings became increasingly frequent as the 2020 election approached, including explicit warnings about a possible October "surprise" involving Burisma. By the time the New York Post published the Hunter Biden laptop story on October 14, 2020, Big Tech companies had been primed to treat the story as disinformation. Internal communications reveal Facebook employees discussing how the story (magically) aligned with the "hack/leak scenario" warned of by the FBI, ultimately leading to its suppression across nearly all major platforms.

234. The Smith-Mundt Modernization Act of 2012 plays a critical role in this process, as it effectively broadened the Government's ability to disseminate false information (or, in this case, mis / disinformation) through domestic channels. Originally intended to counter only foreign

98

propaganda, the act's modernization in 2012 enabled the Government to influence domestic Social Media with Government-curated false narratives. In this instance, the FBI's messaging to Big Tech regarding the Hunter Biden story fit within this framework, as it sought to push out propaganda (known false information) to prime (*i.e.*, pre-bunk) media Platforms to suppress true information, thereby influencing public perception and ultimately altering the course of the election. This strategic pre-dissemination of misleading content through Big Tech represents the pervasive entwinement of Government influence over information flow in the public sphere.

235. Documents in the FBI report also indicate that Big Tech knew their censorship decisions might impact the election (*i.e.,* knew they were being done in bad faith). For instance, Facebook's internal communications included discussions on how the Platform's actions might influence the incoming administration's view of them:[91]



236. Facebook employees highlighted that their actions (restricting and demoting content related to the story) were aligned with their conversations with the Government, even though they lacked concrete evidence of foreign involvement:[92]


**[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]**

---

[91] Oct. 14, 2020, internal messages between Facebook's then-Vice President of Global Affairs, Nick Clegg, to Vice President of Global Public Policy, Joel Kaplan, about Facebook's censorship of the *New York Post* article.

[92] Sept. 21, 2020, internal Facebook email to senior Facebook executives, and Oct. 14, 2020, internal Microsoft notes on meeting between the Government and Big Tech, respectively.

99



**Threat Assessment:** We have recently received indications from USG partners that they believe there is a risk of a hack/leak operation conducted by Russian actors, likely involving real or manufactured evidence concerning links between the Biden family and Ukraine, including the oil company Burisma. Timing for something like this is uncertain, but could happen as soon as the first presidential debate on September 29th. While this assessment is still uncertain, an inoculating announcement about hack/leak now will mitigate the impact of such a leak if it does occur, and send a strong message about Facebook's proactive stance even if no such leak materializes.



Wednesday, October 14, 2020
3:27 PM

-Hack & Leak

FBI tipped us all off last week that this Burisma story was likely to emerge, and today's call indicated that

237.    Big Tech's rapid response to the New York Post's October 14, 2020, story on Hunter Biden underscores the effectiveness of the FBI's "pre-bunking" efforts in conditioning companies to suppress it. Internal Facebook messages reveal that employees immediately labeled the story as a "hack/leak," precisely as the FBI had primed them to do:[93]

- 8:37 AM ET: "About what we expected in the hack/leak department […] it's pretty much exactly what we pregamed."

---

[93] FBI report at nn. 30-38.

- 8:42 AM ET: "It looks like exactly the hack/leak scenario we'd expected."
- 9:06 AM ET: "Can we check with FBI Delaware if they have anything [on] this […] Article claims that FBI has had the HDD [hard drive] since December."
- 9:09 AM ET: "Exact content expected for hack and leak."
- 9:10 AM ET: "Right on schedule."
- 9:14 AM ET: "[Facebook employee] is not in touch with the FBI on this. I'll connect with Maryland and [Facebook employee] will raise at the [FBI's Foreign Influence Task Force] meeting today."
- 9:33 AM ET: "FYI. Our legal team is reaching out to FBI on this."
- 10:40 AM ET: "We're enqueuing the content with demotion and doing outreach to 3PFCs [third-party factcheckers]. No updated info from FBI, no outreach from the Biden campaign."
- • 10:55 AM ET: "is this the Oct surprise everyone was waiting for?"

238.   Continuing:



Within minutes, Facebook employees remarked that the story was "pretty much exactly what we pregamed" and "looks like exactly the hack/leak scenario we'd expected." By 9:06 a.m., Facebook employees were reaching out to the FBI to confirm details, including whether the FBI had indeed held Hunter Biden's hard drive since December.

239.   Following the FBI's (non-optional) "guidance," Social Media companies implemented new policies (*i.e.,* changed the design of their product) to limit the spread of purportedly "hacked materials." Facebook and Twitter quickly acted to suppress the New York

Post story by reducing its reach and blocking links to it. Twitter even temporarily suspended the New York Post's account. Although Twitter eventually lifted the block, these suppression actions took place during a critical voting period, impacting not only social media users but effectively everyone in the United States. The control Social Media companies exert over information reaches far beyond their user base, influencing even those who do not use these platforms due to their significant role in shaping public discourse. This level of influence, particularly when aligned with Government interests and amplified by the Government's ability to push propaganda, is not just dangerous, it is paramount to the future well-being of this nation. It underscores the profound risks of allowing Platforms unchecked immunity to censor content at will or at the Government's behest.

240.     Although the FBI report does not directly mention CCDH in this context, it does describe the extensive reach of various Governmental and academic entities, including the EIP and Stanford Internet Observatory (both discussed above). These group conspirators collaborated with Government agencies, laundering censorship requests to target what was perceived as competitive (falsely labeled "disinformation," "misinformation," "malinformation," or the like), primarily impacting conservative voices (*e.g.*, Plaintiffs).

241.     Documents also reveal that while Facebook employees initially saw the Hunter Biden laptop story as "about what we expected in the hack/leak department," many acknowledged there was insufficient evidence to conclude it was "part of a foreign gov[ernment] influence op[eration]," relying only on "circumstantial instinct." Meta's President of Global Affairs, Nick Clegg, testified that the team felt "very anxious to take a rapid decision" and had been preparing for potential "foreign interference" and "hack-and-leak operations" for some time.[94]

---

[94] Transcribed Interview of Nick Clegg, H. Comm. on the Judiciary (Mar. 1, 2024) (on file with Comm.) at 123. (footnote 191)



Message

From: ███████████ [/O=THEFACEBOOK/OU=EXTERNAL
(FYDIBOHF25SPDLT)/CN=RECIPIENTS/CN=AAB5EA433BDB4D11BA845DF7E834BC16]
Sent: 10/14/2020 10:55:12 PM
To: ███████████ @fb.com]; ██████████ @fb.com]; ████████ @fb.com];
███████ @fb.com]; █████████ @fb.com]; ███████ @fb.com];
████████ @fb.com]; ████████ @fb.com]; ████████ @fb.com];
███████ @fb.com]; ████████ @fb.com]; ████████ @fb.com];
████ @fb.com]; ████████ @fb.com]; ██████ @fb.com];
██████ @fb.com]; ██████ @fb.com]; ████████ @fb.com];
████ @fb.com]; ███████ @fb.com]; ████████ @fb.com];
███████ @fb.com]; █████ @fb.com]; ██████ @fb.com];
██████ @fb.com]; █████ @fb.com]; ██████ @fb.com];
██████ @fb.com]; ████ @fb.com]; ██████ @fb.com];
███████ @fb.com]; ████ @fb.com]; ████ @fb.com]

Subject: Message summary [{"otherUserFbId":null,"threadFbId":
Attachments: sticker.png; sticker.png

████████ (10/14/2020 05:37:06 PDT):
>About what we expected in the hack/leak department: https://nypost.com/2020/10/14/email-reveals-how-
hunter-biden-introduced-ukrainian-biz-man-to-dad/

████████ (10/14/2020 05:37:33 PDT):
>Coming from the nypost, and supposedly discovered some time ago.

████████ (10/14/2020 05:38:09 PDT):
>B/c this comes directly from the press, I don't think there is much we are in a position to do.

████████ (10/14/2020 05:38:25 PDT):
>But it's pretty much exactly what we prepared.

████████ (10/14/2020 05:38:50 PDT):
>DailyMail was also carrying at the top this morning: https://www.dailymail.co.uk/news/article-
8838939/Joe-Biden-met-son-Hunters-Ukrainian-energy-contacts.html

████████ (10/14/2020 05:39:40 PDT):
>Yep. Right on time as well.

████████ (10/14/2020 05:40:23 PDT):
>Given that the story indicates the HDD is in the FBI's possession, we should be watching for more drops
and pressure on them to "reveal what they know."

████████ (10/14/2020 05:45:37 PDT):
>I'll ask our teams in contact with FBI for any add'l context they have.

████████ (10/14/2020 05:47:07 PDT):
> ███████ there's
>No where near enough evidence to determine this is "part of a foreign govt influence op" that I see
here, other then circumstantial instinct. Do you agree?

████████ (10/14/2020 05:51:18 PDT):
>would agree. though that is based on my cursory, quick reads and of course the fantastic journalism and
writing coming out of the dailymail but yes, would agree. that said, would think this merits a quick FYI
we are monitoring email to leadership but defer to you and SR-P on that point.

████████ (10/14/2020 05:53:58 PDT):
>I agree. We can update if we learn anything more from FBI. I know plan was for ████████ to have the
con, but it's not even 6am on the west coast...

242.    Amid their confusion, Defendant Platforms quickly reached out to the FBI.
Facebook's law enforcement team, for example, contacted the FBI's Baltimore field office, which
was handling the Hunter Biden investigation. Notably, many had a pre-scheduled meeting with
the FBI's Foreign Influence Task Force (FITF) that day; ironic, given this was domestic
information. Facebook employees noted internally that information from the FITF would have

103

"huge implications" for their next steps. Said differently, Government guidance would have huge implications on how they would censor domestic information.



243.    As Big Tech platforms assessed how to enforce and redesign their content moderation policies, Facebook preemptively censored the Hunter Biden laptop story. Without actual evidence of a "hack and leak," Facebook did not apply its specific hack-and-leak policy but instead adapted its general misinformation policies to accommodate. Within hours of the New York Post's article publication, Facebook took two key actions: it flagged the article for fact-checking to refute / replace / inform and manually / affirmative / deliberately reduced its visibility in users' feeds by 50% for at least seven days. Notably, this suppression was not automated; rather, it was a deliberate decision by Facebook's Trust and Safety team (*i.e.,* their own speech) to manually target and demote the story – a story that Plaintiffs had reported on that was also suppressed in bad faith.



Joel Kaplan <████████ 's.whatsapp.net>

We have to decide whether to undo this demotion. None of ██████, ██████, ████████, ████████, or I think this was appropriate/justified. But Unwinding will likely leak and be a story (conversely, doing things that might be perceived as anti-conservative, like demoting the content , never seem to leak).

Nick Clegg <████████ @s.whatsapp.net>

Yea I see - unwinding it now will unfortunately create more headaches than it's worth. Calling now

Joel Kaplan <████████ 's.whatsapp.net>

One thing to clarify—The difficult issue is that the demotion was NOT automatic (we manually demoted it). That's what makes it hard—if it were automatic, it would be sort of an easy call not to intervene.

244. Twitter, unlike Facebook, enforced its hacked materials policy on the Hunter Biden story despite lacking clear evidence of a hack and leak, removing not only the content but blocking the URL entirely (*i.e.,* restricting people's access to materials on competitive websites which such conduct falls well outside the scope of the protections contemplated under Section 230). This initial censorship was intended as a temporary measure to limit the story's spread (not to protect the public), but to allow researchers time to verify details (*i.e.,* allow time to develop their own opinion). By restricting the story's reach, Twitter and other platforms could also request additional information from the FBI. Companies wanted to gather more details before making final decisions but began censoring immediately anyway to avoid backlash, particularly from "the press/left."

245. Below is an overview of Big Tech's ongoing interactions with the FBI regarding the Hunter Biden laptop story, highlighting how the FBI withheld key information and influenced content moderation decisions.

246. A meeting with Twitter, the platform's Head of Trust and Safety, Yoel Roth, informed the FBI of Twitter's plan to label the New York Post's Hunter Biden story as Russian disinformation and suppress it. An FBI analyst initially acknowledged that the laptop was real, but

an FBI lawyer quickly intervened, stating "no further comment," effectively ending the FITF discussion.

247.    After the Twitter meeting, the FBI's Foreign Influence Task Force (FITF) held internal discussions to establish a response protocol for inquiries about the laptop. The team reaffirmed that, as the laptop was part of an ongoing investigation, the FBI would maintain a "no comment" stance for future inquiries, aiming to prevent information sharing with Social Media Platforms – or the public for that matter.

248.    Following internal deliberations, the FITF held a scheduled meeting with Facebook, where the FBI maintained its "no comment" policy when asked about the laptop. Although Facebook sought clarity, the FBI's refusal to provide information limited the platform's insight. However, through *unofficial* channels, Facebook personnel later learned that the laptop existed and was "part of a criminal matter:"



249. Despite the FBI's limited disclosures and clear indicators, such as the Biden campaign's failure to deny the laptop's authenticity, Facebook still opted to affirmatively censor the *New York Post* story on Biden family influence peddling, anyhow



Joel D. Kaplan (10/14/2020 17:23:48 PDT):
>I agree that Twitter is in a much more coherent position right now and thus easier to defend. I think either removal or labeling (on newsworthiness grounds) is defensible, if not equally well-received. I think a demotion tied to possible falsity, when none of the parties are actually suggesting the emails/images are false, at least so far-will be increasingly hard to defend. (The fact that the FBI apparently has the laptops may explain why no one in the Biden campaign is denying the authenticity).

250. During the USG-Industry meeting on October 14, 2020, Twitter's Head of Trust and Safety, Yoel Roth, reiterated that Twitter had assessed the New York Post story on Hunter Biden as Russian disinformation and planned to censor it. FBI official Elvis Chan deferred to the same analyst who had previously confirmed the laptop's existence in the Twitter-FITF meeting, but this time the analyst responded with "no comment." This analyst's testimony later contradicted Chan's claims from the *Murthy v. Missouri* deposition (a case on all fours with this case), in which Chan stated he was not part of any meeting with Social Media companies discussing Hunter Biden, aside from the Facebook-FITF meeting, and had "no internal knowledge" of the investigation. The analyst testified, however, that he had messaged Chan that morning, mentioning the ongoing investigation. The Justice Department has since barred Chan from testifying further to the Committee.

**[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]**



251.    The FITF's Russia Unit Chief testified that, during the October 14, 2020, meetings with Social Media companies, confusion arose over the New York Post article on Hunter Biden's laptop. Given an FBI analyst's earlier comment suggesting the laptop was real, the Russia Unit Chief felt it necessary to follow up with major platforms like Twitter, Facebook, Google, and Microsoft to clarify the FBI's stance. In a carefully crafted statement cleared with his superiors, he told them, "the FBI has nothing in its possession to suggest that the laptop is a hack or a leak," deliberately avoiding any mention of an ongoing investigation. When platforms pressed for more information, he reiterated, "I've told you everything I can tell you on this matter."

252.    The Government's sophisticated management of these interactions reveals a deeper intent to shape public perception, far beyond what the general public might realize. This approach, where the Government primes Big Tech to suppress competing narratives that challenge its preferred storyline, is not only dangerous but a direct manipulation of democratic processes. By strategically pushing selective information / propaganda, the Government influenced election outcomes, shaped public responses to COVID-19 vaccinations, and likely affected other significant societal matters, raising concerns under the major questions doctrine. This level of

influence (achieved through sophisticated messaging, platform manipulation, and the deliberate withholding of truth) highlights the risks of a Government attempting to shape reality itself, with public trust and informed choice becoming casualties in the process.

253.     Despite lacking evidence of a "hack-and-leak" operation, Big Tech platforms (especially Facebook) continued to censor the New York Post story and Plaintiffs' related reporting on Biden family influence peddling, partly out of concern over how a potential Biden-Harris administration might view them, essentially to avoid upsetting their Government protectors (re: Section 230). Although the FBI clarified that it had no specific evidence of foreign interference, it withheld the critical fact that it possessed and had authenticated Hunter Biden's laptop, which undermines any justification for its censorship.

**[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]**



From: &lt;/O=THEFACEBOOK/OU=EXTERNAL (FYDIBOHF25SPDLT)/CN=RECIPIENTS
/CN=28E865DE754F42D3ACBCF1C8052D0B8F&gt;

To: ███████████ ; Nick Clegg;
███████████ Joel Kaplan; ███████████

Sent: 10/14/2020 9:56:34 PM
Subject: Message summary [{"otherUserFbId":null,"threadFbId":39402414 16047689}]
Attachments: 121161847_131608654540 1657_7329363007398542195_n.png;
121440254_125184019515940_3016984524154928067_n.jpg;
121523296_4486187921454030_1191778544254324768_n.png;
121570689_337558230646825_1230117776855863053_n.png; sticker.png; sticker1.png

███████████ (10/14/2020 06:03:24 PDT):
>'Morning, the NY Post published an article on what are allegedly leaked Hunter Biden-
Burisma emails. SR (███ and team) will send FYI.
>
>https://nypost.com/2020/10/14/email-reveals-how-hunter-biden-introduced-ukrainian-biz-man-
to-dad/

███████████ (10/14/2020 06:09:51 PDT):
>Exact content expected for hack and leak, but sounds like so far, not much for us to do:
>
>1. No evidence of foreign interference operation
>2. Coming directly from press
>
>Sounds like next steps are to see if FBI contacts have any context for us, and to wait.

>Right on schedule. (10/14/2020 06:10:33 PDT):

███████████ (10/14/2020 07:01:16 PDT):
>Has it been referred to 3PFC?

Nick Clegg (10/14/2020 07:11:08 PDT):
>Looks fairly dodgy: https://mobile.twitter.com/JuddLegum/status/1316376280103825409

███████████ (10/14/2020 07:15:15 PDT):
>Has not been referred to refer yet, asked the team to refer now (but ███████'s assessment FWIW is
that this is couched in a way that would be very difficult for 3PFC to rate).

███████████ (10/14/2020 07:40:10 PDT):
>We're enqueuing the content with demotion and doing outreach to 3PFCs. No updated info
from FBI, no outreach from the Biden campaign. Trump is running ads on the claim.

Joel D. Kaplan (10/14/2020 07:42:35 PDT):
>Do we always apply a demotion when we manually enqueue?

███████████ (10/14/2020 07:43:02 PDT):
>No. We have standards for doing so and this met the test.

254.    As Facebook considered its response, some employees quickly suggested applying

the "hack-and-leak" policy without concrete evidence. In an internal message, one employee noted

the need to assess whether the content violated Facebook's hacked materials policy and if it was

newsworthy, explicitly referencing Twitter's approach as a potential standard. Another employee

responded, after analysis, that the content did indeed violate the hacked materials policy, pending

a determination on its newsworthiness. This alignment with Twitter's actions suggests a

coordinated approach across Platforms, where each decision contributed to a shared strategy to

restrict the story. By treating Twitter's response as a guiding precedent, these decisions reflect a

cross-platform conspiracy to limit access to certain information, raising concerns of a group boycott or coordinated effort to suppress narratives competing with the Government's false narratives, all of which constitute each Platform's own form of speech.



255. Facebook employees affirmatively consider the newsworthiness of content on a case-by-case basis, weighing public interest against potential harm, all of which, again, is their own form of speech. Content deemed uninteresting or harmful would be removed, while high-interest or low-harm content would remain or be labeled harmful in some way. Some employees felt that most material from Hunter Biden's laptop lacked newsworthiness, despite it influencing a Presidential election, arguing that details about his behavior were of low public interest and minimal harm. But Joel Kaplan, Facebook's VP of Global Public Policy, pushed back, stating: "Years of stories about the adult family members of Presidents would suggest that that content is newsworthy."



256. Facebook employees debated whether Hunter Biden qualified as a "prominent person in public life" under Facebook's hacked materials policy, all of which, again, is their own

form of speech. Many argued that, as the son of a presidential candidate, but not a public figure himself, he did not meet this threshold. Joel Kaplan disagreed, stating, "I don't really buy how the adult son of a VP who is being accused of influence peddling for a foreign company is not considered a prominent person in public life."

```
Joel D. Kaplan (10/14/2020 16:48:39 PDT):
>I don't really buy how the adult son of a VP who is being accused of influence peddling
for a foreign company is not considered a prominent person in public life. And if Fox
concludes that misconduct is newsworthy—pretty consistent with the standards that have
applied to adult children of presidents for decades—I don't really buy it's not newsworthy
either.
```

257.    Before determining its newsworthiness, Facebook needed to establish that the New York Post article on Hunter Biden's laptop was the result of an actual "hack." Facebook quickly found, however, that it lacked the evidence to conclude the story came from a hack, and the FBI confirmed it had no such evidence supporting same. Unable to apply its hacked materials policy, Facebook instead turned to its misinformation framework (their go-to justification for "problematic" content) to enforce a seven-day demotion of the story, pending review by third-party fact-checkers. This process, again, reflects Facebook's own form of speech, as the fact-checkers are paid content creators tasked with developing an opinion that aligns with Facebook's restriction stance.

258.    This laundering of Facebook's own speech through third-party fact-checkers becomes particularly evident in a statement by Tess Lyons, Facebook's Newsfeed manager, who outlined the process: "we identify potential hoaxes or misinformation," and "once we predict those things, we send them to Independent third-party fact-checkers with whom we partner." These fact-checkers then "review the content and rate its accuracy," and if they mark it as false, Facebook adjusts its Newsfeed ranking algorithm (effectively modifying its platform design) to "reduce the relevance score and show that piece of content lower in newsfeed, reducing the number of people

who see it." Additionally, Facebook "puts more context around it" – in this case, aligning with Government-driven narratives.

259.    In essence, Facebook selects the content it wants to suppress, labels it as "false" (a non-determiner in Section 230) rather than "offensive," and relies on paid third-party "partners" to legitimize its affirmative restriction actions by creating and developing contrary contextual information Facebook affirmatively provides on its platform. This partnership effectively launders Facebook's restriction / own speech decisions through a veneer of "independence," amplifying Facebook's perspective while presenting it as an objective assessment. Just as Facebook's decisions here are shaped by the Government's joint participation, this partnership cloaks Facebook's actions in objectivity, even as they remain influenced by a paid partnership and Government-driven priorities.

260.    Following its decision, internal dissent grew within Facebook, with Vice President of Global Public Policy Joel Kaplan describing the handling of the story as "outrageous" and other employees expressing concerns that the decision was made hastily. One employee noted that staff were "trigger happy" due to law enforcement's prior "pre-bunking," which had primed them to expect a hack-and-leak scenario.


**[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]**

113



261. The internal debate over Facebook's decision to demote the New York Post story led to discussions about possibly reducing the demotion period from seven days to five or six, especially since no fact-checkers had flagged issues with the content (*i.e.,* the fact-checkers could not achieve Facebook's intended result). Meta's President of Global Affairs, Nick Clegg, testified that COO Sheryl Sandberg favored keeping the full seven-day demotion, arguing against reversing the decision, while CEO Mark Zuckerberg preferred to stick closely to the company's standards but ultimately deferred to Clegg. In internal messages, Facebook's VP of Global Public Policy Joel Kaplan and Clegg discussed concerns about a potential double-standard, noting that Facebook had allowed politically damaging leaked content about President Trump, such as the New York Times story on his tax records, to remain accessible, while demoting similarly leaked content like the New York Post article that could harm their preferred candidate. It is no secret that Big Tech tends to favor the Democratic candidate, knowing this allegiance often allows them to operate with impunity, as discussed in this Complaint.



From: Sender Unspecified
To: Joel Kaplan <████████@s.whatsapp.net>;Nick Clegg
    <████████@s.whatsapp.net>;System Message <>
Sent:
Subject: (No Subject)
Attachments: rsmf.zip

Nick Clegg <████████@s.whatsapp.net>
Which team is responsible for checking how/whether this could be a false hack/leak?
https://mobile.twitter.com/JuddLegum/status/1316376280103825409

Nick Clegg <████████@s.whatsapp.net>
Ignore - see it's shared on 2020 thread

Joel Kaplan <████████@s.whatsapp.net>
I think it's actually kinda outrageous that we are all freaking out about a NY Post cover
story, enqueing and demoting because liberals are tweeting about it, with no evidence
whatsoever. We did not do this when the NYT dunoed an expose on Trump's tax returns citing
leaked documents that they wouldn't even share.

262.    Internal communications obtained by the Committee revealed that Facebook's communications team acknowledged what appeared to be a double-standard in traditional media; though, in reality, this "double-standard" reflected Facebook's own speech. Facebook employees understood that media criticism of Big Tech would hinge not on fair / consistent policy enforcement, but rather on whether enforcement actions helped or harmed President Trump, the Establishment's disfavored candidate. As one Facebook Communications VP put it: "Golden Rule: The Press is only as good to you as you are bad to Trump."

████████ (10/14/2020 19:50:24 PDT):
>I like it. Also, this thread is helpful

████████ (10/14/2020 19:50:29 PDT):
>https://twitter.com/kantrowitz/status/1316569785824612353?s=21

████████ (10/14/2020 19:51:06 PDT):
>(Golden Rule: The Press is only as good to you as you are bad to Trump)

████████ (10/14/2020 20:15:26 PDT):
>I miss nuance

263.    Internal Facebook messages indicate that company leadership chose to continue demoting the New York Post story due to public pressure and concerns about their relationship

with a potential Biden-Harris administration, not because the content was "offensive" or "otherwise objectionable" in "good faith" (pursuant to Section 230 protections), but to appease their legacy media and Government allies. In the discussion, Joel Kaplan raised the need to "decide whether to undo this demotion" but cautioned that reversing the decision might leak and draw unwanted attention, whereas actions perceived as anti-conservative, like the demotion, rarely leaked. Nick Clegg agreed, noting that undoing the decision would create "more headaches than it's worth." In other words, they avoided reversing their stance to evade scrutiny, yet now they are caught red-handed.



264. Later in that same message thread, Clegg acknowledged that Facebook's decisions on this issue could shape how the incoming Biden administration perceived the company. In other words, Clegg admitted their decision was not done in "good faith," it was motivated by political influence.



265. Facebook appeared more focused on preserving its favorable relationship with a potential Biden-Harris administration than on protecting its users' free speech or the integrity of a

presidential election. Despite the FBI confirming there was no evidence that the laptop was part of a Russian influence operation, Facebook maintained its decision to reduce the story's reach by 50 percent for seven days. During this time, over 30 million Americans (nearly one-fifth of the total voters) cast their ballots without access to critical, factual information. In August 2024, CEO Mark Zuckerberg admitted to the Committee that Facebook "shouldn't have demoted the story." Indeed, it should not have, nor should it have suppressed other critical, potentially lifesaving information, such as reports on Ivermectin's use for COVID-19, content Plaintiffs extensively reported but which Facebook similarly suppressed because it did not align with the same ideological motives that influenced their handling of the Hunter Biden story and the election. In other words, the suppression of the Hunter Biden story is not an isolated case, it exemplifies the foundation of Platforms' clandestine "information content provider" business models, operating under the cloak of an "interactive computer service provider."

266. The *Twitter Files*, a series of reports by independent journalists Matt Taibbi, Bari Weiss, and Michael Shellenberger following Elon Musk's acquisition of Twitter, reveal that Twitter quickly enforced its hacked materials policy on the New York Post article about Hunter Biden's laptop (a story Plaintiffs shared on their Twitter accounts). Elon Musk openly admitted he "inherited a crime scene" when he purchased Twitter. Twitter's "crim[inal]" actions included suppressing the article, removing links to competing websites, adding safety warnings (Twitter's own speech), and even blocking the ability to share it *via* direct message (a particularly egregious form of censorship). In other words, the Platform's censorship extended far beyond protecting the public, it aimed to shape public discourse in its entirety, restricting not only content on Twitter but also private conversations and access to other websites.

117

267.     Despite this aggressive censorship response, internal messages show that some Twitter decision-makers questioned their actions. Twitter's VP of Global Communications asked if they could "truthfully claim" the Post article violated the hacked materials policy, while Twitter's Deputy General Counsel admitted they needed "more facts to assess whether the materials were hacked," but decided "it is reasonable for us to assume that they may have been and that caution is warranted." Former Head of Trust and Safety Yoel Roth testified that after reviewing the article, he found it to be an "ambiguous case" and recommended against full enforcement under Twitter's hacked materials policy, suggesting instead that Twitter avoid actively promoting the story. Twitter's leadership, however, influenced by previous FBI warnings, opted for a complete enforcement approach.

268.     In response to public backlash over this decision (stemming from the clear public interest), Twitter amended its hacked materials policy in late-2020, effectively changing its platform's flawed design. The revised policy narrowed its scope to focus on confirmed hacks (*i.e.,* real hacks, not Government contrived hacks) and shifted enforcement from content removal to the application of informational labels, effectively adding Twitter's own speech to the mix. As Roth explained, the updated policy would "no longer remove hacked content unless it is directly shared by hackers or those acting in concert with them."

269.     Other platforms took different approaches. Google's Threat Analysis Group (TAG) quickly assessed the Post article and found no evidence of foreign involvement or a hack-and-leak operation. A TAG member testified that after consulting with industry contacts at Twitter and Apple, they "did not find any evidence that it was part of a foreign hack-and-leak operation." As a result, YouTube chose not to censor the article, highlighting that even with the FBI's warnings, some platforms maintained a more cautious approach, basing decisions on available evidence.

118

270.    These responses highlight a contrast: while Facebook and Twitter acted on FBI warnings and engaged in preemptive censorship (*i.e.,* censoring at the behest of the Government), companies like Google adhered to their protocols and found no grounds for censorship. In the specific case of the Hunter Biden laptop, Plaintiffs were harmed by actions taken by the Government, Facebook, and Twitter, but not necessarily by Defendants Google, CCDH, or Media Matters. This entwinement illustrates an ongoing harm that has evolved over time, yet the Hunter Biden laptop case is only one example cited in this Complaint. As one Facebook employee later noted, platforms like Facebook and Twitter were "trigger happy" and "made [their own] decisions that should not have been made individually and without consultation."

271.    On October 15, 2020, a Facebook employee, formerly with the FBI's FITF, followed up with FBI agent Elvis Chan regarding any updates on possible foreign involvement in the Hunter Biden laptop story. Chan confirmed he was "up to speed" on the FBI's knowledge and stated there was "no current evidence" of any foreign connection or direction behind the leak. He assured the Facebook employee he would reach out if new information emerged. What is critical to note here is that the FBI knew there was "no current evidence" of foreign interference, yet the Government Defendants still sought to restrict domestic speech, based on information and belief, to alter the outcome of the 2020 election – a clear violation of the First Amendment.

I spoke with SSA Elvis Chan (FBI San Francisco) on 15 October 2020, as a follow up to the call with the Foreign Influence Task Force on 14 October. I asked SSA Chan whether there was any update or change since the discussion on 14 October 2020 as to whether the FBI saw any evidence suggesting foreign sponsorship or direction of the leak of information related to Hunter Biden as published in the New York Post story on 14 October. SSA Chan advised that he was up to speed on the current state of the matter within the FBI and that there was no current evidence to suggest any foreign connection or direction of the leak. SSA Chan assured that the FBI would be in contact if any additional information on this was developed through further investigation.

October 15, 2020 · Like · Reply

██████████ subscribed
October 15, 2020 · Like

██████████ Here is where I will be working through the various hack/leak policy factors: https://fb.quip.com/elfiA8ZQDBzL
October 15, 2020 · Like · Reply

272.    On October 18, 2020, a Facebook employee reached out to the Russia Unit Chief of the FBI's FITF to verify if a story supporting the false Russian hack-and-leak narrative had changed the FBI's stance. The Russia Unit Chief requested a call to discuss but continued to withhold that the FBI already possessed and had authenticated Hunter Biden's laptop, concealing the truth to influence the outcome. Despite Facebook's repeated requests for clarification, the FBI merely reiterated that it had "nothing in its possession to suggest that the laptop is a hack or a leak," despite knowing the laptop was neither hacked nor leaked.

273.    On October 19, 2020, fifty-one former intelligence officials issued a statement, orchestrated by a senior Biden campaign official (now-Secretary of State Antony Blinken), claiming the Biden family story bore the hallmarks of Russian influence. This statement was well known within the intelligence community, possibly reaching as high as CIA Director Gina Haspel. Despite platforms repeatedly asking for clarity, the FBI withheld the fact that it had authenticated the laptop, allowing Platforms to continue censoring the story (and Plaintiffs' content), an action with potential election-altering consequences.

274.    These interactions reflect Defendants' (particularly the intelligence community's) strategy of withholding critical information from Big Tech and the public while simultaneously pushing propaganda and false information to social media outlets, effectively engaging in "censorship by substitution." By priming Platforms to treat the story as disinformation, this pervasive Government entwinement with Social Media platforms directly led to anti-competitive and unconstitutional content moderation decisions and product design changes, likely impacting the outcome of the U.S. Presidential election.

275.    The FBI report underscores the deep, joint participation between the Government and Big Tech in censoring a politically significant story for their own interests. It highlights the

120

weaponization of Defendants' disinformation frameworks and specifically the FBI's direct role in shaping the narrative under the guise of national security, raising serious constitutional concerns about free speech and Government overreach.

276.    The FBI report provides a detailed examination of the coordinated censorship effort at play, further supporting the Bollingers' assertion that Government actions, in collusion with Big Tech, suppressed lawful speech (including Plaintiffs' speech) on a matter of critical public interest and electoral relevance.

## D.    The Government's Censorship Leverage Chip (47 U.S.C. § 230)

277.    In *Missouri v. Biden*, the Government argued that there could not be any coercion from threatening to revoke or amend Section 230 because the President does not have the power to amend or revoke a law. The process of amending a law falls under the responsibility of the legislative branch, specifically Congress. Judge Doughty noted, however, that the Democratic Party held the majority at that time in the House of Representatives, the Senate, and the Presidency:

> With respect to 47 U.S.C. § 230, Defendants argue that there can be no coercion for threatening to revoke and/or amend Section 230 because the call to amend it has been bipartisan. However, Defendants combined their threats to amend Section 230 with the power to do so by holding a majority in both the House of Representatives and the Senate, and in holding the Presidency. They also combined their threats to amend Section 230 with emails, meetings, press conferences, and intense pressure by the White House, as well as the Surgeon General Defendants. Regardless, the fact that the threats to amend Section 230 were bipartisan makes it even more likely that Defendants had the power to amend Section 230. All that is required is that the government's words or actions "could reasonably be interpreted as an implied threat." Cuomo, 350 F. Supp. 3d at 114. With the Supreme Court recently making clear that Section 230 shields social-media platforms from legal responsibility for what their users post, Gonzalez v. Google, 143 S. Ct. 1191 (2023), Section 230 is even more valuable to these social-media platforms. These actions could reasonably be interpreted as an implied threat by the Defendants, amounting to coercion.

*Missouri*, [D.E. 293] at 99-100 (W.D. La.),

278.    The 230-related "threat" is both real and enduring, serving as far more than a one-off leverage tactic for the Government's Establishment Party in its efforts to demand compliance from Big Tech: **(a)** In April 2019, House Speaker Nancy Pelosi said "I do think that for the privilege of 230, there has to be a bigger sense of responsibility on it. And it is not out of the question that that could be removed."[95] Pelosi continued that Section 230 "is a gift to [Big Tech] and I don't think that they are treating it with the respect that they should, and so I think that that could be a question mark and in jeopardy."[96] **(b)** In January 2020, then-candidate Biden stated, in an interview with the New York Times editorial board, that, because Big Tech had purportedly not done enough with purported false information, "Section 230 should be revoked, immediately should be revoked, number one. For Zuckerberg and other platforms."[97] Biden continued: "[i]t should be revoked because it is not merely an internet company. It is propagating falsehoods they know to be false.... There is no editorial impact at all on Facebook. None. None whatsoever. It's irresponsible. It's totally irresponsible."[98] Biden also threatened that Facebook CEO Mark Zuckerberg should be subject to civil liability and even criminal prosecution (a heavy threat) for not censoring such core political speech: "He should be submitted to civil liability and his company to civil liability. . . . Whether he engaged in something and amounted to collusion that in fact caused harm that would in fact be equal to a criminal offense, that's a different issue. That's possible. That's possible it could happen."[99] **(c)** In November 2020, Senator Richard Blumenthal said: "I have urged, in fact, a breakup of tech giants. Because they've misused their bigness and

---

[95] https://techcrunch.com/2019/04/12/nancy-pelosi-section-230/

[96] *Id.*

[97] https://www.nytimes.com/interactive/2020/01/17/opinion/joe-biden-nytimes-interview.html

[98] *Id.*

[99] *Id.*

122

power… . And indeed Section 230 reform, meaningful reform, including even possible repeal in large part because their immunity is way too broad and victims of their harms deserve a day in court."[100] **(d)** In December 2020, Bruce Reed, Biden's former chief of staff and top technical advisor, publicly stated that "it's long past time to hold the social-media companies accountable for what's published on their platforms."[101] **(e)** In January 2021, Louisiana Rep. Cedric Richmond warned Facebook and Google that they better start restricting what the Establishment deemed harmful or else: "We're going to make it swift, we're going to make it strong, and we're going to hold them very accountable."[102] **(f)** In or around January 2021, New York Rep. Jerrold Nadler also added: "Let's see what happens by just pressuring them."[103, 104]

279. The Section 230 threat became more explicit in July 2021 when the Biden administration, through Press Secretary Jen Psaki, publicly indicated it would "scrutinize" Section 230, specifically targeting Plaintiffs, members of the so-called DD, falsely identified as responsible for much of the vaccine misinformation. The administration was "flagging problematic posts" and pressuring platforms like Facebook to remove content, while also signaling that Section 230 reforms were being considered. The implicit message to Big Tech was clear: "remove what we say to remove or we will come after you by removing or reforming Section 230 (or just ensuring 230 is applied properly), which such subsequent flood of civil litigation will harm you greatly."

