**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| **CANCER STEP OUTSIDE THE BOX, LLC, TY BOLLINGER (principal owner), and CHARLENE BOLLINGER (principal owner),** | ) ) ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **v.** | ) ) | **Case No. 3:24-cv-01465** |
| **DEPARTMENT OF STATE, GLOBAL ENGAGEMENT CENTER,[1] DEPARTMENT OF DEFENSE, DEPARTMENT OF HOMELAND SECURITY, CYBERSECURITY AND INFRASTRUCTURE SECURITY AGENCY, FEDERAL BUREAU OF INVESTIGATION, DEPARTMENT OF HEALTH AND HUMAN SERVICES, CENTER FOR COUNTERING DIGITAL HATE, INC., META PLATFORMS, INC. (f/k/a FACEBOOK, INC.), GOOGLE, LLC, X CORP. (f/k/a TWITTER, INC.), and JOHN DOES 1–10,** | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **Judge Aleta A. Trauger** |
| **Defendants.** | ) | |

## MEMORANDUM

Before the court are (1) the Motion to Transfer (Doc. No. 41) filed by defendant X Corp.

(f/k/a Twitter, Inc.),[2] which requests that the court sever and transfer the plaintiffs' claims against

X. Corp. to the U.S. District Court for the Northern District of Texas; (2) defendant Meta

---

[1] The court takes notice that the Global Engagement Center was formerly an agency within the Bureau of Global Public Affairs at the United States Department of State, but it was dismantled in December 2024. *See* https://2021-2025.state.gov/bureaus-offices/under-secretary-for-public-diplomacy-and-public-affairs/global-engagement-center/ [https://perma.cc/7R9D-SQH8].

[2] The parties and the court refer to X Corp. as both Twitter and X Corp.

Platforms, Inc.'s Motion to Transfer Venue (Doc. No. 43), which requests that the entire case be transferred to the U.S. District Court for the Northern District of California or, alternatively, that the court sever and transfer the claims against Meta to that district; and (3) defendant Google, LLC's Motion to Transfer Venue to the Northern District of California (Doc. No. 45), in which Google likewise seeks transfer of the entire case or severance and transfer of the claims against it to the Northern District of California.

For the reasons set forth herein, the court deny all three motions, as the interest in judicial economy and maintaining all claims in a single lawsuit trumps the forum selection clauses.

## I.     BACKGROUND

### A.     The First Amended Complaint

Plaintiffs Ty Bollinger, Charlene Bollinger, and Cancer Step Outside the Box, LLC ("CSOB") initiated this lawsuit on December 16, 2024 (Doc. No. 1) and filed their Amended Complaint ("FAC") on January 23, 2025 (Doc. No. 7). In addition to X Corp., Meta, and Google (collectively, the "Media Defendants" or "Platform Defendants"), the plaintiffs sue seven federal government agencies or departments. Of these, it appears that two—the Department of Homeland Security ("DHS") and the Department of Health and Human Services ("HHS")—have been properly served and have entered an appearance. (Doc. No. 52.) The plaintiffs also sue one non-governmental organization ("NGO"), the Center for Countering Digital Hate ("CCDH"), having voluntarily dismissed two other NGOs originally named as defendants. (*See* Doc. Nos. 37, 48.) The FAC alleges that the federal government agency defendants and CCDH are based or headquartered in Washington, D.C. (FAC ¶¶ 44–51.)

The Bollingers own CSOB. (FAC ¶ 357.) CSOB owns TTAC Publishing, LLC ("TTAC") (which stands for "The Truth About Cancer") and TTAV Global, LLC ("TTAV") (which stands for "The Truth About Vaccines"). (*Id.*) The plaintiffs individually and through TTAC and TTAV

operate or operated various social media accounts on social media platforms operated by the Media Defendants.

In their sprawling 317-page pleading, the plaintiffs allege a vast conspiracy ("the Censorship Industrial Complex"), involving numerous federal government agencies (collectively referred to in the FAC as the "Government"), the Media Defendants, and several NGOs, to suppress dissenting voices and control public discourse, particularly regarding COVID-19, vaccines, and election-related information, from at least 2020 through 2024. The plaintiffs allege that, as part of this conspiracy, they were "blacklisted as members of the so-called Disinformation Dozen" by CCDH "at the behest of the Government." (*Id.* ¶¶ 22, 357.) The plaintiffs were "censored on platforms like Facebook, Google, and Twitter per Government directives, often carried out in coordination with NGOs" (*id.* ¶ 358), because the "Government" sought to censor the plaintiffs' speech related to "COVID in general, COVID treatment, and/or COVID prevention," "over which the Government and Plaintiffs are in direct competition" (*id.* ¶ 22).

The Government allegedly coerced social media platforms to censor content by threatening to amend or repeal Section 230 of the Communications Decency Act, 47 U.S.C. § 230, which insulates social media platforms from liability. (*Id.* ¶¶ 68, 344.) In response to such threats, the Media Defendants "adopted increasingly anti-competitive and strict censorship policies, removing or downranking content, applying warning labels . . . , and creating algorithmic barriers . . . to the spread of disfavored content . . . in the competitive digital information market." (*Id.* ¶ 68.) In other words, "the platforms exercise their rights to control content, but do so under immense Government pressure, while simultaneously being unconstitutionally shielded from liability for their purportedly 'voluntary' content moderation decisions that notably restrain the individual civil liberties of third-parties like Plaintiffs without due process." (*Id.* ¶ 344.) As an additional layer to

this construct, NGOs produce "blacklists" that are then used by the Government to justify censorship. (*Id.*) The plaintiffs allege that Mark Zuckerberg, CEO of Meta,[3] and Elon Musk, owner of X Corp., have openly admitted that the "Government" pressured them to "participat[e] in censorship schemes." (*Id.* ¶ 84; *see id.* ¶¶ 96–100, 300.)

At page 174 of the FAC, the plaintiffs finally get around to alleging the "direct evidence of censorship" inflicted on them and the "specific harms" they suffered thereby. (*Id.* ¶ 356.) Specifically, in March 2020, Facebook and Instagram (both owned by Meta) restricted the plaintiffs' TTAV account. (*Id.* ¶¶ 360–63.) In 2021, Facebook altered its algorithmic process to suppress COVID information that did not conform to the Government's preferred narrative and also provided information to the Government about content that could "contribute to vaccine hesitancy." (*Id.* ¶¶ 376–77.) This data was provided to CCDH and later used by the CCDH to target the plaintiffs as purveyors of COVID misinformation. (*Id.* ¶ 377.) On March 2, 2021, the Bollingers posted "vaccine-hesitan[t]" (or "Anti-Vaxxer") content on Facebook and received a three-day suspension. (*Id.* ¶ 380.) On March 3, 2021, CCDH tweeted its "hit list" naming the members of the "Disinformation Dozen," including the Bollingers. (*Id.* ¶ 381.) The plaintiffs allege numerous communications during the Spring of 2021 among government officials, CCDH, Twitter and Facebook confirming a concerted effort to suppress COVID-skeptical or vaccine-skeptical content on the defendants' social media platforms. (*Id.* ¶¶ 383–87.)