---

[100] *Breaking the News: Censorship, Suppression, and the 2020 Election Before the S. Comm. on Judiciary*, 116th Cong. at 36:10–15 (2020)

[101] https://www.cnbc.com/2020/12/02/biden-advisor-bruce-reed-hints-that-section-230-needs-reform.html

[102] https://www.wsj.com/articles/save-the-constitution-from-big-tech-11610387105

[103] *Id.*

[104] For more examples demonstrating that the threat is ongoing, please see the video hyperlkined in Paragraph 20 above.

123

Although the President cannot unilaterally amend Section 230, the administration's combined threat of increased scrutiny and legislative power held significant leverage over the Platforms.

> Plaintiffs assert [as do Plaintiffs here] that since 2018, federal officials, including Defendants, have made public statements and demands to social-media platforms in an effort to induce them to censor disfavored speech and speakers.[105] Beyond that, Plaintiffs argue that Defendants have threatened adverse consequences to social-media companies, such as reform of Section 230 immunity under the Communications Decency Act, *antitrust scrutiny/enforcement*, increased regulations, and other measures, if those companies refuse to increase censorship. Section 230 of the Communications Decency Act shields social-media companies from liability for actions taken on their websites, and Plaintiffs argue that the threat of repealing Section 230 motivates the social-media companies to comply with Defendants' censorship requests. Plaintiffs also note that **Mark Zuckerberg ("Zuckerberg"), the owner of Facebook, has publicly stated that *the threat of antitrust enforcement is 'an existential threat' to his platform***.

*Id.* 8-9 (emphasis added).

280.    Here, Section 230 "scrutiny" carried an important dual meaning. On the one hand, the Biden administration could publicly clarify how Section 230 should apply (how *Fyk v. Facebook* has argued for over six years now), potentially exposing Big Tech to far greater civil liability by narrowing CDA immunity. On the other hand, if the administration chose not to scrutinize the law, the legal ambiguity surrounding Section 230 could be used as leverage – protecting Big Tech when aligned with Government wishes but harming Big Tech when they failed to comply with content moderation demands. This "carrot and stick" approach allowed the Government to offer protection when platforms cooperated, while subtly threatening them with greater exposure to liability when they did not. The ambiguity of Section 230 thus became a leverageable tool to manipulate Big Tech, keeping them in line through both pressure and plausible deniability.

---

[105] Notably, Platforms do not solely target offensive materials or speech in "good faith," they also admittedly target the speakers themselves; *e.g.,* the Disinformation Dozen. In other words, they are not censoring what users say, but targeting who they are because of what they might say.

281.    Additionally, the possibility of a conspiracy among Government officials adds another layer to this manipulation. All three branches (executive, legislative, and judicial) acting in shadowy unison once seemed improbable, but is now a real consideration. If Establishment members of the executive branch conspired with Establishment members in the judicial branch, the executive branch would not need to publicly "scrutinize" Section 230. Instead, they could conspire with Establishment judges to ensure Section 230 was never properly "fixed" (*i.e.*, properly interpreted and applied) in alignment with the text, expressed congressional intent, and the Constitution, which has seemingly been the case (*see, e.g., Fyk v. Facebook*). Through this (more than likely) conspiracy, the executive branch could maintain Section 230's ambiguity, strategically using it as ongoing leverage over Big Tech and the public by proxy. What once seemed like a far-fetched conspiracy theory is now a very real possibility, given the broad reach of the Establishment Party's influence across multiple branches of Government.

282.    This liability "leverage" operates like a simple machine – a rigid bar pivoting on a fixed point. In this case, the fixed "pivot point" was not necessarily the ability to amend or revoke Section 230, but the legal ambiguity surrounding it and the threat of exposure to proper antitrust action. The Government's true influence over Big Tech was / is the ability to use liability exposure as a "carrot and stick" – offering protection through the ambiguous application of Section 230 when Platforms complied with Government demands, while threatening "scrutiny" that could lead to legal challenges or regulatory consequences, including antitrust investigations (*e.g.*, *DOJ v. Google*), if the Platforms did not.[106] By maintaining Section 230's ambiguity and leveraging

---

[106] Consistent with its carrot-and-stick approach to private entities on social-media censorship, the Biden Administration (including the DOS) has richly rewarded the private-sector partners in the censorship consortium (Censorship Industrial Complex). The Censorship Industrial Complex's private "partners all received federal grants from the Biden administration in the next two years." "The National Science Foundation awarded the Stanford and UW projects $3 million in August 2021 'to study ways to apply collaborative, rapid-response research to mitigate online disinformation.'"

antitrust liability, the Establishment held immense power (largely hidden from the public's view) over these Platforms, covertly pressuring them to comply with content moderation demands while maintaining the appearance of independent, voluntary action.

283.    This (conspiratorial) dynamic ties back to the broader theme of the illusion of democracy. On the surface, the argument that the President could not coerce Big Tech appears constitutionally sound, but beneath that, the Administrative State's influence was / is far more pervasive. By threatening legal, criminal, and regulatory consequences and potentially conspiring with judicial allies to preserve Section 230's ongoing ambiguity,[107] the Government exerted immense pressure on Big Tech to shape public discourse while reinforcing Establishment control over political outcomes, all under the guise of protecting national security and public health.

284.    Section 230, long touted as the backbone of free speech online, has morphed into a tool of Establishment control. Originally designed to shield tech platforms from liability for user-expressed content, 230's broad and ambiguous language has allowed the Establishment to exploit the law, exerting extreme pressure on Big Tech to censor content and silence dissenting voices. In serving a larger agenda than the law's intended purpose, 230 is wielded by the Establishment to protect platforms when Big Tech acts as instruments of Government censorship, but the Establishment threatens to "scrutinize" 230 (and put Big Tech's civil liability protection at risk;

---

[107] Upon information and belief, Defendants actively deploy users (or even AI) with dummy or fake accounts to "troll" individuals who challenge the status quo narrative on sensitive topics such as election integrity, COVID-19, and the application of Section 230. This coordinated effort appears to involve coordinated teams of individuals who aggressively target, harass, and discredit dissenting voices, particularly those questioning, for example, Defendants' preferred misapplication of Section 230. These individuals are often identifiable by their use of animal avatars (rather than real profile pictures) and by having very few active followers despite posting tens, hundreds, or even thousands of comments. Working in concert, they attack those who stray from the narrative, herding the public like sheep toward viewpoints that align with Defendants' interests and ensuring their dominance in public discourse These tactics, including trolling and coordinated smear campaigns, bear the hallmarks of both FBI psychological operations and a Smith-Mundt Modernization-inspired strategy, leveraging propaganda-like mechanisms to silence dissent, manipulate public opinion, and reinforce the Establishment's agenda. This raises serious concerns about the ethics and legality of these actions, given their chilling effect on free expression and the apparent misuse of public and private resources to suppress opposition.

126

*i.e.*, expose Big Tech to hundreds, if not thousands, of antitrust lawsuits) if Big Tech fails to comply with the Government's censorship demands. That is more than just an imminent threat, it is a potential path to bankruptcy.

285.    We submit that Section 230 has been (intentionally) misinterpreted and / or misapplied by the judiciary (namely, the California judiciary), thereby paving the way for Big Tech to exploit their "so-called" "immunity" under Section 230 to suppress competition and censor speech on behalf of the Government, all without fear of legal consequences.[108] These inconsistent rulings have allowed Platforms to evade accountability, sacrificing the rights of individuals and smaller businesses in favor of powerful corporate interests. As Justice Thomas warned in *Enigma*: "[e]xtending § 230 immunity beyond the natural reading of the text [*e.g.*, granting any "immunity" at all] can have serious consequences." *Malwarebytes, Inc. v. Enigma Software Group, USA, LLC*, 141 S.Ct. 13, 18 (2020). SCOTUS further articulated:

> The question whether § 230 immunizes platforms for their own conduct warrants the Court's review. In fact, just last Term, the Court granted certiorari to consider whether and how § 230 applied to claims that Google had violated the Antiterrorism Act by recommending ISIS videos to YouTube users. We were unable to reach § 230's scope, however, because the plaintiffs' claims would have failed on the merits regardless. This petition presented the Court with an opportunity to do what it could not in *Gonzalez* and squarely address § 230's scope

> Although the Court denies certiorari today, there will be other opportunities in the future. But, make no mistake about it—there is danger in delay. Social-media platforms have increasingly used § 230 as a get-out-of-jail free card. Many platforms claim that users' content is their own First Amendment speech. Because platforms organize users' content into newsfeeds or other compilations, the argument goes, platforms engage in constitutionally protected speech.

---

[108] "So-called" because Section 230 does not explicitly mention "immunity," its so-called "immunity" is, therefore, a mischaracterization. Section 230 does not provide an express shield from suit; rather, like any other affirmative defense, it requires adherence to specific Congressional requirements, intent, and directives. The "Good Samaritan" provision in Section 230, which includes a "good faith" requirement under 230(c)(2), is not mere surplusage, it is a critical limitation (traditionally overlooked by the California courts) meant to be evaluated based on the facts and merits of each case. Furthermore, Section 230(c)(1), when properly applied, prevents a party from being treated as "the publisher or speaker" of another party's content; *i.e.*, it prevents the platforms from being treated as another only when they have not engaged in any affirmative publishing conduct. It does not inherently provide "immunity" for a platform's own actions or decisions – protection must be determined by the trier of fact.

127

*Doe v. Snap, Inc.*, 144 S.Ct. 2493, 2494 (2024) (internal citations omitted).

286.    This judicial inaction has emboldened Big Tech to weaponize Section 230 as a tool of suppression and monopolistic behavior, undermining both Constitutional rights and fair competition.

287.    If Section 230 were to be properly interpreted and applied (*i.e.*, if the judiciary were to uniformly conclude, for example, that Section 230 does not shield platforms from *all* liability (*i.e.*, grant "immunity"), particularly when their actions infringe on individual civil liberties or foster anti-competitive behavior),[109] the Government's ability to use the ambiguous § 230 legal shield as leverage over Big Tech in the censorship vein (or otherwise) would be significantly diminished if not entirely eliminated.

288.    In sum, under the current (largely California-oriented) Section 230 landscape (inconsistent interpretation and application), we toil about in a lawless Internet no-man's land. This lawless Internet no-man's land is exactly where the Government likes things, because, again, it is in this gray area that the Government is able to wield § 230 against Big Tech (*i.e.*, threaten to disrupt Big Tech's invaluable § 230 civil liability immunization) when (and if) Big Tech does not succumb to the Government's censorship demands.

---

[109] In another matter mentioned earlier (*Fyk v. Facebook* situated in California), undersigned counsel has been entrenched in a six-plus-year-long battle to realign Section 230 with its text, congressional intent, and the Constitution, all while navigating a judicial system (in particularly, the California judiciary) plagued by bias, dysfunction, and confusion, *et cetera* – confidence in the California court system is severely lacking, put mildly. Despite these challenges, counsel for Plaintiffs has already presented a clear and concise "fix" for Section 230 to the Supreme Court twice in *Fyk v. Facebook*, only to have it denied both times, resulting in dangerous and unnecessary delays. If the 9th Circuit denies Mr. Fyk's third attempt to address Section 230, thereby willfully depriving him of his constitutional right to challenge a law that infringes upon his fundamental due process rights, it is inevitable that this matter will return to the Supreme Court for a third time. At that point, we will once again be compelled to raise the same critical question regarding the scope of Section 230(c)(1)'s liability protection / "immunity" – a question that desperately needs resolution to prevent further harm, eliminate legal ambiguity, and halt the continued erosion of constitutional rights.

### E.	The Government's Role In Sedition And / Or Treason

289.	The Government's collaboration with foreign entities like UK-based CCDH, ISD, and GDI to censor domestic speech raises profound constitutional and ethical concerns. By funding and partnering with these organizations, the Government bypasses First Amendment protections, employing direct and indirect strategies to suppress free speech.

290.	Such actions not only undermine the foundational principles of free expression, but also approach (if not amount to) sedition and / or treason. When Government officials conspire with foreign entities to suppress or manipulate American speech (especially to influence public opinion or democratic processes), the people's trust is severely diminished and the officials' constitutional duties are turned upside down. This conduct erodes U.S. sovereignty by leveraging foreign influence to curtail the rights of its citizens, aligning Governmental power with external interests to the detriment of domestic liberties.

291.	A parallel trend exists within the judiciary (a division of Government Defendants), where courts increasingly use lack of "standing" (or otherwise non- merits based "reasons") as a procedural barrier (*i.e.*, undue immunity) to dismiss valid cases, raising significant Constitutional questions. By denying plaintiffs the chance to litigate these issues, the courts sidestep their role as guardians of Constitutional rights, leaving illegal, unconstitutional, and / or inequitable misdeeds unexamined and unaddressed. Among many other things, this practice weakens public trust in the judiciary and creates a chilling effect on the pursuit of justice, allowing Governmental overreach to continue unbridled.

292.	Together, these actions (collaborating with foreign actors to suppress speech and avoiding accountability through judicial hyper-technicalities) highlights a dangerous drift away

from Constitutional principles. If left unchallenged, these trends threaten to dismantle the freedoms and protections upon which this nation was built.

293.    The Government's involvement with foreign entities such as CCDH (and ISD and GDI, for that matter), UK-based organizations, to censor domestic speech raises profound Constitutional concerns. By funding and partnering with these foreign motivated entities, the Government is engaging in a direct or indirect strategy to suppress free speech domestically, bypassing the protections guaranteed by the First Amendment – protections that were not only enshrined in law but were the very impetus for its initial drafting.

294.    Inextricably intertwined with the United States Government, along with the laws that govern our nation, is the United States Constitution. The Constitution is the indispensable bedrock of our country, the ultimate authority underlying our civilized and free society. It is the foundation that makes America what it is … America. Any attempt to undermine or overthrow the Constitution is, by its very nature, an attempt to overthrow the Government itself and the rule of law upon which our nation is built.

295.    Sedition is defined as a "preliminary activity aimed at inciting treason or some lesser commotion against public authority." Garner, Bryan A., *Black's Law Dictionary*, 630 (2d pocket ed., 2001). Put differently, sedition refers to actions that seek to undermine or overthrow lawful authority. Treason is defined as "the offense of attempting to overthrow the government of the state to which one owes allegiance, either by making war against the state or by materially supporting its enemies." *Id.* at 720. Put differently, treason involves betraying one's country by giving aid or comfort to its enemies or acting against the nation's interests.

296.    Here, the Government's involvement with foreign entities (*e.g.*, the United Kingdom) to trample on the United States Constitution raises broader concerns about sedition and,

in some instances, treason. If the Government's collaboration here with foreigners (like CCDH, ISD, and GDI, for examples) was deliberately aimed at suppressing dissent or silencing political opposition (in contravention of the United States Constitution and in deprivation of myriad civil liberties guaranteed therein), it could be viewed as an act of sedition or even treason. If these actions are designed to erode the Constitutional protections of speech and press in general, they may constitute an attempt to undermine the democratic foundation of the U.S. In other words, this is as bad as it gets.

297. By engaging foreign organizations (both known and unknown) to censor domestic speech, as the Government has, the Government is prioritizing foreign influence over the individual rights and interests of its sovereign citizens. Such actions serve the goals of foreign actors seeking to weaken the American Constitutional framework over the American public interests, which ties back to the McCarran Act combatting Communist efforts of the 1950s (discussed above).

298. The Government's preplanning, funding, and involvement in the Censorship Industrial Complex (including its deliberate partnerships with foreign entities like CCDH, ISD, and GDI) represents a grave and unprecedented threat to the First Amendment and the very foundation of American democracy. By enlisting foreign agents to suppress domestic speech, the Government not only circumvents Constitutional protections but actively undermines the sovereignty and freedoms it is sworn to uphold. This betrayal strikes at the heart of what it means to be a free nation, eroding civil liberties and laying the groundwork for a state apparatus that weaponizes censorship to silence dissent and control discourse. If left unchecked, these actions will irreparably damage the cornerstone principles of free speech and open dialogue, extinguishing the liberties that define America's identity and purpose.

299.    *The Government's partnerships with UK-based organizations like CCDH, ISD, and GDI are evidence of not only a challenge to free speech protections but also potential acts of sedition or even treason. These partnerships, aimed at suppressing dissent and undermining democratic principles, represent a betrayal of the Constitution and the trust placed in the Government by We the People. Such conduct transcends civil liability and warrants criminal investigation. While under the Biden DOJ such an investigation would have undoubtedly amounted to nothing, the incoming Trump administration DOJ, operating under the clear mandate delivered by the American people in the 2024 election, must thoroughly investigate and hold accountable those responsible. The Government's actions here represent one of the most egregious attacks (if not the most egregious attack) on Americans' Constitutional rights in the history of this country. The future of this county could literally rest on the outcome of this case.*

**F.    *The Censorship Industrial Complex As Described In Missouri v. Biden***

300.    This case is quite similar to *Missouri v. Biden*, only this case does not suffer from the same early deficiencies identified by SCOTUS in *Murthy v. Missouri* (or from any deficiencies, for that matter).

301.    In *Missouri v. Biden*, Judge Doughty rightly concluded, in part, as follows:

Although [the case] is still relatively young, and at this stage the Court is only examining it in terms of Plaintiffs' likelihood of success on the merits, the evidence produced thus far depicts an almost **dystopian scenario.** During the COVID-19 pandemic, a period perhaps best characterized by widespread doubt and uncertainty, the United States Government seems to have assumed a role similar to an Orwellian 'Ministry of Truth.'

*Missouri v. Biden*, [D.E. 293] at 154 (emphasis added).

302.    Judge Doughty properly described the Defendants' censorship actions (in relation to the DD, the CCDH blacklisted group that Plaintiffs were made part of *via* Plaintiff principals,

Ty and Charlene Bollinger) as "the most massive attack against free speech in United States' history." *Id.* at 2.

303. While *Missouri v. Biden* is nearly identical to the current case factually speaking, there are some key legal / procedural / evidentiary differences between this case and that case.

304. In *Missouri v. Biden*, the plaintiffs faced significant challenges in establishing standing (at least when the case arrived at SCOTUS *via Murthy v. Missouri*) because they were not part of the DD, the group directly targeted by the Government and Big Tech for spreading so-called "misinformation." The case primarily involved states and individuals claiming their speech was indirectly impacted by Government pressure on Social Media platforms. Additionally, the plaintiffs in *Missouri v. Biden* did not directly sue the Big Tech companies that played a key role (strongly coerced role at minimum, but we submit most likely a conspiratorial role) in the content moderation that is the surreptitious Censorship Industrial Complex scheme. This omission meant the case did not include all necessary parties involved in the alleged censorship conspiracy.

305. To the prior point, per SCOTUS in *Murthy v. Missouri*, No. 23-411:

> Here, the plaintiffs' theories of standing depend on **the *platforms'* actions—yet the plaintiffs do not seek to enjoin the platforms from restricting any posts or accounts.** Instead, they seek to enjoin the *Government agencies and officials* from pressuring or encouraging the platforms to suppress protected speech in the future. The one-step-removed, anticipatory nature of the plaintiffs' alleged injuries presents two particular challenges. First, it is a bedrock principle **that a federal court cannot redress 'injury that results from the independent action of some third party not before the court.'** *Simon* v. *Eastern Ky. Welfare Rights Organization*, 426 U. S. 26, 41–42.

*Id.* at 2 (Syllabus) (2023) (emphasis added).

306. SCOTUS' *Murthy* decision emphasized that without including Big Tech companies, the ability of plaintiffs in *Missouri v. Biden* to achieve meaningful relief was constrained because the Social Media platforms could continue their moderation practices

independently, even without the Government coercion / conspiracy. Moreover, SCOTUS found that the plaintiffs in *Missouri v. Biden* lacked the necessary standing, as they could not demonstrate a direct, concrete injury traceable to the Government's actions.

307.    RFK's fairly recent case (consolidated with *Missouri v. Biden*) was also found (by the Fifth Circuit, 2024 WL 4664015 (Nov. 4, 2024)) to not cure early legal / procedural standing deficiencies. As now discussed, however, this case has no such deficiencies.

- The Fifth Circuit found, for example, that RFK, Jr.'s consolidated case relied purely on the *Missouri v. Biden* record. While *Missouri v. Biden* certainly factors into this Complaint, this Complaint goes well beyond factually, evidentiarily, and legally.
- The Fifth Circuit found, for example, that RFK, Jr.'s consolidated case just contained allegations, whereas this Complaint contains a plethora of factual evidence.
- The Fifth Circuit held, for example, that a "certain threshold showing: namely, that a particular defendant pressured a particular platform to censor a particular topic *before* that platform suppressed a particular plaintiff's speech on that topic."
  - o This is precisely why we approached our specific harm section of this Complaint (§III.G) in chronological order, so that the progression is obvious.
- The Fifth Circuit determined, for example, that RFK, Jr.'s consolidated case was not "utterly different" from *Missouri v. Biden*.
  - o This Complaint is "utterly different" in myriad respects. For example, this Complaint addresses the entire Censorship Industrial Complex, which includes, among other things, naming Big Tech as Defendants as well.
- The Fifth Circuit determined, for example, that RFK, Jr.'s consolidated case did not discuss Government actions past 2021.
  - o This Complaint, on the other hand, provides specific examples of how the Defendants misconduct continues to harm Plaintiffs through censorship. There is absolutely no speculation in this Complaint as to ongoing harm, there are direct averments as to ongoing harm.
    - ▪ Moreover, as to ongoing harm, even just Section 230 alone is ongoing harm, as that is the Government's censorship leverage chip with Big Tech. Until Section 230 is rectified, the Government still holds its leverage over Big Tech. Similarly, until the GEC is eradicated (or returned to its original foreign-only scope), the problems at issue in this Complaint persist. Similarly, until the Smith-Mundt Act is restored to its original 1948 form (foreign propaganda only, not domestic propaganda), the problems at issue in this Complaint persist.

134

308.    This case suffers from none of the deficiencies identified by courts at the injunctive stage in *Missouri v. Biden* and in RFK, Jr.'s consolidated case. Standing is undeniable *via* Plaintiff principals Ty and Charlene Bollinger being the #3 on the DD hitlist generated by the CCDH at the Government's behest. And this suit also includes the Platforms (*e.g.*, Facebook) and NGOs (*e.g.*, CCDH) that Government implemented in carrying out the Censorship Industrial Complex. As stated above:

> At minimum, at least one Government agency (e.g., DOS / GEC, DHS / CISA, or DOD), in close collaboration with at least one NGO (e.g., CCDH, MMA or CIS), worked with or pressured at least one Platform (e.g., Facebook, Google, or Twitter) to directly censor or interfere with the free speech and / or business relationships of at least one plaintiff (e.g., Ty and / or Charlene Bollinger).

309.    In *Missouri v. Biden*, the Government defended its actions by claiming it was merely making "public statements" and exercising "government speech." Judge Terry Doughty, however, was rightly not persuaded by this argument. Judge Doughty acknowledged that the Government's role extended beyond mere speech (beyond just propaganda), noting that the use of its power to coerce and encourage Social Media companies to suppress and substitute content likely violated the Free Speech Clause. Judge Doughty recognized that the actions of Government agencies went far beyond public statements, involving a concerted effort to pressure Platforms into censoring information (in favor of their own), including that provided by Plaintiffs, in violation of First Amendment rights:

> The Defendants argue that by making public statements, this is nothing but government speech. However, *it was not the public statements that were the problem. It was the alleged use of government agencies and employees to coerce and/or significantly encourage social-media platforms to suppress free speech on those platforms.* Plaintiffs point specifically to the various meetings, emails, follow-up contacts, and the *threat of amending Section 230 of the Communication Decency Act.* Plaintiffs have produced evidence that Defendants did not just use public statements to coerce and/or encourage social-media platforms to suppress free speech, but *rather used meetings, emails, phone calls, follow-up meetings, and the power of the government to pressure social-media platforms to change their*

135

*policies and to suppress free speech. Content was seemingly suppressed even if it did not violate social-media policies.* It is the alleged coercion and/or significant encouragement that likely violates the Free Speech Clause, not government speech, and thus, the Court is not persuaded by Defendants' arguments here.

*Id.* at [D.E. 293] at 119 (emphasis added).

310.    Government has been deceptively laundering its own censorship through the free speech rights of Social Media platforms for years now. By outsourcing censorship to these private companies, the Government has sought to leverage the platforms' free speech discretion over content, quite conveniently and not-so-coincidentally insulated by the liability protection (Section 230 of the CDA) granted to Big Tech by the same Government conspirators. This created a circular protection paradigm: the platforms exercise their rights to control content, but do so under immense Government pressure, while simultaneously being unconstitutionally shielded from liability for their purportedly "voluntary" content moderation decisions that notably restrain the individual civil liberties of third-parties like Plaintiffs without due process. Adding another layer to this circular paradigm, the Government grants 501(c)(3) status to foreign entities, which produce blacklist-style hit pieces. These blacklists are then used as Government tools by the Government instruments (Platforms) to justify their Government-driven censorship actions. The combination of Government coercion and liability protection has resulted in a system where Big Tech's censorship is directed / instructed / endorsed / facilitated / funded by Government and ultimately protected by Government, which, again, blurs the line between public and private action and raises significant constitutional concerns.

311.    Judge Doughty properly recognized that the issue in *Missouri v. Biden* was not simply the Government's speech / propaganda or its stance on health and vaccines; but, rather, the Government's use of agencies and employees as the Government's tools to "coerce and/or significantly encourage" Social Media platforms to suppress free speech. *Missouri v. Biden* (along

136

with RFK's consolidated case) seemingly missed the deeper issue of this circular protection paradigm at play – the Social Media platforms were not only coerced into acting on the Government's behalf, but were also shielded from liability through Section 230's misapplied protections, which has allowed the Government to deceptively launder its censorship through the Platforms' and NGOs' free speech rights.

312.    Here, the Government did not merely issue public statements, it actively pressured Social Media platforms to align with its narrative by prioritizing and promoting Government-approved content. This pressure was facilitated using Government-endorsed 501(c)(3) approved status NGOs, like CCDH, while simultaneously suppressing and / or eradicating competing viewpoints; *i.e.*, a form of censorship by substitution. This substitution and related suppression (whether voluntary or coerced) was unfair, unlawful, anti-competitive and unconstitutional. This circular system of protection (where the platforms, under extreme Government pressure, acted as censors while eligible for purported Section 230 immunity) and tax-exempt status endorsement is a critically overlooked dynamic to the Censorship Industrial Complex.

313.    Much like the EIP covertly pressured Big Tech to censor election-related speech, the VP, CCDH, MMA, CIS, and the Biden administration (at the time) overtly pressured these same Platforms to suppress health-related speech during the COVID-19 pandemic.[110] Social Media platforms, instead of acting as neutral arbiters ("Good Samaritans" restricting objectionable material in "good faith"), per the CDA's affirmative defense protections, they instead became Instruments of the Government, censoring dissent at the Government's behest to protect their own interests while undermining Americans' free speech rights. As Judge Doughty properly noted,

---

[110] "At the time" because the DOS, DOD, DHS, HHS, and *et cetera* will doubtless continue efforts to unravel the Constitution post-Biden.

these actions went far beyond legitimate Government speech and violated core constitutional principles, negatively impacting others (here, Plaintiff and its principals, Ty and Charlene Bollinger) who sought to provide valuable, potentially life-saving alternative health information during a precarious time in the U.S. (and the world, for that matter) when more information / education was needed from diverse sources as to COVID and COVD vaccination, not less information from one source (the Government, who, we submit, is in bed with Big Pharma and the rest of the Establishment).

314.    Equating some pertinent *Missouri v. Biden* holdings / findings here:

The Plaintiffs contend [as does the DD-related Plaintiff here] that the Defendants are not only accountable for private conduct that they coerced or significantly encouraged, but also for private conduct in which they actively participated as 'joint participants' *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 725 (1961). Although most often 'joint participation' occurs through a conspiracy or collusive behavior, *Hobbs v. Hawkins*, 968 F.2d 471, 480 (5th Cir. 1992), *even without a conspiracy, when a plaintiff establishes the government is responsible for private action arising out of 'pervasive entwinement of public institutions and public officials in the private entity's composition and workings.'* Brentwood Academy. v. Tennessee Secondary Sch. Athletic Ass'n., 531 U. S. 288, 298 (2001).

*Missouri,* [D.E. 293] at 115 (emphasis added).

315.    Continuing:

Much like conspiracy and collusion, joint activity occurs whenever the government has so far insinuated itself into private affairs as to blur the line between public and private action. *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 357 (1974). To become 'pervasively entwined' in a private entity's workings, the government need only 'significantly involve itself in the private entity's actions and decision-making'; *it is not necessary to establish that 'state actors ... literally 'overrode' the private entity's independent judgment.' Rawson v. Recovery Innovations, Inc*., 975 F.3d 742, 751, 753 (9th Cir. 2020). 'Pervasive intertwinement' exists even if the private party is exercising independent judgment. *West v. Atkins*, 487 U.S. 42, 52, n.10 (1988); *Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442, 1454 (10th Cir. 1995) (holding that a 'substantial degree of cooperative action' can constitute joint action).

*Id.* at 116 (emphasis added).

316.    Continuing still:

For the same reasons as this Court has found Plaintiffs met their burden to show 'significant encouragement' by the White House Defendants, the Surgeon General Defendants, the CDC Defendants, the FBI Defendants, the NIAID Defendants, the CISA Defendants, and the State Department Defendants, this Court finds the Plaintiffs are likely to succeed on the merits that these Defendants 'jointly participated' in the actions of the private social-media companies as well, by insinuating themselves into the social-media companies' private affairs and blurring the line between public and private action.

However, this Court finds Plaintiffs are not likely to succeed on the merits that the 'joint participation' occurred as a result of a conspiracy with the social-media companies. The evidence thus far shows that the social-media companies cooperated due to coercion, not because of a conspiracy.

*Id.* at 116-117.[111]

317.    And finally:

This Court finds the White House Defendants, the Surgeon General Defendants, the CDC Defendants, the NIAID Defendants, the FBI Defendants, the CISA Defendants, and the State Department Defendants likely 'jointly participated' with the social-media companies to such an extent that said Defendants have become 'pervasively entwined' in the private companies' workings to such an extent as to blur the line between public and private action. Therefore, Plaintiffs are likely to succeed on the merits that the government Defendants are responsible for the

---

[111] As correctly pointed out in *Missouri*, Plaintiffs do not need to ultimately prove conspiracy; rather, as correctly pointed out in *Missouri*, Plaintiffs need only prove that which is already obvious – Big Tech's capitulation to the Government's extreme pressure / protection leveraging / coercion to censor Plaintiffs. We would be remiss, however, if we did not briefly say something about conspiracy. Again, this case does not suffer from the shortcomings identified early in *Missouri* (or in RFK, Jr.'s consolidated case). Again, for example, this case involves members of the DD who possess indisputable injunction standing, whereas the plaintiffs in *Missouri* seemingly had / have work to do in this regard. As evidenced by a wealth of information already available in the public domain (*e.g.*, materials that have surfaced in *Missouri*, released Twitter files, released Facebook files, FOIA materials, *et cetera*), the DD bore the overt brunt of the Establishment's "anti-vax" smear campaign in myriad respects, in particular with respect to the heightened aggression, conviction, coordination, and intent lacing Defendants targeted attack of Plaintiff (and Plaintiff's principals). Moreover, this case (unlike *Missouri*) names Social Media companies and NGOs as Defendants. Conspiracy is defined as "an agreement by *two or more* persons to commit an unlawful act; a *combination* for an unlawful purpose." Garner, Bryan A., *Black's Law Dictionary* 133 (2d pocket ed., 2001) (emphasis added). Naturally, then, it would have been an issue (perhaps it still is an issue) for the plaintiffs in *Missouri* to travel down a conspiracy path with only 1 of the 2 (or perhaps only 1 of the 3 if the NGO Tools are included in addition to the Social Media Instruments) conspirators present (the plaintiffs in *Missouri* having named the Government as defendants, Conspirator #1, but not the Social Media companies, Conspirator #2 or NGOs as Conspirator #3). Here, however, there is absolutely evidence of conspiracy, and we submit that discovery will only bolster the conspiracy. Again, full-blown conspiracy is not required to sustain this action; but, again, we submit that conspiracy is afoot (and the most succinct discussion of the conspiracy is perhaps best found in the Recapitulation section below, §III.I).

private social-media companies' decisions to censor protected content on social-media platforms.

*Id.* at 117.

318.    Judge Doughty made clear that it is unnecessary to prove whether Social Media platforms acted as part of a formal conspiracy, or whether the Government "literally 'overrode' the platform's independent judgment" (*i.e.*, whether the platforms' actions were voluntary or involuntary) for the Government's (and its cohort's) conduct to be deemed a direct or indirect violation of the First Amendment. When the Government becomes significantly involved in the decision-making processes of a private entity, to the point where the line between public and private actions becomes blurred, the Government can be considered a "joint participant." Liability can arise simply from the "pervasive entwinement of public institutions and public officials in the private entity's composition and workings." *Brentwood Academy v. Tennessee Secondary Sch. Athletic Ass'n*, 121 S.Ct. 924, 932 (2001).

319.    This "joint participation" does not require evidence of a formal conspiracy (although, as noted elsewhere in this Complaint, conspiracy is afoot), nor does it require proof that the Government fully overrode the Social Media platforms' independent judgment for the platforms' actions to be considered both unconstitutional and unlawful, and subject to liability. In fact, none of these factors need to exist for the platforms' own actions to be considered unlawful if they result in the illegal restraint of third-party civil liberties, regardless of Government pressure, when those restrictions exceed Section 230's "Good Samaritan" protections and are not done in "good faith;" *e.g.*, for the benefit of the platform.

320.    Judge Doughty also properly concluded that plaintiffs in *Missouri v. Biden* had likely demonstrated that several Government agencies (including the White House, CDC, FBI, and others) became so deeply entwined with the internal workings of Social Media companies – to the

140

point of calling them "chaos" – that their actions did, in fact, blur the boundary between public and private conduct. As a result, the Government should be held liable for the private companies' decisions to suppress free speech on their Platforms.

321.    In this case, Plaintiffs not only argue this form of "joint participation" and "pervasive entwinement," but also go further by demonstrating, through the history and formation of the Censorship Industrial Complex, that the Government has concretely (conspiratorially) collaborated with non-governmental agents and Big Tech companies to deliberately suppress any dissent; specifically, Plaintiffs' dissent. This (conspiratorial) censorship apparatus, built over time, shows the ongoing concerted effort between the Government, NGOs, and Social Media companies to control and manage public discourse. This deeper connection illustrates the broader (conspiratorial) scheme to silence free speech, making the Government and its private counterparts equally culpable.

## G.    Specific Harms Suffered By Plaintiffs Via Defendants' Censorship Industrial Complex

322.    Having outlined the history and innerworkings of the Censorship Industrial Complex (*i.e.*, having provided the context),[112] we now turn to the direct evidence of the censorship inflicted upon Plaintiffs.