Representatives from the three Media Defendants testified before Congress on March 25, 2021, during which members of Congress directly pressured them to "remove members of the Disinformation Dozen, including Plaintiffs, from their platforms," in reliance on the "Government-

---

[3] The court takes judicial notice that Zuckerberg is CEO of Meta. The FAC does not make this clear.

coordinated CCDH hit piece as the basis for their demands." (*Id.* ¶ 394.) The Media Defendants'
representatives responded by assuring Congress that they would "take swift action in eradicating
the [Disinformation Dozen], including the Bollingers, from their platforms without delay." (*Id.*
¶ 396.)

The Media Defendants subsequently removed the plaintiffs' accounts from their platforms,
purely as a result of government pressure rather than the objective application of their own policies
regarding content. (*Id.* ¶ 397.) Instagram took down all TTAV accounts ("including personal
accounts") on March 25, 2021; Twitter followed suit on April 1, 2021, removing the plaintiffs'
five Twitter channels. (*Id.* ¶¶ 397, 399.) After more concerted pressure, Google took down the
plaintiffs' TTAC YouTube[4] channel on May 17, 2021. (*Id.* ¶ 414.)[5] The pressure campaign by the
Government and the Media Defendants' compliance with censorship efforts continued or ramped
up through the summer of 2021, with continued suppression of the plaintiffs' content as "members
of the [Disinformation Dozen]." (*Id.* ¶ 442; *see id.* ¶¶ 415–60.)

On October 21, 2021, Instagram "shutdown TTAV and Charlene Bollinger's personal
account during a TTAC live event" by hiding the hashtag "#thetruthabout vaccines." (*Id.* ¶ 461.)
On October 28, 2021, Instagram took down Charlene Bollinger's personal account. (*Id.* ¶ 462.) On
November 20, 2021, Facebook removed "a repost of an earlier video by Ty and Charlene Bollinger
that did not violate any rules at the time of the initial posting; but, when reshared by Plaintiffs, it
magically became violative of Facebook's policies." (*Id.* ¶ 472.) Facebook removed another post
by the plaintiffs in December 2021. (*Id.* ¶ 473.) On May 5, 2022, Facebook restricted the

---

[4] The plaintiffs refer to Google and YouTube interchangeably. (*See, e.g.*, FAC at 2 n.7.)

[5] The plaintiffs do not indicate for how long their accounts were suspended or that the
suspensions were permanent. Based on additional allegations in the FAC, it appears they were not
permanent.

Bollinger's personal account for "posting a Goebbels quote," but went back in time to include a December 3, 2021 post and increased the ban from 24 hours to 30 days. (*Id.* ¶ 493.) It restricted two more posts on May 10, 2022. (*Id.* ¶ 493.) Facebook removed the plaintiffs' post that was critical of then-President Joe Biden on March 17, 2024. (*Id.* ¶ 506.) It removed another post on April 17, 2024, falsely accusing the plaintiffs of "tr[ying] to get likes, follows, shares or video reviews in misleading way." (*Id.* ¶ 508.) (*See also id.* ¶¶ 681–83, 691–93,

The plaintiffs allege that these actions caused them reputational damage by branding them as public health threats, caused economic harm by pressuring the Media Defendants to "remove Plaintiffs' content," thus "depriv[ing] them of their ability to engage with their audience and sustain their business," and violated their First Amendment rights. (*Id.* ¶ 247.) The plaintiffs expressly allege that the Media Defendants' acts must be imputed to the Government. (*Id.* ¶ 544.)

Based on these (and numerous other) allegations, the FAC purports to set forth seventeen "counts" or causes of action, identified as follows:

(1) "Abridgement of Plaintiffs' Right to Freedom of Speech" (against all defendants) (FAC at 287);

(2) "Abridgement of Plaintiffs' Right to Freedom of the Press" (against all defendants) (*id.* at 288);

(3) "*Ultra Vires* Non-Final Agency Action Beyond Statutory Authority" (against the Government) (*id.* at 289;

(4) "Unlawful Final Agency Action in Violation of the Administrative Procedure Act" (against the Government) (*id.* at 293);

(5) "*Ultra Vires* Action Beyond Constitutional Bounds" (against the Government) (*id.* at 295);

(6) "Abridgement of Plaintiffs' Privacy Rights" (against the Government) (*id.* at 296);

(7) "Civil Conspiracy" (against all defendants) (*id.* at 298);

(8) "Tennessee Unfair Competition/Antitrust Statutes" (against the Media

Defendants and CCDH) (*id.* at 302);

(9) "Negligence" (against the Media Defendants and CCDH) (*id.* at 303);

(10) "Tortious Interference with Business Relationships/Economic Relationship" (against the Media Defendants and CCDH) (*id.* at 305);

(11) "Negligent Misrepresentation" (against the Media Defendants) (*id.* at 306);

(12) "Negligent Design" (against the Media Defendants) (*id.* at 307);

(13) "Fraud" (against the Media Defendants) (*id.* at 308);

(14) "Promissory Estoppel" (against the Media Defendants) (*id.* at 310);

(15) "Practicing Medicine without a License" (against the Media Defendants) (*id.* at 311);

(16) "Treason" (against the Government) (*id.* at 313); and

(17) "Revocation of 501(c)(3) Status" (against CCDH) (*id.* at 314).

The plaintiffs seek damages, injunctive relief, and "jail time." (*Id.* ¶¶ 715, 720, 739, 745, 752, 761, 768, 769, 778, 782, 786, 790, 797, 802, 808, 816, 822, 833.)[6]

The claims specifically asserted against the Media Defendants are premised upon allegations that these defendants abridged the plaintiffs' First Amendment rights to freedom of speech and freedom of the press by conspiring with the Government to blacklist them and censor their media content, thus engaging in unfair competition, negligence, fraud, promissory estoppel, the unlicensed practice of medicine and so forth.

**B.    The Motions to Transfer**

The Media Defendants' Motions to Transfer are premised upon the existence of forum

---

[6] They seek declaratory and injunctive relief against "the Government," as well as "Imprisonment of not less than five years" of all "implicated" government officials, among other things. (FAC ¶¶ 769, 822.) They seek "jail time" against the Media Defendants for violating Tennessee's prohibition against practicing medicine without a license, a Class B Misdemeanor. (*Id.* ¶¶ 811, 816.) Against CCDH they request, among other things, revocation of tax-exempt status and the imposition of excise taxes. (*Id.* ¶ 833.)

selection provisions in the Terms of Service ("TOS") between the plaintiffs and each of the Media Defendants. The motions are supported by Memoranda of Law and exhibits establishing the existence and content of the TOS and forum selection clauses. (Doc. Nos. 42, 44, 46 and exhibits filed therewith.)