323.    Ty and Charlene Bollinger (husband and wife) are 50 / 50 owners of Cancer Step Outside the Box, LLC ("CSOB"), with CSOB owning TTAC Publishing, LLC ("TTAC," The Truth About Cancer) and TTAV Global, LLC ("TTAV," The Truth About Vaccines). As discussed in greater detail below, the Bollingers were blacklisted as members of the so-called Disinformation

---

[112] The "context" we have thus far explained is likely only the tip of the iceberg. The conspiracy to censor domestic speech is so pervasive and systemic that we have focused solely on the particular facts that illustrate the lead up to Plaintiffs' direct injuries. But the conspiracy at play here is so clandestine that the actions and schemes outlined in this Complaint likely represent only a fraction of the full extent of the misconduct, which is far more pervasive and insidious than can presently be detailed. A broader understanding can be found (in part) in this Mike Benz interview with Tucker Carlson: https://duckduckgo.com/?q=Mike+Benx+tcuker+carlson&atb=v314-1&ia=web

Dozen (by CCDH, for example, at the behest of the Government), and the censorship they faced (by Big Tech at the behest of the Government) flowed from Defendants' desires to control online discourse and stifle critical voices relating to COVID-19.

324. As discussed in greater detail below, the Bollingers, along with others, were censored on platforms like Facebook, Google, and Twitter per Government directives, often carried out in coordination with NGOs like the CCDH, MMA, and CIS. These organizations, acting as intermediaries, provided the Government with cover while pressuring platforms to silence those critical of COVID-19 policies, for example. This case illustrates how the Government, through NGOs, exerts influence over Big Tech (utilizing Section 230 as leverage) to suppress dissent under the pretext of combating "misinformation," and it highlights how this influence extends to market manipulation and tortious interference, including efforts to disrupt advertising revenue streams, further silencing opposition and eliminating competing viewpoints.

325. The averments that follow are largely (if not entirely) fashioned as a chronology. This chronological approach was largely adopted to clearly and irrefutably demonstrate concrete harm (ongoing to the present), traceability / entwinement, and redressability.

326. In an email dated **March 15, 2020**, Mark Zuckerberg proposed coordinating with Anthony Fauci on COVID-19 messaging to "make sure people can get authoritative information from reliable sources," and suggested including a video message from Fauci because "people trust and want to hear from experts." Zuckerberg proposed including this content in a "hub" that "we're going to put at the top of Facebook" to reach "200+ million Americans, 2.5 billion people worldwide."

327. "But an even bigger deal is his offer [REDACTED]. The sooner we get that offer up the food-chain the better." ~ Dr. Deborah Birx (at the time, serving as the White House's

Coronavirus Response Coordinator). Dr. Birx also stated that her staff was "standing by to discuss this with HHS and WH comms," and requested authority to "determine who the best point of contact would be so the Administration can take advantage of this officer, soonest." Fauci responded that "I will write or call Mark and tell him that I am interested in doing this. I will then tell him that you will get for him the name of the USG [on information and belief, shorthand for U.S. Government] point of contact."

328.    In a **March 17, 2020**, email from Fauci to Zuckerberg, Fauci agreed to the collaboration that Zuckerberg proposed and described the redacted proposal as "very exciting." *Missouri v. Biden*, [D.E. 293] at 52.

329.    On **March 30, 2020**, Instagram / Facebook / Meta restricted @thetruthaboutvaccinesttav.[113]  Notably, within two weeks of Facebook's direct interaction with Government actors to "make sure people can get authoritative information from reliable sources," Instagram took direct restrictive actions against Plaintiffs.



330.    As early as **June 2020**, the CIS, working with CISA, was planning a "Reporting Portal" for Government officials seeking to suppress election misinformation that would allow "social-media companies" to "process reports and provide timely responses, to include the removal of reported misinformation from the platform where possible." CIS and CISA work closely to

---

[113] Instagram was / is owned by Facebook / Meta.

remove so-called "misinformation" by flagging content for removal by social-media companies. The Democratic National Committee, Common Cause, and the NAACP were also empowered like the federal agencies to file tickets seeking censorship of content. A DHS-funded collaboration, the Elections Infrastructure Information Sharing and Analysis Center, also had access.

331.    In **November 2020**, a new cyber offensive was launched by the United Kingdom's signal intelligence agency (Government Communications Headquarters), seeking to target websites that publish content deemed to be "propaganda" raising concerns over COVID-19 vaccine development and the multi-national pharmaceutical corporations involved.[114]

332.    On **November 11, 2020**, the United States and United Kingdom intelligence agencies launched a joint initiative to combat disfavored narratives surrounding COVID-19 and its vaccine development. This effort, described as a "cyber war" (better characterized as a joint Government Information War), targeted independent media outlets, like Plaintiffs, that challenged Government and pharmaceutical narratives, suggesting a potential role for the CCDH in advancing this effort under the guise of a nonprofit organization (501(c)(3)). The U.K.'s Government Communications Headquarters (GCHQ) spearheaded censorship operations to disrupt these outlets, employing tactics like blocking communications and encrypting data to impede their ability to publish content. This initiative marked a significant escalation in state-sponsored joint-participant efforts to suppress domestic dissenting voices under the guise of combating misinformation.

333.    On **November 17, 2020**, during a Senate Judiciary Committee hearing, Senator Richard Blumenthal stated: "I have urged, in fact, a breakup of tech giants. Because they've misused their bigness and power.… And indeed Section 230 reform, meaningful reform, including

---

[114] https://unlimitedhangout.com/2020/11/reports/us-uk-intel-agencies-declare-cyber-war-on-independent-media/

even possible repeal in large part because their immunity is way too broad and victims of their harms deserve a day in court." This marked a significant call and renewed effort for holding tech platforms accountable for their expansive influence and legal protections.

334. On **December 2, 2020**, Bruce Reed, Biden's former chief of staff and top tech advisor, publicly declared that it was "long past time" to hold social media companies accountable for the content published on their platforms, signaling the need for meaningful reforms to Section 230.

335. On **December 11, 2020**, shortly after the 2020 elections, the United States granted the CCDH 501(c)(3) tax-exempt status. This timing raised questions about CCDH's alignment with the Government.

336. On **January 23, 2021**, Biden took office and Clarke Humphrey (then White House digital director for Biden's COVID-19 response team) promptly goes on the offensive with respect to Robert Kennedy, Jr. (part of the DD along with the Bollingers).

337. On **February 7, 2021**, Twitter stated that it had been "recently bombarded" with censorship requests from the White House and would prefer to have a streamlined process. Twitter noted that "[i]n a given day last week for example, we had more than four different people within the White House reaching out for issues." *Missouri*, [D.E. 293] at 10.

338. On **February 8, 2021**, Facebook emailed Rob Flaherty (former Deputy Assistant to the President and Director of Digital Strategy) and Humphrey to explain its newest anticompetitive censorship by substitution efforts – expansion of its COVID-19 censorship policy to promote authoritative COVID-19 vaccine information and expanded its efforts to remove false claims on Facebook and Instagram about COVID-19, COVID-19 vaccines, and vaccines in general. *See id.*

339.     On **February 9, 2021**, Flaherty followed up with Facebook in regard to its COVID-19 policy, accusing Facebook of causing "political violence" spurred by Facebook groups by failing to censor false COVID-19 claims, and suggested having an oral meeting to discuss their policies. Facebook responded the same day, stating that even though "vaccine-skeptical" content did not violate its policies, it would have the content's "distribution reduced" and strong warning labels added (a form of its own speech), "so fewer people will see the post." This served as additional confirmation that Big Tech (Facebook, in this instance) was taking no independent stance or engaging in independent thought processes concerning COVID-related censorship; *i.e.*, this confirmed that Big Tech was doing nothing other than kowtowing to Government's censorship demands.

340.     In the same messaging with Flaherty, Facebook advised that it was working to censor content that did not violate Facebook's policy in other ways by "preventing posts discouraging vaccines from going viral on our platform" and by using information labels (a form of their own speech) and preventing recommendations for Groups, Pages, and Instagram accounts pushing content discouraging vaccines. *Id.* at 10-11. Facebook also informed Flaherty that it was relying on the advice of "public health authorities" to determine its COVID-19 policies. *Id.* Again, pure kowtowing to Government's censorship demands / opinions: "yes, Government, we will censor whatever you want, for whatever reason you want … even if it neither violates our policies nor is offensive."

341.     On **February 18, 2021,** the House Energy and Commerce Committee announced that Mark Zuckerberg, Sundar Pichai, and Jack Dorsey would testify at a hearing scheduled for **March 25, 2021**. The Government Defendants pre-planned their March 25, 2021, assault on Plaintiffs' free speech, demonstrating clear premeditation and coordination.

342.     In a **February 19, 2021,** email between Flaherty, Humphrey, several Facebook employees, and others, Flaherty asked to hear more from Facebook about "mis and dis" and later stated that one of his questions was about "algorithmic productions." Flaherty also asked if "plans are in the works … to replicate the strategy you deployed around lockdowns – the 'stay at home' stickers/promoted Instagram story." Upon information and belief, per Flaherty's request, a meeting was held on March 1, 2021, with the subject being "Misinfo & Disinfo." Not only does this further evidence Big Tech's absolute subservience to the Government's censorship-related demands, it also illustrates that Big Tech (Facebook, at the very least) was / is redesigning its product ("algorithmic productions") around the Government's demands (negligent product design / design defect).

343.     On **February 24, 2021**, in an email exchange with Flaherty, Facebook advised that at an upcoming meeting, it would provide detailed information on content that did not explicitly violate policy but could "contribute to vaccine hesitancy." *Missouri*, [D.E. 293] at 12. During this exchange, Flaherty requested detailed metrics on the scale of removals and examples of such content. Upon information and belief, this is when the Government requested the "data" from Facebook (hereafter referred to as the "data," and again in violation of the Fourth Amendment), which the White House subsequently provided to the CCDH. This vaccine hesitancy Facebook data was then used by the CCDH to prepare its preplanned March 24, 2021, hit piece targeting Plaintiffs, which was subsequently leveraged by the House Energy and Commerce Committee during its March 25, 2021, hearing. At this hearing, the CCDH report (relying on the data requested and provided by the White House) was presented, and direct calls for the censorship of Plaintiffs were made. This underscores the premeditated nature of the Government's collusion with Facebook and the CCDH in orchestrating and executing joint censorship efforts.

147

344.     On **March 1, 2021**, Flaherty, Humphrey, and others participated in the prescheduled "Twitter / COVID Misinfo" meeting with Twitter, underscoring Twitter's early participation in the Government's joint censorship efforts.

345.     On **March 2, 2021**, Facebook sent an email to Andrew Slavitt (former White House Senior COVID-19 Advisor), Flaherty, and Humphrey, assuring the Government that Facebook is "[c]ombating vaccine misinformation and de-amplifying content that could contribute to vaccine hesitancy" by "improving the effectiveness of our existing enforcement systems (particularly focusing on entities [the DD] that repeatedly post vaccine misinformation), mitigating viral content that could lead to vaccine hesitancy." Here, Facebook assured the White House that it was actively suppressing vaccine-related content, targeting repeat offenders like the later dubbed "Disinformation Dozen," and limiting the spread of posts that could contribute to "vaccine hesitancy."

346.     Also on **March 2, 2021**, the very same day, Ty and Charlene posted the following "vaccine-hesitan[t]" content on Facebook and received a 3-day suspension. This image (amongst others) was included in CCDH reporting (discussed below) released on March 24, 2021.[115] The timeline of events clearly demonstrates a direct traceability between Facebook's coordination with the Government and the removal of Plaintiffs' content, establishing proximate harm caused by these joint censorship efforts. Traceability does not get any clearer than this.



---

[115] The screenshot of this image featured in CCDH reporting shows that CCDH captured the Bollinger post within 20 hours of posting.

347.    On **March 3, 2021,** the CCDH tweeted out a "hit list" specifically targeting "vaccine hesitancy" (*e.g.*, "Anti-Vaxxers"), that included members of the Disinformation Dozen, featuring Ty and Charlene Bollinger:[116] Notably, the "Top 10 Anti-Vaxxer" "hit list" appears to rely exclusively on data from Facebook and Instagram.



348.    Upon information and belief, between **February 24, 2021**, and **March 3, 2021**, the Government enlisted the CCDH's services to draft its report targeting Plaintiffs, who, again, are members of the so-called "Disinformation Dozen." Furthermore, this "hit list" suggests that the CCDH was aware that Facebook's vaccine hesitancy data would soon be provided by Facebook to the White House and subsequently to the CCDH itself. This further underscores the premeditated nature of the Government's joint censorship efforts.

349.    On **March 12, 2021**, Facebook emailed Flaherty stating: "[h]opefully, this [data] format works for the various teams and audiences within the White House/HHS that may find this data [about vaccine hesitancy, the Bollingers, and other members of the DD] valuable." *Missouri,* [293] at 13. This email also provided a detailed report and summary regarding survey data on

---

[116] Again, the CCDH is a UK-based group who claims to "disrupt the architecture of online hate and misinformation." According to their website, they hope to deplatform, demonetize, and demonize what they refer to as "conspiracy theories, misinformation, and hate."

vaccine uptake from January 10, 2021, to February 27, 2021. Upon information and belief, this "data" provided by Facebook to the White House and by the White House to CCDH would be the vaccine hesitancy data around which the CCDH's first DD / Bollinger hit piece (dated March 24, 2021, and discussed below) revolved. Shortly after (or contemporaneously with) the CCDH's March 24, 2021, hit piece, the Government embarked on its March 25, 2021, full-frontal assault of the Bollingers / DD.

350.    On **March 15, 2021**, Flaherty emailed (subject line – "you are hiding the ball") Facebook, stating: "I've been asking you guys pretty directly, over a series of conversations, for a clear accounting of the biggest issues you are seeing on your platform when it comes to vaccine hesitancy and the degree to which borderline content as you define it – is playing a role." In this email train, Flaherty continued by making clear that the White House was seeking more aggressive action on "borderline content." Specifically, Flaherty's emails stated, in pertinent part:

> I am not trying to play 'gotcha' with you. We are gravely concerned that your service is one of the top drivers of vaccine hesitancy- period. I will also be the first to acknowledge that borderline content offers no easy solutions. But we want to know that you're trying, we want to know how we can help, and we want to know that you're not playing a shell game with us when we ask you what is going on. This would all be a lot easier if you would just be straight with us.

*Missouri*, [D.E. 293] at 13. Facebook responded as follows: "[w]e obviously have work to do to gain your trust…*We are also working to get you useful information* that's on the level. That's my job and I take it seriously – I'll continue to do it to the best of my ability, and *I'll expect you to hold me accountable*." Upon information and belief, the "on the level" data Facebook was trying to provide to the White House was not truly "on the level;" but, rather, the result of coercion from Government pressure to deliver results that aligned with the White House's censorship agenda. The duress Facebook faced is evident in its response to the White House's demands, stating, "hold me accountable," signaling the intense pressure to produce "biggest" actionable targets. Facebook,

150

under pressure, provided flawed / rushed data that lacked a legitimate foundation. This data was then used in the first CCDH hit piece targeting Plaintiffs, including Ty and Charlene Bollinger, as prominent members of the so-called Disinformation Dozen. The White House's focus was aimed at creating a showing of force to chill speech across social media platforms, with the Bollingers as central targets. This coerced and deeply flawed data served as the basis for the CCDH's baseless claim that twelve individuals were responsible for 65% of vaccine hesitancy content on Facebook – a claim wholly divorced from reality. This sequence highlights the premeditated collaboration between the White House, Facebook, and the CCDH to manufacture a chilling narrative and enforce joint censorship efforts, unjustly and unconstitutionally harming Plaintiffs in the process.

351.    Recently, an America First Legal Investigation uncovered a **March 16, 2021**, email sent by Rowan Kane (Counselor to the Connecticut Attorney General and Deputy Director of Policy) to himself, with Margaret Chapple also copied.[117] The email included an attached letter addressed to Jack Dorsey and Mark Zuckerberg and requested confirmation from other state attorneys general offices to "sign-on" to the letter by close of business on **March 23, 2021**. The Connecticut Attorney General's office was part of a larger coalition that included the Attorneys General of New York, Delaware, Iowa, Massachusetts, Michigan, Minnesota, North Carolina, Oregon, Pennsylvania, Rhode Island, and Virginia.[118]


**[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]**

---

[117]    https://aflegal.org/america-first-legal-releases-new-evidence-files-formal-complaint-with-the-doj-to-investigate-uk-based-center-for-countering-digital-hate-for-engaging-in-a-foreign-influence-campaign/

[118] https://ag.ny.gov/press-release/2021/attorney-general-james-calls-facebook-and-twitter-stop-spread-anti-vaxxer



Dear Messrs. Dorsey and Zuckerberg:

As Attorneys General committed to protecting the safety and well-being of the residents of our states, we write to express our concern about the use of your platforms to spread fraudulent information about coronavirus vaccines and to seek your cooperation in curtailing the dissemination of such information. The people and groups spreading falsehoods and misleading Americans about the safety of coronavirus vaccines are threatening the health of our communities, slowing progress in getting our residents protected from the virus, and undermining economic recovery in our states.

With the arrival of safe and effective coronavirus vaccines, our nation now has the tools it needs to end the pandemic. Our ability to do so quickly and limit further loss of life depends on broad public acceptance of the vaccines. However, misinformation disseminated via your platforms has increased vaccine hesitancy, which will slow economic recovery and, more importantly, ultimately cause even more unnecessary deaths. A small group of people—anti-vaxxers—wholly lacking in medical expertise and often motivated by financial interests, are using your platforms to downplay the dangers of COVID-19 and spread misinformation about the safety of vaccines. According to a recent report by the Center for Countering Digital Hate, anti-vaxxer accounts on Facebook, YouTube, Instagram, and Twitter reach more than 59 million followers. Anti-vaxxers are using social media platforms to target people of color and Black Americans specifically, members of communities who have suffered the worst health impacts of the virus and whose vaccination rates are lagging.

Given anti-vaxxers' reliance on your platforms, you are uniquely positioned to prevent the spread of misinformation about coronavirus vaccines that poses a direct threat to the health and safety of millions of Americans in our states and that will prolong our road to recovery.

We applaud the updated policies you have established to prevent the spread of vaccine misinformation. However, anti-vaccine misinformation continues to spread on your platforms, in violation of your stated policies.

• Twitter and Facebook have yet to remove from all their platforms the accounts of prominent anti-vaxxers who have repeatedly violated the companies' terms of service, including Robert F. Kennedy Jr., Sherri Tenpenny, Joseph Mercola, Rizza Islam, Ty & Charlene Bollinger, Kevin Jenkins, Rashid Buttar, Christiane Northrup, Ben Tapper, Kelly Brogan, Sayer Ji, and Erin Elizabeth. Digital media research groups estimate that as of March 10, these 12 anti-vaxxers' personal accounts and their associated organizations, groups and websites are responsible for 65% of public anti-vaccine content on Facebook, Instagram, and Twitter.



From:        Kane, Rowan
Sent:        Tuesday, March 16, 2021 1:54 PM
To:          Kane, Rowan
Cc:          Chappie, Margaret
Subject:     [ EXTERNAL ] Vaccine Disinformation Letter to Facebook and Twitter
Attachments: AG Letter to Tech CEOs re antivax.docx; AG Letter to Tech CEOs Cover Letter.docx

CAUTION: This email originated from outside the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Hi all,

With coronavirus vaccines ramping up dramatically, we are unfortunately seeing a rise in vaccine disinformation on social media. Over 65% of that fraudulent information comes from just 12 individuals. While Facebook (including Instagram) and Twitter have policies outlawing this kind of harmful information, they have thus far been lax in enforcing their policies. Attached is a letter to Mark Zuckerberg and Jack Dorsey asking them to enforce those policies on vaccine disinformation being spread on their platforms. There will be a Congressional hearing next Thursday, 3/25, in the Energy and Technology Committee. We have also attached a cover letter to the leadership of the E&T and the two cognizant subcommittees.

We are asking for any edits to be submitted by COB on Friday, 3/19 and confirmation of sign-on by COB Tuesday, 3/23. Thank you in advance for your support on this issue and please let me know if you have any questions.

Best,

Rowan Kane

Counselor to the Attorney General and Deputy Director of Policy

Office of the Attorney General, 165 Capitol Ave, Hartford, CT 06106

Office Phone:                     URL: http://portal.ct.gov/ag/

352.    On **March 19, 2021**, Facebook had an in-person meeting with White House officials, including Flaherty and Slavitt. Facebook followed up on **March 21, 2021**, noting that the White House had demanded a consistent point of contact with Facebook, additional data from Facebook, "Levers for Tackling Vaccine Hesitancy Content," and censorship policies for Meta's platform WhatsApp. Facebook noted that, in response to White House demands, it was censoring, removing, and reducing the virality of content discouraging vaccines "that does not contain

152

actionable misinformation" (again, negligent product redesign by Facebook purely per the Government's demand as well as a form of Facebook's own speech). Facebook also provided a report for the White House on the requested information on WhatsApp policies:

> You asked us about our levers for reducing virality of vaccine hesitancy content. In addition to policies previously discussed, these include the additional changes that were approved last week and that we will be implementing over the coming weeks. As you know, in addition to removing vaccine misinformation, we have been focused on reducing the virality of content discouraging vaccines that do not contain actionable misinformation.

*Missouri,* [D.E. 293] at 14.

353.     On **March 22, 2021**, Flaherty responded to this email, demanding more detailed information and a plan from Facebook to censor the spread of "vaccine hesitancy" on Facebook. Flaherty also requested more information about and demanded greater censorship by Facebook of "sensational," "vaccine skeptical" content. He also requested more information about WhatsApp regarding vaccine hesitancy. Further, Flaherty stated to Facebook that the White House was hoping they could be "partners here, even if it hasn't worked so far." Id. at 14. A meeting was scheduled for March 24, 2021 (the CCDH hit piece drop day) between Facebook and White House officials to discuss these issues. *Id.* at 15. This indicates the White House had advanced knowledge of the impending CCDH report.

354.     The Twitter Files revealed a **March 23, 2021,** email from Hannah Murphy of the *Financial Times*, stating: "In a report embargoed for tomorrow, the CCDH is urging Twitter and other platforms (Facebook, Google) to ban the accounts of twelve individuals it has found responsible for around two-thirds of online anti-vaccine content."[119] Notably, Ty and Charlene Bollinger were listed as third among the targeted individuals.

---

[119] An embargo is a restriction on the release or distribution of information, goods, or actions until a specified time. Often imposed by governments or regulatory bodies, embargoes control the timing of public announcements, trade, or sensitive data.

153



---

355.     Upon information and belief, the embargo of the CCDH report referenced by Ms. Murphy was orchestrated by the White House, underscoring premeditated coordination between the Government, the CCDH, the media, and social media platforms. This timing conspicuously coincides with the **March 23, 2021,** deadline for Attorneys General to sign onto a related letter. Evidence suggests the CCDH provided advance copies of the report to the Connecticut Attorney General's office, the Financial Times, and the White House before its public release on March 24, 2021.

356.     Upon information and belief, the meeting scheduled on **March 22, 2021,** for **March 24, 2021** (the CCDH hit piece drop day), was preplanned to provide White House officials, social media platforms, and specific Congressional members with advance notice of the report, facilitating their coordination in the broader effort to target Plaintiffs. This meeting and its timing further demonstrate premeditated efforts to align the report's release with governmental actions.

357.     This timing and behind-the-scenes coordination suggest the Government strategically imposed the embargo to delay the public release of the CCDH report until March 24,

2021. This allowed the White House, Attorneys General, and media to align their efforts ahead of the preplanned March 25, 2021, House Energy and Commerce Committee hearing, amplifying the report's impact.

358.     On **March 24, 2021,** the CCDH published its report, *The Disinformation Dozen*, along with a related article targeting Plaintiffs. *That very same day*, New York Attorney General Letitia James, as part of a coalition of twelve Attorneys General, publicly called on Facebook and Twitter to remove accounts linked to the Disinformation Dozen. This letter cited the CCDH report as evidence and demanded stronger measures to combat anti-vaccine content:[120]

> New York Attorney General Letitia James, as part of a coalition of 12 attorneys general, today called on Facebook and Twitter to take stronger measures to stop the spread of coronavirus disease 2019 (COVID-19) vaccine disinformation being spread by anti-vaxxers on their social media platforms.
>
> Twitter and Facebook have yet to remove from all their platforms the accounts of prominent anti-vaxxers who have repeatedly violated the companies' terms of service. Digital media research groups estimate that, as of March 10, 2021, 12 anti-vaxxers' personal accounts and their associated organizations, groups, and websites are responsible for 65 percent of public anti-vaccine content on Facebook, Instagram, and Twitter.
>
> Joining Attorney General James in sending today's letter to Facebook and Twitter are the attorneys general of Connecticut, Delaware, Iowa, Massachusetts, Michigan, Minnesota, North Carolina, Oregon, Pennsylvania, Rhode Island, and Virginia.

359.     Furthermore, the coalition of twelve state Attorneys General signed and released their letter condemning Plaintiffs on "the very same day" the CCDH report was made public – an action that would have been impossible without prior coordination and access to the report. Put simply, the Government had to have been jointly participating with the CCDH prior to March 24, 2021, as such synchronized releases could not have occurred without deliberate collaboration.

---

[120] https://ag.ny.gov/press-release/2021/attorney-general-james-calls-facebook-and-twitter-stop-spread-anti-vaxxer

360.    On **March 25, 2021,** Mark Zuckerberg (Meta/Facebook), Jack Dorsey (Twitter), and Sundar Pichai (Google) testified before Congress. During this hearing, Congressional members directly pressured these CEOs to remove members of the Disinformation Dozen, including Plaintiffs, from their platforms, relying on the Government-coordinated CCDH hit piece as the basis for their demands.

361.    Based on the conspicuous alignment of key dates, it is self-evident that a coordinated effort took place. The House Energy and Commerce Committee pre-scheduled its March 25, 2021, hearing on February 18, 2021, strategically aligning it with the attorneys generals' March 23, 2021, letter, and media release, as well as the planned March 24, 2021, CCDH report release. The timing of these events, when considered alongside the facts and evidence, reveals an inconceivable alignment of timelines that cannot be dismissed as a mistake or coincidence. Instead, this was a meticulously planned and premeditated assault on free speech orchestrated by U.S. Government and its censorship instruments – Defendants. This sequence of events demonstrates a deliberate and coordinated conspiratorial effort between the White House, Attorneys General, Congress, CCDH, Big Tech, and media to suppress dissenting voices like Plaintiffs, shape public opinion, and influence oversight discussions on platform censorship.

362.    At the March 25, 2021, congressional hearing, Representative Mike Doyle introduced the now-revealed Government-coordinated and preplanned CCDH 40-page hit piece. Representative Doyle's interrogation of Zuckerberg, Dorsey, and Pichai (during which he aggressively insisted that the Social Media giants immediately remove the DD, including the Bollingers, from their platforms) was laced with hostility and urgency. Representative Doyle's agitated and forceful approach successfully garnered verbal commitments from Zuckerberg,

156

Dorsey, and Pichai to take swift action in eradicating the DD, including the Bollingers, from their platforms without delay.

363.    After expressing some initial reluctance, Facebook, Twitter, and Google ultimately capitulated to Representative Doyle's demands, agreeing to censor the individuals dubbed the Disinformation Dozen (*i.e.,* the Government Defendants were specifically targeting Plaintiffs), including the Bollingers. This decision was made without any independent assessment or analysis by the Platforms of the Government to determine whether the Bollingers or the DD had, in fact, engaged in any "offensive" conduct that would have independently justified such action in the ordinary course of providing interactive computer services. The Platforms' removals were plainly the result of Government pressure, not the result of an objective application of Platform policies.

364.    This coordinated conduct was incontrovertibly State action / State censorship targeting the individuals (not "offensive" content along the lines of the Communications Decency Act, Title 47 U.S.C. § 230) disparagingly identified and targeted in the Government-induced CCDH report. Facebook complied with Representative Doyle's / the Government's censorship demands immediately, Twitter a week later, and Google one-and-a-half months later. On **March 25, 2021**, Instagram (owned by Facebook / Meta) took down all TTAV accounts (all at once), including personal accounts. In other words, the Government (including the White House, Attorneys General, and Congress) deliberately targeted Plaintiffs and used the CCDH, media, and social media platforms as instruments to ultimately execute their coordinated censorship plans. Notably, neither Zuckerberg, Dorsey, nor Pichai made any independent assessment of the targeted individuals' content at that hearing, yet they committed at that hearing to censoring the Government's chosen targets nonetheless – indicating that their actions were based on the Government's demands rather than any independent evaluation of the Plaintiffs' content. Simply

157

put, the Government said, "Take these people down," and Big Tech replied, "Sure thing, boss!"— and then carried out the orders.

365.    On **April 1, 2021** (a week after the hearing), Plaintiffs' five Twitter channels (@TTAVOfficial / @truthaboutbigc / @TYCharleneB / @CancerTruthNews / @charlis_beauty) were suspended. X (Twitter) has subsequently restored @TTAVOfficial, @TyCharleneB, and @charlis_beauty but in appearance not in function; *i.e.*,@TTAVOfficial, @TyCharleneB, and @charlis_beauty are still badly restricted / shadow banned (operating in a diminished service capacity). Moreover, regarding the two accounts that X has "restored," Plaintiffs attempted to run an audit on their accounts with X's own open-source code *via* Grok so as to determine whether any suppression labels (*e.g.*, "search blacklist," "do not amplify," "state media," "spam," and *et cetera*) are still affixed to their accounts, negatively influencing the performance of their accounts. Plaintiffs, however, were unable to make a determination, as X has seemingly disabled this audit function, possibly to conceal its nefarious hidden restrictions – perhaps because it recognizes that those labels constitute a form of its own disparaging speech.

366.    Twitter's initial stated reason for the suspension was as follows: "[y]our account was permanently suspended due to multiple or repeat violations of the Twitter Rules: https://twitter.com/rules. In reality, Twitter's reason for the suspensions was "because the Government said so." Recognizing that "because the Government said so" is not a legally viable (or "good faith") reason for badly damaging someone's livelihood or personality / reputation, X manufactured the "repeat violation of the Twitter Rules" nonsense.

367.    Big Tech companies often fall back on this circular notion of "repeat violation" – the Platform first identifies a target it wants banned, then actively searches for instances to label "violations." Platforms subsequently claim that these "repeated violations" (which they are

158

actively searching for – not passively determining – a form of content development) serve as justification for banning the targeted party, even though the supposed infractions result from the Platform's deliberate content de-development efforts to find some sort of fault or wrongdoing in the target. Distilled, the approach boils down to – "we do not want you on our platform, so we will find a reason to get rid of you." Notably, users are sometimes cited for content violations stemming from posts made as much as a decade earlier (which is absurd) – content that would be nearly impossible to find, content that nobody will ever see again, and content that did not violate the "rules" at the time it was posted. Yet, these outdated posts are conveniently used as retroactive justification for claiming repeated violations to enforce a "repeat violation" ban. This backwards approach (targeting an individual and then searching retroactively for information supportive of such decisions, rather than making present day decisions) is driven by the very same predetermined outcome the Government sought here, rather than objective standards, which certainly is not the behavior of a "Good Samaritan" functioning in "good faith." In other words, some platforms have designed their interactive computer service products to target individuals not based on the offensiveness of their content, but rather on their own interests, the interests of the Government, or their own anticompetitive intent.

368.    On **April 21, 2021**, the Government met with several YouTube officials (note: YouTube is owned by Google).

369.    By email dated **April 22, 2021**, Flaherty provided a recap of the meeting and stated his concern that misinformation on **<u>YouTube</u>** was "shared at the highest (and I mean the highest) levels of the White House." Flaherty indicated that the White House remains concerned that YouTube is "funneling people into hesitancy and intensifying people's vaccine hesitancy." Flaherty further shared that "we" want to make sure YouTube has a handle on vaccine hesitancy

and is working toward making the problem better. Flaherty again noted vaccine hesitancy was a concern that is shared by the highest ("and I mean the highest") levels of the White House. *Missouri*, [D.E. 293] at 19.

370. On **April 23, 2021**, Flaherty sent Facebook an email including a document entitled "Facebook COVID-19 Vaccine Misinformation Brief" ("the Brief"), which indicated that Facebook plays a major role in the spread of COVID vaccine misinformation and found that Facebook's policy and enforcement gaps enable misinformation to spread. The Brief recommended much more aggressive censorship (more aggressive enforcement of Facebook's policies; *i.e.,* find more "repeat violations" to target the DD) and called for progressively severe penalties. The Brief further recommended Facebook stop distributing anti-vaccine content in News Feed or in group recommendations. The Brief also called for "warning screens" (a form of their own speech) before linking to domains known to promote vaccine misinformation. Flaherty noted sending this Brief was not a White House endorsement of it, but "this is circulating around the building and informing thinking." *Missouri*, [D.E. 293] at 20.

371. On **April 28, 2021**, CCDH published a sequel report,[121] again directly identifying Ty and Charlene Bollinger as part of the Government targeted DD. The findings of this report were raised with Twitter, Facebook, and Instagram by Senators Klobuchar and Luján, by Senator Warner and twelve state attorneys general amidst Congress' "call[ ] for action on the Disinformation Dozen." Members of Congress pressed Facebook, Twitter, and Google to review CCDH reporting "and take action to enforce their existing policies."

---

[121] https://counterhate.com/wp-content/uploads/2022/05/Disinformation-Dozen-The-Sequel.pdf





372. On **May 1, 2021,** Facebook's Nick Clegg (President of Global Affairs) sent an email to Slavitt indicating Facebook and the White House met recently to "share research work." Clegg apologized for not catching and censoring three pieces of vaccine content that went viral and promised to censor such content more aggressively in the future: "I wanted to send you a quick note on the three pieces of vaccine content that were seen by a high number of people before we demoted them. Although they don't violate our community standards, we should have demoted them before they went viral, and this has exposed gaps in our operational and technical process." Clegg told Slavitt that Facebook teams had spent the past twenty-four hours analyzing gaps and would be making changes (notably, to their product / services) the upcoming week. Clegg also noted the White House's demands from a recent meeting: (a) address Non-English mis/disinformation circulating without moderation; (b) do not distribute or amplify vaccine hesitancy, and Facebook should end group recommendations for groups with a history of COVID-19 or vaccine misinformation; (c) monitor events that host anti-vaccine and COVID

161

disinformation; and (d) address twelve accounts [the DD] that were responsible for 73% of vaccine misinformation.

373. Regarding the twelve accounts identified in Facebook's four objectives tracking the same four Government demands, Facebook noted that it was scrutinizing (*i.e.*, targeting) these accounts and censoring them whenever it could, but that most of the content did not violate Facebook's policies. Facebook referred to its new policy as their "Dedicated Vaccine Discouraging Entities." In sum, Facebook changed its products and policies at the Government's request and assured the Government that it would continue to persistently target Plaintiffs.

374. Ironically, Facebook even suggested that too much censorship might be counterproductive and drive vaccine hesitancy: "[a]mong experts we have consulted, there is a general sense that deleting more expressions of vaccine hesitancy might be more counterproductive to the goal of vaccine uptake because it could prevent hesitant people from talking through their concerns and potentially reinforce the notion that there's a 'cover-up.'" *Missouri*, [D.E. 293] at 20-22. In other words, Facebook cautioned the Government that overtly censoring too much content might expose their conspiracy to censor Plaintiffs – *well, we caught them.*

375. On **May 3, 2021**, it was reported that DHS intended to "partner with private firms," (upon information and belief, that included social-media companies, and private NGOs), to monitor disfavored speech online.[122]

376. The Department of Homeland Security ("DHS"), as a Government agency, is constitutionally restricted in its ability to monitor citizens online. Under the Fourth Amendment,

---

[122] https://www.cnn.com/2021/05/03/politics/dhs-partner-private-firms-surveil-suspected-domestic-terrorists/index.html.

the Government is limited to browsing publicly available information on social media platforms unless it obtains proper legal authorization. This limitation does not, however, cover the detailed information previously sought by Flaherty and other White House officials in preparation for their March censorship efforts. This overreach indicates that the Government not only violated Plaintiffs' First Amendment rights but also their Fourth Amendment rights by leveraging private entities to gather and act on information beyond its constitutional authority. To circumvent these restrictions, upon information and belief, the To circumvent these restrictions, DHS partnered with private social media companies, outsourcing tactics that would otherwise be unlawful for the Government to perform directly. For example, in gathering information, DHS relied (in whole or in part) on social media platforms to engage in practices such as assuming false identities to infiltrate private groups, tactics that would constitute clear Fourth Amendment violations if executed directly by the Government. Upon information and belief, many of the players in this censorship scheme have also created or utilized bot or fake accounts to drive Government-preferred narratives, further manipulating public discourse.