X Corp's filings establish that, as of the time the plaintiffs opened their accounts with Twitter and at the time they filed suit, Twitter had instituted policies pursuant to which the plaintiffs'—and any other users'—use of the Twitter platform was conditioned upon the plaintiffs' agreement to be bound by Twitter's TOS. (Doc. No. 42-2, Scolari Decl. ¶¶ 4–5.) Twitter's policy was to provide notice of each new version of the TOS to all Twitter users and notice that the continued use of the Twitter platform "constitutes acceptance of the revised Terms." (*Id.* ¶ 6.) The operative TOS agreement contains a choice of law provision stating that Texas law would govern the Terms and "any dispute that arises" between a user and Twitter; it also contains a forum selection clause unambiguously requiring that "[a]ll disputes related to these Terms or the Services" provided by Twitter "will be brought exclusively in the U.S. District Court for the Northern District of Texas or state courts located in Tarrant County, Texas," and all users "consent to personal jurisdiction in those forums and waive any objection as to inconvenient forum." (Doc. No. 42-2 at 283.)[7]

Similarly, the policies implemented by Meta, which operates Facebook and Instagram, in effect for the duration of the plaintiffs' use of Meta's platforms and at the time this suit was filed,

---

[7] As alleged in the Amended Complaint, X Corp was incorporated in Nevada, and its principal place of business had, as of the date the plaintiffs' filed suit, been relocated to Bastrop County, Texas. When X was still known as Twitter, it was incorporated in Delaware and its principal place of business was in San Francisco County, California. (FAC ¶ 56.) The court takes judicial notice that Bastrop County encompasses Austin, Texas. Tarrant County encompasses Fort Worth, Texas. Both counties are within the Northern District of Texas. *See* https://www.txnd.uscourts.gov/.

are set forth in Meta's "Community Standards," which each user agrees to follow under Facebook's Terms of Service and Instagram's Terms of Use. (Doc. No. 47, Andre Decl. ¶¶ 5–7, 11–12.) Facebook's and Instagram's TOS also specify that the platforms have the right to unilaterally modify the Terms and that continued use of the platforms constitutes acceptance of new or updated terms. (*Id.* ¶¶ 8–9, 13–14.) Both sets of TOS specify that Meta will notify users of proposed changes and provide an opportunity to review them before they go into effect. (*See, e.g.*, Doc. No. 47-2 ag 9; Doc. No. 47-37 at 9.) And both sets of TOS contain forum selection clauses requiring that, aside from exceptions not relevant here, all lawsuits raising "any cause of action, legal claim, or dispute" between the user and the platform "arising out of or related to these Terms or [the platform]" will be governed by California law and will be "resolved exclusively in the U.S. District Court for the Northern District of California or a state court located in San Mateo County." (*See, e.g.*, Doc. No. 47-31 at 9–10 (Instagram); *see also* Doc. No. 47-2 at 11 (clause covering "any claim, cause of action, or dispute between us that arises out of or relates to these Terms or your access or use of the Meta Products").[8]

The claims against Google relate to the plaintiffs' use of YouTube. Users with a YouTube channel can, among other things, upload videos and make comments. To create a YouTube channel, the user must maintain a Google account. And to create a Google account, the user must agree to Google's TOS. (Doc. No. 46-4, Marte Decl. ¶¶ 4–6.) The TOS in effect when the plaintiffs instituted this action provided:

> California law will govern all disputes arising out of or relating to these terms, service specific additional terms, or any related services, regardless of conflict of laws rules. These disputes will be resolved exclusively in the federal or state courts of Santa Clara County, California, USA, and you and Google consent to personal

---

[8] As alleged in the FAC, Meta was incorporated in Delaware, and its principal place of business is in San Mateo County, California. (FAC ¶ 54.)

jurisdiction in those courts.

(Doc. No. 46-5 at 17.)[9]

The plaintiffs oppose the Motions to Transfer principally on the basis that the TOS do not govern the claims brought in this lawsuit, because the alleged censorship efforts "began outside the Platforms," through actions taken by the Government and the NGOs, which "later enlisted the Platforms to target Plaintiffs' speech and business" and "have [nothing] to do with or relate to the [Media] Defendants' so-called contracts" containing forum-selection clauses. (Doc. No. 56 at 2–4; *see also id.* at 6 ("The scope of this case extends well beyond the social media services contemplated by the TOS.").) They characterize the motions as attempting to "fracture this case and scatter its pieces across the country," which they contend would severely prejudice them and result in the waste of judicial resources and the possibility of inconsistent rulings. (Doc. No. 56 at 2.) The plaintiffs also contend that the forum selection clauses are unenforceable due to "fraud" and "overreach," and that there is a strong public interest in having a Tennessee court adjudicate their claims, "given the. . . California judiciary's bias in Big Tech Disputes." (*Id.* at 7.)

DHS and HHS filed a Response to the Motions to Transfer Venue, indicating that they take no position on whether the Media Defendants' TOS warrant transfer to either the Northern District of Texas or the Northern District of California, but they request transfer of the matter as a whole rather than severance and transfer of only the claims against the Media Defendants, in the interests of judicial economy. (Doc. No. 55.) The plaintiffs and CCDH have entered a joint stipulation pursuant to which CCDH shall have until forty-four days after resolution of the Motions to Transfer to answer or otherwise respond to the Amended Complaint. (*See* Doc. No. 58.) CCDH

---

[9] Google, as alleged by the plaintiffs, has at all times been a Delaware limited liability company whose principal place of business is in Santa Clara County, California. (FAC ¶ 55.)

has taken no position on the Motions to Transfer.

The Media Defendants filed Reply briefs (Doc. Nos. 59, 60, 61) reiterating that the plaintiffs' claims against them all relate to the plaintiffs' use of their internet platforms, arguing that the plaintiffs fail to present any viable defense to the enforceability of the forum selection clauses and that their judicial bias arguments are without merit.

The plaintiffs filed a Notice of Filing Supplemental Materials in Further Support of Their Amended Complaint & Omnibus Response in Opposition to the Platform Defendants' Transfer Motions. (Doc. No. 63.) These additional materials include numerous articles and court filings in other cases that have no bearing on the present motions.

## II.    LEGAL STANDARD

Under 28 U.S.C. § 1404(a), "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." This provision "give[s] district courts the discretion to transfer cases on an individual basis by considering convenience and fairness." *Kerabo v. Sw. Clean Fuels Corp.*, 285 F.3d 531, 537 (6th Cir. 2002).