377.    On **May 5, 2021**, Jen Psaki (then White House Press Secretary) began her public pressuring of Big Tech, commenting at a White House press conference that there could be "legal consequences" if Big Tech did not censor more aggressively pursuant to Government demands. A primary example of "legal consequence" leveraged by the Government would be the use of / eligibility for Section 230 immunity, as discussed elsewhere in this Complaint.

378.    Also at a **May 5, 2021**, White House press conference involving Psaki and Tom Vilsack (Secretary of Agriculture), Psaki stated that "t]he President's view is that the major platforms have a responsibility related to the health and safety of all Americans to stop amplifying untrustworthy content, disinformation, and misinformation, especially related to COVID-19,

vaccinations, and elections."[123] Psaki immediately went on to state that Biden "supports . . . a robust anti-trust program," and that the President's "view is that there's more that needs to be done to ensure that this type of misinformation; disinformation; damaging, sometimes life-threatening information is not going out to the American public." The Government wielded Section 230 immunity as both a carrot and a stick – creating a "rewarded if you do, damned if you don't" scenario for Big Tech. As outlined elsewhere in this Complaint, if Big Tech was doing enough to appease Government's insatiable desire to censor COVID dissenters (Plaintiffs), then the Government was content to leave the overbroad Section 230 immunity framework intact. Whenever the Government felt that Big Tech was not bending over backwards far enough to meet its censorship expectations, however, it threatened revocation of Section 230 immunity, leveraging this judicial antitrust pressure to foster compliance with its demands.

379.    In **May 2021**, the Government started to turn up the heat on Big Tech regarding efforts to censor the DD pursuant to Government's demands. More specifically, on **May 6, 2021**, Flaherty demanded more information about Facebook's efforts to demote borderline content, stating, "[n]ot to sound like a broken record, but how much content is being demoted, and how effective are you at mitigating reach, and how quicky?" Flaherty also criticized Facebook's efforts to censor the DD: "[s]eems like your 'dedicated vaccine hesitancy' policy isn't stopping the disinfo-dozen – they're being deemed as not dedicated – so it feels like that problem likely coming over to groups." Tensions rose between the White House and Facebook, culminating with

---

[123] Under the proper interpretation / application of Section 230, amplification constitutes content development, making it the Platform's own speech and disqualifying it from Section 230(c)(1) protection. Platforms may only restrict (not amplify) content in "good faith" under Section 230(c)(2). Yet, Platforms have long acted as information content providers through selective amplification and de-amplification (*i.e.*, content development). Now acting on behalf of the Government, these Platforms engage in censorship far beyond Section 230's intended protections, raising serious constitutional concerns.

Flaherty's **July 15, 2021**, email to Facebook: "Are you guys fu@king serious? I want an answer on what happened here and I want it today." *Missouri*, [D.E. 293[ at 22-23.

380.    On **May 17, 2021**, without the prerequisite warning, YouTube (owned by Google) suspended the TTAC channel. This likely flowed from the aforementioned April 21, 2021, meeting.

381.    On **May 20, 2021**, Mina Hsiang of the Office of Management and Budget wrote to a Google employee, apparently following up on a conversation from the previous day that was "critically helpful for the nationwide vaccination effort."[124] Hsiang suggested a change to results yielded by a search for "who can get vaccinated now." A subsequent meeting was arranged. This is a prime example of censorship by substitution, where Government-facilitated propaganda was deliberately identified to displace Americans' speech.

382.    On **May 25, 2021,** the first meeting occurred between the Office of the Surgeon General (Vivek Murthy) and social-media platforms (Clegg), as well as Slavitt. The purpose of this call was to introduce Murthy to Clegg. After the meetings with social-media platforms, the platforms fell in line with the Office of Surgeon General's and White House's requests. For

---

[124] *See* n. 2, *supra*. Discovery will doubtless reveal what (if any) additional individuals / entities need to be added to the universe of Defendants. For example, in a response to a third-party subpoena in another similar action, YouTube (owned by Google) has identified myriad individuals (Faught, Molina-Irizarry, Galemore, Wakana, Flaherty, and Waldo, among others), as federal officials likely to have "communicated with YouTube custodians about misinformation about COVID, the census, or elections." We do not yet know, sans discovery, the degree to which the aforementioned individual contributed to the wrongdoing at issue here. And the same goes for Mina Hsiang, for that matter. Did Ms. Hsiang's conversation(s) with Google ultimately result in change to the Google search engine that influenced search results? Did Ms. Hsiang's suggestion(s) relate to the silencing of COVID-19 vaxx dissenters such as Plaintiffs? Did a search result change occur that harmed the Bollingers? We do not yet know the extent of involvement of various individuals / entities mentioned in this Complaint, but we would be remiss to leave such mentions / discussions out, as such discussions lend context to the overall story / lend clarity to the overall picture. For example, mention of Ms. Hsiang's conversation with Google illustrates the width and breadth of the Government's censorship efforts – the censorship efforts were so widespread as to encompass ordinary Google search results and we will be quite curious to learn in discovery, among many other things, whether Google manually manipulated its ordinary search results in relation to the Bollingers and whether such manipulation has exacerbated the harms suffered by the Bollingers. Hence, the earlier reservation of right to amend this Complaint.

examples, Facebook announced policy updates on May 27, 2021, and Clegg emailed Murthy with a report of misinformation on Facebook on May 28, 2021. *Missouri*, [D.E. 293] at 30-31. One of the more noteworthy Facebook policy changes that occurred following meetin4gs with the Surgeon General (and pursuant to Facebook's unwavering desire to be in the good graces of an incredibly demanding and protective Government) was Facebook's policy change to expand penalties for individual Facebook accounts that shared misinformation.

383.    From **May 28, 2021, to July 10, 2021**, a senior Meta executive reportedly copied Slavitt on his emails to Murthy alerting them that Meta, pursuant to the White House's requests, was engaging in censorship of COVID-19 misinformation and expanding penalties for individual Facebook accounts that share misinformation. *Missouri*, [D.E. 293] at 12. Meta further assured the Government that "there is considerably more we can do in 'partnership' with you and your team to *drive behavior*;" *i.e.*, chill unwanted speech. *Id.* (emphasis added).

384.    In **June 2021**, the National Security Council released its National Strategy for Countering Domestic Terrorism ("NSCDT").[125] The NCSDT repeatedly claimed that "disinformation and misinformation" are important elements of "domestic terrorism." It claimed that the "ideologies" of domestic terrorists "connect and intersect with conspiracy theories and other forms of disinformation and misinformation." It stated that such "elements" of domestic terrorism "can combine and amplify threats to public safety," "[e]specially on Internet-based communications platforms such as social-media." It stated that DHS and others "are currently funding and implementing or planning" programs to "strengthen[] user resilience to disinformation and misinformation online for domestic audiences." The Strategy memo identified, as its "broader

---

[125]        https://www.whitehouse.gov/wp-content/uploads/2021/06/National-Strategy-for-Countering-Domestic-Terrorism.pdf.

priority," the task of "enhancing faith in government and addressing the extreme polarization, fueled by a crisis of disinformation and misinformation often channeled through social-media platforms, which can tear Americans apart." And it called for DHS and others to "accelerat[e] work to contend with an information environment that challenges healthy democratic discourse," and to "find[] ways to counter the influence and impact" of online disinformation.

385. This broadened mandate, aligning with the GEC's expanded mission, effectively labels a wide range of dissenting perspectives, including Plaintiffs, as "threats" (*i.e.,* threats to the Administrative State). Beyond traditional threats, the Government began categorizing groups and ideologies far removed from violence or extremism as potential threats to public safety. While white supremacist and neo-Nazi organizations, anarchist extremists, and anti-government factions like militias and sovereign citizen movements were identified (groups that, as deplorable as their views may be, still retain First Amendment protections for their speech), the scope expanded significantly. This broader categorization began to scrutinize, for examples, environmental and animal rights activists (*e.g.*, Earth Liberation Front, "ELF," and Animal Liberation Front, "ALF"), as well as religious organizations.

386. This expansive definition of "domestic terrorism" demonstrates how the Administrative State leveraged the NCSDT to target more than those engaged in violence, now also targeting suppression of dissent from a wide array of problematic ideological and political perspectives. By broadly labeling these groups as threats to "healthy democratic discourse," the Government has chilled constitutionally protected speech under the guise of maintaining public safety.

387. On **June 3, 2021**, Facebook removed Plaintiffs' April 21, 2021, post: "EPISODE 1: The Sorid History of the Cancer Cartel: A Century of Suppression and Censorship,"

ambiguously (and in bad faith) claiming that the post "didn't follow [Facebook's] Community Standards."



388. Beginning on **June 14, 2021,** Facebook (Clegg) "began sending bi-weekly COVID content reports." *Missouri*, [D.E 293] at 32.

389. On **July 6, 2021**, Eric Waldo (Senior Advisor to the Surgeon General) emailed Twitter to set up the rollout call for the Office of the Surgeon General's health advisory on misinformation and told Twitter that Murthy had been thinking about how to stop the spread of health misinformation; that he knew Twitter's teams were working hard and thinking deeply about the issue; and that he would like to chat over Zoom to discuss. Twitter ultimately publicly endorsed the Office of the Surgeon General's call for greater censorship of health misinformation. *Missouri*, [D.E. 293] at 32.

390. Waldo sent an email to YouTube (owned by Google) on **July 6, 2021**, to set up the rollout call and to state that the Office of the Surgeon General's purpose was to stop the spread of misinformation on social media platforms. Succumbing to the Government's censorship pressure, YouTube eventually adopted a new policy on combatting COVID-19 misinformation and began

providing federal officials with updates on YouTube's efforts to combat the misinformation. *Id.* at 32-33.

391.    On **July 12, 2021**, and **July 14, 2021**, the Office of the Surgeon General held pre-rollout calls with Twitter and YouTube regarding the forthcoming Surgeon General's health advisory on misinformation. *Id.* at 31. Much like the CCDH shared its report with the Government before its official release, these pre-rollout discussions reveal the reverse dynamic – the Government actively sharing its plans with Big Tech to align its censorship efforts in advance. This pre-coordination underscores the entwinement between the Government and social media platforms, illustrating how both parties worked hand-in-glove at all times to suppress dissent and manipulate public discourse under the fraudulent veil of combating misinformation.

392.    On **July 15, 2021**, the Surgeon General of the United States released a report entitled "Confronting Health Misinformation."[126] At a **July 15, 2021,** joint press conference between Psaki and Murthy, "the two made the comments … which publicly called for social-media platforms 'to do more' to take action against misinformation super-spreaders." *Id.* at 28. "Murthy was directly involved in editing and approving the final work product for the July 15, 2021, health advisory on misinformation." *Id.* The Surgeon General's July 15, 2021, rollout was coordinated with Renee DiResta ("DiResta") from the Stanford Internet Observatory, a leading organization of the Virality Project. *Id.* at 29. And this was not the full extent of the Surgeon General's partnership / coordination with the Stanford Internet Observatory / Virality Project. Again, much like the Government's relationship with the CCDH, this coordination with Stanford highlights how NGOs played a pivotal role in amplifying and operationalizing the Government's censorship

---

[126] https://www.hhs.gov/sites/default/files/surgeon-general-misinformation-advisory.pdf; *see also*

*https://www.nationalreview.com/news/psaki-white-house-flagging-covid-disinformation-for-social-media-companies/*

efforts, creating a seamless partnership aimed at suppressing dissent under the pretense of addressing health misinformation.

393. The July 15, 2021, rollout with Facebook "was negatively affected because of the public attacks by the White House and Office of the Surgeon General towards Facebook for allowing misinformation to spread. Clegg of Facebook reached out to attempt to request 'de-escalation' and 'working together' instead of the public pressure. In the call between Clegg and Murthy, Murthy told Clegg he wanted Facebook to do more to censor misinformation on its platforms." *Id.* at 29.

394. In deposition, Waldo "admitted that Murthy used his office to directly advocate for social- media platforms to take stronger actions against health 'misinformation' and that those actions involved putting pressure on social-media platforms to reduce the dissemination of health misinformation. Surgeon General Murthy's message was given to social-media platforms both publicly and privately." *Id.* at 28. Waldo also admitted that Murthy used his "bully pulpit" to talk about health misinformation and to put public pressure on social-media platforms. *Id.*

395. Waldo and the Office of the Surgeon General received a briefing from the CCDH about the DD. CCDH gave a presentation about the DD and how CCDH measured and determined that the DD were primarily responsible for a significant amount of online misinformation. *Id.* at 30. Upon information and belief, the CCDH specifically relied on the data the Government had requested from Facebook on February 18, 2021, to substantiate its claims and explain its methodology. The CCDH, however, misinterpreted that data, leading to the absurd and baseless claim that 65% of the misinformation online stems from just twelve people.

396. At the aforementioned **July 15, 2021**, press conference, Murthy described health misinformation as one of the biggest obstacles to ending the pandemic; insisted that his advisory

was on an urgent public health threat; and stated that misinformation poses an imminent threat to the nation's health and takes away the freedom to make informed decisions. Murthy further stated that health disinformation is false, inaccurate, or misleading, based upon the best evidence at the time. *Id*,. at 33. The irony, however, is that Murthy's efforts to suppress dissenting voices / alternative perspectives (like Plaintiffs') stripped Americans of their ability to exercise informed consent, the very foundation of personal freedom and medical autonomy.

397.    Murthy called upon social media platforms to operate with greater transparency and accountability, to monitor information more clearly, and to "consistently take action against misinformation super-spreaders [DD] on their platforms." By doing so, the Government effectively attempted to bypass Fourth Amendment restrictions, forcing private information to be made more publicly available to the Government.

398.    At his deposition, Waldo agreed that the word "accountable" carries with it the threat of consequences. (footnote 179: [Id.]) Murthy further demanded social-media platforms do "much, much, more" [censoring] and take "aggressive action" against misinformation because the failure to do so is "costing people their lives." (footnote 180: [Id.]) *Id.* at 33. Sadly, the Government's efforts to censor Plaintiffs' alternative health options and quash informed consent (most of which later proved correct) likely resulted in more lives lost.

399.    Under a heading entitled "What Technology Platforms Can Do" the Surgeon General's health advisory called for platforms to take a series of steps to increase and enable greater social-media censorship of misinformation, including product changes, changing algorithms to avoid amplifying misinformation, building in "frictions" to reduce the sharing of misinformation, and practicing the early detection of misinformation super-spreaders, along with

171

other measures. The consequences for misinformation would include flagging problematic posts, suppressing the spread of the information, suspension, and permanent de-platforming. *Id*. at 34.

400.     On **July 16, 2021**, Biden remarked on purported anti-vaccine misinformation, stating that the DD and their purported COVID misinformation were "killing people." More realistically, however, the suppression of open dialogue and dissenting opinions, often revolving around incomplete or evolving science, likely cost lives by undermining informed decision-making and trust in public health narratives. Also on **July 16, 2021**, Clegg emailed Murthy and stated, "I know our teams met today to better understand the scope of what the White House expects of us on misinformation going forward." *Missouri*, [D.E. 293] at 35.

401.     On **July 17, 2021**, a Facebook official sent an email to Anita B. Dunn (Senior Advisor to the President) asking for ways to "get back into the White House's good graces" and stated Facebook and the White House were "100% on the same team here in fighting this." *Id.* at 25. In other words, Facebook wanted the Government to return to using the carrot rather than continuing to endure the stick.

402.     On **July 18, 2021**, Clegg messaged Murthy stating "I imagine you and your team are feeling a little aggrieved – as is the [Facebook] team, it's not great to be accused of killing people – but as I said by email, I'm keen to find a way to deescalate and work together collaboratively. I am available to meet/speak whenever suits." As a result of this communication, a meeting was scheduled for July 23, 2021. *Id.* at 35. To be abundantly clear, Plaintiffs are accusing the Defendants of unconstitutional and unlawful actions that suppressed potentially life-saving information that more likely than not directly contributed to the loss of lives.

403.     The Office of the Surgeon General also collaborated with the Democratic National Committee. Flaherty emailed Murthy on **July 19, 2021**, to put Murthy in touch with Jiore Craig

from the Democratic National Committee who worked on misinformation and disinformation issues. *Id.* at 37.

404. At a **July 20, 2021**, White House press conference, Kate Bedingfield (White House Communications Director) stated that the White House would be announcing whether social-media platforms are legally liable for misinformation spread on their platforms and examining how misinformation fits into the liability protection granted by Section 230 of the Communications Decency Act (which shields social-media platforms from being responsible for posts by third parties on their sites). Bedingfield further stated the administration was reviewing policies that could include amending the Communication Decency Act and that the social-media platforms "should be held accountable. The public and private pressure from the White House had its intended effect on Big Tech – all twelve members of the DD were censored, and pages, groups, and accounts linked to the DD were removed. *Missouri*, [D.E. 293] at 24.

405. On the same day, **July 20, 2021**, Humphrey emailed Facebook asking for the takedown of an Instagram account parodying Fauci. In less than two minutes, Facebook replied, "Yep, on it!" Soon thereafter, Facebook reported that the account had been censored.

406. On **July 21, 2021**, Facebook emailed Waldo and Fullenwider with CrowdTangle (note: CrowdTangle is a Facebook entity) data and with "interventions" that created "frictions" with regard to COVID misinformation, in contemplation of product design changes aimed at the ability to use social media services rather than aimed at the restriction of information. The interventions also included limiting forwarding of WhatsApp messages, placing warning labels on fact-checked content, and creating "friction" when someone tries to share these posts on Facebook. Facebook also reported other censorship policy and actions, including censoring content that contributes to the risk of imminent physical harm, permanently banning pages, groups, and

173

accounts that repeatedly broke Facebook's COVID-19 misinformation rules, and reducing the reach of posts, pages, groups, and accounts that share other false claims **"that do not violate our policies** but may present misleading or sensationalized information about COVID-19 and vaccines." (footnote 188: [Doc. No. 210-15]) *Missouri*, [D.E. 293] at 35.

407. On **July 21, 2021**, Clegg had a meeting with Murthy's office:



408. Following the July 21, 2021, meeting, Clegg had to report back to Murthy as to Facebook's censorship of Plaintiffs (members of the DD):

409. In this **July 23, 2021**, email from Facebook to the HHS, Facebook inquires as to setting up a "regular cadence of meetings with" the Government / HHS, stating, among other things that the Government / HHS had identified four steps / processes for Facebook to undertake to improve on its free speech censorship abilities and capabilities. This July 23, 2021, also reports to HHS on measures Facebook had (recently) taken to censor the DD and affiliates.



410.     Another call took place on **July 23, 2021,** between Murthy (Surgeon General), Waldo (Surgeon General assistant), DJ Patil (chief data scientist in the Obama administration), Clegg (Facebook), and Rice (Facebook). At the meeting, Murthy raised the issue of wanting to better understand the reach of misinformation and disinformation as it relates to health on Facebook; Murthy often referred to health misinformation in these meetings as "poison." The Surgeon General's health advisory explicitly called for social-media platforms to do more [censoring] to control the reach of misinformation.  *Missouri*, [D.E. 294] at 31. Ironically, as it turns out, the vaccines proved to be the real "poison."

411.     At the **July 23, 2021,** meeting, the Office of the Surgeon General officials were concerned about understanding the reach of Facebook's data. Clegg even sent a follow-up email after the meeting to make sure Murthy saw the steps Facebook had been taking to adjust policies with respect to misinformation and to further address the DD. Clegg also reported that Facebook had changed its product design for the Government by "expand[ing] the group of false claims that we remove, to keep up with recent trends of misinformation that we are seeing." Further, Facebook also agreed to "do more" to censor COVID misinformation, to make its internal data on

misinformation available to federal officials, to report back to the Office of the Surgeon General, and to "strive to do all we can to meet our 'shared' goals.'" *Missouri*, [D.E. 293] at 36.

412.    On **July 23, 2021**, Clegg emailed Murthy stating, "I wanted to make sure you saw the steps we took just this past week to adjust policies on what we are removing with respect to misinformation, as well as steps taken to further address the 'disinfo dozen': we removed 17 additional Pages, Groups, and Instagram accounts tied to the disinfo dozen."

413.    On **July 26, 2021,** the Global Internet Forum to Counter Terrorism (GIFCT), an "organization formed by some of the biggest U.S. tech companies including Facebook and Microsoft," which includes DHS on its board of advisors, announced that it is "significantly expanding the types of extremist content shared between firms in a key [blacklist] database," to move from images and videos to content-based speech tracking.

414.    "GIFCT … was created in 2017 under pressure from U.S. and European governments," and "its database mostly contains digital fingerprints of videos and images related to groups on the U.N. Security Council's consolidated sanctions list and a few specific live-streamed attacks." *Id.* "Until now, the [GIFCT] database has focused on videos and images from terrorist groups on a United Nations list," but now the group announced that it would move into content-based speech tracking. *Id.* On information and belief, DHS officials, including Defendants, have access to such database(s) as tools to advance censorship of online speech.

415.    On **July 30, 2021**, Waldo had a meeting with Google / YouTube representatives. At the meeting, Google and YouTube reported to the Office of the Surgeon General what [State] actions they were taking following the Surgeon General's health advisory on misinformation. *Missouri*, [D.E. 293] at 31.

176

416.    On **August 2, 2021**, DHS Secretary Mayorkas announced that DHS was working directly with social-media companies to censor disfavored speech on social- media platforms. "On [a] broadcast of MSNBC's 'Andrea Mitchell Reports,' DHS Secretary Alejandro Mayorkas stated that the department is working with tech companies 'that are the platform for much of the disinformation that reaches the American public, how they can better use their terms of use to really strengthen the legitimate use of their very powerful platforms and prevent harm from occurring.'"[127]

417.    Soon after Mayorkas's August 2, 2021, comments, DHS officials began plotting to create a "Disinformation Governance Board" within DHS. *See Missouri v. Biden*, No. 3:22-cv-01213-TAD-KDM (W.D. La.), ECF No. 10-1, at 19-23 (Glenn Decl. Ex. 1, at 6-10). On **September 13, 2021**, senior DHS officials Robert Silvers and Samantha Vinograd sent a memorandum to Secretary Mayorkas recommending the creation of the Disinformation Governance Board. The opening sentence of the Memorandum noted that the Board's purpose would be to combat "[t]he spread of disinformation" regarding "[c]onspiracy theories about the validity and security of elections," including "disinformation surrounding the validity of the 2020 election," and "[d]isinformation related to the origins and effects of COVID- 19 vaccines or the efficacy of masks," which "undercut[] public health efforts to combat the pandemic."

418.    Waldo was aware of at least one call between Murthy and Facebook in the period between Biden's election and assuming office, and he testified that the call was about misinformation; *i.e.*, the Biden Administration was planning to engage in the censorship that is the

---

[127]    https://www.breitbart.com/clips/2021/08/02/mayorkas-were-workgin-with-platforms-on-how-they-can-better-use-their-terms-to-prevent-harm-from-misinformation/

subject of this lawsuit before Biden took office. Waldo was also aware of other emails and at least one phone call where Flaherty communicated with Facebook. *Missouri*, [D.E. 293] at 30.

419. On **August 10, 2021**, Waldo and Flaherty had a call with Rice, Facebook was told to report to federal officials as to Facebook's actions to remove "disinformation" and to provide details regarding a vaccine misinformation operation Facebook had uncovered. *Missouri*, [D.E. 293] at 31.

420. On **August 18, 2021**, still under the Government's immense censorship pressure (and constantly being asked by the Government to demonstrate compliance with the Government's censorship demands), Facebook published an article entitled "How We're Taking Action Against Vaccine Misinformation Superspreaders."[128] In the article, in an effort to further quell the Government and its constant censorship demands, Facebook explained:

> In recent weeks, there has been a debate about whether the global problem of COVID-19 vaccine misinformation can be solved simply by removing 12 people from social media platforms. People who have advanced this narrative contend that these 12 people are responsible for 73% of online vaccine misinformation on Facebook. There isn't any evidence to support this claim. Moreover, focusing on such a small group of people distracts from the complex challenges we all face in addressing misinformation about COVID-19 vaccines.
>
> That said, any amount of COVID-19 vaccine misinformation that violates our policies is too much by our standards — and we have removed over three dozen Pages, groups and Facebook or Instagram accounts linked to these 12 people, including at least one linked to each of the 12 people, for violating our policies. We have also imposed penalties on nearly two dozen additional Pages, groups or accounts linked to these 12 people, like moving their posts lower in News Feed so fewer people see them or not recommending them to others. We've applied penalties to some of their website domains as well so any posts including their website content are moved lower in News Feed.

Translated, Facebook is literally advising the Government that there is no evidence supporting the claim that the DD make up 73% of the misinformation online but reassuring the Government that

---

[128] https://about.fb.com/news/2021/08/taking-action-against-vaccine-misinformation-superspreaders/

Facebook is nevertheless moderating the DD's content. Likely, this flawed statistic stems from the CCDH's inability to properly interpret the information the Government had obtained from Facebook per its February 24, 2021, request. It is also worth noting that Facebook, having learned from its experience with the deletion of the purported "300 Russian bot accounts" in the run-up to the 2016 election, has indicated that removing the dozen DD accounts would not achieve the level of censorship the Government desires. This acknowledgment reveals the ongoing collaboration and mutual understanding between Facebook and the Government to refine and amplify their censorship strategies to better align with the Government's overall censorship objectives.

421.    Upon information and belief, in the first half of August 2021, Facebook sent its "How We're Taking Action Against Vaccine Misinformation Superspreaders" publication to the Office of the Surgeon General, which such publication detailed a list of censorship actions taken against the DD. *Id.* at 36.[129]

422.    On **August 20, 2021**, Clegg followed-up with Waldo and Flaherty with an email entitled "Limiting Potentially Harmful Misinformation," which detailed more efforts to censor COVID-19 Misinformation. Facebook continued to report back to Waldo and Flaherty with updates on September 19, 2021, and September 29, 2021. *Id*. at 36.

423.    Also on **August 20, 2021**, Clegg emailed Murthy to assure him that Facebook "will shortly be expanding our COVID policies to further reduce the spread of potentially harmful content on our platform. These changes will apply across Facebook and Instagram," and they included "increasing the strength of our demotions for COVID and vaccine- related content" and "making it easier to have Pages/Groups/Accounts demoted for sharing COVID and vaccine-related misinformation." In addition, Clegg sent a "Facebook bi-weekly covid content report" to Murthy

---

[129] https://about.fb.com/news/2021/08/taking-action-against-vaccine-misinformation-superspreaders/

(Surgeon General) and to Slavitt (White House) to reassure these federal officials that Facebook's suppression of COVID-19 "misinformation" was aggressive enough for their liking.

424.    On **August 23, 2021**, Flaherty emailed Facebook requesting a report on how Facebook intended to promote the FDA approval of the Pfizer vaccine. He also stated that the White House would appreciate a "push" and provided suggested language. *Missouri*, [D.E. 293] at 27.

425.    On **September 14, 2021**, another meeting took place between Google / YouTube, Waldo, and Flaherty to discuss a new policy YouTube was working on and to provide the federal officials with an update on YouTube's efforts to combat harmful COVID-19 misinformation on its platform.

426.    On **September 18, 2021**, regarding a story in the Wall Street Journal about COVID-19 "misinformation" circulating on Facebook, Flaherty demanded that Facebook provide an explanation "as we have long asked for how big the problem is, what solutions you're implementing, and how effective they've been." The "solutions" referred to policies to censor and suppress more private speech on Facebook's platforms, and Facebook promised to "brief" the White House on those.

427.    On **October 21, 2021**, Instagram (Facebook / Meta) shutdown TTAV and Charlene Bollinger's personal account during a TTAC live event / speaker dinner (which such events / dinners tended to go viral). Then Instagram hid the hashtag: **#thetruthaboutvaccines**

 

428.    On **October 28, 2021,** Instagram (Facebook / Meta) took down Charlene Bollinger's personal account:



429.    On **October 29, 2021**, Facebook asked federal officials to provide a "federal health contract" to dictate "what content would be censored on Facebook's platforms." Federal officials informed Facebook that the CDC was the federal health authority that could dictate what content could be censored as misinformation. *Missouri*, [D.E. 293] at 37.

430.    On **October 29, 2021**, the Surgeon General tweeted from his official account (as opposed to his personal account, which remains active), in a thread: "We must demand Facebook and the rest of the social media ecosystem take responsibility for stopping health misinformation on their platforms. The time for excuses and half measures is long past. We need transparency and accountability now. The health of our country is at stake."[130] Interactive computer service

---
[130] https://twitter.com/Surgeon_General/status/1454181191494606854

providers (the Platforms) are protected under Section 230(c)(1) from being treated as the publisher or speaker of third-party content, even if they fail to remove potentially harmful material. The ongoing pressure exerted by the Government, however, such as demanding platforms take "responsibility for stopping health misinformation on their platforms," was deliberately aimed at eroding Platforms' confidence in their Section 230 protections. This tactic coerced Platforms into overcompensating by engaging in heightened censorship, undermining the statutory safeguards intended to shield them from such liability.

431.    On **November 9, 2021**, Vimeo took down the TTAC channel. Notably, Murthy's October 29, 2021, statement emphasized that "*the rest* of the social media ecosystem take responsibility," explicitly extending this expectation beyond just Facebook, Google, and Twitter to include other platforms like Vimeo. This highlighted the Government's expansive and coercive approach, pressuring the entire spectrum of online platforms to align with its content moderation demands.

432.    On **November 10, 2021**, CISA (an agency within DHS) announced that it was "beefing up its disinformation and misinformation team in the wake of a divisive presidential election that saw a proliferation of misleading information online."[131] "'I am actually going to grow and strengthen my misinformation and disinformation team," CISA Director Jen Easterly said." *Id*. Easterly said that so-called "disinformation" and "misinformation" pose "a top threat for CISA, which is charged with securing critical <u>infrastructure,</u> to confront." *Id.*

433.    Easterly claimed that social-media speech is a form of "infrastructure," and that policing speech online by the federal government falls within her agency's mission to protect "infrastructure," stating that CISA is "in the business of critical infrastructure, and the most critical

---

[131] https://thehill.com/policy/cybersecurity/580990-cyber-agency-beefing-up-disinformation-misinformation-team/

infrastructure is our cognitive infrastructure, so building that resilience to misinformation and disinformation, I think, is incredibly important." *Id.* In other words, CISA declared that safeguarding "cognitive infrastructure" (protecting minds from misinformation and disinformation) is vital in securing physical infrastructure.

434. Easterly announced that CISA was working directly with unnamed "partners in the private sector" and other Government agencies to police online speech: "We are going to work with our partners in the private sector and throughout the rest of the government and at the department to continue to ensure that the American people have the facts that they need to help protect our critical infrastructure." *Id.* Said differently, the Government jointly participates with private entities to (a) ensure Americans are censored, and (b) substitute enough propaganda to ensure the Administrative State's infrastructure.

435. Easterly texted with Matthew Masterson about "trying to get us in a place where Fed can work with platforms to better understand the mis/dis trends so relevant agencies can try to prebunk/debunk as useful," and complained about the Government's need to overcome the social-media platforms' "hesitation" to working with the government: "Platforms have got to get more comfortable with gov't. It's really interesting how hesitant they remain." Said differently, the Government sought deeper collaboration with private platforms to identify and counter dissenting views, expressing frustration at the platforms' reluctance and exploring ways to apply more pressure to accelerate compliance.

436. "We now live in a world where people talk about alternative facts, post-truth, which I think is really, really dangerous if you get to pick your own facts, and it's particularly corrosive when you talk about matters of election security." *Id.* Instead, she indicated, federal officials like herself should intervene to help Americans "pick" the right "facts." *Id.* Translated, Easterly

suggested that federal officials should take an active role in guiding Americans toward Government-approved "facts," undermining the public's ability to independently assess information.

437.     Today, a veritable army of federal bureaucrats is involved in censorship activities "across the federal enterprise." There are so many, in fact, that CISA Director Easterly and Matthew Masterson complained in text messages that "chaos" would result if all federal officials were "independently" contacting social-media platforms about so-called misinformation: "Not our mission but was looking to play a coord role so not every D/A is independently reaching out to platforms which could cause a lot of chaos." Easterly's acknowledgment specifically underscores the "pervasive entwinement" at the heart of Government censorship, where the chaotic reality of numerous federal officials independently contacting platforms to censor speech necessitated a coordinated approach, further entrenching the Government's influence over / participation with private entities.

438.     On or about **November 20, 2021**, Facebook removed a video interview link dated November 17, 2021, which was a repost of an earlier video by Ty and Charlene Bollinger that did not violate any rules at the time of the initial posting; but, when reshared by Plaintiffs, it magically became violative of Facebook's policies.


**[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]**



439.     On **December 3, 2021,** FB post removed December post (*see* May 5, 2022, *infra*).

440.     On **December 21, 2021,** Murthy made additional censorship relevant statements on

the following platforms:

> a **December 21, 2021** podcast threatening to hold social-media platforms
> accountable for not censoring misinformation; … a **January 3, 2022** podcast with
> Alyssa Milano stating that 'platformers need to step up to be accountable for
> making their spaces safer'; … and a **February 14, 2022** panel discussion hosted by
> the Rockefeller Foundation, wherein they discussed that technology platforms
> enabled the speed, scale, and sophistication with which this misinformation was
> spreading… .

*Missouri,* [D.E. 293] at 37-38 (internal footnotes omitted).

441.     In **January 2022**, Facebook reported to Rowe, Murthy, Flaherty, and Slavitt that it

had "labeled and demoted" vaccine humor posts whose content could discourage vaccination.

Facebook also reported to the White House that it "labeled and demoted" posts suggesting natural

immunity to a COVID-19 infection is superior to vaccine immunity like Plaintiffs' November

2021 and December 2021 posts. *Missouri,* [D.E. 293] at 25.

442.     On **February 1, 2022**, Psaki stated that the White House wanted every social-media

platform to do more to call out misinformation and disinformation, and to uplift (*i.e.*, help develop

in part) accurate information. *Id.* at 26.

443. On **February 17, 2022**, Lauren Protentis (CISA) reached out to contacts at Facebook and stated, "The Deputy Secretary at Treasury [Wally Adeyemo] would like to be connected to industry partners to discuss potential influence operations on social media. We'd like to make the connection to Facebook if you're amenable?" On information and belief, the nearly identically-phrased inquiries to Twitter and Microsoft that Protentis sent on the same day were also sent at Adeyemo's direct request. Notably, "influence operations" is just another way of saying Government-led psychological operations, which bear a very similar intent to the events surrounding January 6, 2021, as discussed above.

444. On **February 7, 2022**, DHS issued a National Terrorism Advisory Bulletin.[132] It begins by stating: "The United States remains in a heightened threat environment fueled by several factors, including an online environment filled with false or misleading narratives and conspiracy theories, and other forms of mis- dis- and mal-information (MDM)." *Id.* The first critical "factor" contributing to a "heightened threat environment," according to the Bulletin, is "(1) the proliferation of false or misleading narratives, which sow discord or undermine public trust in U.S. government institutions." *Id.* Again, the first "[k]ey factor contributing to the current heightened threat environment" identified in the Bulletin is "[t]he proliferation of false or misleading narratives, which sow discord or undermine public trust in U.S. government institutions: For example, there is widespread online proliferation of false or misleading narratives regarding unsubstantiated widespread election fraud and COVID-19. Grievances associated with these themes inspired violent extremist attacks during 2021." *Id.* (emphasis added). The Bulletin stated that DHS is directly coordinating with social-media platforms to address so-called "MDM": "DHS is working with public and private sector partners, as well as foreign counterparts, to identify and

---

[132] https://www.dhs.gov/ntas/advisory/national-terrorism-advisory-system-bulletin-february-07-2022.

evaluate MDM, including false or misleading narratives and conspiracy theories spread on social media and other online platforms that endorse or could inspire violence." *Id.* And it specifically stated that CISA likewise "works with public and private sector partners … [to] increase nationwide cybersecurity resilience." *Id.*

445. The Government has redefined free speech as a form of domestic terrorism and a threat to national security, using vague claims of misinformation to silence dissent. This tactic undermines the principles of free expression, suppresses opposing viewpoints, and secures the Administrative State's grip on power, eroding the constitutional protections at the core of American democracy.