Generally, the defendant carries a heavy burden in establishing that a plaintiff's choice of forum should be disturbed. *Reese v. CNH Am. LLC*, 574 F.3d 315, 320 (6th Cir. 2009). Under ordinary circumstances, a court reviewing a motion to transfer venue must "consider the private interests of the parties, including their convenience and the convenience of potential witnesses, as well as other public-interest concerns, such as systemic integrity and fairness, which come under the rubric of 'interests of justice.'" *Moore v. Rohm & Haas Co.*, 446 F.3d 643, 647 n.1 (6th Cir. 2006) (quoting *Moses v. Bus. Card Exp., Inc.*, 929 F.2d 1131, 1137 (6th Cir. 1991)).

The Supreme Court has recognized, however, that a party may enforce a contractual forum selection clause through a motion to transfer venue under § 1404(a). *Atl. Marine Constr. Co. v. U.S. Dist. Ct.*, 571 U.S. 49, 59 (2013). "[A] proper application of § 1404(a) requires that a forum-selection clause be 'given controlling weight in all but the most exceptional cases.'" *Id.* at 59–60 (quoting *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 33 (1988) (Kennedy, J., concurring)). At the same time, "the existence of a forum selection clause cannot be dispositive on a motion for transfer." 15 Fed. Prac. & Proc. Juris. § 3854.1 (4th ed.)

In the Sixth Circuit, evaluating a forum selection clause is typically a two-step process. *Lakeside Surfaces, Inc. v. Cambria Co.*, 16 F.4th 209, 215 (6th Cir. 2021). First, the court determines whether a forum selection clause is "applicable to the claims at issue, mandatory, valid, and enforceable." *Id.* If so, then the plaintiff's "choice of forum 'merits no weight' and courts consider arguments only under the public-interest factors, treating the private-interest factors as 'weigh[ing] entirely in favor of the preselected forum.'" *Id.* (quoting *Atl. Marine*, 571 U.S. at 63–64). At the second step, the plaintiff "bears the burden of showing that the public factors weigh heavily against [transfer]." *Id.* at 216. The public interest factors generally include "administrative difficulties flowing from court congestion; the 'local interest in having localized controversies decided at home'; the interest in having the trial of a diversity case in a forum that is at home with the law that must govern the action; the avoidance of unnecessary problems in conflict of laws, or in the application of foreign law; and the unfairness of burdening citizens in an unrelated forum with jury duty." *Id.* at 215 n.2 (quoting *Hefferan v. Ethicon Endo-Surgery Inc.*, 828 F.3d 488, 500 (6th Cir. 2016)). However, because the public interest factors "will rarely defeat" a valid forum selection clause, "the practical result is that forum-selection clauses should control except in unusual cases." *Atl. Marine*, 571 U.S. at 64.

There are relatively few cases involving multiple defendants seeking to enforce multiple conflicting contractual forum selection clauses, along with other defendants that do not invoke forum selection clauses. The Third Circuit relatively recently addressed the issue of how district courts should apply *Atlantic Marine* "where some, but not all, of [the] defendants are parties to forum-selection clauses that designate different districts." *In re: Howmedica Osteonics Corp.*, 867 F.3d 390, 397 (3d Cir. 2017). The court there emphasized *Atlantic Marine*'s holding that, "in most cases, district courts must enforce valid forum-selection clauses when adjudicating § 1404(a) transfer motions," but it also recognized that, in *Atlantic Marine*, the Supreme Court "did not have occasion to address how that general rule should apply where non-contracting parties are present, much less how it should apply where . . . there are other complications such as competing forum-selection clauses [and] personal jurisdiction challenges." *Id.* at 401.

As the Third Circuit noted, however, *Atlantic Marine* "did not disturb in any way the customary § 1404(a) analysis that applies where parties are not bound by a forum-selection clause." *Id.* at 403. That court therefore concluded that a "separate framework" was required to shape the § 1404(a) analysis, "where both contracting and non-contracting parties are found in the same case and where the non-contracting parties' private interests run headlong" into *Atlantic Marine*'s presumption in favor of enforcing forum selection clauses. *Id.* Building on an earlier Fifth Circuit case, *In re Rolls Royce Corp.*, 775 F.3d 671 (5th Cir. 2014), the Third Circuit laid out a four-step inquiry that requires: (1) considering the forum selection clauses, (2) analyzing private and public interests relevant to non-contracting parties, (3) if Steps One and Two "point different ways," then addressing threshold issues related to severance, and (4) "if more than one outcome satisfies the threshold severance constraints," proceeding to determine "which transfer decision most promotes efficiency while minimizing prejudice to non-contracting parties' private

interests." *Howmedica*, 867 F.3d at 404. At Step Four, the court must remain mindful of *Atlantic Marine*'s "directive that 'courts should not . . . disrupt the parties' settled expectations' embodied in forum-selection clauses except when other factors 'overwhelmingly' weigh against enforcing the clauses." *Id.* at 409 (quoting *Atl. Marine*, 571 U.S. at 67).

The Sixth Circuit has not addressed this issue or adopted *Howmedica*, and the two district court cases from this circuit addressing somewhat similar fact patterns did not find it persuasive, at least on the facts of the cases before them.[10] This court, however, is persuaded that *Howmedica*'s attention to conflicting forum selection clauses and to the effect of forum selection clauses on parties with which the plaintiffs have not entered forum selection agreements is persuasive and should be applied in this case.

## III. DISCUSSION

### A. Step One: The Forum Selection Clauses

This step requires determination of whether the forum selection clauses are "applicable to the claims at issue, mandatory, valid, and enforceable." *Lakeside Surfaces*, 16 F.4th at 215. Assuming they are, the court then considers whether the plaintiff has established that the relevant "public-interest factors weigh heavily against [transfer]." *Id.* at 216. As set forth above, the court presumes at this step that, "'[i]n all but the most unusual cases,' claims concerning those parties [with which the plaintiffs have forum selection clauses] should be litigated in the fora designated

---

[10] *See Palinode, LLC v. Plaza Servs., LLC*, No. 3:20-CV-00807, 2021 WL 4460509, at *5 (M.D. Tenn. Sept. 28, 2021) (Richardson, J.) (noting that, when a non-signatory to a forum selection clause is a party to a case, the Third and Fifth Circuits take into consideration the private interests of the non-signatory, but also concluding that "the Sixth Circuit has never utilized this approach" and finding no reason to do so in that case); *Holtzman v. Vill. Green Mgmt. Co. LLC*, No. 2:19-CV-11150, 2020 WL 264331, at *11 n.12 (E.D. Mich. Jan. 17, 2020) ("This Court is, however, not aware of any courts in the Sixth Circuit that have followed [*Howmedica*'s] line of thinking. Further, consideration of the non-signatory parties' private interests would not yield a different outcome in this matter.").

by the clauses." *Howmedica*, 867 F.3d at 404 (quoting *Atl. Marine*, 571 U.S. at 66).