446. On **March 3, 2022**, the Office of the Surgeon General issued a formal Request for Information ("RFI"), published in the Federal Register, seeking information from social-media platforms and others about the spread of misinformation. The RFI indicated that the Office of the Surgeon General was expanding attempts to control the spread of misinformation on social media and other technology platforms. The RFI also sought information about censorship policies, how they were enforced, and information about disfavored speakers. The RFI was sent to Microsoft, Facebook, Google/YouTube, LinkedIn, and Twitter, by Max Lesko (Murthy's Chief of Staff), requesting responses from these social-media platforms. Murthy again restated social-media platforms' responsibility to reduce the spread of misinformation in an interview with GQ Magazine. Murthy also specifically called upon Spotify to censor health information. *Missouri*, [D.E. 293] at 38.

447. On **April 12, 2022**, CISA published another bulletin announcing that it was coordinating directly with social-media platforms to police "Mis, Dis, Malinformation" (which it

calls "MDM"). CISA, Mis, Dis, Malinformation.[133] It states that "COVID-19-related MDM activities seek to undermine public confidence and sow confusion," and claims that "the rapid evolution of accurate information makes older, dated information a potential catalyst of confusion and distrust as well." *Id.* Thus, it claims, "[t]he MDM team supports the interagency and *private sector partners'* COVID-19 response efforts via regular reporting and analysis of key pandemic-related MDM trends." *Id.* (emphasis added). On information and belief, these "private sector partners" include social-media firms, and the "reporting and analysis" includes flagging disfavored content for censorship.

448.    On **April 25, 2022**, at a White House press conference after being asked to respond to news that Elon Musk may buy Twitter, Psaki again mentioned the threat to social-media companies to amend Section 230 of the Communications Decency Act, linking these threats to social-media platforms' failure to censor misinformation and disinformation. *Missouri*, [D.E. 293] at 26. Ironically, a proper reading of Section 230(c)(1) would actually protect platforms from being treated as "the publisher or speaker" of another's information when they fail to remove harmful content. Here, however, the Government is implicating a nuanced argument: if the platform *chose not to act*, like the determination in *Anderson v. TikTok*, it could potentially be held liable for its own decision-making. This nuanced understanding of Section 230(c)(1) (largely ignored by the California Courts) is critical to the proper application of Section 230 protections.

449.    On **April 27, 2022,** Mayorkas announced that DHS was creating a "Disinformation Governance Board."[134] "The Department of Homeland Security is setting up a new board designed to counter misinformation related to homeland security, with a focus specifically on Russia and

---

[133] https://www.cisa.gov/mdm.

[134]    https://thepostmillennial.com/breaking-biden-administration-creates-disinformation-governance-board-under-dhs-to-fight-misinformation

irregular migration. The board will be called the 'Disinformation Governance Board,' and will be headed by executive director Nina Jankowicz." *Id.* During congressional testimony, Mayorkas described the endeavor as a "just recently constituted Misinformation/Disinformation Governance Board." *Id.* He stated: "The goal is to bring the resources of the Department together to address this threat." *Id.* This is as Orwellian as it gets, the Disinformation Governance Board mirrors the infamous "Ministry of Truth" from George Orwell's *1984*, where the government seeks to control narratives, redefine truth, and suppress dissent under the semblance of maintaining order and security.

450.    In the internal memo to Secretary Mayorkas advocating for the DGB's creation, the very first two topics of "disinformation" to be targeted were "conspiracies about the validity and security of elections," and "disinformation related to the origins and effects of COVID-19 vaccines or the efficacy of masks." The Government's goals mirror those of the EIP and VP, both aimed at suppressing dissent on election integrity and COVID-19 while aligning public discourse with State-approved narratives, undermining free speech and open debate.

451.    On **April 25, 2022,** Psaki was asked at a White House press briefing to respond to the news that Elon Musk would acquire Twitter, and asked "does the White House have any concern that this new agreement might have President Trump back on the platform?"[135] Psaki responded: "No matter who owns or runs Twitter, the President has long been concerned about the power of large social-media platforms … [and] has long argued that tech platforms must be held accountable for the harms they cause. He has been a strong supporter of fundamental reforms to

[135]    https://www.whitehouse.gov/briefing-room/press-briefings/2022/04/25/press-briefing-by-press-secretary-jen-psaki-april-25-2022/.

achieve that goal, including reforms to Section 230, enacting antitrust reforms, requiring more transparency, and more. And he's encouraged that there's bipartisan interest in Congress."

452.    At the same press briefing, Psaki was asked: "Are you concerned about the kind of purveyors of election misinformation, disinformation, health falsehoods, sort of, having more of an opportunity to speak there on Twitter?" *Id.* She responded by specifically linking the legal threats to the social-media platforms' failure to more aggressively censor free speech: "We've long talked about and the President has long talked about his concerns about the power of social-media platforms, including Twitter and others, to spread misinformation, disinformation; the need for these platforms to be held accountable." *Id.* Psaki's statement includes a Freudian slip, as she initially uses "we" before backtracking to include Biden. Critics (like the Bollingers) have long-argued that Biden may not be the only one in charge (if in charge at all). The "we" in Psaki's statement likely refers to the network of Administrative State allies orchestrating efforts to undermine Americans' rights. In reality, the political left was more concerned about their rival, President Trump, regaining his unfiltered ability to reconnect directly with his electorate, thereby overcoming the Administrative State's death grip on information – a grip he ultimately overcame in the 2024 election.

453.    Psaki was then asked a question that noted that "the Surgeon General has said that misinformation about COVID amounts to a public health crisis," and then queried, "would the White House be interested in working with Twitter like it has in the past to continue to combat this kind of misinformation? Or are we in a different part of the pandemic where that kind of partnership is no longer necessary?" *Id.* Psaki responded: "we engage regularly with all social-media platforms about steps that can be taken that has continued, and I'm sure it will continue. But there are also reforms that we think Congress could take and we would support taking, including

190

reforming Section 230, enacting antitrust reforms, requiring more transparency. And the President is encouraged by the bipartisan support for — or engagement in those efforts." *Id.* In other words, the Government would initially attempt the carrot approach, but if that did not work, it would resort to wielding the Section 230 stick once again.

454. The profound irony here is that the real public health crisis was the Government's active suppression of alternative health information, such as Plaintiffs', which effectively limited (if not outright eliminated) "informed consent." Since then, Fauci and the CDC have both acknowledged risks associated with vaccines, risks that the Bollingers tirelessly sought to bring to public attention. *See* n. 12 and ¶ 231, *supra*. These risks have tragically resulted in physical vaccine injuries and even deaths. In other words, the Government's actions, in coordination with the CCDH and tech platforms, not only suppressed vital information but also directly contributed to the loss of lives, a devastating and unconscionable consequence of their ongoing censorship efforts.

455. Speaking of Fauci's admissions and the Bollingers' tireless efforts to inform the public about COVID-19 and vaccinations, the **December 4, 2024,** House Report is particularly telling. This report, when distilled, validates the Bollingers' positions while discrediting the actions of the Government and Fauci. *See* n. 12 and ¶ 231, *supra*.

456. Notably, Fauci and the CDC are not alone in their admissions. As early as October 2020, the FDA acknowledged the dangerous real-world side effects of the COVID-19 vaccination. *See* https://www.fda.gov/media/143557/download


**[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]**

**FDA Safety Surveillance of COVID-19 Vaccines :**
**DRAFT Working list of possible adverse event outcomes**
**\*\*\*Subject to change\*\*\***

- Guillain-Barré syndrome
- Acute disseminated encephalomyelitis
- Transverse myelitis
- Encephalitis/myelitis/encephalomyelitis/ meningoencephalitis/meningitis/ encepholapathy
- Convulsions/seizures
- Stroke
- Narcolepsy and cataplexy
- Anaphylaxis
- Acute myocardial infarction
- Myocarditis/pericarditis
- Autoimmune disease

- Deaths
- Pregnancy and birth outcomes
- Other acute demyelinating diseases
- Non-anaphylactic allergic reactions
- Thrombocytopenia
- Disseminated intravascular coagulation
- Venous thromboembolism
- Arthritis and arthralgia/joint pain
- Kawasaki disease
- Multisystem Inflammatory Syndrome in Children
- Vaccine enhanced disease

457.    On **April 28, 2022**, Jankowicz (head of DHS' DGB) arranged for a meeting between Secretary Mayorkas and / or other senior DHS officials, including Undersecretary Robert Silvers, and "Twitter executives Nick Pickles, Head of Policy, and Yoel Roth, Head of Site Integrity," to discuss "public-private partnerships [*i.e.*, psy-ops], MDM, and countering DVE. The meeting is off the record and closed press." *Missouri*, [D.E. 293] at 31 (Glenn Decl. Ex. 1, at 18). This was to be a cozy meeting: Jankowicz, who drafted the meeting brief, noted that "Nick and Yoel both know DGB Executive Director Nina Jankowicz." *Id.* The meeting was to be "an opportunity to discuss operationalizing public-private partnerships between DHS and Twitter." *Id.* Keeping the meeting "off the record" indicates they were fully aware their conduct violated people's rights; *i.e.*, Defendants' unconstitutional actions to suppress dissent were intentional (knowing and willful), escalating this matter above and beyond mere negligence. The Government Defendants' actions not only violated their constitutional oaths but also suppressed vital information, directly contributing to the loss of lives, a consequence that underscores the gravity of their coordinated censorship efforts. Such willful disregard for their constitutional duties

192

constitutes a serious violation of the public trust and the Constitution. As legal scholars have noted, serious or serial violations of the Constitution or departure from sworn constitutional duty are grounds for impeachment. This misconduct, therefore, should warrant immediate impeachment proceedings for all Government employees involved herein to uphold the integrity of our constitutional system. Every single Government agent involved in the censorship of Americans should be fired and permanently barred from holding any Government position again (which is one such punishment available under the Treason Cause of Action below).

458. On **May 5, 2022**, Facebook restricted Ty and Charlene Bollinger's personal account. The initial May 5, 2022, ban was for posting a Goebbels quote, but Facebook then went back in time to include December 3, 2021. Then Facebook went back further to increase the ban length from 24 hours to 30 days. This is a clear example of the retroactive enforcement tactics platforms employ, targeting individuals by changing their policies and then working backwards to find repeated "violations" that were not considered offenses at the time. In some instances, platforms like Facebook have gone back as much as an entire decade (mentioned previously) to unearth alleged infractions against individuals they aim to suppress. By retroactively applying newly crafted "standards," these platforms justify revoking interactive services, in violation of their legal duties, that they claim to provide freely to all and for "all ideas," revealing the completely arbitrary and punitive nature of their censorship practices.


**[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]**











459. On **May 10, 2022**, Facebook restricted two more posts:



460.  On **May 13, 2022**, Vimeo, another video hosting platform similar to YouTube, "suspended" the TTAV channel.

461.  In or around **May 2022**, Google removed the docu-series "Propaganda Exposed" from a user's *private* G-drive claiming it contains "misleading content" (*i.e.,* a Google statement). Note: this film was purchased by the user (Kestutis Masionis). Although the user had legally purchased this film through Google, it was subsequently removed by Google, potentially exposing the Bollingers to liability for Google's actions.



462.  On **June 13, 2022,** Flaherty demanded Meta continue to produce periodic COVID-19 insight reports to track COVID-19 misinformation, and he expressed a concern about

misinformation regarding the upcoming authorization of COVID-19 vaccines for children under five years of age. Meta agreed to do so on June 22, 2022. *Missouri,* [D.E. 293] at 26.

463. On **June 14, 2022**, White House National Climate Advisor, Gina McCarthy, spoke at an Axios event titled "A conversation on battling misinformation."[136] McCarthy publicly demanded that social media platforms engage in censorship and suppression of speech that contradicts federal officials' preferred narratives on climate change.

464. During the event, "McCarthy skewered Big Tech companies for 'allowing' disinformation and cheered Congress for 'taking action' to enact more censorship last Thursday." *Id.* "Axios political reporter Alexi McCammond asked McCarthy how so-called 'rampant mis-and-disinformation around climate change online and in other platforms' has 'made your job harder?'" *Id.* "McCarthy responded by slamming social-media companies: 'We have to get tighter, we have to get better at communicating, and frankly, the tech companies have to stop allowing specific individuals over and over again to spread disinformation.'" *Id.* (emphasis added). "She suggested further that 'we have to be smarter than that and we need the tech companies to really jump in.'" *Id.* (emphasis added). "McCammond responded by asking: 'Isn't misinformation and disinfo around climate a threat to public health itself?' McCarthy asserted that it 'absolutely' is: 'Oh, absolutely.'" *Id.*

465. On **June 17, 2022**, twenty-one Democratic U.S. Senators and Representatives sent a letter to Sundar Pichai, the CEO of Alphabet Inc., which owns Google, demanding that Google censor, suppress, and de-boost search results and Google Maps results for pro-life pregnancy

[136] https://www.foxnews.com/media/biden-climate-advisor-tech-companies-censor-disinformation-promote-benefits-clean-energy (video of her comments embedded in link).

resource centers.[137] The letter's co-signers included many of the Members of Congress who have previously made threats of adverse legal consequences if social-media platforms do not increase censorship, such as Senators Mark Warner, Amy Klobuchar, and Richard Blumenthal. *Id.* The letter cited "research by the Center for Countering Digital Hate (CCDH)," *id.* – the same organization that Jen Psaki and the White House coordinated with to demand the censorship of the so-called "Disinformation Dozen." The letter describes pro-life pregnancy resource centers as "fake clinics," and demands that Google proactively censor search results, mapping results, and advertisements relating to such clinics. *Id.* The letter demands that Google "limit the appearance of anti-abortion fake clinics or so-called 'crisis pregnancy centers' in Google search results, Google Ads, and on Google Maps"; that Google "add user-friendly disclaimers that clearly indicate whether or not a search result does or does not provide abortions"; and that Google take "additional steps to ensure that users are receiving accurate information when they search for health care services like abortion on Google Search and Google Maps." *Id.*

466.    This is particularly egregious. In sum, the Government is not only advocating for the killing of preborn babies, but also actively working to suppress differing viewpoints, including, upon information and belief, Plaintiffs' pro-life position, which was censored as a direct result of the Government's actions. It is one thing to debate the legislative merits of abortion, but it is entirely another thing for Government actors to impose their opinions on public discourse, let alone coordinate with private entities to suppress opposing perspectives.

467.    On **June 23, 2022,** Facebook assured Flaherty that it was expanding its censorship of COVID-19 "misinformation" to ensure that speech critical or skeptical of COVID-19 vaccines

---

[137] https://reason.com/wp-content/uploads/2022/06/26F26BB28841042A7931EEC58AC80E08.anti-abortion-letter-to-google-final.pdf.

for children under 5-years old – a highly controversial topic – would be censored.[138] Upon information and belief, Plaintiffs' information advocating against vaccinating children under five years old was covertly suppressed (*i.e.,* shadow banned) as a direct result of the Government's actions.

468.    On **August 26, 2022**, Mark Zuckerberg appeared on "The Joe Rogan Experience" podcast and, when asked about Facebook's censorship of the Hunter Biden laptop story, revealed that Facebook had acted as a result of communications from the FBI.[139] Upon information and belief, Plaintiffs' report on the Hunter Biden laptop story was directly censored as a result of the Government's censorship actions.

469.    Zuckerberg stated: "The FBI came to us" and told Facebook to be "on high alert," asserting to Facebook that there had been "a lot of Russian propaganda" in the 2016 presidential election, and warning Facebook that "there's about to be some kind of dump that's similar to that, so just be vigilant."[140] More of this is discussed in the FBI section of this Complaint, §III.C.3.

470.    On **March 7, 2023,** it was revealed that in mid-December 2022, after publication of the initial installment of the Twitter Files, instead of investigating possible violations of the First Amendment by Government actors seeking to induce, encourage, and promote social media censorship, the Administration instead commenced an investigation of Twitter and the Twitter Files journalists. Notably, on December 13, 2022, the Federal Trade Commission sent private communications to Twitter demanding that Twitter disclose its interactions with Twitter Files journalists "Bari Weiss, Matt Taibbi, [and] Michael Shellenberger" and "[i]dentify all journalists

---

[138] https://www.nytimes.com/2022/02/28/health/pfizer-vaccine-kids.html.

[139] This FBI interplay with Big Tech is discussed in greater detail above. *See* § III.C.2.

[140] https://www.bbc.com/news/world-us-canada-62688532.

198

and other members of the media" with whom Twitter had shared internal documents.[141] The exposed information threatened the Administrative State's agenda; hence, the Administration targeted Twitter and whistleblowing journalists instead of investigating possible violations of the First Amendment. This reveals a deliberate effort to suppress dissent and control the narrative rather than uphold constitutional protections.

471.    On **March 9, 2023**, Matt Taibbi provided the following statement to Congress regarding the "Twitter Files:"

> *We learned* Twitter, Facebook, Google, and other companies developed a formal system for taking in moderation 'requests' from every corner of government: the FBI, DHS, HHS, DOD, the Global Engagement Center at State, even the CIA. For every government agency scanning Twitter, there were perhaps 20 quasi-private entities doing the same, including Stanford's Election Integrity Project, Newsguard, the Global Disinformation Index, and others, many taxpayer-funded.
>
> A focus of this fast-growing network is making lists of people whose opinions, beliefs, associations, or sympathies are deemed 'misinformation,' 'disinformation,' or 'malinformation.' The latter term is just a euphemism for 'true but inconvenient.'

472.    On **March 17, 2024,** Facebook removed Plaintiffs' post asking "Is Hitler [Biden] glitching?" Why is it ok for mainstream media to pointblank call President Trump "Hitler" and for such to be allowed on social media, and yet it is not ok for Plaintiffs to allude to same about Biden? Either way, from either side of the equation, it is free speech and absolutely does not warrant inconsistent suppression (a form of the platform's own speech / opinions). It matters not whether someone agrees with either type reference to either President, what matters is that free speech is to be preserved, especially Government dissenting speech. Facebook reviewed the post, did not restore same, and a 30-day restriction was instituted. This very recent incident exemplifies the ongoing harms Plaintiffs endure as a direct result of the Government's continued participation in

---

[141]                              https://judiciary.house.gov/sites/evo-subsites/republicans-judiciary.house.gov/files/evo-media-document/Weaponization_Select_Subcommittee_Report_on_FTC_Harrassment_of_Twitter_3.7.2023.pdf.

censoring free speech. It underscores the urgent need to enjoin the Government's unconstitutional conduct moving forward, lest the Administrative State's suppression of dissent never come to an end.



473.    On **April 6, 2024,** Ty and Charlene Bollinger's Facebook 30-day restriction expired.

474.    On **April 18, 2024**, only twelve days later, Facebook removed Plaintiffs' April 17, 2024, "TTAC Substack LINK," with the bad faith Facebook removal post falsely and disparagingly claiming: "It looks like you tried to get likes, follows, shares or video views in a misleading way." Plainly, however, a link pointing users to where they can find additional information is not trying to "get likes, follows, shares or video views in a misleading way."

H.    *Most Germane Legal Principles*

1.    **The 1st Amendment Prohibits Abridgment Of The Right To Freedom Of Speech And Press**

475.    The First Amendment prohibits the federal government from "abridging the freedom of speech, or of the press." U.S. CONST. amend. I.

476.    The prohibition against the abridgement of Freedom of Speech and Freedom of Press applies to all branches of the government, government entities, and government actors. *See, e.g.*, *Matal v. Tam*, 137 S.Ct. 1744, 1757 (2017).

200

477.     The right to Freedom of Speech is robust, *see New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964), ensuring "that all persons have access to places where they can speak and listen, and then, after reflection, speak and listen once more." *Packingham v. North Carolina*, 127 S.Ct. 1730, 1735 (2017).

478.     And "as a general matter, social media is entitled to the same First Amendment protections as other forms of media." *Knight First Amend. Inst. v. Trump*, 928 F.3d 226, 237 (2d Cir. 2019), vacated on other grounds, 141 S. Ct. 1220 (2021).

479.     Further, the right to Freedom of Speech reaches all "field[s] of human interest," *Thomas v. Collins*, 323 U.S. 516, 531 (1945), and, "[]as a general matter, ... government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Ashcroft v. American Civil Liberties Union*, 535 U.S. 564, 573 (2002) (citation omitted). "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *W. Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).

480.     "[D]ecisions [by governmental officials] to list particular publications as objectionable" constitute an unconstitutional "system of prior administrative restraints" without judicial oversight. *See Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70–71 (1963).

481.     Governmental expression of opinions about particular social media posts publicly and transparently is generally legal. Doing so contributes to the national debate by subjecting those expressions to the marketplace of ideas and to criticism. But when the Government "blacklists" (vis-à-vis Government-backed tools such as CCDH the "tools"), especially behind closed doors where no one else knows or can criticize the blacklist, they unlawfully participate in shutting down

debate. And that problem is compounded by Government equipping Big Tech with aforementioned "tools" and exerting extreme pressure / coercion on Big Tech to implement such tools in censorship of others (such as Plaintiffs).

482.    Further, while the Government generally has the authority to publicly express disagreement with private speech or the press, that does not imply the authority – overtly or covertly – to fund and promote censorship tools that blacklist the press or Americans' speech (the Plaintiffs).

483.    The Supreme Court has held that even "false statements, as a general rule" are not "beyond constitutional protection." *United States v. Alvarez*, 567 U.S. 709, 718 (2012). Thus, merely labeling disfavored speech as "disinformation," "misinformation," or "mal-information" does not strip it of First Amendment protection.

484.    "This comports with the common understanding that some false statements are inevitable if there is to be an open and vigorous expression of views in public and private conversation, expression the First Amendment seeks to guarantee." *Id*. (quoting *United States v. Stevens*, 559 U.S. 460, 470 (2010)).

485.    "Were the Court to hold that the interest in truthful discourse alone is sufficient to sustain a ban on speech ... it would give government a broad censorial power unprecedented in this Court's cases or in our constitutional tradition. The mere potential for the exercise of that power casts a chill, a chill the First Amendment cannot permit if free speech, thought, and discourse are to remain a foundation of our freedom." *Id*. at 723.

486.    "The theory of our Constitution is 'that the best test of truth is the power of the thought to get itself accepted in the competition of the market.'" *Id*. at 728 (quoting *Abrams v. United States*, 250 U.S. 616, 630 (1919) (Holmes, J., dissenting)).

487.     SCOTUS continued in *Alvarez*:

The First Amendment itself ensures the right to respond to speech we do not like, and for good reason. Freedom of Speech and thought flows [sic] not from the beneficence of the state but from the inalienable rights of the person. And suppression of speech by the government can make exposure of falsity more difficult, not less so. Society has the right and civic duty to engage in open, dynamic, rational discourse. These ends are not well served when the government seeks to orchestrate public discussion through content-based mandates.

*Id*. at 728.

488.     The Press Clause also "comprehends every sort of publication which affords a vehicle of information and opinion," *Lovell v. Griffin*, 303 U.S. 444, 452 (1938), and the guarantee of Freedom of the Press does not change depending on the publication's characteristics or third-party ratings, for "freedom to publish means freedom for all and not for some." *Assoc. Press v. United States*, 326 U.S. 1, 20 (1945).

489.     Further, Freedom of the Press "rests on the assumption that the widest possible dissemination of information from diverse and antagonistic sources is essential to the welfare of the public, that a free press is a condition of a free society." *Id*.

490.     To that end, the constitutional protection of Freedom of the Press is exceedingly broad and while it undoubtedly protects against prior restraints on publication, it is not limited to "any particular way of abridging" the right, for "[t]he evils to be prevented were not the censorship of the press merely, but any action of the government by means of which it might prevent such free and general discussion of public matters as seems absolutely essential to prepare the people for an intelligent exercise of their rights as citizens." *Grosjean v. American Press Co.*, 297 U.S. 233, 249-250 (1936) (quoting 2 Cooley's Constitutional Limitations, 8th ed., p. 886).

491.     As such, SCOTUS has long afforded constitutional protection to the press to disseminate the news, for "liberty of circulating" is essential to a free press, and "without the

circulation, the publication would be of little value." *Lovell v. City of Griffin*, 303 U.S. 444, 452 (1938) (quoting *Ex Parte Jackson*, 96 U.S. 727, 733 (1877)).

492.     The Government abridges Freedom of the Press by "penalizing the publishers and curtailing the circulation of a selected group of newspapers." *Grosjean*, 297 U.S. at 251.

## 2.     Defendants May Not Directly Or Indirectly Abridge The 1st Amendment Rights Of Its Citizens

493.     The Government Defendants (and Government actors – CCDH, Facebook, Google, Twitter) have no statutory authority to censor speech and the press. It follows that they also lack the power to attempt to censor speech and the press, and they lack the power to ask others to censor speech and the press.

494.     Plaintiffs need not establish that they were censored, suppressed, or silenced directly by Government action; they need only establish the Government Defendants abridged their First Amendment rights.

495.     The First Amendment itself establishes that principle: It bars any law or government policy from "abridging" Freedom of Speech or Freedom of the Press. Thus, what matters in assessing whether the Defendants have violated the First Amendment is whether the Defendants' actions have had the consequence of abridging Freedom of Speech or Freedom of the Press, not whether Defendants have acted directly, not whether a private partner has become a Government actor, and not whether Government has acted coercively or with undue pressure – for it is "axiomatic" that the Government may not "induce, encourage, or promote private persons to accomplish what it is constitutionally forbidden to accomplish." *Norwood v. Harrison*, 413 U.S. 455, 465 (1973). Although, as discussed above, the Government certainly has acted coercively and with undue pressure as to the private entities making up the rest of the named Defendants.

496.     Indeed, whereas the First Amendment bars the Government from "prohibiting" the

free exercise of religion, it forbids the Government from even so much as "abridging" Freedom of Speech or Freedom Press. Const. Amend I. Accordingly, in a First Amendment claim, the constitutional question is simply whether the Government (and / or its actors) has been abridging (*i.e.*, diminishing) protected speech or the press.

497. As detailed above and as further explained in the individual counts, the Defendants' actions abridge Plaintiffs' First Amendment rights.

498. Courts can enjoin federal officials who censor speech and the press. *See Am. Sch. Of Magnetic Healing v. McAnnulty*, 187 U.S. 94 (1902) (reversing the dismissal of a request for an injunction against the Postmaster General's alleged censorship of mail); *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326–27 (2015) ("[F]ederal courts may in some circumstances grant injunctive relief against state officers who are violating, or planning to violate, federal law. But that has been true not only with respect to violations of federal law by state officials, but also with respect to violations of federal law by federal officials.").

499. Further, "the history of past censorship provides strong evidence that the threat of future censorship is not illusory or speculative," making declaratory and injunctive relief appropriate. *See Missouri v. Biden*, ----F.Supp.3d----, 2023 WL 4335270 *60 (W.D. LA July 4, 2023), rev'd in part, No. 23-30445, --- F.4th --, 2023 WL 5821788 (5th Cir. Sept. 8, 2023), cert. granted in *Murthy v. Missouri*, 601 U.S. ----, --- S. Ct. ----, 2023 WL 6935337 (Mem).

500. The Government (and / or its actors) also violate the First Amendment when they "deliberately set out to achieve the suppression of publications" through "informal sanctions," including "the threat of invoking legal sanctions and other means of coercion, persuasion, and intimidation." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 66-67 (1963) (even where private party is "free" to ignore Government's "advice" because its refusal would violate no law, it is still state

action when the Government induces a private party to suppress speech).

501.   It is enough to show that the Government's funding, support, and collusion with private parties "cast disapproval on particular viewpoints" and "risk[ed] the suppression of free speech and creative inquiry." *Rosenberger*, 515 U.S. at 836.

502.   Additionally, the actions of private actors are imputed to the Government when (a) it provides "significant encouragement" to the private actors, *Blum v. Yaretsky*, 457 U.S. 991, 1004; (b) when the private actors operated as willful participants in joint activity with the Government, *Lugar v. Edmondson Oil Co.*, 457 U.S. 992, 941 (1982); or (c) when private actors jointly engaged with Government actors to carry out constitutionally forbidden actions. *Dennis v. Sparks*, 449 U.S. 24 (1980).

503.   State action through joint engagement also occurs when the Government "knowingly accepts the benefits derived from unconstitutional behavior." *Kirtley v. Rainey*, 326 F.3d 1088, 1093 (9th Cir. 2003).

504.   Joint action may also be proven by showing that Government officials and private parties have acted in concert in effectuating a particular deprivation of constitutional rights. *See, e.g., Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442, 1453 (10th Cir. 1995).

505.   Further, private acts may constitute joint state action if the private parties "have conspired with a state official." *Sims v. Jefferson Downs Racing Ass'n, Inc.*, 778 F.2d 1068, 1076 (5th Cir. 1985). To establish a conspiracy, "[i]t is enough that [a private party] is a willful participant in joint activity with the State or its agents." *Id.* (citing *United States v. Price*, 383 U.S. 787, 794 (1966)).

506.   Joint activity also occurs when the Government has "so far insinuated itself" into the private affairs of a non-governmental entity that the line between public and private action is

blurred. *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 357 (1974). In such circumstances, the Government's entanglement with the management and control of private entities will impute private action to the government. *Evans v. Newton*, 382 U.S. 296, 299 (1966).

507.    Likewise, the Government is responsible for private action "when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed that of the State," *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982). As recognized in *Trinity Lutheran v. Comer*, 582 U.S. 449, 450, 463 (2017), such coercive power includes "indirect coercion," such as a very minor monetary inducement.

508.    Thus, private action may be rendered state action in many ways including where the Government finances and assists in the development of censorship technology, promoting censorship technology, and / or providing Government technology and resources to private actors to effectuate a censorship scheme. *See, e.g. Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 606, 606-12, 615 (1989) ("Government did more than adopt a passive position toward the underlying private conduct.").

509.    Upon information and belief, the Government has provided "significant encouragement" to the Tools and Instruments to limit the circulation and / or distribution of Plaintiffs' news reporting and speech. Upon information and belief, this encouragement has directly resulted in the private companies (CCDH, Facebook, Google, Twitter) downranking Plaintiffs' journalism in search results, and de-amplifying, deplatforming, de-boosting, demonetizing, suspending, shadow-banning, restricting, or limiting access, and / or posting warnings on their news reports and coverage. Such private conduct thus constitutes state action imputed to the Government.

510.    Through the efforts described above, the Government has also become entwined in

the management and control of those entities that developed censorship technology – technology that work to limit the distribution of Plaintiffs' reporting. This further establishes that the private companies' censorship activities qualify as state action imputed to the Government.

511. The private actors whose censorship technology the Government has funded, marketed, and promoted (in particular, CCDH, but also unknown and untold others) have operated as willful participants in joint activity with the Government to unconstitutionally censor the American press and Americans' speech. Their conduct is accordingly imputed to the Government as state action as well.

512. The private actors (CCDH) coordinated with Big Tech, or otherwise participated in the Government's efforts to censor American press outlets and speakers, operated as willful participants in joint (unconstitutional) activity with the Government. Their conduct thus also constitutes state action that is imputed to the Government.

513. Even if the Government did not censor by means of contract and encouragement (they did), they violated the First Amendment by offering coordination. Even if the Government was not seeking censorship (they were), and even if the censorship was performed independently by private corporations (it was not), private corporate censorship cannot be effective unless it is coordinated across different platforms. The platforms need coordination to ensure they are all censoring the same sorts of materials and not just driving customers to competitors.[142] But the companies (Facebook, Google, Twitter, *et cetera*) themselves cannot coordinate without antitrust difficulties. So, they need Government coordination. By supplying such coordination, the Government is abridging Plaintiffs' Freedom of Speech and Freedom of the Press.

---

[142] There have been many examples of what is commonly called "deplatforming" or "depersoning," which is coordinated attack across all platforms.

514. "Further, the government actor need not have direct power to take adverse action over a targeted entity for comments to constitute a threat, provided the government actor has the power to direct or encourage others to take such action." *Nat'l Rifle Ass'n of Am. v. Cuomo*, 350 F.Supp.3d 94, 115 (N.D.N.Y. 2018).

515. Where (as here) the Government financed, encouraged, and rewarded / protected private actors for adopting the Government's preferred policy, there is "significant encouragement, overt or covert[,]" constituting government action. *Mathis v. Pacific Gas & Electric Co.*, 891 F.2d 1429, 1431 (9th Cir. 1989).

### 3. Agencies Can Only Exercise Congressionally Delegated Authority

516. [A]gency actions beyond delegated authority are ultra vires and should be invalidated." *Detroit International Bridge Company v. Government of Canada*, 192 F.Supp.3d 54, 65 (D.D.C. 2016).

> At common law, the ultra vires exception to sovereign immunity provides that where the officer's powers are limited by statute, his actions beyond those limitations are considered individual and not sovereign actions. Such actions are ultra vires [*i.e.*, beyond] his authority and therefore may be made the object of specific relief. To invoke this exception, a plaintiff must do more than simply allege that the actions of the officer are illegal or unauthorized. Rather, the complaint must allege facts sufficient to establish that the officer was acting without any authority whatever, or without any colorable basis for the exercise of authority. Under the common-law ultra vires doctrine, then, a strong merits argument is needed to overcome sovereign immunity – even at the pleading stage.

*Apter v. Dep't of Health & Human Services*, 80 F.4th 579, 587–88 (5th Cir. 2023) (cleaned up, citations omitted).

517. Courts look to an agency's enabling statute to determine whether the agency has exceeded its authority, and enabling legislation is "generally not an 'open book to which the agency [may] add pages and change the plot line.'" *Midship Pipeline Co., L.L.C. v. FERC*, 45 F.4th 867, 876 (5th Cir. 2022) (quoting *West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022)).

209

518. Where there is "no clear expression of congressional intent" in an agency's enabling statute to convey broad authority, a court will not infer it. *See BST Holdings, L.L.C. v. Occupational Safety & Health Admin., United States Dep't of Lab.*, 17 F.4th 604, 618 (5th Cir. 2021).

519. This tenet dates to the nation's founding. As Alexander Hamilton explained, in a constitutional order that assigns the lawmaking and appropriations powers to the legislature, "no money can be expended, but for an object, to an extent, and out of a fund, which the laws have prescribed." Alexander Hamilton, Explanation, in The Works of Alexander Hamilton, Vol. 8, p.128 (Henry Cabot Lodge ed., 2d ed. 1903) (emphases in original).

520. The Government's organic statute charges its Secretary of State, for example, with enumerated duties "respecting foreign affairs." 22 U.S.C. § 2656.

521. According to DOS, for example, its mission is "[t]o protect and promote U.S. security, prosperity, and democratic values and shape an international environment in which all Americans can thrive." Congress appropriates funds to the DOS for "the administration of foreign affairs." Department of State, Foreign Operations, and Related Programs Appropriations Act, 2023.

522. The statute which confers authority upon the DOS, for example, provides that:

The Secretary of State shall perform such duties as shall from time to time be enjoined on or intrusted [sic] to him by the President relative to correspondences, commissions, or instructions to or with public ministers or consuls from the United States, or to negotiations with public ministers from foreign states or princes, or to memorials or other applications from foreign public ministers or other foreigners, or to such other matters *respecting foreign affairs* as the President of the United States shall assign to the Department, and he shall conduct the business of the Department in such manner as the President shall direct.

22 U.S.C. § 2656 (emphasis added).

523. The Government's disinformation tools were developed not merely to assist in

gathering information, but as tools of warfare – information warfare – to shape the perceptions and opinions of others. These mechanisms of information warfare, which were developed in the context of national security, foreign relations, and to combat American adversaries abroad, have been misappropriated and misdirected to be used at home against domestic political opponents and members of the American press with viewpoints conflicting with those of the Government. By targeting domestic political disagreement, the Government violated the organic statute, as well as the most fundamental principles upon which our Constitution was founded.

524.    Any Government scheme designed to fund, support, and encourage private companies for the purpose of censoring, degrading, or demonetizing American press outlets falls outside the statutory authority of the DOS and the Government as a whole. The statutory language also does not authorize the Government to encourage the private sector to adopt censorship technology that will suppress certain content and viewpoints of the American press. Nor could it, consistent with the Government's enumerated powers and the First Amendment.