The plaintiffs do not dispute the mandatory nature of the Media Defendants' forum selection clauses. Indeed, each of the clauses uses mandatory language, providing that any lawsuits "will" be brought or resolved "exclusively" in the selected fora. (*See supra* at 8–10.) The plaintiffs contend, however, that the clauses are not applicable to their claims and are otherwise invalid or unenforceable. They also argue that the public interest weighs against enforcing the clauses in this case.

### 1. Applicability

The applicability of a forum selection clause is "distinct from and antecedent to" the question of its enforceability. *Firexo, Inc. v. Firexo Grp. Ltd.*, 99 F.4th 304, 326 (6th Cir. 2024). "Whether and how a contract provision applies to the parties or claims in a lawsuit is generally a matter of contract interpretation . . . ." *Id.* at 309. "As an ordinary matter of contract interpretation, a federal court sitting in diversity begins with a conflict-of-laws analysis using the law of the State in which it sits to determine the governing law, and then interprets the contract provision under that law." *Id.* at 310.[11] In other words, "the court first determines the controlling law and then assesses the forum-selection clause under that law to determine whether and how it applies to the parties and claims in the pending lawsuit." *Id.*; *see also id.* at 326 (concluding that "courts must use the *Erie* approach to contract interpretation to determine the [forum selection] clause's

---

[11] The plaintiffs invoke the court's diversity jurisdiction under 28 U.S.C. § 1332. (FAC ¶ 58.) However, the plaintiffs also—at least implicitly—invoke federal question jurisdiction, insofar as they bring claims against all defendants for violating their constitutional rights. Generally, when both federal and state law claims are before a federal court, a federal court applies federal law to the federal claims and state substantive law to the claims based on state law, "to the same extent as if it were exercising its diversity jurisdiction." *Jones v. City of Elyria*, 947 F.3d 905, 912 (6th Cir. 2020) (quoting *Super Sulky, Inc. v. U.S. Trotting Ass'n*, 174 F.3d 733, 741 (6th Cir. 1999)).

applicability under that appropriate law").

Meta and Google assert that California law applies to the applicability question. X Corp. does not address this issue and presumes that Sixth Circuit law applies. The plaintiffs do not address the question of which states' laws apply. The court finds little difference in the laws of the relevant jurisdictions and, given the plaintiffs' failure to address the issue, finds no need to conduct a choice-of-law analysis.

The plaintiffs contend that this lawsuit is not simply a "spat" about the provision of services through the Media Defendants' various internet platforms but instead a "multi-faceted" challenge to a "conspiratorial web between Government, Big Tech, and other foreign and domestic NGOs that has nothing to do with the ordinary *private* . . . interactive computer services contemplated by the Platforms' TOS containing the [forum selection clauses] at issue." (Doc. No. 56 at 10 13.) The plaintiffs quote from the FAC at length and itemize each claim against the Media Defendants to show that "99.9% of the averments and causes of action have absolutely nothing to do with the subject matter of the TOS that contain [forum selection clauses]." (*Id.* at 16; *see id.* at 11–15.) What the plaintiffs do not do is grapple with the language of the forum selection clauses themselves or explain how they do *not* broadly apply to essentially any dispute that might arise between the plaintiffs and the Media Defendants relating to the plaintiffs' use of the Media Defendants' platforms.

Under California law, in considering the applicability of a forum selection clause, "the court may examine only the agreement itself and the complaint filed by the party" refuting the clause. *Rice v. Downs*, 203 Cal. Rptr. 3d 555, 562 (Cal. Ct. App. 2016). Generally, under California law, broadly worded forum selection clauses that cover "any claim arising from or related to" a certain agreement are deemed to encompass all tort and contract claims that may arise under, or

from, the contractual relationship. *See, e.g.*, *Howard v. Goldbloom*, 241 Cal. Rptr. 3d 743, 746 (Cal. Ct. App. 2018); *see also Olinick v. BMG Ent.*, 42 Cal. Rptr. 3d 268, 278 (Cal. Ct. App. 2006) (holding that the phrase "all disputes arising under this Agreement" encompasses all causes of action arising from or related to the agreement regardless of how they are categorized). In other words, "[f]or a party's claims to come within the scope of such a clause, the factual allegations of the complaint need only 'touch matters' covered by the contract containing the [forum] clause." *Howard*, 241 Cal. Rptr. 3d at 746 (some internal quotation marks and citation omitted); *see also Rice*, 203 Cal. Rptr. 3d at 563 ("There is no requirement that the cause of action arising out of a contractual dispute must be itself contractual. At most, the requirement is that the dispute must arise out of the contract." (citation omitted)). Likewise, under the various Sixth Circuit district court cases cited by X Corp. and Google, "forum selection clauses with 'related to' language" apply to "tort or consumer protection claims 'related to' the contract's purpose." *Hasler Aviation, L.L.C. v. Aircenter, Inc.*, No. 1:06-CV-180, 2007 WL 2463283, at *5 (E.D. Tenn. Aug. 27, 2007) (collecting cases); *Wireless Props., LLC v. Crown Castle Int'l Corp.*, No. 1:10-CV-269, 2011 WL 3420734, at *6 (E.D. Tenn. Aug. 4, 2011) ("This Court, along with other courts in this Circuit, ha[s] consistently held that tort claims can be encompassed by a forum selection clause."). Tennessee law is in accord. *See, e.g.*, *Medina-Tratel v. Holloway*, No. M2022-01640-COA-R3-CV, 2024 WL 1479976, at *4 (Tenn. Ct. App. Apr. 5, 2024) (finding that misrepresentation and conversion claims fell "within the plain language" of a contractual forum selection clause that applied to "disputes among any Members" and "any dispute arising under this LLC agreement").

Other courts confronted with claims similar to those here have found that those claims fall within the scope of the broadly worded forum selection clauses at issue in those cases. Specifically, in a case nearly identical to this one, the plaintiffs alleged that Meta and Google (and perhaps X

Corp.) had conspired with numerous government agencies to "silence [Plaintiffs'] competitive COVID-related speech" by "shadow-bann[ing]," "delist[ing]," and suspending their Google accounts, and "block[ing]" or deleting their Facebook accounts. *Webseed, Inc. v. Dep't of State*, No. 1:24-CV-00576-RP, 2025 WL 996458, at *1 (W.D. Tex. Feb. 24, 2025), *report & recommendation adopted*, No. 1:24-CV-576-RP, 2025 WL 993375 (W.D. Tex. Apr. 1, 2025). The plaintiffs argued that transfer under the defendants' forum selection provisions was not warranted, because their claims had "nothing to do" with the defendants' TOS and instead was "'really about' violations of Plaintiffs' constitutional rights and other laws." *Id.* at *5. The court disagreed based on the plain language of each of the forum selection clauses, finding that, "[b]ecause Plaintiffs' claims arise from their use of Facebook and Twitter accounts and Meta and X Corp.'s alleged interference with that use, this case falls within the scope of the TOS." *Id.* at *6.[12] Other courts are in accord. *See, e.g.*, *Wise Guys I v. Meta Platforms, Inc.*, No. 3:23-CV-0217-X, 2023 WL 8434452, at *2 (N.D. Tex. Dec. 4, 2023) (finding that Meta's forum selection clause encompassed First Amendment viewpoint discrimination claims, as the claims "concern[ed] whether Meta unlawfully restricted [the plaintiffs'] access and use of Facebook" (citing *J.V. & Sons Trucking, Inc. v. Asset Vision Logistics, LLC*, No. 1:20-CV-163-H, 2020 WL 10458645, at *4 (N.D. Tex. Dec. 15, 2020));[13] *Moates v. Facebook, Inc.*, No. 4:21-CV-694-ALM-KPJ, 2022 WL 2707745, at *1, *5