525.    Further, even if such a scheme were lawful – which it never could be – its funding would require a lawful appropriation by Congress. Sans such appropriation, the funding would violate the Anti-Deficiency Act, which prohibits federal agencies from obligating or expending federal funds outside of, in advance of, or in excess of an appropriation. 31 U.S.C. §§ 1341(a), 1342 and 1517. Thus, the provision of Government funds and technology to outside entities to violate the First Amendment is doubly prohibited by law.

### 4.    Congress Cannot Delegate Authority Violative Of The Constitution

526.    Congress' authority is "limited to those powers enumerated in the Constitution," as the Constitution withholds from Congress "a plenary police power that would authorize enactment of every type of legislation." *United States v. Lopez*, 514 U.S. at 566; see also Const. art. I, § 8.

527.    "The powers of the legislature are defined and limited; and that those limits may not be mistaken, or forgotten, the constitution is written." *Marbury v. Madison*, 1 Cranch 137, 176 (1803).

528.    Congress is prohibited from conferring on a federal agency power or authority that is contrary to the Constitution, *Bowsher v. Synar*, 478 U.S. 714, 736 (1986), and Congressional enactments that exceed Congress's constitutional bounds are invalid. *Id*. at 607; *see also United States v. Lopez*, 514 U.S. 549 (1995).

**5.      The Government's Funding, Development, Marketing, And Promotion Of Private Censorship Tools, Technologies, And Censorship Enterprises Is A Non-Final, Unlawful Agency / Instrument Action That Must Be Enjoined**

529.    Under the Administrative Procedure Act ("APA"), sovereign immunity is waived to non-monetary claims challenging non-final agency action as ultra vires.

530.    Government's censorship scheme is ultra vires and must be enjoined.

531.    Litigants can use the APA to assert ultra vires claims against Government actors and overcome sovereign immunity that would otherwise protect those Government actors. *Apter*, 80 F.4th at 587.

532.    "Section 702 of '[t]he APA generally waives the Federal Government's immunity from a suit seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority.'" *Id*. at 589 (quoting *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012), in turn quoting 5 U.S.C. § 702)).

533.    "[A] non-statutory cause of action under the APA (that is, an ultra vires claim that uses the APA as a vehicle to sue an agency)" is a "distinct type[] of claim[]" from "a cause of action under the APA's general provisions." *Id*. at 592 (citing *Alabama-Coushatta Tribe of Tex. v.*

*United States*, 757 F.3d 484, 489 (5th Cir. 2014)).

534. The 1976 amendment to 5 U.S.C. § 702 "waived sovereign immunity for suits seeking nonmonetary relief through nonstatutory judicial review of agency action." *Geyen v. Marsh*, 775 F.2d 1303, 1307 (5th Cir. 1985).

535. Section 702's waiver "applies when judicial review is sought pursuant to a statutory or non-statutory cause of action that arises completely apart from the general provisions of the APA. There is no requirement of 'finality' for this type of waiver to apply." *Alabama-Coushatta Tribe*, 757 F.3d at 489.

536. Per *Apter*:

When a plaintiff uses the APA to assert a 'non-statutory cause of action'—such as an ultra vires claim – section 702 contains two separate requirements for establishing a waiver of sovereign immunity. First, the plaintiff must identify some 'agency action' affecting him in a specific way. The action need not be final. Second, the plaintiff must show that he has been adversely affected or aggrieved by that action. To satisfy this second requirement, the plaintiff must establish that the injury he complains of falls within the 'zone of interests' sought to be protected by the statutory provision whose violation forms the legal basis for his complaint.

*Apter*, 80 F.4th at 589–90 (cleaned up, citations omitted).

537. Under the APA, "'agency action' includes the whole or a part of an agency ... relief." 5 U.S.C. § 551(13).

538. "'[R]elief' means the whole or a part of an agency grant of money, assistance, license, authority, exemption, exception, privilege, or remedy." 5 U.S.C. § 551(4).

539. Thus, the Government's funding, development, marketing, and promotion of censorship tools, technologies, and censorship enterprises is "relief" under the APA, and accordingly constitutes "agency action."

540. Plaintiffs' injuries are in the APA's "zone of interests."

541. In keeping with Congress' evident intent when enacting the APA to make agency

action presumptively reviewable, the zone-of-interests test is not especially demanding. *Apter*, 80 F.4th at 592; *Texas v. United States (DACA Case)*, 50 F.4th 498, 520-21 (5th Cir. 2022). The test is satisfied if the claims are arguably within the zone of interests to be protected by the statute. *Apter*, *supra*; DACA at 521. The Supreme Court has always conspicuously included the word arguably in the test to indicate that the benefit of any doubt goes to the plaintiff. *Apter*, *supra*; *DACA*, *supra*. Review is foreclosed only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit. *Apter*, *supra*; *DACA*, *supra*.

542. This challenge is within the APA's zone of interests. For Plaintiffs, the Government's illegal relief limits their ability to distribute and profit from their speech.

543. Moreover, illegal relief is explicitly covered by the APA, and thus the Government's ultra vires relief explicitly falls within the APA's zone of interests, as do the injuries resulting from that ultra vires relief.

544. Consequently, the Government lacks sovereign immunity to Plaintiffs' claims against the Government (Counts I-V, *infra*).

**6.      Alternatively, The Government's Funding Of Private Censorship Tools Is Final Agency Action That Must Be Set Aside And Vacated**

545. The APA authorizes courts to hold unlawful and set aside final agency action found to be: "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (D) without observance of procedure required by law ... ." 5 U.S.C. § 706(2)(A)-(D). The Government Defendants' conduct violates each of these prohibitions.

546. In the Fifth Circuit, the "final agency action" requirement is a jurisdictional

threshold, not a merits inquiry, and is guided by the Supreme Court's interpretation of the APA's finality requirement as 'flexible' and 'pragmatic.'" *Texas v. Equal Emp. Opportunity Comm'n*, 933 F.3d 433, 440–41 (5th Cir. 2019) (quoting Abbott Labs. v. Gardner, 387 U.S. 136, 149 (1967)).

547. Even agency advisory opinions can be deemed to have "consummated the Department's decisionmaking process." *Data Mktg. P'ship, LP v. United States Dep't of Lab.*, 45 F.4th 846, 853 (5th Cir. 2022).

548. Further, "the mere possibility that an agency might reconsider" its advisory "in light of 'informal discussion' and invited contentions of inaccuracy does not suffice to make an otherwise final agency action nonfinal." *Sackett v. EPA*, 566 U.S. 120, 127 (2012).

549. The Government's secretive scheme to suppress, derogate, defund, discredit, and reduce the circulation of a segment of the press by, among other things, funding, marketing, and / or promoting censorship tools, technology and censorship enterprises operating in the United States – specifically the censorship-by-risk-rating technology and entities – constitutes final agency action under the APA.

550. The Government's scheme as alleged herein constitutes "final agency action" because no further action is needed and it thus "marks the consummation of the agency's decisionmaking process." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (quotation marks omitted).

551. Further, the Government's scheme as alleged herein entails actions by which "rights or obligations have been determined," and "from which legal consequences will flow." *Id*.

552. The Government's scheme alleged herein clearly constitutes "consummation" of the agency's decision-making process and is not tentative or interlocutory. *See Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992).

553.     Nothing in the governing statutes gives or purports to give the Government the power to fund or participate in this scheme. The Government's conduct thus exceeds any statutory authority and is unlawful under the APA. *See* 5 U.S.C. §§ 706(2)(B), (C).

554.     Further, the Government's conduct is "contrary to constitutional right, power, privilege, or immunity" because it violates the First Amendment rights of Plaintiffs, as set forth above. 5 U.S.C. § 706(2)(B).

555.     Moreover, under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

556.     Agency action is arbitrary and capricious if the agency fails to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (cleaned up).

557.     The Government's censorship scheme is arbitrary and capricious because it has been entirely secretive and non-transparent. The Government has not even attempted to explain, let alone satisfactorily, how it serves the DOS' charge to, for example, manage foreign affairs. Nor could it, as this scheme has regulated domestic media content and speech without any basis in law to do so.

558.     The Government's scheme is also arbitrary and capricious because it is being deployed to promote the federal Government's preferred viewpoints while suppressing dissent therefrom.

559.     For the foregoing reasons, the Government's conduct is arbitrary, capricious, and an abuse of discretion and must be set aside.

560.	In sum, the entire initiative described above exceeds any conceivable statutory authority and is accordingly invalid under the APA. See 5 U.S.C. §§ 706(2)(A)-(D).

## I.	*Recapitulation – Information Wars*

561.	Much like the timeless struggle between the Rebel Alliance and the Empire in *Star Wars*, this case tells the story of an epic ongoing battle – one not fought with lightsabers or starships, but with narratives, censorship, and the weaponization of information. Here, the Administrative State, a shadowy network wielding immense and unchecked power, seeks to suppress dissent and consolidate control. On the other side stands "We the People," waging a tireless fight to restore freedom and uphold the principles of our constitutional republic. This is a story of resistance, of good versus systemic corruption, and the stakes could not be higher – the preservation of free speech and the very soul of our self-governance are entirely on the line.

562.	We understand the voluminous nature of the preceding pages, an exhaustive presentation of facts, evidence, and historical context crafted with the aim of leaving no question regarding standing, traceability, or redressability unanswered. This level of detail was necessary to lay bare the entire landscape of this case. Yet, we recognize that in the density of this comprehensive Complaint, it would be easy for the reader to lose sight of the bigger picture; *i.e.*, to miss the forest for the trees. That is why this recapitulation serves as a guide to step back, simplify, and reveal the grander narrative (the forest itself).

563.	This section strives to distill the intricacy and volume of this case to its core essence. This section consolidates the critical elements of the conspiracy that unfolded, demonstrating how the manipulation of public discourse and the erosion of constitutional safeguards inflicted harm not only on the Plaintiffs but on the fabric of our nation. This section unveils (in a simpler fashion

217

than the body of this Complaint) Defendants' coordinated effort to stifle freedom and silence dissent, with ramifications extending far beyond this case and U.S. borders.

564. This is America's story of the *Information War*, a clash for the ages, fought not with armies but with influence, control, and the suppression of ideas. It is a story of seeing the forest once more, of understanding the profound dynamics that define this struggle for the future of freedom. Let us now briefly (relatively speaking) revisit the essence of this epic battle for truth and justice.

### 1. Rise Of The Administrative State (A Shadow Network)

565. The Administrative State is a sprawling amalgam of foreign and domestic actors, encompassing Government officials, private citizens, and entities from various sectors. It includes federal and state employees, non-governmental organizations (foreign and domestic NGOs), schools, think tanks, Hollywood elites, billionaires, foundations, non-profits, PACs, and operatives embedded across all branches and agencies of Government. Functioning as a shadow network, this coalition that is the Administrative State wields immense power, often acting in coordinated unison to protect and expand its influence while evading traditional accountability structures.

566. Known by many names (*e.g.*, Deep State, Swamp, Establishment, Uni-Party, Elite, Blob, New World Order, *et cetera*), we will, for our purposes, most often refer to it as the Administrative State. Its agenda, whether framed as globalist, authoritarian, or collectivist, revolves around consolidating power, wealth, and control. It employs censorship, propaganda, and the systematic suppression of dissent to maintain dominance over society, governance, and free thought.

567. Operating in the shadows, the Administrative State transcends any single administration. Its amorphous nature makes it difficult to fully identify its players, but its deep

entrenchment within Government agencies, private entities, and media outlets ensures its continuity regardless of who occupies the presidency. While Biden has willingly advanced its agenda, President Trump's first term posed a significant threat to its power. Upon President Trump's return to office, he is doubtless poised to dismantle the Administrative State's carefully constructed system of control; but, the absolutely necessary dismantling requires more than the executive branch. The judicial branch (this Court, this case) must also act to ensure not only the well-being and rectification of the Plaintiffs but also the well-being and rectification of this country (and this world, for that matter).

568.    "We the People," juxtaposed to the Administrative State, represent those who fight for constitutional freedoms, individual sovereignty, and the preservation of the American Republic. "We the People" includes ordinary citizens, grassroots movements, and populist leaders who challenge the Administrative State's overreach. In an attempt to vilify these defenders of liberty, the Administrative State has mischaracterized "We the People" as, for examples, the Disinformation Dozen, antivaxxers, election deniers, insurrectionists, MAGA, Deplorables, Garbage, Racists, White Supremacists, Nationalists, Neo-Nazis, and *et cetera*, so as to undermine their credibility and divide their ranks.

569.    In this epic and ongoing saga, not unlike the timeless struggle depicted in *Star Wars*, the two sides are not merely political factions but embodiments of opposing ideologies – centralized power versus individual liberty. The Administrative State, a shady combination of entrenched Government actors, private institutions, and global interests, seeks to cement its hegemony, while "We the People," fueled by the ideals of self-governance and constitutional freedoms, strive to restore a nation founded on the principles of liberty. This is not just a clash of policy but a fight for the very soul of the Constitutional Republic.

570. Our story begins on **January 20, 2011** … the day Barack Obama was sworn into office. Obama is often seen as a key figure in the Administrative State, symbolizing the growth of the modern Administrative State by way of his rapid rise to power and his focus on expanding federal programs and regulations. Obama's rise to power marked the rise of the Administrative State and the beginning of the battle for America's freedom.

571. In **2011**, the Global Engagement Center ("GEC") was first established as the Center for Strategic Counterterrorism Communications ("CSCC"), with a primary focus on countering foreign terrorism and extremism. Over the years, however, the GEC evolved into a central tool in the Government's broader efforts to influence public discourse and suppress dissenting voices (*i.e., its efforts to control free speech*), both abroad and (unconstitutionally) domestically. This transformation became particularly evident in 2016- 2017, when Congress significantly expanded its mission through the National Defense Authorization Act ("NDAA"); *i.e.*, it gave the Government more power to control what people say and hear. The creation of the CSCC marked the inception of the Administrative State's first major weapon to undermine free speech. Its initial mission was deliberately repurposed, shifting from countering foreign threats to (unconstitutionally) suppressing domestic discourse.

572. On **January 2, 2013**, as part of the NDAA for Fiscal Year 2013, the Smith-Mundt Modernization Act was signed into law by Obama (amending the Smith-Mundt Act of 1948). It removed the prohibition of domestic dissemination of U.S. Government propaganda, originally imposed by the Smith-Mundt Act of 1948. This change allowed federal agencies to distribute Government-produced content (good and bad), such as information campaigns, within the United States, raising serious concerns about the potential for manipulation of domestic public discourse. The Smith-Mundt Modernization Act stripped away long-standing protections against

Government propaganda, giving the Administrative State yet another powerful weapon to control narratives and manipulate public beliefs.

573. In **2016**, in the final days of Obama's administration, an executive order transformed the CSCC into the GEC. This reorganization was framed as a modernization effort to enhance the U.S. Government's ability to counter terrorism and extremism in the digital age. While the GEC retained the CSCC's original counterterrorism mission, it sought to expand its reach and effectiveness by incorporating advanced data analytics, forming partnerships with private organizations and alien nations, and adopting more sophisticated messaging strategies. The move was presented as a necessary response to evolving threats in the information space (*i.e.,* the information war), including the rise of online propaganda and disinformation. The transformation of the CSCC into the GEC, like the Smith-Mundt Modernization Act, was not about "modernization," it was about weaponization. Framed as a counterterrorism upgrade, this shift armed the Administrative State with cutting-edge tools (data analytics, private partnerships, and global alliances) for its forthcoming information war. The GEC's (the Government's) target was not just foreign propaganda anymore; rather, the necessary groundwork was being laid to topple free speech in America by controlling domestic narratives.

## 2. A New Hope For America

574. On **November 3, 2016**, President Donald Trump (the populist candidate) unexpectedly beat Hillary Clinton (the Administrative State's candidate). Clinton was not supposed to lose. The Administrative State underestimated the power of social media and a candidate's ability to connect directly with voters. Trump's victory in 2016 shattered the Establishment's carefully orchestrated plan, exposing the illusion of choice – the magic trick they had long relied on to maintain control.

575.    Again, on **December 23, 2016**, in the final days of his term, Obama signed into law the NDAA for Fiscal Year 2017, which formally established the GEC. Although the law took effect in 2017, it was critical that this was enacted before President Trump took office, as the DOS would later weaponize the GEC against President Trump, Plaintiffs, and anyone else who stood in opposition to the Administrative State's agenda. The weaponization of the GEC through the NDAA was a last-minute effort by the Administrative State when Hillary Clinton unexpectedly lost the 2016 election – the Establishment was caught off guard and hastily formalized the GEC before Trump could assume office. This move not only revealed how the Administrative State operates outside the President's control (*e.g.*, through the DOS), but also highlighted the lengths the Administrative State would go to undermine the Trump administration and the will of the American people. We are now witnessing similar preemptive legislation aimed at preserving bloated Government budgets and obstructing the mandate the People elected President Trump to carry out in 2024 – the battle rages on.

576.    On **January 20, 2017**, President Donald Trump was sworn into office. This moment marked America's first big win in the fight for freedom, igniting "a new hope" for the nation's future. But, although a battle was won, the larger war loomed.

577.    Upon entering office in 2017, President Trump quickly discovered he had stepped into a nest of vipers – an entrenched Administrative State, lacing every corner of Government and operating in blind spots to "resist" him at every turn. It was no coincidence that the Establishment media openly called for their anonymous Deep State allies to "resist" President Trump. Yet, by resisting President Trump, they were ultimately resisting the will of the American people who had elected him to bring about meaningful change. President Trump's entry into office exposed an Administrative State far more deeply entrenched than imagined. Operating in obscurity to resist

222

President Trump and the will of the American people, this "Deep State" (or "Swamp," as President Trump aptly called it), was (and is) deeply entwined with private companies, foreign governments, and third-party organizations. It wields its power to control narratives (silencing dissent and pushing propaganda) and suppress freedoms – revealing the very tyranny the Founding Fathers sought to prevent through the Constitution.

578.    In **2018–2019**, Trump's presidency faced relentless obstruction from the Administrative State. Congress delayed his appointments to key positions, ensuring entrenched Deep State operatives remained in control – a resistance tactic they intend to repeat in 2025. Meanwhile, the media, acting as the Establishment-controlled propaganda arm of the Administrative State, launched nonstop smears, amplified rallying cries to "resist," and framed the Trump administration as illegitimate and a "threat to democracy." Prominent Establishment allies joined the fray, including Congresswoman Maxine Waters, who infamously urged supporters to "get in the[ ] face" of members of President Trump's administration. These coordinated efforts stoked public hostility toward patriotic Americans who were fighting for their freedoms, such as the Plaintiffs, while working to preserve the Administrative State's grip on power. President Trump fought back, however, branding the media as "fake news" and exposing its role in manipulating public opinion to shield this entrenched system.

579.    When President Trump took office in 2017, he began dismantling what he could of the "D.C. Swamp," but its reach was far deeper than he anticipated. He underestimated the sheer extent of its entrenchment across every branch, agency, media outlet, organization, foreign entity, and public-private partnership. Plainly, the harms that Plaintiffs have suffered (and continue to suffer) as a result of the Administrative State's conspiratorial plan to topple the Constitution did not stem from a nearly senile (if not senile) Biden. The true evildoer (the "Deep State") has

infiltrated every corner of Government. While this case addresses only a relatively small piece of the global problem, it marks a crucial step in the ongoing fight that We the People must undertake to reclaim our Government and restore our freedoms.

### 3. The 2020 Election And The Establishment Menace (Donald J. Trump)

580. In **2020**, the Election Integrity Partnership ("EIP") was formed as a coalition of organizations like the Stanford Internet Observatory and the Atlantic Council's DFRLab, ostensibly to combat "misinformation" during the election. Its coordination with Government entities and private organizations, however, quickly revealed its true purpose – suppressing domestic speech to influence the outcome of the 2020 election. At the same time, the GEC unconstitutionally expanded its mission from countering foreign propaganda to targeting any speech (domestic or foreign) that challenged the Administrative State's control agenda. This expansion blurred constitutional boundaries, enabling the suppression of Americans' free speech; *e.g.*, the Hunter Biden laptop story (critical information in relation to the outcome of the 2020 election) was suppressed under the guise of combating purported "foreign disinformation."

581. The EIP and GEC, like the CCDH that followed, were tools of the Administrative State, united in their ultimate goal – controlling the public narrative, preserving their power, and removing President Trump (their greatest threat) from office by ensuring 2020 reelection failure. This ongoing censorship campaign was not about who held the presidency, it operated outside the President's authority to ensure the Administrative State maintained covert control over the presidency itself, leveraging decades of entrenchment within the Industrial Complex.

### a. COVID's Role In The 2020 Election

582. The COVID-19 pandemic catalyzed one of the largest wealth transfers in American history, fueled by, among other things, lockdowns, vaccine mandates, and a tightly controlled

narrative. At its core, COVID-related responses such as lockdowns (correlated with a substantial uptick in mail-in ballots for the 2020 election, for example) appear to have been exacerbated by the New World Order (a global Administrative State) to influence the outcome of the 2020 election.

583.    COVID-19 was first publicly announced by Chinese officials (potentially allied with the Administrative State) on **December 31, 2019**, when they reported cases of a mysterious pneumonia in Wuhan, Hubei Province, to the World Health Organization ("WHO").

584.    On **March 11, 2020**, the WHO declared COVID-19 a global pandemic. Likely unaware that COVID-19 was being spun into a global strategy to ensure reelection failure, on March 13, 2020, President Trump declared a national emergency in the United States. By the end of March 2020, most states had implemented stay-at-home orders or restrictions on gatherings and businesses, marking the most extensive coordinated Government lockdown effort in history.

585.    COVID-19 being spun into a disruption / interference of the 2020 U.S. election (so as to impede President Trump's reelection in contravention of the Constitution) was / is not implausible, as the U.S. (and the intelligence community) has implemented similar regime change tactics in other countries in order to supplant leaders and / or political factions.

b.    **Election Security Concerns**

586.    As noted in the preceding section, with COVID we saw a large uptick in mail-in ballots in relation to the 2020 election cycle. Reasons being: (a) lockdowns prevented people from leaving their homes to cast in-person votes; and (b) the Government and its associates (*e.g.*, Fauci) instilled immense fear in people with respect to "social distancing."

587. With respect to mail-in ballots, critics (like the Bollingers) have long-raised concerns about election security and reliability, arguing that such balloting is inherently more susceptible to corruption than in-person voting.

588. The concerns include, but are not necessarily limited to, the following: (a) voter fraud risks – verifying voter identity without direct oversight is challenging, leaving room for misuse and manipulation, especially when ballots are sent to outdated voter rolls or misdelivered by the postal service; (b) lack of secure chain of custody – without a clear chain of custody from the voter to election officials, the integrity of the process is further questioned; and (c) inconsistent signature verification – critics point to variations in signature verification methods as a significant vulnerability for validating mail-in ballots.

589. These vulnerabilities, combined with delays in counting large quantities of mail-in ballots, created uncertainty and eroded public trust in the 2020 election outcome.

### c. The "Globally Coordinated Coup"

590. Plaintiffs contend that the COVID-19 pandemic was turned into a larger global strategy aimed at destabilizing the United States, ensuring the failure of President Trump's 2020 reelection efforts, and systematically undermining the Constitutional rights of "We the People." This COVID "coup" seemingly succeeded.

591. According to the Pew Research Center, approximately 65,000,000 mail-in ballots were cast in the 2020 U.S. presidential election, a significant increase from previous elections. This surge was quickly attributed to the COVID-19 pandemic, as voters purportedly "opted for mail-in voting" to minimize health risks ("social distancing") and / or not violate lockdown directives. The dramatic rise in mail-in ballots also conveniently contributed to "delays" in vote counting and reporting final results. This substantial increase in mail-in voting and associated vote

226

counting delays (all laced with lack of transparency, broken chains of custody, and inconsistencies) was not a mere consequence of COVID, it was by design with COVID as the "justification."

### d.    2024's Exposure Of Inconsistencies

592.    In the 2020 presidential election, Joe Biden received over 81,000,000 votes, and Donald Trump received over 74,000,000 votes, totaling approximately 155,000,000 votes – 65,000,000 of which were mail-in ballots. By contrast, in the 2024 U.S. presidential election, Donald Trump secured approximately 76,800,000 votes, while Kamala Harris received about 74,300,000 votes, for a total of 151,100,000 votes – a 4,000,000 vote drop from 2020, despite reports of increased voter registration and turnout. It might not seem that 4,000,000 is all that much, maybe 4,000,000 people were lazy and just did not vote; but, critics (like the Bollingers) question – where did the other votes go?

593.    Between the 2020 and 2024 election cycles, the United States saw a significant increase in voter registrations, with approximately 6,800,000 new voters added to the rolls. Despite this, the total number of votes cast dropped by 4,000,000. That is strange, why did the voter turnout drop while voter registration increased? Proponents of the Administrative State might argue this could be attributed to deaths caused by COVID-19. But, between 2020 and 2024, according to reports, approximately 1,150,000 Americans died because of COVID-19. Even accounting for all 1,150,000 purported deaths, there is still an 8,650,000 voter discrepancy that remains unexplained.

594.    Historical voter turnout trends also raise common sense questions. From 2012 to 2016, voter turnout increased by approximately 5.83%. From 2016 to 2020, it surged by 16.84%. However, from 2020 to 2024, voter turnout decreased by approximately 6.4%, despite the addition of 6,800,000 new registered voters. Again, that is bizarre. This discrepancy creates a stark 23.24% swing (from a sharp increase to a sharp decrease) in voter turnout between the voter upswing in

2020 and downswing in 2024, raising serious concerns about the integrity of the 2020 election results. Was the U.S. election stolen in 2020 vis-à-vis the Administrative State?

595.    Something about the 2020 election does not add up. This case is not about proving whether the Administrative State stole the 2020 election, however, it is about demonstrating how the same tactics used in 2020 (*e.g.,* the EIP) were employed (*e.g.,* morphed into the Virality Project, VP) to manipulate the 2024 election cycle – tactics that directly harmed Plaintiffs through censorship. Undoubtedly, the Administrative State will attempt these tactics again in the 2028 election cycle, and the censorship efforts will persist unless stopped by this Court right now.

### e.    FBI's Censorship Role In The 2020 Election

596.    In the lead-up to the 2020 election, the FBI played another pivotal role in shaping public perception through a coordinated effort with Big Tech, most notably Facebook. This Complaint reveals that the FBI, leveraging its authority, engaged in a "pre-bunking" campaign – anticipating and undermining the Hunter Biden laptop story before its public release.

597.    FBI officials met with Facebook representatives (and other social media platforms) on numerous occasions to coordinate content moderation strategies on behalf of Government Defendants. These meetings included directives to monitor and suppress purported "misinformation" surrounding politically sensitive topics. The Hunter Biden laptop story, containing potentially damaging revelations about the Biden family's business dealings and threatening the Administrative State's preferred candidate in the 2020 election, was flagged as a primary concern. Despite the story's authenticity, the FBI preemptively labeled it as "Russian disinformation," a narrative Facebook and other platforms acted upon.

598.    When the *New York Post* broke the story, Facebook implemented aggressive measures to limit its reach, including algorithmic suppression and content warnings. These actions

effectively silenced Plaintiffs' reporting, restricted the dissemination of critical information, and prevented millions of users from accessing the truth during a crucial election period.

599.    This mischaracterization, amplified by the FBI's involvement, had immediate and significant consequences. Plaintiffs allege that this interference was not incidental but part of a deliberate attempt to sway the 2020 election. By collaborating with Facebook, the FBI turned the platform into an extension of Government propaganda, eroding First Amendment protections under the guise of combating purported "foreign" "misinformation" – a false narrative repeatedly implemented by the Government to conceal its unconstitutional actions.

600.    Moreover, the FBI's collaboration with Facebook exemplifies the broader strategy employed by the Administrative State to control the narrative and suppress dissent. Through repeated interactions with Social Media platforms, the FBI ensured that stories detrimental to their preferred candidate were systematically buried, while platforms were pressured to amplify content aligned with Government-endorsed narratives. This deliberate manipulation of digital information markets highlights the extensive influence of the Government Defendants over public discourse, raising grave concerns about democratic integrity and the erosion of fundamental freedoms, including those of Plaintiffs.

601.    This censorship-by-substitution strategy is a stark reminder of the Administrative State's willingness to weaponize its resources to maintain control. The FBI's involvement, coupled with Facebook's compliance, served as a blueprint for further governmental overreach in the digital information space, with profound implications for free speech and public trust in election integrity.

602.    The FBI's coordination with Facebook to suppress the Hunter Biden laptop story reveals a disturbing pattern: the Administrative State's willingness to weaponize its authority and

manipulate public discourse to maintain power. According to some reports, the suppression of this single story was enough to sway the outcome of the 2020 election. Combined with the broader coordinated efforts of the Defendants, the larger conspiracy begins to take shape.

      **f.**      **January 6, 2021 – Insurrection Or Government Psy-op?**

603.    Feeling disenfranchised, countless Americans gathered in Washington, D.C., on **January 6, 2021**, to voice concerns over what they believed to be a stolen election. This moment became a turning point in the Administrative State's campaign to consolidate power and suppress dissent. Unbeknownst to President Trump, much of Congress and his own Vice President, Mike Pence, was, at least in part, aligned with the Administrative State. As Vice President, Pence had the constitutional authority to challenge or delay the certification of electoral results, a move that could have changed the course of history. The Administrative State, however, was determined to prevent that from happening.

604.    The battle for America's future reached a critical juncture as masses of disenfranchised Americans, having lost confidence in the integrity of the election, marched on the Capitol. Evidence has since surfaced that covert Establishment actors, including alleged FBI operatives like Ray Epps and other Administrative State-aligned individuals, infiltrated the crowd, posing as Trump supporters to provoke chaos. And this is much like how certain groups (*e.g.*, Black Lives Matter) conveniently go on hiatus for years and reappear during election cycles when the Administrative State seeks to provoke social unrest.

605.    Tragically, the situation escalated when Capitol Police fired on the crowd (a fact that was secreted for quite some time by members of Congress), exacerbating panic and confrontation. Nancy Pelosi (House Speaker at the time) declined President Trump's offer to

deploy the National Guard, raising serious questions about intent and preparation. The day's events were further marred by manipulation and misrepresentation.

606.    Ashli Babbitt, an unarmed Air Force veteran, was fatally shot point blank by a Capitol Police officer who faced no accountability under the Biden DOJ but would undoubtedly face scrutiny under a President Trump DOJ. Rosanne Boyland died under contested circumstances, beaten by police, and crushed in the crowd. Meanwhile, the mainstream media (acting as the Administrative State's propaganda arm) propagated myriad false narratives (which continue to this day), including the claim that Capitol Police Officer Brian Sicknick was bludgeoned to death by rioters wielding a fire extinguisher. It was later proven / revealed that Sicknick died of a stroke the following day, unrelated to the Capitol events.

607.    These distortions (put mildly) were deliberate, designed by an Administrative State-controlled media to frame January 6, 2021, as an "insurrection" and to paint disenfranchised Americans as "insurrectionists;" *i.e.*, enemies of the state – the Administrative State. Although no participants were ever charged with that crime, the label became the foundation for vilifying MAGA and President Trump supporters, justifying an unprecedented crackdown on dissent. The chaos provided the perfect pretext for the Establishment to criminalize defenders of liberty, consolidate power, and tighten its grip on the nation. January 6, 2021, was infiltrated and exploited by the Administrative State as a tool to vilify Patriots as "enemies of the [Administrative] State" to crush liberty and control the public narrative.

### g.    Misapplication Of Law To Send A Chilling Message

608.    The Administrative State's strategy extended beyond media manipulation to include deliberate misapplication of law, sending a clear message – if you stand up for freedom, the Government will take your freedom away. Following January 6, 2021, the Department of

231

Justice (DOJ), led by Merrick Garland, utilized 18 U.S.C. § 1512(c)(2) (a statute intended to prevent obstruction of justice through evidence or witness tampering) to over-prosecute individuals involved in the Capitol breach. This law criminalizes "corruptly... obstruct[ing], influenc[ing], or imped[ing] any official proceeding, or attempt[ing] to do so."

609.    The DOJ absurdly broadened this statute's application, charging over 350 individuals with obstructing an official proceeding by disrupting the certification of the 2020 presidential election. In **June 2024**, the U.S. Supreme Court ruled that the DOJ had grossly overreached, finding that § 1512(c)(2) was never meant to apply to generalized disruptions of proceedings.

610.    The weaponized DOJ and its ally judges deliberately misinterpreted § 1512(c)(2) to persecute (not prosecute) January 6, 2021, participants, creating a chilling effect designed to deter Americans from standing up for their rights in the future.

611.    This "deliberate distortion" tactic is not unique to January 6, 2021. As alleged in this case, Section 230(c)(1) of the Communications Decency Act has also been deliberately misinterpreted (*i.e.,* distorted) by Administrative State allies to grant Big Tech absurd levels of immunity. Similarly, courts have distorted the facts in election integrity cases to find a lack of standing, dismissing cases pre-suit and never considering the evidence. Meanwhile, the Administrative State's media allies beat the drum of "no evidence of election fraud in 2020," perpetuating another deliberate distortion of truth. The reality is that there was evidence, courts simply dismissed these cases on procedural grounds without ever addressing the merits, much like how California courts have repeatedly dismissed valid cases (*e.g., Fyk v Facebook*) by applying absurdly broad interpretations of Section 230 immunity.

612.    Courts have, over time, become complicit in this political persecution, eroding public faith in the judiciary. Unfortunately, many Americans, including Plaintiffs, now believe that case outcomes hinge more on venue and the integrity of assigned judges than on the law itself.

613.    Distrust in the court system creates a chilling effect discouraging Americans from challenging unlawful and unconstitutional actions. The Government is increasingly seen not as a protector of the people but as an enabler of Establishment oppression. We will trust that this Court possesses the integrity to stand up to the formidable forces of evil at play, because they are immense … and Plaintiffs are undoubtedly fighting well above their weight class here.

**h.    Shift In Tactics To Secure Perpetual Control**

614.    Following the 2020 election, the Administrative State wasted no time adapting its strategies to consolidate power and suppress dissent. Within three days of President Biden's inauguration, Government officials engaged Facebook to unconstitutionally collect extensive private data on users, narratives, and accounts deemed "problematic," which, upon information and belief, included Plaintiffs. This private data was then funneled to organizations like the Center for Countering Digital Hate (CCDH), a newly minted 501(c)(3) tax-exempt entity, which such 501(c)(3) status was conveniently approved by the Government just a couple weeks earlier in December 2020. The CCDH quickly became a key instrument in the Administrative State's next phase – shifting focus from electoral politics to public health narratives under the guise of combating health "misinformation."

615.    After achieving their goal of removing President Trump *via* thwarting of reelection, the Administrative State pivoted to silencing dissent more broadly, using tools like the CCDH to target narratives that threatened their agenda, including "vaccine hesitancy."

233

616.    This transition from Election Integrity to COVID-19 virality narratives mirrored the evolution of the Election Integrity Partnership (EIP) into the Virality Project (VP). While the EIP focused on suppressing claims of election fraud and undermining "election integrity" narratives, the VP turned its attention to combating "vaccine hesitancy" and controlling public perception of COVID-19 policies. This shift was deliberate, signaling the Administrative State's strategy to maintain control ahead of the 2024 election. By shifting the battleground from election integrity to public health, the Administrative State expanded its influence while laying the groundwork to ensure future compliance and dominance in 2024 and beyond.

**4.    The Administrative State Strikes Back – The Conspiracy Unfolds**

617.    The following abbreviated timeline highlights pivotal events detailed in this Complaint, exposing the coordinated efforts of the Administrative State, the CCDH, Big Tech, and other aligned entities. Seen in the proper light, these events exemplify the Establishment conspiracy that swiftly took shape just before and after President Biden assumed office.

618.    This chronology underscores the systematic preplanning, pervasive entwinement, and collusion among multiple entities to target Plaintiffs directly, manipulate public discourse, and cement the Administrative State's dominance over freedom of speech and thought, all in preparation for controlling the narrative leading into the 2024 election.

619.    On **November 3, 2020**, Biden was announced as the winner of the U.S. Presidential election, a result that was met with significant public discontent and widespread debate. Many Americans believe(d) the 2020 election was stolen.