---

[12] All of the relevant forum selection clauses at issue in that case required suit to be brought in the Northern District of California. *Webseed, Inc.*, 2025 WL 996458, at *4. The plaintiffs apparently did not sue any NGOs (or, in any event, the court did not consider their interests), and the government defendants, as they did here, took no position on whether transfer was warranted, other than to opine that, if the court was inclined to grant the transfer motions, it should transfer the entire case on judicial-economy grounds. *Id.* at *1 n.3. In other words, *Webseed* was substantially less complicated than this case.

[13] The court also found that the "interpretation of a forum-selection clause is a matter of state law" and that this analysis was "identical under either Texas or California law." *Wise Guys I*, 2023 WL 8434452, at *2.

(E.D. Tex. June 13, 2022) (applying California law to find that the plaintiff's claims for "libel; breach of contract; violations of the Texas Deceptive Trade Practices Act; product liability claims; claims for fraud, 'aiding and encouraging suicide,' and 'data theft' under the 'Penal Code'; claims for 'data/cyber security,' 'biometric data,' and the 'right to adequate assurance of performance'" all "concern his Facebook accounts, his activities conducted while using the accounts, Facebook's collection of information from his online activities, the termination of his accounts, and Facebook's allegedly fraudulent acts related to [the plaintiff's] Facebook accounts" and therefore fell "within the broad scope of the forum selection clauses"), *report & recommendation adopted*, No. 4:21-CV-694-ALM-KPJ, 2022 WL 2705245 (E.D. Tex. July 12, 2022).

In this case, with respect to each of the Media Defendants, the plaintiffs allege that the conspiracy in which the defendants participated resulted in the defendants' decisions to remove or block the plaintiffs' speech displayed or distributed through the Media Defendants' various platforms, whether YouTube, Facebook, Instagram, or Twitter. Irrespective of how the claims are characterized, the dispute and alleged damages arise from the defendants' decisions regarding how to apply their various policies relating to users' communications and use of their platforms. In other words, all of the disputes "aris[e] out of or relate[] to" the Media Defendants' TOS and the services provided by each. This court finds that, regardless of which state's law applies, the respective forum selection clauses are clearly applicable to the plaintiffs' various tort-based claims against the Media Defendants—even the claim that the defendants engaged in the unlawful practice of medicine by blocking certain content from their platforms. In short, the plaintiffs would not have any claims against the Media Defendants if they had not entered into the TOS and availed themselves of the services and internet platforms made available by the Media Defendants to users who accepted those agreements.

2. *Enforceability*

Federal law governs the enforceability of a forum selection clause. *Wong v. PartyGaming Ltd.*, 589 F.3d 821, 828 (6th Cir. 2009). The party opposing enforcement of the clause bears the burden of showing that it is not enforceable. *Id.* To determine whether a forum selection clause is enforceable, courts in the Sixth Circuit must consider:

> (1) whether the clause was obtained by fraud, duress, or other unconscionable means;
>
> (2) whether the designated forum would ineffectively or unfairly handle the suit; and
>
> (3) whether the designated forum would be so seriously inconvenient such that requiring the plaintiff to bring suit there would be unjust.

*Firexo*, 99 F.4th at 309 (citing *Wong*, 589 F.3d at 828).

The plaintiffs argue that the TOS as a whole are "unenforceable contracts of adhesion." (Doc. No. 56 at 16.) In support of this argument, they assert only that the agreements were not "freely bargained for." (*Id.* at 17.) But the plaintiffs are simply incorrect in arguing that contracts of adhesion are unenforceable *per se*. The Sixth Circuit "recognize[s] the validity of forum selection clauses even when those clauses were not the product of an arms-length transaction." *Smith v. Aegon Cos. Pension Plan*, 769 F.3d 922, 930 (6th Cir. 2014) (citing *Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 595 (1991)). Notably, in *Carnival Cruise*, the Supreme Court held that form forum selection clauses contained in contracts of adhesion are presumptively enforceable and that the party contesting such a clause has a "heavy burden" of proving that the clause is inherently unreasonable or the product of overreaching or bad faith, or that the plaintiffs lacked notice of the forum clause. *Carnival Cruise*, 499 U.S. at 593–95. Here, the plaintiffs do not contend that they lacked notice of the provisions or that the fora selected by the Media Defendants' TOS lack any reasonable connection to the parties' relationship.

The plaintiffs *do* contend that the forum clauses are the "product of overreach and fraud." (Doc. No. 56 at 18.) However, they present no evidence of, or argument supporting, fraud. Instead, they maintain that "there is no way that the parties can contract around the U.S. Constitution or Tennessee law or otherwise contract as to illegality" and that, to construe the forum clauses broadly enough to cover their constitutional tort claims in this case "would be the epitome of 'overreach.'" (*Id.*) The plaintiffs do not claim that the forum selection clauses themselves violate the Constitution or are illegal. Constitutional claims are a species of tort claim, and forum selection clauses are a matter of contract law. It is well established that federal statutory claims, such as claims under the Americans with Disabilities Act, may be the subject of arbitration agreements—a form of forum selection clause—"since the agreement 'only determines the choice of forum.'" *Wilson v. CPB Foods, LLC*, No. 3:18-CV-014-CHB, 2018 WL 6528463, at *5 (W.D. Ky. Dec. 12, 2018) (quoting *E.E.O.C. v. Waffle House, Inc.*, 534 U.S. 279, 295 n.10 (2002)); *see Smith* , 769 F.3d at 931 (holding that ERISA does not preclude venue selection clauses). The plaintiffs provide no law to support their contention that other constitutionally based claims should be treated any differently. In sum, the parties were free to agree to the forum in which disputes of this type would be litigated, and the court does not find overreach.