620.    On **November 11, 2020**, the U.S. and U.K. announced a "joint initiative" to target independent media outlets, including Plaintiffs, under the guise of combating "misinformation." This so-called "cyber war" (more accurately described here as an "Information War") marked a

coordinated effort between the two governments to suppress dissenting voices globally, including Plaintiffs' domestic free speech. This "joint [conspiratorial] initiative" marked the start of a coordinated effort by at least the U.S. and U.K. (with strong indications that other world governments were / are also involved) to target American independent media like Plaintiffs, undermining the U.S. Constitution and the sovereignty of its citizens. In other words, the New World Order launched its direct assault on American Freedom in declaration of Information War – the Administrative State was coming for free speech.

621.     On **November 17, 2020**, during a Senate Judiciary Committee hearing, Senator Richard Blumenthal renewed calls for Section 230 reform, stating: "I have urged, in fact, a breakup of tech giants. Because they've misused their bigness and power. … And indeed Section 230 reform, meaningful reform, including even possible repeal in large part because their immunity is way too broad and victims of their harms deserve a day in court." Translated, Establishment-aligned members of Congress renewed their calls to compel social media companies to suppress disfavored speech through the threat of exposure to legal liability.

622.     On **December 2, 2020**, Bruce Reed, who would later be appointed Deputy White House Chief of Staff under Biden, publicly declared that it was "long past time" to hold social media companies accountable for the content published on their platforms, content rightly protected under Section 230(c)(1) when applied properly. Translated, Establishment-aligned members of the incoming Administration renewed their calls to compel social media companies to suppress disfavored speech through the threat of exposure to legal liability

623.     On **December 11, 2020**, the Government granted the CCDH 501(c)(3) tax-exempt status, exactly one month after the U.S. and U.K. announced their joint "cyber war" initiative. The timing raises significant questions about the CCDH's alignment with the broader Government

235

strategy. With its newly obtained nonprofit status, the CCDH was positioned as a central tool in the Government's forthcoming censorship campaign, a foreign entity masquerading as an independent U.S. nonprofit organization. In preparation for the Administrative State's assault on free speech, Establishment-aligned members of the Internal Revenue Service (IRS) legitimized a U.K.-based conspirator as a semi-diplomatic U.S. nonprofit organization, relating back to the McCarron Act discussed above concerning Communist activities of the 1950s.

### 5.    Biden Administration

624.    On **January 23, 2021**, just three days after Biden took office, Clarke Humphrey, then White House Digital Director for Biden's COVID-19 response team, emailed Twitter to launch an offensive censorship campaign targeting RFK, Jr. A prominent figure later labeled as part of the "Disinformation Dozen" by the CCDH, RFK Jr. was both a fierce political rival and a leading voice of populist opposition to the Administrative State's control agenda. The Biden Administration wasted no time mobilizing its co-conspirators, including Twitter, to censor disfavored rivals like RFK Jr., with Plaintiffs being swept up in that political rivalry as members of the later-dubbed "Disinformation Dozen."

625.    On **February 7, 2021**, Twitter revealed that it had been "bombarded" with censorship requests from the White House – more direct evidence of joint participation, noting that over four different individuals within the Biden Administration had contacted them in a single day. Twitter expressed a preference for a more streamlined process to handle the influx of demands. The Biden Administration was moving aggressively to suppress dissent.

626.    On **February 8, 2021**, Facebook contacted White House officials Rob Flaherty, Deputy Assistant to the President and Director of Digital Strategy, and Clarke Humphrey to report that it had expanded its COVID-19 censorship policies. These updates aligned with the Biden

Administration's directives, focusing on promoting authoritative vaccine information while suppressing competing narratives on both Facebook and Instagram. Facebook reached out to the White House to confirm its capitulation, signaling its role as a willing co-conspirator in the Government's censorship campaign.

627. On **February 9, 2021**, Rob Flaherty followed up with Facebook, accusing the platform of contributing to "political violence" by inadequately censoring COVID-19 misinformation (effectively claiming Facebook was not censoring enough). Facebook responded the same day, acknowledging that while "vaccine-skeptical" content did not violate its policies, it would still take measures to reduce the distribution of such content and add strong warning labels to ensure fewer people saw it. Facebook outlined further censorship actions, including suppressing viral posts that discouraged vaccines, limiting recommendations for groups or pages promoting such content, and relying on guidance from "public health authorities" (*e.g.*, Fauci) to shape its content moderation policies.

628. Facebook had not done enough to satisfy the White House's demands, so it reassured officials by promising to restrict content that did not violate its rules. Facebook even explained how it would modify its platform to suppress (chill) even more vaccine-related speech at the Government's request.

629. On **February 18, 2021**, the House Energy and Commerce Committee announced that Mark Zuckerberg, Sundar Pichai, and Jack Dorsey would testify at a hearing scheduled for March 25, 2021. This announcement coincided with an email exchange involving Rob Flaherty, Clarke Humphrey, several Facebook employees, and other conspirators. Notably, the timing aligns suspiciously with the CCDH's DD hit piece / report release on **March 24, 2021**, just one day before the hearing. These events strongly indicate that, as of at least February 18, 2021, the

Government was actively coordinating with Big Tech and NGO Defendants to amplify its narrative, suppress dissenting voices (including Plaintiffs), and shape public opinion, all while expanding its control over digital platforms. Congress was preplanning for the CCDH report before it was even public, revealing that all Defendants were complicit in the conspiracy to suppress free speech. The whole censorship scheme was pre-manufactured by the Government.

630.   On **February 19, 2021**, Rob Flaherty and Clarke Humphrey, alongside Courtney Rowe and Joshua Peck from the White House COVID-19 Response Team, engaged with Facebook employees again to discuss "misinformation and disinformation." During the meeting, Flaherty specifically inquired about "algorithmic productions" (*i.e.,* product design changes) and whether Facebook planned to replicate its lockdown messaging strategies, such as using "stay at home" stickers to influence user behavior. A follow-up meeting on "Misinfo & Disinfo" was subsequently scheduled for **March 1, 2021**. This further demonstrates the coordinated conspiratorial effort between the Government and Facebook that was transpiring behind the scenes to control the public narrative and shape perception.

631.   On **February 24, 2021**, a Facebook employee reported back to Rob Flaherty about COVID-19 misinformation themes being removed from the platform, including claims about vaccine toxicity, false side effects, comparisons to flu vaccines, and downplaying COVID-19's severity. During this exchange, Flaherty requested detailed metrics on the scale of removals and examples of content that, while not explicitly violating platform policies, could "contribute to vaccine hesitancy."

632.   This exchange marked the point where the Government-induced, preplanned CCDH report began to take shape. Flaherty's request for detailed "data" illustrates the Government's active role in gathering information essential for the CCDH's forthcoming hit piece

targeting Plaintiffs, including the so-called "Disinformation Dozen." This "request for detailed metrics," which such metrics were then given to the CCDH, demonstrates that the CCDH was not an independent entity acting alone, but rather a tool of the Government Defendants, tasked with producing the pre-planned March 24, 2021, report that would be used in the upcoming and preplanned March 25, 2021, Congressional hearing. It further underscores the pervasive entwinement between the Government, CCDH, and Big Tech in their coordinated campaign to suppress dissenting voices. The White House was actively requesting data to be weaponized by the CCDH to justify Big Tech's censorship actions against Plaintiffs on behalf of the Government. It is a fairly straightforward conspiracy plan, and the Administrative State got caught red-handed and that is why Plaintiffs are here.

633. On **March 1, 2021**, Rob Flaherty, Clarke Humphrey, Courtney Rowe, and Ben Wakana, Director of Strategic Communications and Engagement for the White House COVID-19 Response Team, attended another preplanned meeting with Twitter titled "Twitter / COVID Misinfo." The White House was actively coordinating with its co-conspirators (joint participants), ensuring that Twitter was censoring content exactly as the Government wanted.

634. On **March 2, 2021**, Facebook emailed Rob Flaherty, Clarke Humphrey, and Andrew Slavitt, White House Senior COVID-19 Advisor, to assure them of its ongoing efforts to combat vaccine misinformation and de-amplify content that could "contribute to vaccine hesitancy." Facebook outlined measures such as enhancing enforcement systems and limiting the spread of viral content deemed harmful. That very same day, Facebook took direct action to censor Plaintiffs by removing their "vaccine hesitant" post, which stated, "Have you had enough of this fake pandemic yet?"

635.     Facebook's actions that day perfectly illustrate direct, traceable harm. The Government wanted vaccine-hesitant content censored, Facebook assured them it would comply, and then Facebook censored Plaintiffs – *all on the same day*. Put differently, one Government compelled / coerced[143] one platform to censor one Plaintiff. Plaintiffs standing is undeniable here, but this is just the tip of the iceberg.



636.     On **March 3, 2021**, just one day after Facebook censored Plaintiffs' content, the CCDH tweeted out a "hit list" that included members of the later-dubbed "Disinformation Dozen," prominently featuring the Bollingers.

637.     Sometime between **February 24, 2021**, and **March 3, 2021** (although Plaintiffs submit it was most likely the day before – **March 2, 2021**), the Government engaged the CCDH to draft its report specifically targeting Plaintiffs. Notably, the CCDH's "hit list" explicitly references Facebook and Instagram (see below), platforms that had been in direct contact with the Government the previous day and whose "data" the Government was collecting. The striking precision of this alignment strongly suggests a deliberate connection between Facebook's provision of data to the Government and the CCDH's subsequent weaponization of that information to suppress and target Plaintiffs on behalf of the Administrative State. At this point, it is blatantly obvious that these entities were conspiring together to silence Plaintiffs' speech.

---

[143] We remind this court once more of the maxim dictating that "what cannot be done directly cannot be done indirectly" applies here.



638.     On **March 12, 2021**, Facebook emailed Rob Flaherty with a detailed report summarizing the requested survey "data" on vaccine uptake collected between **January 10, 2021**, and **February 27, 2021**, timing that aligned directly with the Government's **February 28, 2021**, request. The email included the statement, "Hopefully, this format works for the various teams and audiences within the White House/HHS that may find this data valuable."

639.     Upon information and belief, the "teams and audiences" within the White House that received Facebook's "valuable" data included the CCDH, further illustrating the entwinement of these entities in a coordinated censorship conspiracy. The White House requested vaccine hesitancy data from Facebook, and Facebook complied. The White House then engaged the CCDH to produce its hit piece, armed them with Facebook's data, identified their targets, and set a March 24, 2021, deadline to align with the preplanned March 25, 2021, Congressional hearing.

640.     On **March 16, 2021**, an America First Legal investigation uncovered an email from Rowan Kane, Counselor to the Connecticut Attorney General and Deputy Director of Policy, to

himself, with Margaret Chapple also copied (see below).[144] The email included an attached letter addressed to Jack Dorsey and Mark Zuckerberg (both of whom the Biden White house was already engaged with), requesting confirmation from other state attorneys general offices to "sign-on" to the letter by "COB" Tuesday, **March 23, 2021** (just one day before the CCDH's "embargoed" hit piece / report would be publicly released).

641.    The CCDH had provided a non-public version of its forthcoming March 24, 2021, hit piece to at least the Connecticut Attorney General's Office and the White House, evidencing direct coordination and conspiracy between the CCDH and state officials to harm Plaintiffs. The Connecticut Attorney General's Office was part of a larger coalition of attorneys general that included representatives from New York, Delaware, Iowa, Massachusetts, Michigan, Minnesota, North Carolina, Oregon, Pennsylvania, Rhode Island, and Virginia. This advance notice and alignment among state officials, an NGO, and Big Tech illustrates a coordinated and premeditated campaign to target and censor Plaintiffs as members of the so-called "Disinformation Dozen."

**[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]**

---

[144] America First Legal Releases New Evidence, Files Formal Complaint With the DOJ to Investigate UK-Based "Center for Countering Digital Hate" for Engaging in a Foreign Influence Campaign to Stop Free Speech in the United States - America First Legal

242





### 6. What We Know So Far (Recap Of The Recap) – A Timeline Of Coordination And Conspiracy Before The CCDH Hit Piece On The Disinformation Dozen Went Public

642. "What a tangled web we weave when first we practice to deceive." ~ Walter Scott.

The deceitful web that is the Censorship Industrial Complex is so complex that we provide a brief

recapitulation of the recapitulation:

- **November 11, 2020:** The U.S. and U.K. announce their coordinated "cyber war" on misinformation, marking the beginning of the Information War.
- **November 17, 2020:** Congress renews calls for platform accountability, signaling the Establishment's intent to compel Big Tech to censor disfavored speech.
- **December 2, 2020:** Incoming White House officials echo Congress' calls for holding social media platforms accountable, amplifying the narrative of suppressing "misinformation."
- **December 11, 2020:** The IRS grants the U.K.-based CCDH 501(c)(3) tax-exempt status, positioning the organization as a key tool in the forthcoming censorship campaign.
- **January 23, 2021:** The Biden White House begins its censorship efforts, engaging Twitter to target RFK, Jr. and vaccine-hesitant content.
- **February 7, 2021:** Twitter reports being "bombarded" with White House censorship requests.
- **February 8, 2021:** Facebook contacts the White House to assure them it is censoring content per Government requests.
- **February 9, 2021:** The White House accuses Facebook of not censoring enough. Facebook responds the same day, acknowledging that the content in question does not violate its rules but promises to restrict it anyway.
- **February 18, 2021:** Congress schedules a hearing on March 25, 2021, to address so-called "misinformation."
- **February 19, 2021:** The White House contacts Facebook again, urging algorithmic design changes to suppress "misinfo and disinfo."
- **February 24, 2021:** Facebook reports back to the White House, confirming its compliance. During this exchange, the White House requests vaccine hesitancy data from Facebook.
- **March 1, 2021:** The White House holds a meeting with Twitter titled "Twitter / COVID Misinfo," reinforcing its coordinated censorship efforts.
- **March 2, 2021:** Facebook emails the White House to reiterate its compliance with the Government's vaccine hesitancy censorship agenda. That same day, Plaintiffs' vaccine hesitancy post is censored on Facebook.
- **March 3, 2021:** The CCDH tweets a hit list the very next day, prominently featuring Plaintiffs as part of the so-called "Disinformation Dozen."
- **March 12, 2021:** Facebook delivers the vaccine hesitancy data requested by the White House on February 24, 2021.
- **March 16, 2021:** State attorneys general are given a preview of the CCDH's preplanned report, enabling the assembly of additional AG signatories.

643. This sequence of events demonstrates a deliberate and tightly coordinated conspiracy among the Administrative State, the CCDH, Big Tech, and aligned state officials. The timeline reflects a systematic effort to suppress dissenting voices, including Plaintiffs, through a weaponized campaign of censorship and narrative control.

244

644. On **March 24, 2021,** the CDDH published its 40-page hit piece report and a related article called: "The Disinformation Dozen."

645. On **March 24, 2021**, the CCDH, acting on behalf of and in coordination with the Biden White House, produced a hit piece based on Facebook's vaccine hesitancy "data," targeting Plaintiffs as members of the "Disinformation Dozen." This premeditated report was then shared with Establishment-aligned attorneys general so that Congress, the White House, and state officials could coordinate their free speech attack on all fronts against Plaintiffs. This represents the single greatest coordinated assault on free speech in America's history. Plaintiffs were not just the target; so too, by proxy, were the American people, whom the Government sought to misinform and silence regarding critical health-related information. It simply does not get any worse than this.

646. On **March 25, 2021**, during the preplanned Congressional hearing, Representative Doyle and the twelve attorneys general (who had previewed the March 24, 2021, CCDH report) demonstrated clear signs of having advance knowledge of its contents. This premeditated timing strongly indicates that members of Congress were active participants in the broader conspiracy, as the hearing was specifically scheduled to align with the CCDH report's release to amplify its impact.

647. The direct and proximate harm to Plaintiffs became immediately apparent. On **March 25, 2021** (the very same day as the hearing), Facebook complied with the Government's censorship demands by taking down all of Plaintiffs' accounts, including their personal accounts, further underscoring its advance coordination with the conspiracy.

648. Approximately one week later, on **April 1, 2021**, Twitter followed suit by suspending all of Plaintiffs' Twitter channels, reinforcing its ongoing collaboration with Government agents.

245

649.    Then, on **May 17, 2021**, without any prior warning, Google suspended Plaintiffs' YouTube channel, taking approximately one-and-a-half months to execute its role in the Administrative State's agenda.

650.    This chain of events demonstrates the extensive and deliberate coordination among the Government, Congress, the CCDH, media, and Big Tech, all conspiring in a premeditated effort to suppress dissenting voices, including Plaintiffs, under the guise of combating "misinformation." These actions were not isolated incidents, but part of a systematic campaign to silence Plaintiffs and otherwise de-platform them.

651.    Facebook acted immediately as a fully complicit participant in the Government's censorship efforts, Twitter was involved in advance but to a lesser degree, and Google, though slower to act, ultimately joined the conspiracy to carry out the Administrative State's agenda. These actions directly and proximately harmed Plaintiffs and underscore the pervasive reach of this coordinated censorship campaign.

652.    On **May 1, 2021**, Facebook informed the White House that it would intensify censorship efforts following recent demands, including targeting vaccine-hesitant content and the twelve accounts labeled as the "Disinformation Dozen." This despite acknowledging again that much of the flagged content did not violate their policies. Notably, Facebook admitted that over-censorship could actually backfire by fostering distrust, reinforcing notions of a "cover-up," and undermining vaccine uptake. This response underscores a counterintuitive strategy: after learning in 2016 that deleting 300 Russian bot accounts failed to shift public discourse, Facebook still capitulated to the Government's demands, even when the approach risked eroding public trust. Facebook assured the White House it was complying with its censorship demands, even though the content did not violate its policies. Facebook, however, warned that targeting and removing

246

just twelve individuals would not achieve the desired effect and might instead risk exposing their coordinated conspiracy and "cover-up." This is one of those instances in which the truth is more unbelievable than fiction.

653. On **August 18, 2021,** Facebook publicly distanced itself from the CCDH's 65% claim in a report titled *"How We're Taking Action Against Vaccine Misinformation Superspreaders,"* suggesting the "data" (which Facebook provided to the White House) had been exaggerated or misunderstood by both the Government and the CCDH. This contradiction between Facebook's assessment of its own data and the CCDH's interpretation underscores Facebook's role as a premeditated "instrument" in the Government's censorship scheme.

654. Notably, Facebook's public disavowal of the CCDH's claim, while simultaneously censoring content at the Government's request, underscores internal concerns about potential future liability (like this case). Facebook publicly claimed the CCDH and the White House were wrong, but it censored Plaintiffs anyway, revealing the extent of its complicity in the censorship conspiracy.

655. On **September 13, 2021,** senior DHS officials Robert Silvers and Samantha Vinograd sent a memorandum to Secretary Mayorkas recommending the creation of the Disinformation Governance Board. The memorandum outlined the Board's purpose as combating the spread of disinformation, specifically targeting conspiracy theories about election validity, narratives about the 2020 election, and COVID-19 topics such as vaccine origins and mask efficacy, which they claimed undermined public health efforts. The Establishment openly seeks to turn Orwell's dystopian vision of thought control (akin to the Ministry of Truth) into a reality.

656. Our illustrations of the continuous, ongoing censorship experienced by the Bollingers could go on and on and on. In the spirit of limiting the volume of an already incredibly

lengthy Complaint, however, we will fast-forward to a handful of more recent censorship activities simply to demonstrate that the harms complained of herein are ongoing to present.

657. In **March / April 2024**, Facebook even went so far as to censor Plaintiffs' religion, removing an artistic rendering of Jesus' resurrection that the Bollingers had posted on Resurrection Sunday / Easter. As Charlene Bollinger aptly described in her rebuttal posting: "Do they hate Jesus, or just us, or maybe both?" *See*

*https://www.facebook.com/story.php?story_fbid=7734902809873381&id=100000612171277*

658. On **April 18, 2024**, Facebook's targeted censorship of the Plaintiffs continued vis-à-vis the removal of various posts "predicated" on falsehoods, including: (a) "It looks like you tried to get likes, follows, shares or video views in a *misleading* way" (emphasis added). (b) "Our technology found your content doesn't follow our Community Standards. As a result, a member of our team took action." (c) "Hi Ty Charlene, it looks like your account was sending out spam. …" *See* https://www.facebook.com/tycharlene.bollinger/posts/facebook-continues-to-target-ty-charlene-bollinger-wcensorship-see-screenshots/7724594790904183/

659. On **June 4, 2024**, Facebook's censorship fishing expedition journeyed seven years back in time, removing an April 2, 2017, post concerning Plaintiffs' vaccine awareness efforts as supposedly trying to "get likes, follows, shares or videos in a misleading way." As explained in Charlene Bollinger's rebuttal posting, however, Facebook's characterization of the Bollingers as "misleading" was false:

https://m.facebook.com/story.php?story_fbid=7945491125481214&id=100000612171277

660. Moreover, as if the Platforms' censorship of Plaintiffs on their platforms was not bad enough, the Platforms also aim to censor Plaintiffs on other platforms. More specifically, Facebook, for example, has removed Plaintiffs' comments addressing followers' inquiries about

what other social media platforms Plaintiffs could be found on. When, for example, Plaintiffs posted on Facebook that they could also be found on Substack, Facebook was quick to remove such posts as supposed "spam" and supposedly violative of "Community Standards." *See* https://www.facebook.com/tycharlene.bollinger/posts/facebook-continues-to-target-ty-charlene-bollinger-wcensorship-see-screenshots/7724594790904183/

661. On **October 30, 2024**, an FBI report (titled "Election Interference: How the FBI 'Prebunked' a True Story About the Biden Family's Corruption in Advance of the 2020 Presidential Election") surfaced, shedding lift on deeply troubling practices. The report included an internal Facebook message referencing a meeting with the FBI, stating: "[W]hen we get hauled up to [Capitol] hill [or before this Court] to testify on why we influenced the 2020 elections, we can say we have been meeting for YEARS with USG [U.S. Government] to plan for it."[145]

662. Facebook knew they were going to be "hauled up" before Congress (and this Court here) because it had been working with the Government to censor "for YEARS." This censorship effort was not confined to the Biden administration, as some cases argue in isolation. Instead, it is a decades-long, global operation deliberately designed to undermine Americans' sovereignty and rights. Spanning multiple countries, agencies, NGOs, private platforms, and even societal institutions like schools, this censorship campaign represents the deeply entrenched and coordinated reach of the Administrative State.

### 7. America's Great Awakening (2020-2024)

663. Between 2020 and 2024, the Administrative State unleashed its full arsenal to maintain control of the narrative – weaponizing health crises, orchestrating relentless media smears, waging endless litigation, and enforcing unprecedented social media censorship. Yet,

---

[145] This FBI report is featured in and discussed further in § III.C.3 of this Complaint.

despite its overwhelming influence, the American people resisted. Lies that once shaped public perception unraveled, and the nation started pushing back against the Administrative State's grip on power and information.

664. The Government fully committed to censorship during this period, recognizing it as the ultimate battle for future dominance. For the Administrative State, the 2024 election represented a critical tipping point – either it retained control or faced an existential reckoning. The stakes were so high that even being caught red-handed in its efforts, as this Complaint lays bare, seemed irrelevant to its overarching mission – the 2024 election was do or die for both the Administrative State and We the People.

665. Hardened by the devastation of the 2020 election and armed with truths revealed during the COVID-19 lockdowns, Americans, due in large part to citizen journalism, began to awaken to the deceptions embedded in official narratives. Plaintiffs' relentless dissent and advocacy were instrumental in this great awakening, empowering Americans to reject blind acceptance of the Defendants' narratives. A renewed skepticism swept the nation, encapsulated by the adage: "Fool me once, shame on you. Fool me twice, [we'll lose our country.]"

666. Despite the combined might of the Government, various NGOs (*e.g.*, CCDH), and Big Tech, Plaintiffs' (citizen journalists themselves) unwavering stand shattered the Administrative State's stranglehold on public opinion. Their courage to endure the ongoing harms they suffered (and continue to suffer) inspired millions and undermined the Establishment's attempts to exploit future health crises, like Monkey Pox and Murder Hornets, for political gain. Yet, this fight for liberty came at a steep cost. The Administrative State's conspiratorial efforts to silence Plaintiffs complained of herein inflicted significant harm on Plaintiffs, violated their

fundamental rights, and painted them as enemies of the narrative (and by extension, enemies of the Administrative State itself).

667.    In a way, it was fortuitous that Facebook ignored its own advice. Even Facebook acknowledged internally that over-censorship could backfire, warning that excessive suppression might: "… prevent hesitant people from talking through their concerns and potentially reinforce the notion that there's a 'cover-up.'"

668.    Despite this clear warning, Facebook and its co-conspirators proceeded to over-censor, and the result was precisely as predicted. By targeting the so-called "Disinformation Dozen," including Plaintiffs, their actions fostered widespread distrust in the Government and solidified public perception of a massive Government "cover-up."

669.    Defendants' overzealous efforts to silence dissent awakened the nation to the reality of Government overreach and deception. Plaintiffs' courageous stand against the Administrative State's evil empire broke the chains of public manipulation, proving that liberty, though suppressed for a time, can never truly be extinguished.

670.    The momentum of the American people, cases like this, and the rise of challengers such as Donald Trump, J.D. Vance, RFK, Jr., Elon Musk, Tulsi Gabbard, Vivek Ramaswamy, and other Freedom loving allies, signals a seismic shift, one that could set the Administrative State back centuries and restore the principles of liberty and accountability it has sought to suppress. This great awakening is not merely a response to recent injustices but the beginning of a broader movement to reclaim freedom in America – the Administrative State's day of reckoning is here.

**8.    The Decisive Battle For The Future Of The Constitutional Republic – The 2024 Election**

671.    By November 2024, the battle for America's soul had reached its decisive climax. The Administrative State, much like the Galactic Empire in *Star Wars*, loomed as a colossal and

251

unchecked force, weaponizing every tool at its disposal (pandemics, media smears, censorship, and propaganda) to crush dissent and maintain its stranglehold on the Republic.

672.    Much like the climactic confrontation in *Star Wars*, the Administrative State's version of the Death Star was aimed squarely at the heart of liberty, threatening to eradicate individual freedoms and destroy the Republic forever. The stakes could not have been higher. The 2024 election became the ultimate battleground, determining whether tyranny or freedom would shape the future.

673.    Then, as in the story, unexpected heroes emerged to shift the tide. Figures like Elon Musk and RFK, Jr. stepped into the fray, embodying the spirit of Han Solo (courageous rogues who defied overwhelming odds and risked everything to disrupt the status quo). Their efforts exposed the rot within the Administrative State and alleviated some of the pressure on the central figure in this fight, President Trump. Navigating the metaphorical trenches of the Death Star, President Trump harnessed the collective force of liberty, rallying the American people to deliver a decisive blow.

674.    In the end, 2024 was far more than an election, it was the decisive battle in the war for America's future. Against all odds, liberty triumphed. The illusion of control constructed by the Administrative State was shattered, and the Republic was restored.

675.    This Great Awakening marked a defining moment in American history, proving that no matter how overwhelming the forces of tyranny may seem, the spirit of freedom will always endure. Just as Luke Skywalker's triumph over the Death Star delivered a crippling blow to the Empire, the 2024 election struck a decisive blow to the Administrative State; but, the larger war for freedom is far from over.

676.    Much like the Galactic Empire, the Administrative State was / is not entirely defeated. The battles between freedom and tyranny will undoubtedly rage on, as seen in the Bollingers' ongoing fight for justice. The courts now stand at a critical crossroads. Unless they deliver a lasting blow to Government tyranny (through true redressability that reestablishes constitutional accountability), the Administrative State will inevitably regroup and the fight for liberty will continue. Only through decisive legal action can tyranny be set back another 250 years, safeguarding the Republic for future generations.

## IV.    CAUSES OF ACTION

### COUNT I – Abridgement Of Plaintiffs' Right To Freedom Of Speech
### (Re: All Defendants)

Plaintiffs re-allege Paragraphs 1 through 676 as if fully set forth herein, and further allege as follows.

677.    The text of the Constitution's First Amendment is clear. *See, e.g.*, n. 8, *supra*.

678.    Any law or policy that "abridges" or reduces the sphere of constitutionally protected speech thus violates the First Amendment.

679.    The Defendants have abridged Plaintiffs' right to freedom of speech by funding and assisting in the development of, marketing, and / or promoting censorship technologies – in particular, the censorship-by-risk-rating technology and related entities (*e.g.*, CCDH, CIS) that Government used to censor Plaintiffs' speech by Big Tech.

680.    Plaintiffs each face blacklisting, reduced advertising revenue, reduced potential growth, reputational damage, economic cancellation, reduced circulation of reporting and speech, and social media censorship, all as a direct result of the Defendants' unlawful conduct.

681.    Plaintiffs suffered and continue to suffer imminent, continuing, and irreparable injuries and losses as the direct and proximate result of the Defendants' conduct. The Defendants'

conduct is the cause-in-fact, legal cause, and but-for cause of these injuries, which include past, ongoing, and imminent future injuries.

WHEREFORE, Plaintiffs, Cancer Step Outside the Box, LLC, Ty Bollinger, and Charlene Bollinger, request (a) immediate injunctive order mandating the immediate end of the Defendants' constitutionally repugnant conduct, by way of the declarations / enjoiners found in the below Prayer for Relief section pertaining to Counts I-VII, which such Prayer for Relief section is incorporated into this Count by reference; (b) attorneys' fees pursuant to Title 42, United States Code, Section 1988, or as otherwise awardable such as, for example, through a prospective statutory offer of judgment / proposal for settlement, (c) costs incurred bringing this action, and (d) for such other relief as this Court deems equitable, just and proper.

### COUNT II – Abridgement Of Plaintiffs' Right To Freedom Of The Press
### (Re: All Defendants)

Plaintiffs re-allege Paragraphs 1 through 676 as if fully set forth herein, and further allege as follows.

682.    The First Amendment to the United States Constitution prohibits Congress from making laws "abridging" the freedom of the press, U.S. CONST. amend. I. Any law or policy that "abridges" or reduces the sphere of constitutionally protected freedom of the press thus violates the First Amendment.

683.    The Defendants have abridged Plaintiffs' right to freedom of the press by funding and assisting in the development of, marketing, and/or promoting censorship technologies – in particular, the censorship-by-risk-rating technology and entities – that are used to censor Plaintiffs' reporting.

684.    The Defendants' conduct inflicted past injury, and continues to inflict present, ongoing, imminent, and continuing irreparable injury on Plaintiffs by, among other things,

254

reducing the revenue, reach, readership, and circulation of their reporting and speech, and otherwise negatively impacting the operations of Plaintiffs.

685. Plaintiffs each face blacklisting, reduced advertising revenue, reduced potential growth, reputational damage, economic cancellation, reduced circulation of reporting and speech, and social media censorship – all as a direct result of Defendants' unlawful conduct.

686. Plaintiffs suffered and continue to suffer imminent, continuing, and irreparable injuries and losses as the direct and proximate result of Defendants' conduct. Defendants' conduct is the cause-in-fact, legal cause, and but-for cause of these injuries, which include past, ongoing, and imminent future injuries.

WHEREFORE, Plaintiffs, Cancer Step Outside the Box, LLC, Ty Bollinger, and Charlene Bollinger, request (a) immediate injunctive order mandating the immediate end of the Defendants' constitutionally repugnant conduct, by way of the declarations / enjoinders found in the below Prayer for Relief section pertaining to Counts I-VII, which such Prayer for Relief section is incorporated into this Count by reference; (b) attorneys' fees pursuant to Title 42, United States Code, Section 1988, or as otherwise awardable such as, for example, through a prospective statutory offer of judgment / proposal for settlement, (c) costs incurred bringing this action, and (d) for such other relief as this Court deems equitable, just and proper.

### COUNT III – *Ultra Vires* Non-Final Agency Action Beyond Statutory Authority (Re: The Government)

Plaintiffs re-allege Paragraphs 1 through 676 as if fully set forth herein, and further allege as follows.

687. The Constitution provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States." U.S. CONST. art. I § 1.

688. As the Supreme Court has clarified, "[t]he nondelegation doctrine bars Congress from transferring its legislative power to another branch of Government." *Gundy v. United States*, 139 S. Ct. 2116, 2121 (2019).

689. Nonetheless, within the confines of the nondelegation doctrine, Congress may seek assistance from another branch, but "an agency's power is no greater than that delegated to it by Congress." *Lyng v. Payne*, 476 U.S. 926, 937 (1986).

690. No federal statute authorizes the Government to engage in the conduct alleged herein.

691. The Government's funding, development, marketing, and promotion of private censorship tools, technology, and censorship enterprises constitutes "relief" under the APA, and is, therefore, "agency action."

692. Further, just as it "strains credulity" to accept the CDC's position that a "decades-old statute that authorizes it to implement measures like fumigation and pest extermination," authorizes the CDC to "impose[] a nationwide moratorium on evictions," it "strains credulity," to imagine the Government's organic statute authorizes a secretive scheme to fund the development of censorship tools, technology, and enterprises – or to promote, test, and market that technology and those censorship enterprises to the American private sector, including web browsers, social media companies, and NGOs. *Cf. Alabama Ass'n of Realtors v. Dep't of Health and Hum. Servs.*, 594 U.S. ___, 1 (2021) (slip op.).

693. This conclusion is reinforced by the fact the Government's scheme is unprecedented in history. Indeed, its organic statute has never been interpreted to authorize the regulation of the American press, much less a multi-agency scheme to fund the development of censorship tools and technology designed to silence speech by Americans, in America, for

256

Americans and then to promote, test, and market such technology to the private sector. *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014) ("When an agency claims to discover in a long-extant statute an unheralded power to regulate ... we typically greet its announcement with a measure of skepticism.").

694.    Not only is this action unauthorized by Congress, but Congress expressly prohibited the funds, appropriated or otherwise, made available to GEC from being used other than to counter "foreign" propaganda or disinformation.

695.    Congress likewise limited NED's (DOS' National Endowment for Democracy) use of grant funds to those activities consistent with its statutorily defined purposes, 22 U.S.C. § 4412. Importantly, by statute, the DOS' NED's purpose is solely to further Democracy abroad. 22 U.S.C. § 4411.

696.    Moreover, Article I, § 9, of the Constitution provides: "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." This Clause seeks "to assure that public funds will be spent according to the letter of the budgetary judgments reached by Congress as to the common good and not according to the individual favor of Government agents or the individual pleas of litigants." *Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 428 (1990). Accordingly, "no money can be paid out of the Treasury unless it has been appropriated by an act of Congress." *Id.* at 424 (quoting *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937)).

697.    "All funds belonging to the United States – received from whatever source, however obtained, and whether in the form of cash, intangible property, or physical assets – are public monies, subject to public control and accountability." *See generally*, Kate Stith, Congress' Power of the Purse, 97 YALE L.J. 1343, 1356 (1988). Executive agencies may spend funds on a

program only if they can convince Congress to appropriate the money. *This applies not only to direct grants, but also to the vast diversion of government technology, support, employee time, and promotion efforts.*

698.    Appropriations "shall be applied only to the objects for which the appropriations were made except as otherwise provided by law." 31 U.S.C. § 1301(a). "A law may be construed to make an appropriation out of the Treasury ... only if the law specifically states that an appropriation is made[.]" *Id.* at § 1301(d).

699.    The expenditure of public funds that were not lawfully appropriated for that purpose violates the Anti-Deficiency Act's prohibition against federal agencies obligating or expending federal funds outside of, in advance of, or in excess of an appropriation. 31 U.S.C. §§ 1341(a), 1342 and 1517. Federal employees who violate the Act are subject to sanctions, including removal from office, fines, imprisonment, or both. *See Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 430 (1990). "The misappropriation or disposition of public funds, or of any money or thing of value of the United States, or of any department or agency thereof, or any property made under contract for any department or agency thereof for an unauthorized use" constitutes a federal crime punishable by fines and imprisonment. *See* 18 U.S.C. § 641.

700.    By funding or even just promoting censorship tools and technology and censorship enterprises that seek to silence members of the American press and speech, the Government acted in an ultra vires manner.

701.    GEC (part of the Government Defendants) further acted in an ultra vires manner by using misappropriated funds to develop, promote, test, and/or market censorship tools and technology and censorship enterprises to the private sector, including web browsers and social media companies, seeking the silencing of disfavored elements of the American press.