The plaintiffs argue that transfer to California is unwarranted because the courts there will not fairly handle the suit and that they will be deprived of due process in that jurisdiction. More specifically, they contend that California courts have regularly construed Section 230(c)(1) of the Communications Decency Act ("CDA") as providing internet platforms like the Media Defendants "absolute immunity from suit, improperly treating [the CDA] as a jurisdictional bar rather than an affirmative defense." (Doc. No. 56 at 19 (citing *Fyk v. Facebook, Inc.*, No. C 18-05159 JSW, 2019 WL 11288576 (N.D. Cal. June 18, 2019), *aff'd*, 808 F. App'x 597 (9th Cir. 2020)).) They allege

that the "California courts have systematically" ignored recent developments of the law and have regularly "shield[ed] Big Tech from accountability in direct contradiction to statutory text and constitutional principles." (*Id.*)

However, the Northern District of California, like any other federal court, "is presumed to be unbiased and impartial." *United States v. Cook*, No. 3:18-CR-19-PLR-DCP, 2019 WL 2932660, at *3 (E.D. Tenn. July 8, 2019); *see id.* (noting that a showing of bias requires "more than conclusory statements"). And, although the plaintiffs claim that their counsel has "personally reviewed several dozen Big Tech-related cases in California" (Doc. No. 56 at 19), "judicial rulings alone almost never constitute a valid basis for a bias," *Liteky v. United States*, 510 U.S. 540, 555 (1994). Moreover, "[l]ess favorable law in the alternative forum will not, on its own, make the forum inadequate." *Wong* , 589 F.3d at 831. The plaintiffs have not carried their burden of showing that litigating in either Texas or California "will be so gravely difficult and inconvenient that [the plaintiffs] will for all practical purposes be deprived of [their] day in court." *Lakeside Surfaces*, 16 F.4th at 218.

The plaintiffs have not established that the forum selection clauses are unenforceable.

### 3. *Weighing the Public Interest Factors*

The Sixth Circuit has identified the public interest factors to be considered as including "court congestion, local interest in the matter, interest in having the trial at home with the law that governs, avoidance of conflict-of-law problems or application of foreign law, and unfairness in burdening local citizens with jury duty." *Wong*, 589 F.3d at 832. However, public interest factors "will rarely defeat" a valid forum selection clause, and "forum-selection clauses should control except in unusual cases." *Atl. Marine*, 571 U.S. at 64.

The plaintiffs argue that public policy weighs against transfer, insofar as Tennessee has a "compelling interest in protecting its citizens" and in "ensur[ing] that Big Tech does not undermine

its unfair competition and antitrust laws." (Doc. No. 56 at 23.) As Meta argues, however, Tennessee law supports the freedom to contract, and Tennessee courts generally enforce forum selection provisions, so long as they are "fair and reasonable in light of all the surrounding circumstances attending their origin and application." *Relyant Glob., LLC v. Fernandez*, No. E2021-00515-COA-R3-CV, 2022 WL 2903333, at *4 (Tenn. Ct. App. June 24, 2022) (quoting *Dyersburg Mach. Works, Inc. v. Rentenbach Eng'g Co.*, 650 S.W.2d 378, 380 (Tenn. 1983)). Thus, such clauses are typically enforced absent "evidence indicating that the forum selection clause itself was procured by fraud, misrepresentation, duress, or any other unconscionable means." *Id.* (citing *Lamb v. MegaFlight, Inc.*, 26 S.W.3d 627, 631 (Tenn. Ct. App. 2000)). As set forth above, the plaintiffs have not established such fraud or duress related to the procurement of their agreement to the forum selection clauses.

The plaintiffs argue in passing, without specifically arguing the point, that granting the Motions to Transfer would "fracture this case and scatter its pieces across the country . . . , thereby severely prejudicing Plaintiffs, wasting judicial resources, and inviting inconsistent rulings," which could be both inefficient and unjust. (Doc. No. 56 at 2.) Generally, the plaintiffs' private interest in keeping the case together, standing alone, would not be sufficient to defeat the forum selection clauses. As for the waste of judicial resources and the possibility of inconsistent rulings, the court cannot assess these matters before determining whether, in fact, severance will be required. Accordingly, these questions will be addressed in subsequent steps.

At this step of the analysis, the plaintiffs have not made a strong showing that the forum selection clauses should *not* control. The court presumes that the claims against Meta and Google should be transferred to California and that the claims against X Corp. should be transferred to Texas.

**B.    Step Two: The Non-Contracting Parties' Interests**

Under *Howmedica*, Step Two requires "an independent § 1404(a) analysis of private and public interests relevant" to the defendants with which the plaintiffs have not entered into forum selection agreements. *Howmedica*, 867 F.3d at 408. The analysis at this step is rendered somewhat difficult by the fact that only two of the seven government agencies named as defendants have entered an appearance, while the two that responded to the motion expressed concern only with keeping the case together. The sole remaining NGO defendant, CCDH, has made an appearance only for purpose of entering into a stipulation with the plaintiffs that its deadline for responding to the pleadings is extended until after the transfer motions are resolved. In other words, those defendants that have been served have effectively waived objection to transfer based on either their private or public interests, so it is not entirely clear what those interests are or how the court should independently analyze them.

Regardless, the court finds that nearly all of the relevant private and public factors weigh against transfer, particularly in light of the deference accorded the plaintiffs' choice of forum under an ordinary forum *non conveniens* analysis. Nashville is closer to Washington, D.C., where the non-contracting defendants are based, making travel here for witnesses and lawyers less time-consuming and likely less expensive than traveling to California or Texas. The non-contracting defendants, as discussed below, would also have an interest in keeping the case together in one forum, if possible, and no particular public interest factors weigh in favor of transfer.

Because the court's Step Two analysis weighs against transferring the plaintiffs' claims against CCDH and the government agency defendants to another district, and that result is in conflict with the Step One presumption that the claims against the Media Defendants should proceed in the selected fora, the court must next assess whether severance is warranted. *Accord Howmedica*, 867 F.3d at 408.

**C.       Step Three: Threshold Issues Related to Severance**

At this step, the court considers "threshold issues such as the presence of indispensable parties and defects in subject-matter jurisdiction, personal jurisdiction, venue, or joinder, all of which may direct [the] severance analysis." *Id.*

Although the parties have not addressed these issues, there seems to be no significant impediment to pursuing the claims against the government defendants in any federal venue. While transfer of the case against the government agency defendants that have not yet been served might complicate or slow service, the two that have entered an appearance have waived any objection to transfer. Thus, it seems the claims against the government agency defendants could proceed as well in California as here.[14]

---

[14] The court observes that, "[a]bsent a waiver, sovereign immunity shields the Federal Government and its agencies from suit." *Federal Deposit Insurance Corp. v. Meyer*, 510 U.S. 471, 475 (1994). The United States has not consented to suit for damages based on constitutional violations. *See id.* at 477–78 (concluding that the Federal Tort Claims Act did not provide a cause of action for constitutional violations). And the Supreme Court did not abrogate the sovereign immunity of the United States or that of a federal agency in *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971). *Scott v. U.S. Dep't of Just.*, No. 2:21-CV-11146, 2021 WL 2895293, at *3 (E.D. Mich. July 9, 2021) (citations omitted).