702.    Also, it is highly unlikely that the CCDH hit piece concerning the DD enlisted by the Government came for free; rather, it is more likely than not that the Government misappropriated funds to derogate Americans and eliminate their voices.

703.    Because no Act of Congress "specifically states that an appropriation is made" to fund this censorship scheme, the Government's expenditure of public funds, as well as its expenditure of Government technology and resources, including human resources (through GEC, for example, or CCDH, as another example) is unconstitutional.

704.    Because the aforementioned actions are ultra vires, these actions must be declared invalid and enjoined.

705.    Plaintiffs suffered and continue to suffer imminent, continuing, and irreparable injuries and losses as the direct and proximate result of the Government's conduct. Government's conduct is the cause-in-fact, legal cause, and but-for cause of these injuries, which include past, ongoing, and imminent future injuries.

WHEREFORE, Plaintiffs, Cancer Step Outside the Box, LLC, Ty Bollinger, and Charlene Bollinger, request (a) immediate injunctive order mandating the immediate end of the Government's constitutionally repugnant conduct, by way of the declarations / enjoiners found in the below Prayer for Relief section pertaining to Counts I-VII, which such Prayer for Relief section is incorporated into this Count by reference; (b) attorneys' fees pursuant to Title 42, United States Code, Section 1988, or as otherwise awardable such as, for example, through a prospective statutory offer of judgment / proposal for settlement, (c) costs incurred bringing this action, and (d) for such other relief as this Court deems equitable, just and proper.

259

## COUNT IV – Unlawful Final Agency Action In Violation Of The Administrative Procedure Act (Re: The Government)

Plaintiffs re-allege Paragraphs 1 through 676 as if fully set forth herein, and further allege as follows.

706. The Government's conduct violates the APA because its conduct constitutes final agency action and is "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

707. The Government's conduct also violates the APA because its conduct constitutes final agency action and is "(B) contrary to constitutional right, power, privilege, or immunity" of Plaintiffs. 5 U.S.C. § 706(2)(B).

708. Additionally, the Government's conduct violates the APA because its conduct constitutes final agency action and is "(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

709. Further, the Government's conduct violates the APA because its conduct constitutes final agency action and Government failed to observe the "procedure required by law ... ." 5 U.S.C. § 706(2)(D).

710. In sum, the entire initiative described above violates the APA in every conceivable way and is therefore invalid. *See* 5 U.S.C. §§ 706(2)(A)-(D).

711. Plaintiffs suffered and continue to suffer imminent, continuing, and irreparable injuries and losses as the direct and proximate result of Government's conduct. The Government's conduct is the cause-in-fact, legal cause, and but-for cause of these injuries, which include past, ongoing, and imminent future injuries.

WHEREFORE, Plaintiffs, Cancer Step Outside the Box, LLC, Ty Bollinger, and Charlene Bollinger, request (a) immediate injunctive order mandating the immediate end of the

Government's constitutionally repugnant conduct, by way of the declarations / enjoinders found in the below Prayer for Relief section pertaining to Counts I-VII, which such Prayer for Relief section is incorporated into this Count by reference; (b) attorneys' fees pursuant to Title 42, United States Code, Section 1988, or as otherwise awardable such as, for example, through a prospective statutory offer of judgment / proposal for settlement, (c) costs incurred bringing this action, and (d) for such other relief as this Court deems equitable, just and proper.

### COUNT V – *Ultra Vires* Action Beyond Constitutional Bounds
### (Re: The Government)

Plaintiffs re-allege Paragraphs 1 through 676 as if fully set forth herein, and further allege as follows.

712.     Congress's authority is "limited to those powers enumerated in the Constitution." The Constitution withholds from Congress "a plenary police power that would authorize enactment of every type of legislation." *United States v. Lopez*, 514 U.S. 549 (1995); see also Const. art. I, § 8.

713.     Although Congress enjoys authority under the Commerce Clause to regulate the channels and instrumentalities of commerce among the states, *Gibbons v. Ogden*, 22 U.S. 1, 91 (1824), including electronic channels and instrumentalities, it may not regulate noneconomic matters, such as speech, that were never within the scope of the Commerce Clause and that only indirectly have a substantial effect on interstate commerce. *See* James Wilson, State House Yard Speech (Oct. 6, 1787).

714.     Congress is prohibited from conferring upon a federal agency power or authority that is contrary to the Constitution. *See, e.g., Bowsher v. Synar*, 478 U.S. 714, 736 (1986) ("[T]he fact that a given law or procedure is efficient, convenient, and useful in facilitating functions of government, standing alone, will not save it if it is contrary to the Constitution").

715.    The Government's censorship scheme violates Plaintiffs' First Amendment rights as detailed above.

716.    Therefore, even if (contrary to what is alleged above) the Government's censorship scheme were within the bounds of the statutory authority delegated by Congress – it is not – the Government's conduct would, and does, remain ultra vires in violation of any conceivable constitutional authority.

717.    For these reasons, the Government proceeded without any authority, much less delegated authority (which, in fact, Congress could never grant them), so their action is ultra vires and must be declared invalid and enjoined.

718.    Plaintiffs suffered and continue to suffer imminent, continuing, and irreparable injuries and losses as the direct and proximate result of the Government's conduct. Government's conduct is the cause-in-fact, legal cause, and but-for cause of these injuries, which include past, ongoing, and imminent future injuries.

WHEREFORE, Plaintiffs, Cancer Step Outside the Box, LLC, Ty Bollinger, and Charlene Bollinger, request (a) immediate injunctive order mandating the immediate end of the Government's constitutionally repugnant conduct, by way of the declarations / enjoinders found in the below Prayer for Relief section pertaining to Counts I-VII, which such Prayer for Relief section is incorporated into this Count by reference; (b) attorneys' fees pursuant to Title 42, United States Code, Section 1988, or as otherwise awardable such as, for example, through a prospective statutory offer of judgment / proposal for settlement, (c) costs incurred bringing this action, and (d) for such other relief as this Court deems equitable, just and proper.

262

## COUNT VI – Abridgement Of Plaintiffs' Privacy Rights
## (Re: The Government)

Plaintiffs re-allege Paragraphs 1 through 676 as if fully set forth herein, and further allege as follows.

719.   The Fourth Amendment provides as follows:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

720.   The Fourth Amendment, in whole or in part, is aimed at protecting the privacy of Americans.

721.   The Government is not allowed to unilaterally search out private information of Americans so as to persecute such Americans. And, yet, that is precisely what happened here.

722.   As discussed in the Common Allegations above, the Government solicited personal data of individuals from Big Tech companies from Facebook. Once such private data was obtained by the Government, the Government turned around and provided same to CCDH (of foreign origin) in order to generate a censorship "misinformation" / "disinformation" hit piece specific to same. And, here, that hit piece was specific to the Disinformation Dozen, inclusive of the Bollingers.

723.   Then, the Government pushed the CCDH's hit piece onto Big Tech in order for Big Tech to carry out the censorship of the Disinformation Dozen.

724.   The Government had absolutely no right to demand of private entities (Big Tech) private data of Americans so as to then use such data to crush those Americans merely because those Americans disagreed with Government narratives / prerogatives (*e.g.*, COVID-19 vaccinations).

263

725. The Government's private dirt digging (without any sort of warrant, as if a warrant would have been achievable anyway … it would not have) was violative of the Plaintiffs' Fourth Amendment rights.

726. Plaintiffs each face blacklisting, reduced advertising revenue, reduced potential growth, reputational damage, economic cancellation, reduced circulation of reporting and speech, and social media censorship, all as a direct result of the Defendants' unlawful conduct.

727. Plaintiffs suffered and continue to suffer imminent, continuing, and irreparable injuries and losses as the direct and proximate result of the Defendants' conduct. The Defendants' conduct is the cause-in-fact, legal cause, and but-for cause of these injuries, which include past, ongoing, and imminent future injuries.

WHEREFORE, Plaintiffs, Cancer Step Outside the Box, LLC, Ty Bollinger, and Charlene Bollinger, request (a) immediate injunctive order mandating the immediate end of the Defendants' constitutionally repugnant conduct, by way of the declarations / enjoiners found in the below Prayer for Relief section pertaining to Counts I-VII, which such Prayer for Relief section is incorporated into this Count by reference; (b) attorneys' fees pursuant to Title 42, United States Code, Section 1988, or as otherwise awardable such as, for example, through a prospective statutory offer of judgment / proposal for settlement, (c) costs incurred bringing this action, and (d) for such other relief as this Court deems equitable, just and proper.

## COUNT VII – Civil Conspiracy (RE: All Defendants)

Plaintiffs re-allege Paragraphs 1 through 676 as if fully set forth herein, and further allege as follows.

728. The elements of a cause of action for civil conspiracy in Tennessee are: (a) a common design between two or more persons; (b) to accomplish by concerted action an unlawful

purpose, or a lawful purpose by unlawful means; (c) an overt act in furtherance of the conspiracy; and (d) resulting injury.

729.    What else to say at this point? This entire Complaint outlines Defendants' conspiracy to censors the Disinformation Dozen, inclusive of Plaintiffs (namely, the Bollingers). Every single element of a conspiracy cause of action is laid out in the Common Allegations *ad nauseum*. Common design between two or more persons – check (eradicate free speech, among other things). Concerted action of an unlawful purpose – check (the organization and premeditation amongst Defendants to carry out eradication of free speech was extensive). Dozens of overt acts carried out by Defendants to eradicate free speech are discussed above – check. And the Plaintiffs have been crushed (monetarily, reputationally, *et cetera*) as a result; *i.e.*, badly injured – check.

730.    As Judge Doughty properly pointed out in *Missouri v. Biden*, the nefarious censorship conduct at play does not need to rise to the level of "conspiracy" in order to maintain an action such as this action. For example, extreme coercion and joint participation is enough.

731.    But this case lays out far more information (history / background / context / *et cetera*) than *Missouri v. Biden* as to the overall Censorship Industrial Complex, in part to demonstrate that the conduct complained of herein goes above and beyond extreme coercion. *The Censorship Industrial Complex was orchestrated and collaborated and premeditated amongst all Defendants, and all Defendants voluntarily undertook their part in carrying out the Censorship Industrial Complex and injuring the Plaintiffs.*

732.    This case is hornbook civil conspiracy. Indeed, if the conduct complained of herein was not considered civil conspiracy, then the civil conspiracy cause of action might as well be erased from the hornbooks because there would be no such thing.

733. Plaintiffs each face blacklisting, reduced advertising revenue, reduced potential growth, reputational damage, economic cancellation, reduced circulation of reporting and speech, and social media censorship, all as a direct result of the Defendants' unlawful conduct.

734. Plaintiffs suffered and continue to suffer imminent, continuing, and irreparable injuries and losses as the direct and proximate result of the Defendants' conduct. The Defendants' conduct is the cause-in-fact, legal cause, and but-for cause of these injuries, which include past, ongoing, and imminent future injuries.

WHEREFORE, Plaintiffs, Cancer Step Outside the Box, LLC, Ty Bollinger, and Charlene Bollinger, request (a) immediate injunctive order mandating the immediate end of the Defendants' constitutionally repugnant conduct, by way of the declarations / enjoinders found in the below Prayer for Relief section pertaining to Counts I-VII, which such Prayer for Relief section is incorporated into this Count by reference; (b) attorneys' fees pursuant to Title 42, United States Code, Section 1988, or as otherwise awardable such as, for example, through a prospective statutory offer of judgment / proposal for settlement, (c) costs incurred bringing this action, and (d) for such other relief as this Court deems equitable, just and proper

**Prayer For Injunctive Relief (Counts I-VII)**

735. Plaintiffs, Cancer Step Outside the Box, LLC, Ty Bollinger, and Charlene Bollinger, request immediate injunctive order mandating the immediate end of the Defendants' constitutionally repugnant conduct featured in Counts I-VII above (namely, the Censorship Industrial Complex), by way of injunctive order inclusive of the following declarations and / or enjoinders:

(A) Government's funding, development, marketing, and promotion of censorship tools, technologies, and censorship enterprises constitutes ultra vires action lacking statutory authority and exceeding constitutional authority;

266

(B)     Government's funding, development, marketing, and promotion of censorship tools, technologies, and censorship enterprises violates Plaintiffs' rights to freedom of the press and freedom of speech under the First Amendment of the Constitution;

(C)     Government's funding, development, marketing, and promotion of censorship tools, technologies, and censorship enterprises violates the Appropriations Laws of the United States, specifically the Anti-Deficiency Act, 31 U.S.C. §§ 1341(a), 1342 and 1517 and the laws respecting misappropriation of public money, 18 U.S.C. § 641;

(D)     Government's conduct violates the Administrative Procedure Act and accordingly is unlawful and invalid;

(E)     Preliminarily and permanently enjoin the Government (inclusive of its officers, officials, agents, servants, employees, attorneys, agents, instruments, and all persons acting in concert or participation with them inclusive of Defendants, see Fed. R. Civ. P. 65(d)(2)) from further engaging in the unlawful conduct as alleged herein;

(F)     Preliminarily and permanently enjoin the Government (inclusive of its officers, officials, agents, servants, employees, attorneys, agents, instruments, and all persons acting in concert or participation with them inclusive of Defendants, see Fed. R. Civ. P. 65(d)(2)), from developing, funding, testing, maintaining, storing, highlighting, promoting, using, or encouraging, urging, pressuring, or otherwise inducing others to use, technology to track, rate, rank, silence, assess, counter, amplify, de-amplify, deplatform, de-boost, demonetize, suspend, shadow ban, de-boost, restrict, limit, reduce access to, or otherwise abridge the lawful speech of the American press and Americans, whether that be through the Government's extreme coercion / pressuring of private entities and / or the Government's conspiratorial efforts with private entities pertaining to same.

(G)     Preliminarily and permanently enjoin the Government (inclusive of its officers, officials, agents, servants, employees, attorneys, agents, instruments, and all persons acting in concert or participation with them inclusive of Defendants, see Fed. R. Civ. P. 65(d)(2)), from dirt-digging through American's private information in violation of the Fourth Amendment; *i.e.*, preliminarily and permanently enjoin the Government from laundering their Fourth Amendment privacy prohibitions to the private sector or otherwise.

### <u>COUNT VIII – Tennessee Unfair Competition / Antitrust Statutes</u><br><u>(Re: CCDH, MMA, CIS, Facebook, Google, and Twitter)</u>

Plaintiffs re-allege Paragraphs 1 through 676 as if fully set forth herein, and further allege as follows.

736.    Tennessee's unfair competition / antitrust laws are codified in Title 47 Chapter 25.

737.    Section 47-25-101 provides as follows:

All arrangements, contracts, agreements, trusts, or combinations between persons or corporations made with a view to lessen, or which tend to lessen, full and free competition in trade or commerce affecting this state, and all arrangements, contracts, agreements, trusts, or combinations between persons or corporations designed or which tend to advance, reduce, or control the price or the cost to the producer or the consumer of any product or service in trade or commerce affecting this state, are declared to be against public policy, unlawful, and void.

TN Code § 47-25-101 (2023).

738.    Section 47-25-102 provides, in turn, as follows: "It is unlawful for any corporation or person to monopolize, attempt to monopolize, conspire to monopolize, or maintain a monopoly over any part of trade or commerce affecting this state." TN Code § 47-25-102 (2023).

739.    Section 47-25-103(b) provides, in turn, as follows: "Any violation of § 47-25-101 or § 47-25-102 by a corporation shall upon conviction be punished by a fine not exceeding one million dollars ($1,000,000)." TN Code § 47-25-103 (2023).

740.    At minimum, Defendants' conduct violates Sections 101 and 102.

268

741. As outlined above, Defendants' (CCDH, MMA, CIS, Facebook, Google, Twitter) mission was / is to conspire to stunt the economic competition that was / is Plaintiffs, contrary to Sections 101-102.

742. As outlined above, CCDH, MMA, CIS, Facebook, Google, and Twitter conspired / combined to "lessen … full and free competition in trade or commerce" in relation to Plaintiffs, in violation of Section 101. Not only lessen full and free competition, but eradicate Plaintiffs from the competitive digital information marketplace (the modern day public square) altogether.

743. As outlined above, CCDH, MMA, CIS, Facebook, Google, and Twitter conspired / combined "to monopolize, attempt to monopolize, conspire to monopolize, or maintain a monopoly over any part of trade or commerce," in violation of Section 102.

744. Defendants' violations of Sections 101-102 allow for this civil suit seeking actual damages (*see* Section 103) to the tune of $1,000,000.00 per offender.

WHEREFORE, Plaintiffs, Cancer Step Outside the Box, LLC, Ty Bollinger, and Charlene Bollinger, request the entry of judgment against Defendants, CCDH, MMA, CIS, Facebook, Google, and Twitter, for liability and for damages including, but not limited to, (a) $1,000,000.00 per each of the aforementioned Defendants (an award of $6,000,000.00 to Plaintiffs in total, which such $6,000,000.00 does not even begin to approach the monetary harm suffered by Plaintiffs as a result of Defendants' wrongdoing), (b) any awardable attorneys' fees, (c) costs incurred bringing this action, and (d) for such other relief as this Court deems equitable, just and proper.

## COUNT IX – Negligence (Re: CCDH, MMA, CIS, Facebook, Google, and Twitter)

Plaintiffs re-allege Paragraphs 1 through 676 as if fully set forth herein, and further allege as follows.

269

745.    In Tennessee, the elements of a negligence cause of action are as follows: (a) duty owed by defendant to plaintiff; (b) breach of that duty; (c) injury or loss; (d) causation in fact; (e) proximate or legal causation.

746.    The Defendants implicated by this Count owed Plaintiffs a general duty to act reasonably.

747.    The "blacklists" flowing from the NGOs and the Platform-effectuated censorship relating to the NGOs' character "data" were the antithesis of reasonable; *i.e.*, the Defendants implicated by this Court breached their general duty to act reasonably with respect to Plaintiffs.

748.    As to the proximate causation chain, the chain links closest to the harms suffered by Plaintiff are the NGOs (as to generating bogus ratings concerning Plaintiffs) and Big Tech (as to carrying out censorship on Social Media platforms). But for the unreasonable character "data" manufactured by the NGOs and / or but for Big Tech's censorship predicated on such NGO-generated information, Plaintiffs would not have suffered the damages articulated throughout this Complaint (*e.g.*, monetary, reputational).

WHEREFORE, Plaintiffs, Cancer Step Outside the Box, LLC, Ty Bollinger, and Charlene Bollinger,, request the entry of judgment against Defendants, CCDH, MMA, CIS, Facebook, Google, and Twitter, for liability and for damages including, but not limited to, (a) Plaintiffs lost monies to date well in excess of $75,000.000, all lost monies Plaintiffs stand to lose moving forward, and all associated awardable accrued interest on these monies, (b) any awardable attorneys' fees, (c) costs incurred bringing this action, and (d) for such other relief as this Court deems equitable, just and proper.

## COUNT X – Tortious Interference with Business Relationships / Economic Relationship (Re: CCDH, MMA, CIS, Facebook, Google, and Twitter)

Plaintiffs re-allege Paragraphs 1 through 676 as if fully set forth herein, and further allege as follows.

749.     In Tennessee, to prevail on a claim for tortious interference with a prospective business relationship / economic advantage, the plaintiff must establish: (a) an existing business relationship with specific third parties or a prospective relationship with an identifiable class of third persons; (b) the defendant was aware of the relationship; (c) the defendant intended to induce a breach or terminate the relationship; (d) the defendant's improper motive or improper means; and (e) damages resulting from the tortious interference.

750.     First, the Defendants implicated by this Count were certainly intentional / conscious in their desire to destroy Plaintiffs' economic advantage; *i.e.* in their effort to destroy Plaintiffs' businesses.

751.     Second, a simple review of Plaintiffs' historical reach and historical finances demonstrates that only growth laid ahead for Plaintiffs. There was / is most certainly a reasonable probability the Plaintiffs would have entered into additional relationships but for Defendants' interference.

752.     Third, as for the Defendants implicated by this Count having engaged in an independently tortious or unlawful act that prevented the relationship from occurring, there are plenty of independent wrongs that led to the loss of business relations. There are independent torts that Defendants committed in meddling with Plaintiffs' growth potential; *e.g.*, negligence. There is also independent unlawful misconduct by Defendants; *e.g.*, abridgement of Plaintiffs' first amendment rights, contravention of Tennessee statute, *et cetera*.

WHEREFORE, Plaintiffs, Cancer Step Outside the Box, LLC, Ty Bollinger, and Charlene Bollinger, request the entry of judgment against Defendants, CCDH, MMA, CIS, Facebook, Google, and Twitter, for liability and for damages including, but not limited to, (a) Plaintiffs lost monies to date well in excess of $75,000.00, all lost monies Plaintiffs stand to lose moving forward, and all associated awardable accrued interest on these monies, (b) any awardable attorneys' fees, (c) costs incurred bringing this action, and (d) for such other relief as this Court deems equitable, just and proper.

### COUNT XI – Negligent Misrepresentation (RE: Facebook, Google, and Twitter)

Plaintiffs re-allege Paragraphs 1 through 676 as if fully set forth herein, and further allege as follows.

753. In Tennessee, the elements of a negligent misrepresentation cause of action are as follows: (a) that the defendant was acting in the course of its business, profession, or employment; (b) that the defendant supplied false information for the guidance of others in its business transactions; (c) that the defendant failed to exercise reasonable care in obtaining or communicating the information; and (d) the plaintiff justifiably relied on the information.

754. Here, Facebook, Google, and Twitter affirmatively represented that their Internet Computer Services are free to all, open to all, and utilizable by all. Moreover, Facebook, Google, and Twitter certainly had a pecuniary interest in representations made to Plaintiffs.

755. These representations, callously made by Facebook, Google, and Twitter, were plainly false. Moreover, these representations were plainly made by Facebook, Google, and Twitter so as to guide the formation of businesses through their Internet Computer Services.

756. Plaintiffs (along with tens of thousands of others) justifiably relied on Facebook, Google, and Twitter in availing themselves of these Internet Computer Services to form and grow

their businesses. When Facebook, Google, and Twitter pulled the ICS rug out from underneath Plaintiffs, Plaintiffs sustained (and continue to sustain) substantial damages (monetary and reputational).

WHEREFORE, Plaintiffs, Cancer Step Outside the Box, LLC, Ty Bollinger, and Charlene Bollinger, request the entry of judgment against Defendants, Facebook, Google, and Twitter, for liability and for damages including, but not limited to, (a) Plaintiffs lost monies to date (more than $75,000.00), all lost monies Plaintiffs stand to lose moving forward, and all associated awardable accrued interest on these monies, (b) any awardable attorneys' fees, (c) costs incurred bringing this action, and (d) for such other relief as this Court deems equitable, just and proper.

## COUNT XII – Negligent Design (Re: Facebook, Google, and Twitter)

Plaintiffs re-allege Paragraphs 1 through 676 as if fully set forth herein, and further allege as follows.

757.     In Tennessee, the elements of a negligent design cause of action are as follows: (a) the product was defective at the time it left the control of the designer; and (b) the defective design caused injury.

758.     A defectively designed product is one that failed to perform as safely as a reasonable person would expect, even when used as intended (or at least in a manner that was reasonably foreseeable).

759.     In order to recover damages in a design defect case based on strict liability, one must establish that: (a) the product was "unreasonably dangerous" at the time it left the control of the designer; and (b) the unreasonably dangerous condition caused the injury.

760.     Here, the Common Allegations are replete with averments making clear that Big Tech altered their policies and algorithms at Government's behest in order to better effectuate the

Censorship Industrial Complex with Plaintiffs (Disinformation Dozen) at the epicenter of that Complex.

761.    As alleged above, Big Tech did not question the propriety of such policy and algorithm changes or engage in any sort of independent thought regarding same; rather, as alleged above, at the Government's behest, Big Tech just pulled the trigger on such changes.

762.    Big Tech's new policies and algorithms implemented as a result of Government's "because we say so" were / are the epitome of dangerous, were dangerous at the time they left the designer, and such dangerousness harmed Plaintiffs – chief among the dangers of Big Tech's designs was / is the point blank violation of the U.S. Constitution (the First Amendment, the Fourth Amendment, and to some extent the Fifth Amendment).

763.    When Facebook, Google, and Twitter altered the design of their products to further tighten down the censorship on Plaintiffs, Plaintiffs sustained (and continue to sustain) substantial damages (monetary and reputational).

WHEREFORE, Plaintiffs, Cancer Step Outside the Box, LLC, Ty Bollinger, and Charlene Bollinger, request the entry of judgment against Defendants, Facebook, Google, and Twitter, for liability and for damages including, but not limited to, (a) Plaintiffs lost monies to date (more than $75,000.00), all lost monies Plaintiffs stand to lose moving forward, and all associated awardable accrued interest on these monies, (b) any awardable attorneys' fees, (c) costs incurred bringing this action, and (d) for such other relief as this Court deems equitable, just and proper.

## COUNT XIII – Fraud (RE: Facebook, Google, and Twitter)

Plaintiffs re-allege Paragraphs 1 through 676 as if fully set forth herein, and further allege as follows.[146]

764.    In Tennessee, the elements of a fraud cause of action are as follows: (a) an intentional misrepresentation with regard to a material fact; (b) made knowingly and with a fraudulent intent; (c) upon which the plaintiff reasonably relied and suffered damage; and (d) which relates to an existing or past fact or, if the claim is based on promissory fraud, the misrepresentation embodied a promise of future action without the present intention to carry out the promise.

765.    Here, Facebook, Google, and Twitter affirmatively represented that their Internet Computer Services are free to all, open to all, and utilizable by all. And Facebook, Google, and Twitter fully intended for Plaintiffs to act upon these falsehoods.

766.    Facebook, Google, and Twitter certainly had a pecuniary interest underlying the falsehoods put forth to Plaintiffs.

767.    These representations, callously made by Facebook, Google, and Twitter, were plainly false, and plainly intentional. Moreover, these representations were plainly made by Facebook, Google, and Twitter so as to guide the formation of businesses through their Internet Computer Services.

768.    Plaintiffs (along with tens of thousands of others) justifiably relied on Facebook, Google, and Twitter in availing themselves of these Internet Computer Services to form and grow

---

[146] This and the negligent misrepresentation cause of action again are pleaded in the alternative, with the main difference between the two causes of action being intentionality. From all the premeditation and orchestration outlined in the Common Allegations (*i.e.*, there was nothing accidental about Big Tech's conduct here), we submit that fraud (laced with intention) is the more likely of the two causes of action, but we are allowed to plead in the alternative and negligent misrepresentation is accordingly pleaded in this Complaint in the alternative in an abundance of caution.

their businesses. When Facebook, Google, and Twitter pulled the ICS rug out from underneath Plaintiffs, Plaintiffs sustained (and continue to sustain) substantial damages (monetary and reputationally, for examples).

WHEREFORE, Plaintiffs, Cancer Step Outside the Box, LLC, Ty Bollinger, and Charlene Bollinger, request the entry of judgment against Defendants, Facebook, Google, and Twitter, for liability and for damages including, but not limited to, (a) Plaintiffs lost monies to date (more than $75,000.00), all lost monies Plaintiffs stand to lose moving forward, and all associated awardable accrued interest on these monies, (b) any awardable attorneys' fees, (c) costs incurred bringing this action, and (d) for such other relief as this Court deems equitable, just and proper.

### COUNT XIV – Promissory Estoppel (RE: Facebook, Google, and Twitter)

Plaintiffs re-allege Paragraphs 1 through 676 as if fully set forth herein, and further allege as follows.[147]

769.    In Tennessee, the elements of a promissory estoppel cause of action are as follows: (a) the defendant made a promise; (b) the promise was definite enough and unambiguous enough to be enforced; and (c) that the plaintiff reasonably relied on the promise.

770.    Here, Facebook, Google, and Twitter promised their Internet Computer Services to users (like Plaintiffs) were free, open to all, and utilizable by all.

771.    It is undeniable that Facebook, Google, and Twitter intended for the promisee (here, Plaintiffs) to rely on promises made; *i.e.*, Facebook, Google, and Twitter cannot somehow legitimately say that they did not foresee other users' reliance on their promises.

---

[147] *See* n. 146, *supra*. Promissory estoppel is the equitable cause of action that is pleaded in the alternative to fraud and negligent misrepresentation.

772.    A huge portion of Plaintiffs' businesses revolves around Internet Computer Services, in particularly Facebook, Google, and Twitter; thus, Plaintiffs' reliance on the promises of Facebook, Google, and Twitter cannot be classified as anything other than "substantial."

773.    And the damages sustained by Plaintiffs in relation to Facebook's, Google's, and Twitter's pulling the ICS rug out from underneath Plaintiffs notwithstanding promises to the contrary are "substantial."

774.    In the end, it is evident that Facebook's, Google's, and Twitter's promises were lies and that they knew that their promises were false / hollow promises all along.

WHEREFORE, Plaintiffs, Cancer Step Outside the Box, LLC, Ty Bollinger, and Charlene Bollinger, request the entry of judgment against Defendants, Facebook, Google, and Twitter, for liability and for damages including, but not limited to, (a) Plaintiffs lost monies to date (more than $75,000.00), all lost monies Plaintiffs stand to lose moving forward, and all associated awardable accrued interest on these monies, (b) any awardable attorneys' fees, (c) costs incurred bringing this action, and (d) for such other relief as this Court deems equitable, just and proper.

## COUNT XV – Treason (RE: the Government)

Plaintiffs re-allege Paragraphs 1 through 676 as if fully set forth herein, and further allege as follows.

775.    Treason is defined as "the offense of attempting to overthrow the government of the state to which one owes allegiance, either by making war against the state *or by materially supporting its enemies*." Garner, Bryan A., *Black's Law Dictionary*, 720 (2d pocket ed., 2001) (emphasis added). Put differently, treason involves betraying one's country by giving aid or comfort to its enemies or acting against the nation's interests.

776.    "Treason against the United States, shall consist only in levying war against them, *or in adhering to their enemies, giving them aid and comfort*. No person shall be convicted of

277

treason unless on the testimony of two witnesses to the same overt act, or on confession in open court." Art. III, § 3 (emphasis added).

777.    Here, the Censorship Industrial Complex aimed at undermining the United States Constitution (namely free speech / press under First Amendment and, to some extent, due process under the Fifth Amendment, in addition the Fourth Amendment) spearheaded by the Government was not at all in the interests of the United States; but, rather, was in the interests of the New World Order (made up of several foreigners who do not have the well-being of the United States in mind but rather wish to see the United States fail).

778.    The Government adhered to the objectives (censorship) of enemies lurking within the United Kingdom. The Government gave aid to the objectives (censorship) of enemies lurking within the United Kingdom. And we would comfortably wager that it was / is not just the United Kingdom (as enemy of the State in relation to censorship at the very least), but also other countries throughout the world … Brazil, for example, has been at "war" with Elon Musk with respect to Elon Musk's support of free speech, as Brazil has been adhering to the censorship model to ensure certain candidates are elected.

779.    The New World Order is not the U.S. Government, it is made up of several governments. The Government's giving aid and comfort to the New World Order, in the Censorship Industrial Complex bent on harming Americans and imploding the Constitution, is the definition of treason.

780.    Per Title 18, United States Code, Section 2381:

Whoever, owing allegiance to the United States, levies war against them or adheres to their enemies, giving them aid and comfort within the United States or elsewhere, is guilty of treason and shall suffer death, or shall be imprisoned not less than five years and fined under this title but not less than $10,000; and shall be incapable of holding any office under the United States.

278

WHEREFORE, Plaintiffs, Cancer Step Outside the Box, LLC, Ty Bollinger, and Charlene Bollinger, request the entry of judgment against the Government Defendants (and all implicated officials / agents therein), as follows: (a) Imprisonment of not less than five years (death is a bit much, so Plaintiffs will forego that); (b) Fines of not less than $10,000.00; (c) Restriction on holding office in the United States ever again; and (d) for such other relief as this Court deems equitable, just and proper.

**COUNT XVI– Revocation of 501(c)(3) Status (RE: CCDH, MMA, CIS)**

Plaintiffs re-allege Paragraphs 1 through 676 as if fully set forth herein, and further allege as follows.

781. CCDH, MMA, and CIS all enjoy 501(c)(3) tax-exempt status.

782. To be tax-exempt under section 501(c)(3) of the Internal Revenue Code, an organization must be organized and operated exclusively for exempt purposes set forth in section 501(c)(3), and none of its earnings may inure to any private shareholder or individual. In addition, it may not be an action organization, *i.e.,* it may not attempt to influence legislation as a substantial part of its activities and it may not participate in any campaign activity for or against political candidates.

783. Immediately, under the preceding parameters alone, CCDH, MMA, and CIS are not entitled to maintain their 501(c)(3) status. These three Defendants intimately interacted with political figures and the Democratic Party in their constitutionally repugnant effort to quash the free speech / press of hundreds upon hundreds of Americans, including the DD.

784. Put differently, under the Internal Revenue Code, all section 501(c)(3) organizations are absolutely prohibited from directly or indirectly participating in, or intervening in, any political movement on behalf of (or in opposition to) any party. Here, the CCDH, MMA, and CIS absolutely targeted eradicating the speech / press of those who opposed political

279

movements (such as the Government's over-the-top COVID-19 initiatives and mandates); here, the DD, for example.

785. Politically-oriented activities with evidence of bias that (a) would favor one candidate over another; (b) oppose a candidate in some manner; or (c) have the effect of favoring a candidate or group of candidates, will constitute prohibited 501(c)(3) participation or intervention. Again, the CCDH, MMA, and CIS were biased to the core in supporting the Government's absurd COVID-19 initiatives and mandates by, in large part, assisting the Government in silencing dissent.

786. A 501(c)(3) is not allowed to be an action organization; *i.e.*, a politically skewed activist. A 501(c)(3) is not allowed to focus its efforts on contravening the Constitution.

787. Violating the above prohibitions may result in revocation of tax-exempt status and the imposition of certain excise taxes.

788. The exempt purposes set forth in section 501(c)(3) are charitable, religious, educational, scientific, literary, testing for public safety, fostering national or international amateur sports competition, and preventing cruelty to children or animals. The term charitable is used in its generally accepted legal sense and includes relief of the poor, the distressed, or the underprivileged; advancement of religion; advancement of education or science; erecting or maintaining public buildings, monuments, or works; lessening the burdens of government; lessening neighborhood tensions; eliminating prejudice and discrimination; defending human and civil rights secured by law; and combating community deterioration and juvenile delinquency.

789. Here, there was / is nothing "charitable" about the CCDH, MMA, and CIS contributions to the Censorship Industrial Complex. The CCDH, MMA, and CIS, for example, conducted no "testing for public safety;" rather, the CCDH, MMA, and CIS served as the

Government's minions in censoring those who actually were "testing for public safety" (the DD, or the Plaintiffs / Bollingers at the very least).

790.    In sum, the CCDH, MMA, and CIS are the antithesis of 501(c)(3) organizations. They are not charitably inclined, they are hired guns for a devious political faction called the Administrative State.

791.    This Court should revoke these organizations' tax-exempt status posthaste and impose payment of certain excise taxes.

WHEREFORE, Plaintiffs, Cancer Step Outside the Box, LLC, Ty Bollinger, and Charlene Bollinger, request the entry of judgment against Defendants, CCDH, MMA, and CIS, as follows, (a) revocation of these Defendants' 501(c)(3) tax-exempt status, (b) imposition of payment of certain excise taxes against these Defendants, and (c) for such other relief as this Court deems equitable, just and proper.

## V.    JURY DEMAND

792.    Plaintiffs, Cancer Step Outside the Box, LLC, Ty Bollinger, and Charlene Bollinger, demand a trial by jury on all issues so triable as a matter of right.

Dated:  December 16, 2024.

Respectfully Submitted,

**GREYBER LAW, PLLC**

*/s/* Jeffrey L. Greyber
**Jeffrey L. Greyber, Esq.**
M.D. Tennessee Admitted
9170 Glades Rd., #161
Boca Raton, Florida  33434
(561) 702-7673
(833) 809-0137 (f)
jgreyber@greyberlaw.com
*Attorney for Plaintiffs*

*and*

281

**CRAIN LAW GROUP, PLLC**
Larry L. Crain, Esq.
BPR No. 009040
5214 Maryland Way, Ste. 402
Brentwood, Tennessee  37027
(615) 376-2600
(615) 345-6009 (f)
larry@crainlaw.legal
*Attorney for Plaintiffs*