Based on this precedent, the court might have expected the federal agency defendants to seek to remove themselves quickly from the lawsuit based on sovereign immunity. However, in *Webseed, Inc.*, the case transferred to the Northern District of California from the Western District of Texas, the government has not yet filed an answer or a Rule 12 motion, but, in a Joint Status Report filed on July 2, 2025, it requested a continuation of the stay already entered in that case, pending an anticipated report pursuant to Executive Order 14149, *Restoring Freedom of Speech and Ending Federal Censorship*, 90 Fed. Reg. 8,243 (Jan. 20, 2025) ("EO 14149"). As set forth in the Joint Status Report, EO 14149, among other things, directed the Attorney General "in consultation with the heads of executive departments and agencies," to "investigate the activities of the Federal Government over the last 4 years that are inconsistent with the purposes and policies of this order and prepare a report to be submitted to the President . . . with recommendations for appropriate remedial actions to be taken based on the findings of the report." Joint Status Report at 3–4, *Webseed, Inc. v. Dep't of State*, No. 3:25-cv-03020 (N.D. Cal. July 2, 2025), ECF No. 100. The federal agency defendants in that case anticipated that the findings in the anticipated report would be "relevant to their Rule 12 response." *Id.* at 4. In light of the agencies' posture in that case, it is not entirely clear whether or to what extent the government will assert sovereign immunity in this case.

However, it appears that transfer of the claims against CCDH would not be feasible, because nothing in the FAC suggests that CCDH would be subject to personal jurisdiction in either Texas or California or that venue as to CCDH in either of those jurisdictions would be appropriate. Likewise, X Corp. has moved its operations out of California; the Terms of Service governing the plaintiffs' claims against it call for suit in Texas and the application of Texas law; and plaintiffs' claims against it are not centered in California. Consequently, it does not appear likely that X Corp. would be subject to personal jurisdiction in California.[15] Nor would there be any legitimate basis for transferring the claims against Meta and Google to Texas. In other words, this is the only venue in which the case as a whole could have been brought, and it is not possible to transfer the entire case to another venue. Thus, to grant the Media Defendants' motions, severance of the claims against them, at least, would be required.

The plaintiffs contend that their claims are complex and multi-faceted and that severance gives rise to a risk of inconsistent judgments. The parties do not argue that any party is or is not an indispensable party, and the court presumes that none is indispensable. Accordingly, it appears possible to sever the claims against the Media Defendants.

None of these conclusions dictates a resolution of the transfer motions. Rather, it appears that there are at least three possible outcomes that would satisfy the threshold issues: (1) keep the entire case in this court; (2) sever and transfer the claims against the Media Defendants to California (Meta and Google) and Texas (X Corp.); or (3) sever and transfer the claims against the Media Defendants to California and Texas, while also severing and transferring the claims against the government agency defendants to either Texas or California. The court, therefore, must

---

[15] The court expresses no opinion as to whether it has personal jurisdiction over the defendants in Tennessee, as no party has raised that issue.

proceed to Step Four.

### D. Step Four: Efficiency and the Non-Contracting Parties' Private Interests

So, to summarize, the court has found that the forum selection agreements weigh in favor of transfer; the private and public interests of the non-contracting defendants weigh against transfer; and the court is presented with three options as to how to proceed, as identified above. To select among these options, the court at Step Four is to exercise its discretion to choose the most appropriate course of action, "measur[ing] its decision against two key sets of interests." *Howmedica*, 867 F.3d at 405. These are (1) "efficiency interests in avoiding duplicative litigation," while also "taking into account case management techniques that can reduce inefficiencies accompanying severance, as well as any other public interests that may weigh against enforcing a forum-selection clause"; and (2) "the non-contracting parties' private interests and any prejudice that a particular transfer decision would cause with respect to those interests." *Id.* (citations omitted).

The courts have a strong interest in judicial economy and preserving resources, and the non-contracting parties, too, have a significant interest in avoiding duplicative litigation. Several of the claims in this case are asserted against all defendants, most notably the First Amendment and conspiracy claims, and the allegations against all of the defendants supporting these claims are closely intertwined. While some case management techniques—such as taking joint discovery— might reduce the inefficiencies that would otherwise accompany severance, severance and transfer would undoubtedly result in duplicative efforts by three different district courts, as well as potentially conflicting resolutions.

As a result, the court finds that this is the rare case in which the inefficiency attendant upon breaking this case into three pieces "'overwhelmingly' outweigh[s] the interests in upholding the [contracting] parties' 'settled expectations.'" *Howmedica*, 867 F.3d at 410–11 (quoting *Atl.*

*Marine*, 571 U.S. at 67, 66); *accord Fed. Mach. & Equip. Co. v. Tousey*, No. 1:21-CV-01422, 2022 WL 615032, at *3 (N.D. Ohio Mar. 2, 2022) (in a case involving multiple agreements with different forum-selection clauses, where enforcement of all the forum-selection clauses "would lead to parallel proceedings involving the same issues in at least two different venues that could result in conflicting judgments," enforcing only one of the forum selection agreements and transferring the entire case to the forum in which most of the claims arose); *Polaris Eng'g, Inc. v. Texas Int'l Terminals, Ltd.*, No. CV H-20-3389, 2021 WL 5155691, at *15 (S.D. Tex. Apr. 16, 2021) (declining to enforce a mandatory forum selection clause, finding that the "the need—rooted in the valued public interest in judicial economy—to pursue the same claims in a single action in a single court can trump a forum-selection clause" (quoting *In re Rolls Royce Corp.*, 775 F.3d at 679)); *Blissfield Mfg. Co. v. Blue H2O Sols., LLC*, No. 12-15610, 2013 WL 5450289, at *5 (E.D. Mich. Sept. 30, 2013) (declining to enforce two different forum selection clauses, despite their validity, where the core factual allegations against each defendant were identical, enforcing both forum selection clauses would require the maintenance of "a minimum of two separate lawsuits which concern the same underlying events," and the defendants "would be required to defend against [certain claims] in two different jurisdictions"); *Long John Silver's, Inc. v. Pressdough of Bismarck, LLC*, No. CV 08-129-KSF, 2008 WL 11346402, at *5 (E.D. Ky. June 16, 2008) (declining to enforce competing forum selection clauses and stating: "Because of the conflicting nature of the forum selection clauses contained in the parties' various agreements, this is indeed a case where it would be unjust to enforce all of the forum selection clauses. The facts surrounding both restaurants and the parties' agreements are so intertwined that dividing the case up among the different forums could lead to unjust and conflicting results, confusion, expense, and a waste of resources."). Under the facts presented here, the court's interest in judicial economy trumps the

Media Defendants' forum selection clauses.

## IV.    CONCLUSION

Accordingly, for the reasons set forth herein, the three Motions to Transfer (Doc. Nos. 41, 43, 45) will be denied. An appropriate Order is filed herewith.

 

 

ALETA A. TRAUGER
United States District Judge